## IN THE UNITED STATE DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MONICA DANIEL HUTCHISON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 09-3018-CV-S-RED** |
| **vs.** | ) | |
| | ) | **Jury Trial Demanded** |
| **TEXAS COUNTY, MISSOURI;** | ) | |
| **MICHAEL R. ANDERSON,** | ) | |
| **TEXAS COUNTY PROSECUTING** | ) | |
| **ATTORNEY; and** | ) | |
| **MICHAEL R. ANDERSON, individually** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT ANDERSON'S MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

STEELMAN, GAUNT & HORSEFIELD

By:  /s/   Stephen F. Gaunt
     MO Bar #33183
     David L. Steelman   MO Bar #27334
     901 Pine Street, Ste. 110
     P.O. Box 1257
     Rolla, MO  65402
     Telephone:  573-341-8336
     Fax:  573-341-8548
     sgaunt@steelmanandgaunt.com
     dsteelman@steelmanandgaunt.com

     ATTORNEYS FOR PLAINTIFF

Dated:  September 20, 2010

1

# **TABLE OF CONTENTS**

I.      Plaintiff's Response to Defendant Anderson Statement of Uncontroverted
        Material Facts…………………………………………………………5-23

II.     Plaintiff's Statement of Additional Material Facts…………………………23-31

III.    Legal Analysis…………………………………………………………………31-57

        A.      Introduction                                                31

        B.      Standard for Granting Summary Judgment                      31

        C.      §1983 Sexual Harassment Claim                               31-38

        D.      §1983 Retaliation and First Amendment Claim                 38-40

        E.      Defamation Claim                                            40-42

        F.      Intentional Infliction of Emotional Distress                43-44

        G.      Hutchison's Malicious Prosecution Claim                     44-49

        H.      Abuse of Process                                            49-57

Case 6:09-cv-03018-RED    Document 207    Filed 09/20/10    Page 2 of 58

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page(s)**

*Arana v. Reed*, 793 S.W.2d 224, 226 (Mo App. 1990)                                            45, 46

*Brockman v. Regency Financial Corporation*, 124 S.W.3d 43 (Mo App. 2004)                      49

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)                                                  39, 53

*Celotex Corporation v. Catrett*, 477 U.S. 317, 330-331                                        31

*City of Kansas City v. Thorpe*, 499 S.W.2d 454 (Mo 1973)                                      44

*Fust v. Francois*, 1913 S.W.2d 38, 44 (Mo App. 1995)                                          47

*Imbler v. Pachtman*, 424 U.S. 409 (1976)                                                      53

*Jenson v. Eveleth Taconite Company*, 130 F.3d 1287, 1302 (8th Cir. 1997)                    32

*Johnson v. State of Missouri*, 952 S.W.2d 834 (Mo Banc 1996)                                  50, 54

*Kalina v. Fletcher*, 118 Supreme Court 502 (1997)                                             52, 54

*Kelley v. Kelly Residential Group, Inc.*, 954 S.W.2d 544, 551 (Mo App. 1997)                  49

*Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 817, n.3 (Mo. Banc 2003)                    42

*KG v. RTR*, 918 S.W.2d 795 (Mo Banc 1996)                                                     43

*Laun v. Union Electric Company of Missouri*, 166 S.W.2d 1065, 1069 (Mo 1943)                  41

*Moring v. Arkansas Department of Correction*, 243 F.3d, 452 (8th Cir. 2001)                 35, 38

*Nolan v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994)                                         32, 33, 35

*Pernoud v. Martin*, 891 S.W.2d 528, 535 (Mo App. 1995)                                        49

*Ridder v. Hibsch*, 94 S.W.3d 470, 472 (Mo App. 2003)                                          34

*Romeo v. Jones*, 86 S.W.3d 428, 433 (Mo App. 2002)                                            50, 52, 56

*Sanders v. Pete and Son's Garage, Inc.*, 769 S.W.2d 844 (Mo App 1989)                         53

Case 6:09-cv-03018-RED   Document 207   Filed 09/20/10   Page 3 of 58

**CASES**                                                                     **Page(s)**

*Sauers v. Salt Lake County*, 1 F.3d, 1122 (10th Cir. 1993)         39

*Scott v. LeClercq*, 136 S.W.3d 183, 194 (Mo App 2004)        42

*Stafford v. Muster*, 582 S.W.2d, 670 (Mo Banc 1979)        50

*State Ex Rel Police Retirement System of St. Louis v. Mummert*,    47
875 S.W.2d 553, 555 (Mo Banc 1994)

*The Shotts Family v. Gierer*, 399 F.Supp.2d 1973, 1978 (E.D.Mo 2004)   33

*Waddell v. Krausc*, 241 S.W. 964, 967 (Mo App. 1922)        49

*West v. Atkins*, 487 U.S. at 49-50 (1988)             35

**STATUES**                                                                     **Page(s)**

§56.085, R.S.Mo                                   50, 54

§516.100 R.S.Mo.                                  42

42 U.S.C.§1983                                  32-40

42 U.S.C. §2000(e-3)(a)                        39

Title VII                                          32, 39, 40

**MISCELLANEOUS**

*25 Wm. & Mary L.* Rev 747 (1984)                   42

MAI 16.01                                      49

34 Mo Practice §7:12                            53

Case 6:09-cv-03018-RED   Document 207   Filed 09/20/10   Page 4 of 58

<u>**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT**</u>
<u>**ANDERSON'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW Plaintiff, Monica Daniel Hutchison, and submits these Suggestions in

Opposition to Defendant's Motion for Summary Judgment.

**I.    Plaintiff's Response to Defendant Anderson's Statement of Uncontroverted Material Facts.**

Plaintiff responds to Defendant Anderson's Statement of Uncontroverted

Material Facts as follows:

1.    Controverted in part.  While this Court granted Plaintiff's Motion for Leave to Amend, document #52, Plaintiff Monica Daniel Hutchison filed her Second Amended Complaint on or about October 8, 2009.  (Plaintiff's Second Amended Complaint, document #53.)

2.    Uncontroverted.

3.    Uncontroverted.

4.    Uncontroverted.

5.    Uncontroverted.

6.    Uncontroverted.

7.    Uncontroverted.

8.    Uncontroverted.

9.    Uncontroverted.

10.    Uncontroverted.

11.    Uncontroverted.

12.    Uncontroverted.

13.    Controverted in part.  Plaintiff did testify that rather than verbally tell Defendant

Anderson not to touch her on her shoulder, she would move away from Defendant Anderson when

he would put his hand on her shoulder; however, Plaintiff also indicated that Defendant Anderson's

5

touching her shoulder made her feel uncomfortable, and that she believed it could have a sexual connotation. (Deposition of Plaintiff, p. 47, lines 22-25; p. 48, lines 1-9.) (Hutchison deposition excerpts attached hereto as Exhibit 1).

14. Uncontroverted.

15. Uncontroverted.

16. Uncontroverted.

17. Uncontroverted.

18. Uncontroverted.

19. Uncontroverted.

20. Uncontroverted.

21. Uncontroverted.

22. Controverted in part. Plaintiff actually testified that the comments Defendant Anderson made to her while working at his private practice made her "uncomfortable", and "it bothered me, but it wasn't to where I couldn't do my job." (Deposition of Plaintiff, p. 57, lines 16-22.)

23. Uncontroverted.

24. Uncontroverted.

25. Controverted in part. Plaintiff actually testified that if she had told Defendant Anderson to stop doing something while she was working for him at his private practice, then he would leave her alone "usually for the rest of the day, yes." (Deposition of Plaintiff, p. 58, lines 15-22.) In addition, Mr. Anderson's behavior at the private law office reached the point where Plaintiff dreaded being alone in a room with him because "I just always felt like there was going to be some kind of comment made that I would have to say, you know, 'hey, stop it. You're creeping me out.

6

You're being disgusting. Cut it out.'" (Deposition of Plaintiff, p. 60, lines 18-25; p. 61, lines 1-3 and lines 14-21.)

26.     Uncontroverted.

27.     Uncontroverted.

28.     Uncontroverted.

29.     Controverted. Among the reasons Plaintiff testified she did not consider leaving her employment with Mr. Anderson at his private law practice was "because in Texas County there is not a lot of available positions there, and I enjoyed working in that field." (Deposition of Plaintiff, p. 62, lines 3-7.)

30.     Uncontroverted; however, additional facts provide contest for the comment. Plaintiff testified that Mr. Anderson made some inappropriate comment and she told him "'cut it out. Quit,' and he's, like 'come on let me flirt with you' and I told him, you know, no, or I changed the subject or left the office or left the room." (Deposition of Plaintiff, p. 62, lines 23-25; p. 63, lines 1-3.)

31.     Uncontroverted.

32.     Uncontroverted. However, Plaintiff explained that she only rode the motorcycle on that occasion because "I thought if I did then he would stop asking me, cause I didn't want to ride on the motorcycle." (Deposition of Plaintiff, p. 67, lines 3-7.)

33.     Uncontroverted.

34.     Controverted. The testimony cited by Defendant in support of this proposition does not indicate that Plaintiff "never told Defendant Anderson that she was uncomfortable with him visiting her house outside of work." She testified that she didn't tell him "at that time", referring to the occasion when Defendant Anderson showed up unannounced at her house on his motorcycle. And she was uncomfortable with him visiting her home outside of work, but was afraid of losing her

7

job, so she handled the situation by pretending not be home.  (Deposition of Plaintiff, p. 68, lines 6-25; p. 69, lines 1-3.)

35.     Controverted in part.  The comments in question were made on more than one occasion according to Plaintiff's testimony.  Furthermore, they were not limited to teasing about age, but included Defendant Anderson saying "what does he have that I don't have?"  (Deposition of Plaintiff, p. 71, lines 10-25, p. 69 lines 9-15.)

36.     Uncontroverted.

37.     Uncontroverted.

38.     Uncontroverted.

39.     Controverted.  Plaintiff testified that "I don't recall for sure if we did invite her." (Deposition of Plaintiff, p. 75, lines 9-10.)

40.     Controverted in part.  Plaintiff testified that she went to the club with friends, not all of whom were employed by either the Prosecuting Attorney's office or Texas County.  (Deposition of Plaintiff, p. 76, lines 11-14.)

41.     Uncontroverted.

42.     Uncontroverted.

43.     Uncontroverted.

44.     Uncontroverted.

45.     Controverted in part.  Plaintiff did testify that Defendant Anderson offered her his room key while she and Defendant Anderson were at a conference at the Lake of the Ozarks (Deposition of Plaintiff, p. 117, lines 2-5.)  However, Plaintiff did not testify that Defendant Anderson's offer was "just in case you needed something out of his room"; she testified Defendant Anderson offered that as an explanation, but Plaintiff refused the offer saying she didn't need his

8

room key and testified "I don't know what he was referring to" when he tried to pass off his offer of the room key as being "just in case she needed something from his room". (Deposition of Plaintiff, p. 117, lines 9-10.) However, Plaintiff explained that she found this odd, that there was nothing that she knew of she would need in Defendant Anderson's room, and that she has no idea what he might have had in his room which she might have needed. (Deposition of Plaintiff, p. 117, lines 13-22; p. 118, line 2.)

46.     Controverted in part. While Plaintiff testified that she did not find Defendant Anderson's offer of his room key explicitly harassing, because "he didn't say, hey come have sex with me", she found it odd and his explanation for the room key offer made no sense to her. (Deposition of Plaintiff, p. 117, lines 11-12; p. 118, lines 2-5.) (See also response to Statement of Uncontroverted Material Fact #45.)

47.     Uncontroverted.

48.     Uncontroverted.

49.     Uncontroverted.

50.     Uncontroverted.

51.     Uncontroverted; however, Plaintiff further testified that those discussions were "not in detail and not all the time." (Deposition of Plaintiff, p. 122, line 25.)

52.     Uncontroverted.

53.     Uncontroverted.

54.     Uncontroverted.

55.     Controverted. This comment is taken out of context. Plaintiff actually testified that when the co-employee in question, Stephanie Creek, would say "I'm so fat, you know, nobody looks

Case 6:09-cv-03018-RED   Document 207   Filed 09/20/10   Page 9 of 58

at me", Plaintiff would "no you're not. You're beautiful. You're sexy." (Deposition of Plaintiff, p. 131, lines 8-12.)

56.     Uncontroverted.

57.     Uncontroverted; however, this refers to the same incident discussed in Statement of Uncontroverted Material Fact #56.

58.     Uncontroverted.

59.     Uncontroverted.

60.     Uncontroverted that that is part of Plaintiff's testimony.  However, this testimony was elicited in response to questions in which Plaintiff indicated that Anderson would ask her to go out to get drinks with him "if he had a good day in court or something", and that Plaintiff was not comfortable doing that and told him no.  (Deposition of Plaintiff, p. 138, lines 3-11.)

61.     Uncontroverted.

62.     Uncontroverted.

63.     Controverted in part.  Plaintiff agrees that she testified that while she was at the bar, a man offered to buy her a drink, which she refused.  She talked with the man briefly, then returned to her table.  Later, Plaintiff and Stephanie from the Texas County Prosecuting Attorney's office got up to join in a line dance with a group of people, and the gentleman that had offered to buy Plaintiff a drink joined in dancing with everyone.  After the group line dances concluded, the man came over the table and introduced himself to the other ladies and to Mr. Anderson.  Defendant Anderson stood up and glared at the man.  (Deposition of Plaintiff, p. 42, lines 2-25; p. 143, lines 1-11.)

64.     Uncontroverted that the cited statements represent some of Plaintiff's testimony about the incident.

65. Uncontroverted that the cited statements represent some of Plaintiff's testimony regarding the conversation with Defendant Anderson in question. In addition to what is set forth in Defendant's Statement of Uncontroverted Material Facts paragraph #65, Plaintiff testified that she told Defendant Anderson that the other girls in the office had indicated to her "that they felt like something was going on between him and [her]" and that she wanted to "distance myself so there wouldn't-I mean, so there wouldn't be any comments or anything said." She further explained, when asked what he was doing that resulted in her request to "keep it work related, that there would be no joking around or making comments like he used to, such as "you like nice in your jeans today" or "that looks really good on you." (Deposition of Plaintiff, p. 149, lines 12-25; p. 150, lines 1-6.)

66. Uncontroverted.

67. Uncontroverted; however, Plaintiff also testified that she did find the incident at the conference inappropriate. (Deposition of Plaintiff, p. 152, line 22.)

68. Uncontroverted that paragraph #68 of Defendant's Statement of Uncontroverted Material Facts contains part of Plaintiff's testimony about the incident in question, but omits important details. Plaintiff also testified that the phone call to her at her house by Defendant Anderson was at 2:00 or 3:00 in the morning, was on a weekend, and Defendant Anderson had already asked her about the file in question. (Deposition of Plaintiff, p. 153, lines 3-16.)

69. Uncontroverted.

70. Controverted. Plaintiff never testified that there was no sexual harassment going on up to that point, but she testified that although she believed there were "inappropriate actions going on" she did not intend to file a sexual harassment lawsuit at that point. (Deposition of Plaintiff, p. 156, lines 2-11.)

71. Uncontroverted.

72.    Uncontroverted.

73.    Uncontroverted.

74.    Uncontroverted; however, Plaintiff testified that she and Millie Williams had only had "a little to drink and did not consume any alcoholic beverages when they returned back to her house."  (Deposition of Plaintiff, p. 164, lines 21-25; p. 165, lines 1-22.)

75.    Uncontroverted.

76.    Controverted in part.  While much of Defendant's recitation of Plaintiff's testimony is correct, some of it is inaccurate and it leaves out important details.  For example, Plaintiff testified that Defendant Anderson arrived at her house "right after the phone call, probably between 1:20 and 1:30.  I mean, it was just right after."  Furthermore, he initially knocked on her door "several" times before him going back to his car.

77.    Uncontroverted; Plaintiff explained that she called the Licking Police Department rather than 911 because she "knew the Licking City Police would be the ones to respond, so I called that number."  (Deposition of Plaintiff, p. 170, lines 19-21.)

78.    Uncontroverted, but it leaves out important details.  Plaintiff's testimony regarding the phone call is that she told Officer Hood "'it's Monica.  My boss Mike's outside beating on my door.  I think he's drunk.  He's mad.  He's trying to get in.  He's not leaving.  He's been out here for quite some time.  Could you drive by and see if you could get him to leave?' and he said 'you mean the Prosecutor?'  I said, 'yes.  Could you please come by here?'"  (Deposition of Plaintiff, p. 171, lines 2-9.)

79.    Uncontroverted.

80.    Uncontroverted.

12

81.     Controverted.  Plaintiff testified, as noted earlier, to events on December 18 which she believes constitute sexual harassment.  (Deposition of Plaintiff, p. 174, line 25; p. 175, lines 1-10.)  Plaintiff further testified "I felt like that was sexually harassing me, coming to my house, and I felt like he came there in order to try and have sex with me, and that he was mad because I wouldn't let him."  (Deposition of Plaintiff, p. 179, lines 18-22.)  She further testified that she considered the statements Anderson made on her answering machine professing his love and saying he had feelings about her that she didn't know to be sexual in nature.  (Deposition of Plaintiff, p. 173, lines 24-25; p. 174, lines 1-5.)  She further testified that the entire week after the December 18 incident where Mr. Anderson showed up at her house in the middle of the night she found the work environment to be "very hostile, yes, that whole week."  (Deposition of Plaintiff, p. 180, lines 12-19.)

82.     Controverted in part.  Uncontroverted that Plaintiff  recorded the messages left on her digital answering machine on to a tape.  She testified she copied it on to a tape because the messages would be lost if the electricity went out or there was a power surge.  However, the recorded messages were left by Defendant Anderson in the early morning of December 18 and not "on the night of December 17 and/or early morning of December 18."  (Deposition of Plaintiff, p. 229, lines 17-25; p. 230, lines 1-12.)  See response to Statement of Uncontroverted Material Facts #76.

83.     Uncontroverted.

84.     Controverted in part.  Plaintiff actually testified that Defendant Anderson requested the tape that she had made "so it could be destroyed", and did not simply ask to listen to the tape.  (Deposition of Plaintiff, p. 227, lines 12-25.)  Plaintiff did not voluntarily provide him with the tape because "I felt that was the only thing that would keep me safe and anyone ever believing that he even said anything like that to me."  (Deposition of Plaintiff, p. 228, lines 11-17.)

85.     Uncontroverted.

86.     Controverted.  Defendant Anderson did request Judge Bradford Ellsworth to sign an investigative subpoena directed to Plaintiff ordering her to produce "for copying, any voice recording, audio or otherwise and any telephone answering machine recordings of Michael Anderson taken at your residence on December 18, 2005".  Plaintiff's Second Amended Complaint, Exhibit C, Document #53.  However, the subpoena did not require Plaintiff to turn over a "copy" of the tape, but the tape and/or answering machine itself.  Furthermore, the request was made a day or two prior to December 23.  (Deposition of Defendant Anderson, p. 170, lines 9-11.)  (Anderson deposition excerpts attached as Exhibit 2).  Furthermore, although Defendant Anderson told Judge Ellsworth he wanted the subpoena to preserve evidence because he believed he may have been drugged, he wanted Plaintiff's tape of his phone messages destroyed, and told Plaintiff he wanted it destroyed, as of December 21, 2005.  (Deposition of Defendant Anderson, p. 182, lines 20-24.)  In addition, when Defendant Anderson requested the subpoena there was no criminal file open, he had not requested a special prosecutor be appointed, and the only step he took toward investigating the alleged assault he claimed to be the victim of was to contact Lieutenant Dunn with the Sheriff's Department, who informed him that "she didn't want to get involved."  (Deposition of Defendant Anderson, p. 170, lines 12-25; p. 171, lines 1-7.)  Furthermore, Defendant Anderson, upon obtaining the tape, did not turn it over to any law enforcement personnel for investigation and did not have anyone listen to it.  (Deposition of Defendant Anderson, p. 207, lines 7-11.)  Lieutenant Dunn testified that the tape the Judge was handed in response to the subpoena was handed to Mike Anderson, which she believed to be inappropriate because "you don't turn over evidence to the victim while you are investigating a crime."  (Deposition of Melissa Dunn, p. 22, lines 18-23; p. 23, lines 3-9.)  (Dunn deposition excerpts attached hereto as Exhibit 3).  Lieutenant Dunn also testified that Defendant Anderson's reported concern about having been drugged "was a line of horseshit."

14

(Deposition of Melissa Dunn, p. 25, line 8.)  When asked why, she explained "I think he got drunk and he did something he probably shouldn't have done and he made up this big story.  He tells me there is supposed to be a videotape of him at the bar, but he won't tell me who told him that so I can investigate it.  He tells me there is a doctor who can prove that he was—maybe it would prove he was drugged, but did he give me the tape and let me talk to the doctor?  He handles it all himself, which as a prosecutor he knows is totally inappropriate.  How many different ways can he do that so it looks wrong?  The Judge issues a subpoena, after he signs it the subpoena it's supposed to be sent down for service.  The Judge doesn't serve a subpoena himself and then collect the evidence himself."  (Deposition of Melissa Dunn, p. 25, lines 11-25; p. 26, lines 1-3.).

     87.     Uncontroverted.

     88.     Controverted.  Defendant Anderson's testimony is inconsistent with the testimony of Judge Ellsworth regarding conversations about the subpoena.  Defendant Anderson stated that Judge Ellsworth told him simply "no, Mike, I am not going to do it."  (Deposition of Defendant Anderson, pg. 170, lines 4-5.)  Defendant Anderson did not indicate that the Judge told him he would do it if he could not get it voluntarily from Monica, or that he would issue the subpoena if Defendant Anderson provided him with additional information.  Defendant Anderson further testified that it wasn't him going back to Judge Ellsworth that resulted in the subpoena being issued, but that "a day or two days later, after no more discussion, he called me back, said that he had thought about it and that he agreed with me and that he was going to sign the subpoena."  (Deposition of Defendant Anderson, p. 170, lines 5-8.)

     89.     Controverted.  Defendant Anderson's testimony is inconsistent with the testimony of Judge Ellsworth regarding conversations about the subpoena.  Defendant Anderson stated that Judge Ellsworth told him simply "no, Mike, I am not going to do it."  (Deposition of Defendant Anderson,

pg. 170, lines 4-5.) Defendant Anderson did not indicate that the Judge told him he would do it he could not get it voluntarily from Monica, or that he would issue the subpoena if Defendant Anderson provided him with additional information. Defendant Anderson further testified that it wasn't him going back to Judge Ellsworth that resulted in the subpoena being issued, but that "a day or two days later, after no more discussion, he called me back, said that he had thought about it and that he agreed with me and that he was going to sign the subpoena." (Deposition of Defendant Anderson, p. 170, lines 5-8.)

90. Controverted. The subpoena for investigation required Plaintiff to produce not a copy of the tape, but "for copying, any voice recording audio or otherwise and any telephone answering machine recordings of Michael Anderson taken at your residence on December 18, 2005". (Plaintiff's Second Amended Complaint, Exhibit C, Document #53.)

91. Controverted. Plaintiff's actual testimony is that she asked the Judge "if I give you a copy of this tape, will you not let them come search my house?" and he said, "Absolutely." (See deposition excerpts cited by Defendant.)

92. Uncontroverted.

93. Uncontroverted.

94. Uncontroverted; however, Defendant Anderson not only wrote the note, but he handed it to her as a person to call out loud outside the courtroom as a witness. When Plaintiff came back in from the hall after reading the note she appeared to be upset. (Deposition of Jessica Sparks, p. 34, lines 10-25; p. 35, lines 10-20.) (Sparks deposition excerpts attached hereto as Exhibit 4.) Furthermore, Defendant Anderson later told the story two or three times at a gathering with local attorneys and Judges present, and was laughing about it. (Deposition of Jessica Sparks, p. 36, lines 10-23.)

16

95.     Controverted in part.  Plaintiff actually testified that she didn't believe any follow up was necessary "at that time", and testified that she had already told Defendant Anderson, with respect to the note, to "quit being disgusting."  (Deposition of Plaintiff, p. 201, lines 19-21.)

96.     Uncontroverted.

97.     Uncontroverted.

98.     Uncontroverted.

99.     Uncontroverted.

100.    Uncontroverted.

101.    Uncontroverted  that was her testimony "at that time".

102.    Uncontroverted.

103.    Uncontroverted.

104.    Uncontroverted.

105.    Controverted.  What Plaintiff actually said is that no one had specifically said to her that they thought less of her because of what Mike Anderson alleged in his lawsuit or because of what they read in the newspaper.  (Deposition of Plaintiff, p. 238, lines 10-13.)  She also said that people have indicated through their actions that they think less of her because of these allegations.  (Deposition of Plaintiff, p. 269, lines 6-7.)  She described incidents where people have thrown trash in her yard of the sexual nature and said that when she went out in public people would look at her and whisper, and it was embarrassing.  (Deposition of Plaintiff, p. 269, lines 12-22.)  See also Response to #115 Statement of Uncontroverted Facts (hereinafter R.S.F.)

106.    Uncontroverted.

107.    Controverted.  Plaintiff actually testified that she was concerned she would not be able to get referrals from different Children's Divisions and counties that may have heard about

these allegations when she is able to go out on her own to do therapy, which she had not yet been able to do at the time of her deposition. Furthermore, her testimony was just as to what had been said "to date". (Deposition of Plaintiff, p. 281, lines 18-25; p. 282, lines 1-8.)

108. Controverted. What Plaintiff actually said is that no one had specifically said to her that they thought less of her because of what Mike Anderson alleged in his lawsuit or because of what they read in the newspaper. (Deposition of Plaintiff, p. 238, lines 10-13.) She also said that people have indicated through their actions that they think less of her because of these allegations. (Deposition of Plaintiff, p. 269, lines 6-7.) She described incidents where people have thrown trash in her yard of the sexual nature and said that when she went out in public people would look at her and whisper, and it was embarrassing. (Deposition of Plaintiff, p. 269, lines 12-22.) See also R.S.F. #115.

109. Uncontroverted.

110. Controverted. Plaintiff testified that she believed Defendant Anderson came to her house the night of December 18, 2005 to try to have sex with her and that he was mad because she would not let him. (Deposition of Plaintiff, p. 179, lines 18-22.)

111. Controverted. Plaintiff testified that she did not discuss the use of sex toys with her co-workers while at the Prosecutor's office. (Deposition of Plaintiff, p. 303, line 25; p. 304, lines 1-13.)

112. Controverted. Defendant Anderson's entire actions and comments, including saying "ignore me, you fucking bitch" after banging on the side of Plaintiff's house, was threatening enough that Mildred Williams told Monica "you better call the cops or I will." (Deposition of Mildred Williams, p. 39, lines 15-25; p. 40, lines 1-2.) (Williams depositon excerpts attached hereto as Exhibit 5). As previously noted, Plaintiff agreed and called the police.

113.    Controverted.  Plaintiff's position is that the entire incident the early morning of December 18 was a proposition for sex.  (Deposition of Plaintiff, p. 179, lines 18-22.)

114.    Controveted in part.  Defendant Anderson actually opened Plaintiff's screen door. (Deposition of Mildred Williams, p. 36, lines 18-21.)

115.    Controverted.  In addition to Plaintiff's Response to Statement of Uncontroverted Facts #105 and #108, Plaintiff also testified that there were derogatory comments about her on internet blogs, and "it was so upsetting to me of people making these derogatory comments and believing this, so I quit reading it, cause I couldn't deal with it."  (Deposition of Plaintiff, p. 276, lines 15-25; p. 277, lines 1-8.)  Furthermore, even Danny McNew testified, when asked if the lawsuit Mike Anderson filed against Plaintiff in any way impacted his impression of her, he testified "well, I'd like to say no, but when you read things like that, it makes you wonder.  But beings I knew I would have to say no.  But it-you know, when you read things like that, I guess I would like-it does make you wonder."  (Deposition of Danny McNew, p. 37, lines 12-17.)  (McNew deposition excerpts attached hereto as Exhibit 6).

116.    Uncontroverted.

117.    Uncontroverted.

118.    Uncontroverted.

119.    Uncontroverted.

120.    Uncontroverted.

121.    Controverted.  Defendant Anderson testified that one of his reasons for filing the suit was that "the actions they had taken certainly undermined the office."  (Deposition of Defendant Anderson, p. 121, lines 17-18.)  Furthermore, the damage complaint itself references in several places that the actions he alleged Monica Daniel and Mildred Williams had taken were "to the

detriment of … the office of the Texas County Prosecutor". Plaintiff's Second Amended Complaint, Exhibit B, Document #53. Furthermore, Defendant Anderson issued a press release regarding the lawsuit specifically in his capacity as Texas County Prosecutor, and even signed the press release "Mike Anderson, Texas County Prosecutor." (Plaintiff's Second Amended Complaint, Exhibit D, Document #53.)

122.    Controverted. Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office. Defendant Anderson indicated to Jeff Kinder that he intended to stay at his office for a while. (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.) (Kinder deposition excerpts attached hereto as Exhibit 7). Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this. You can't be having sex with other cops." (Deposition of Christina Mosely, p. 148, lines 4-8.) (Mosely deposition excerpts attached hereto as Exhibit 8). She reiterated several times that Defendant Anderson told her his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops". (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

123.    Controverted. Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office. Defendant Anderson indicated to Jeff Kinder that he intended to stay at his office for a while. (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.) Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this. You can't be having sex with other cops." (Deposition of Christina Mosely, p. 148, lines 4-8.) She reiterated several times that Defendant Anderson told her

his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops". (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

124.    Controverted. Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office. Defendant Anderson indicated to Jeff Kinder that he intended to stay at his office for a while. (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.) Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this. You can't be having sex with other cops." (Deposition of Christina Mosely, p. 148, lines 4-8.) She reiterated several times that Defendant Anderson told her his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops". (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

125.    Controverted. Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office. Defendant Anderson indicated to Jeff Kinder that he intended to stay at his office for a while. (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.) Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this. You can't be having sex with other cops." (Deposition of Christina Mosely, p. 148, lines 4-8.) She reiterated several times that Defendant Anderson told her his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops". (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

126.    Controverted. Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office. Defendant Anderson indicated to Jeff Kinder that

he intended to stay at his office for a while.  (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.)  Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this.  You can't be having sex with other cops."  (Deposition of Christina Mosely, p. 148, lines 4-8.)  She reiterated several times that Defendant Anderson told her his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops".  (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

127.     Controverted.  Corporal Jeff Kinder, with whom Defendant had ridden earlier on the evening of December 17, 2005, stated that he dropped Defendant Anderson off at sometime between 10:30 and 11:00 at Defendant Anderson's office.  Defendant Anderson indicated to Jeff Kinder that he intended to stay at his office for a while.  (Deposition of Jeff Kinder, p. 15, lines 9-12, 25; p. 16, lines 1-8.)  Furthermore, Defendant Anderson told Christina Mosely he went to Monica Daniel's house to tell her "we've got to fix this.  You can't be having sex with other cops."  (Deposition of Christina Mosely, p. 148, lines 4-8.)  She reiterated several times that Defendant Anderson told her his purpose in going to Monica Daniel's house that evening was "to talk to her about what had happened with these cops".  (Deposition of Christina Mosely, p. 150, lines 12-14 and lines 17-21.)

128.     Uncontroverted.

129.     Uncontroverted.

130.     Uncontroverted.

131.     Uncontroverted.

132.     Controverted that there was any "settlement agreement".  First, Plaintiff does not agree with that interpretation of the letter Defendant attaches and relies on, which disposes of no claim with prejudice and does not release any claim.  Furthermore, Plaintiff testified that she never agreed to and was not informed of any agreement with Ms. MacPherson and that her attorneys had

informed her that Mr. Anderson had simply decided to dismiss his claim. (Deposition of Plaintiff, p. 252, lines 15-21.)

133.     Controverted that there was any "settlement agreement". First, Plaintiff does not agree with that interpretation of the letter he attaches and relies on, which disposes of no claim with prejudice and does not release any claim. Furthermore, Plaintiff testified that she never agreed to and was not informed of any agreement with Ms. MacPherson and that her attorneys had informed her that Mr. Anderson had simply decided to dismiss his claim. (Deposition of Plaintiff, p. 252, lines 15-21.)

134.     Uncontroverted.

135.     Uncontroverted.


**II.     Plaintiff's Statement of Additional Material Facts.**

136.     During the interview process for a vacant position at the Prosecutor's office, Mr. Anderson refused to even interview a man that had applied and told Plaintiff "he wasn't comfortable with a male working as a secretary there." Plaintiff told him this was inappropriate and the man appeared to be very well qualified, had a Bachelor's Degree and had worked as a school teacher or something like that. (Deposition of Plaintiff, p. 106, lines 8-23.)

137.     Mr. Anderson's conduct at the Lake of the Ozarks conference described previously in the Statement of Uncontroverted Facts and Responses to the Statement of Uncontroverted Facts caused Plaintiff's co-workers, who had witnessed it, to question her about whether she had "ever been intimate with Mike and is that why he was acting like that." (Deposition of Plaintiff, p. 146, lines 14-17.)

138.     Plaintiff tried to distance herself from Defendant Anderson after the incident at the Lake of the Ozarks because she didn't want the appearance that anything was going on between them and avoided Mr. Anderson at a Thanksgiving party. (Deposition of Plaintiff, p. 149, lines 8-23; p. 151, lines 2-8.)

139.     Plaintiff after the incident at the Lake of the Ozarks did not want to put herself in a position where she would be alone with Mr. Anderson at a party where there is alcohol. (Deposition of Plaintiff, p. 151, lines 15-18.)

140.     The December 1 discussion in which Defendant Anderson told Plaintiff to resign or be fired came not long after the Thanksgiving party and the weekend where he called her in the middle of the night about the file and she started trying to distance herself from him. (Deposition of Plaintiff, p. 153, lines 14-25; p. 154, lines 1-18.)

141.     After firing her, Defendant Anderson asked Jeff Kinder to contact Monica on his behalf because she wouldn't take his calls, and to find out if she would be willing to come back to work. (Deposition of Jeff Kinder, p. 11, lines 5-13; p. 44, lines 8-24.)

142.     Plaintiff considered the statements Defendant made in his phone calls on December 18, professing his love and saying he had feelings about her that he didn't know he had, to be sexual in nature. (Deposition of Plaintiff, p. 174, lines 2-5.)

143.     Plaintiff testified she found the work environment from December 18 through December 23 very hostile, and specified "him showing up at my house, leaving those messages, and then the whole next week it was a constant every day harassment of trying to get a copy of that tape from me." (Deposition of Plaintiff, p. 180, lines 16-25; p. 181, line 1.)

144.     Defendant Anderson was angry when he would ask her about getting the tape. (Deposition of Plaintiff, p. 191, lines 8-12.)

24

145.    Plaintiff explained that she could no longer do her job because of the events of December 18 through 23 and Defendant's actions leading up to that, and that "I was hoping I could just find another job and then finally whenever-I mean it's the Judge-Mike was being able to do whatever, and-I mean he was-had a very high authority, and the Judge had an even higher authority, so, yeah, I didn't feel like I could be there anymore after the Judge issued me that." (Deposition of Plaintiff, p. 240, lines 13-22.)

146.    Plaintiff testified that after Defendant's lawsuit she received harassing phone calls, including hang ups, calls from the press, to the extent she had to end up getting her number changed. There were phone calls in the middle of the night where her phone would ring and they would say "you whore" or breathe heavy and hang up. (Deposition of Plaintiff, p. 286, lines 9-20.)

147.    Both Jeff Kinder and Danny McNew denied any sexual activities with Plaintiff in the courthouse or Prosecutor's or during hours when Plaintiff should've been at work. (Deposition of Jeff Kinder, p. 22, line 37; Deposition of Danny McNew, p. 23.)

148.    Both Danny McNew and Jeff Kinder denied having Monica rearrange dates and times of testimony, change subpoenas or fix tickets for them. (Deposition of Jeff Kinder, p. 26; Deposition Danny McNew, p. 44.)

149.    Officer Mike Hood, the Licking Police officer who responded to Plaintiff's phone call on the morning of December 18, did not make any log entry with respect to responding to the call. Hood had talked to Assistant Chief Lindsey and they decided it would be best not put it on the log. (Deposition of Danny McNew, p. 19; p. 61, lines 19-25; p. 62, lines 1-25.)

150.    When Police Chief Danny McNew was told by Monica Daniels on December 20 about her call to the police department and her concern they did nothing, he checked on the logs,

found no entry, and had to make Officer Hood log the call. (Deposition of Danny McNew, p. 60, lines 7-22; p. 67, lines 16-25.)

151. Officer Hood is still employed with the City of Licking. Assistant Chief Lindsey is now the Chief of Police. (Deposition of Danny McNew, p. 63, lines 2-13).

152. Seth Walker denied any sexual encounters with Plaintiff at the Prosecutor's office or the courthouse. (Deposition of Seth Walker, p. 35.) (Walker deposition excerpts attached hereto as Exhibit 11).

153. Jeff Kinder testified that Defendant Anderson went down to the river where Jeff Kinder was fishing on December 21 to find him and told him at that time he thought he had been drugged "because of his behavior." Although he didn't mention a doctor, he asked Kinder to go with him to retrieve a video tape from a bar in Licking. Kinder said he couldn't do that because he wasn't in uniform and there was no formal investigation that he could be a part of. Defendant Anderson accepted that explanation. Jeff Kinder suggested that Defendant Anderson contact an officer with the drug task force. (Deposition of Jeff Kinder, p. 19-20.)

154. Defendant Anderson testified that sometime in the first week of December, he met with Plaintiff to tell her that she needed to change her ways or find another job, and that one of things he was concerned about what his belief that she was having affairs with several married police officers. (Deposition of Defendant Anderson, p. 39, lines 8-10, 25; p. 40, lines 1-17.)

155. Plaintiff's treating counselor, Dina Vitoux, opined that the incident at Plaintiff's home caused Plaintiff to suffer from Post Traumatic Stress Disorder. As explained by Ms. Vitoux in her report, the events at Plaintiff's house on the morning of the 18th involved what Plaintiff perceived to be a threat of serious injury or physical integrity of herself and her friend, and Plaintiff's response involved intense fear and helplessness. Her response was intensified by the

power displayed by Defendant Anderson when he was able to get a court order for the tapes, which violated her sense of privacy and any feelings of safety that may have remained after the night Anderson came to her home.  Ms. Vitoux further points out in her report that Plaintiff's feelings of fear and threat were further intensified "with the act of calling the police but having no record filed of the event."  (Report of Dina Vitoux, attached hereto as Exhibit #9.)

156.    Plaintiff's treating physician, Dr. Myers, testified that Plaintiff suffers from medically diagnosable depression, anxiety and insomnia for which he has prescribed medicine, including Xanax, Cymbalta, Rozarem, and Hydroxyzone Pamoate, and that "Mrs. Hutchison's need for the medication listed above from December 2005 to date is primarily caused and necessitated by Mike Anderson's conduct and harassment described above", referring to the incident of December 18, 2005.  (Report of Dr. Myers, attached hereto as Exhibit #10.)

157.    Defendant Anderson issued a press release signed and issued by "Michael R. Anderson, Texas County Prosecuting Attorney."  (Plaintiff's Second Amended Complaint, Document #53, Exhibit D.)

158.    Newspaper publisher Brad Gentry testified that Anderson continued to make statements regarding the litigation as late as January 29, 2009, when another article was published based on either a verbal or written response from Anderson in which Anderson stated "these are the same claims investigated by the Equal Employment Opportunity Commission and the Department of Justice.  Those investigations found no basis for a claim then, and nothing has changed" and "these are false claims made by a disgruntled former employee hoping to make a profit."  (Deposition of Brad Gentry, p. 47, lines 17-25; p. 48, lines 13-15; pertinent portion of Brad Gentry Deposition Exhibit 51, attached hereto as Exhibits 12 and 13.)

159.    The EEOC investigator assigned to Plaintiff's complaint, Harold Emde, testified that Mr. Anderson's statement in the article was not accurate with respect to the investigation." (Deposition of Harold Emde, p. 34, lines 18-22.)  (Emde deposition excerpts attached hereto as Exhibit 14.)  The EEOC in fact found reasonable cause to believe that Plaintiff's allegations were true.  (Deposition of Defendant Anderson, Exhibit 11, attached hereto as Exhibit 15.)

160.    Defendant Anderson's dismissal of his lawsuit against Plaintiff was without prejudice and, at the time of his deposition taken on August 25, 2009, he had not decided whether or not to re-file his claim.  (Deposition of Defendant Anderson, p. 142, lines 11-14.)

161.    Defendant Anderson testified that Plaintiff's alleged affairs with Danny McNew and Jeff Kinder were not part of the sex ring he alluded to in his lawsuit.  (Deposition of Defendant Anderson, p. 44, lines 1-25.)

162.    With respect to his allegation in paragraph #4a of his complaint against Plaintiff, Defendant testified that Debbie James told him that Millie Williams said he threatened to kill Monica Daniel "if she cut off our affair."  (Deposition of Defendant Anderson, p. 122, lines 20-25; p. 123, lines 1-11; p. 126, lines 11-21.)

163.    However, Debbie James not only denied telling Mr. Anderson that, but Millie Williams never told her that.  (Deposition of Debbie James, p. 17, lines 19-25; p. 18, lines 1-3.) (James deposition excerpts attached hereto as Exhibit 16).

164.    Defendant Anderson did not testify he had information that Monica Daniel was making those statements.  (Deposition of Defendant Anderson, p. 122, lines 20-25; p. 123, lines 1-11; p. 126, lines 11-21.)

165.    With respect to paragraph #4c of his complaint, Defendant Anderson testified "the talk around the courthouse was that Monica and I had had some blow up at the Lake and I had acted

inappropriately towards her." When asked where that information came from, Defendant Anderson said he couldn't remember, but he thinks it may have come from Nina Creek and that he was "guessing" that who told her was her daughter-in-law Stephanie Creek. However, he did not recall anyone saying that Mildred Williams, whom he sued, had made any such statements. (Deposition of Defendant Anderson, p. 130, lines 20-25; p. 131, lines 1-13.)

166.    Defendant Anderson testified that he had no information that Mildred Williams had been involved in conspiring to cover up the removal of criminal investigative documents from the Texas County Prosecutor's office, but testified that he named her because "I think it was obvious by the fact that Ms. Daniel could not have done it on her own without some record appearing in the court records." (Deposition of Defendant Anderson, p. 134, lines 6-13.)

167.    Defendant Anderson also testified with respect to only one criminal investigative document that he suspected had been removed, and he had no information that Plaintiff had removed the accident report in question. (Deposition of Defendant Anderson, p. 132, lines 1-25; p. 133, lines 1-19.)

168.    Defendant Anderson admitted he did not talk to any of the alleged participants involved in the alleged group sex ring, he did not go out and interview people about his allegations, that he didn't talk to Judge Ellsworth regarding Millie Williams and her alleged role in the conspiracy alleged in his lawsuit. (Deposition of Defendant Anderson, p. 51, lines 10-25; p. 52, lines 1-3.) In fact, the only investigation he did, which was to contact the Attorney General's office, resulted in a negative computer forensics report, which he received prior to filing his lawsuit. (Deposition of Defendant Anderson, p. 135, lines 5-25; p. 136, lines 1-25; p. 137, lines 1-3.)

169.     Defendant Anderson also admitted that his allegations against Millie Williams with respect to the sex ring were based on his assumption "that Monica didn't do much without Millie there at the time."  (Deposition of Defendant Anderson, p. 138, lines 7-8.)

170.     With respect to his claim that he was drugged, when Defendant Anderson was asked if Melissa Dunn was the person "we would talk to or depose regarding your investigation into your claims that you were drugged", Defendant Anderson said "I discussed it with her, but she never did anything that I am aware of…. "(Deposition of Defendant Anderson, p. 97, lines 7-11.)

171.     Defendant Anderson named no other law enforcement officials as persons he discussed this with or had investigate his purported drugging.  (Deposition of Defendant Anderson, p. 97, lines 12-21.)

172.     Lieutenant Dunn testified in this case that she was summoned to Judge Ellsworth's office to meet with the Judge and Defendant Anderson on December 22, 2005 and Defendant Anderson claimed that he had spoken to a doctor and the doctor told him he had possibly been under the influence of GHB, a date rape drug, on the evening of December 17 through December 18, 2005, and that the doctor supposedly could tell him if he had been under the influence of the drug if he could hear or see a tape from the evening.  (Deposition of Melissa Dunn, p. 13, lines 7-25; p. 14, lines 1-9 ; and Deposition Exhibit 37, attached hereto as Exhibit 17.)

173.     Lieutenant Dunn informed Mr. Anderson that the alleged crime was in the jurisdiction of the Licking Police Department and they are the ones that should conduct the investigation.  (Deposition of Melissa Dunn, p. 14, lines 15-25; p. 15, lines 1-2.)

174.     Lieutenant Dunn indicated in her report that on the morning of December 23, 2005 she informed the Texas County Sheriff of the discussion she had had with Judge Ellsworth and Defendant Anderson on December 22, 2005.  The Sheriff and Lieutenant Dunn went to speak to

30

Judge Ellsworth, and the Judge informed them that "it would be best to leave this alone." Later on the afternoon of December 23, 2005 Lieutenant Dunn was informed that Defendant Anderson had taken an investigative subpoena to the Judge requesting the answering tape recording from Monica Daniel. (Deposition of Melissa Dunn Exhibit 37.)

175.    Lieutenant Dunn testified she thought the Judge might have changed his mind and that it was to be investigated, so she went to the Judge's office and asked for the tape. She was informed that the tape instead had been turned over to the Prosecuting Attorney. (Deposition of Melissa Dunn Exhibit 37.)


**III.    Legal Analysis**

A.    <u>Introduction</u> – No response necessary.

B.    <u>Standard for Granting Summary Judgment</u>

In <u>*Celotex Corporation v. Catrett*</u>, 477 U.S. 317, 330-331 (1986), the Supreme Court explained that the "ultimate burden of persuasion" on a motion for summary judgment under Rule 56 "always remains on the moving party." The court stated "the burden of persuasion imposed on a moving party by Rule 56 is a stringent one. Summary judgment should not be granted unless it is clear that a trial is unnecessary, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party." <u>Id</u> at 331, n.2. The Supreme Court also noted "if…there is any evidence in the record from any source from which a reasonable inference in the [non-moving] party's favor may be drawn, the moving party simply cannot obtain its summary judgment…." <u>Id</u>. (Citations omitted.) This latter point is especially important in a case such as this one, where much of what Defendant challenges has to do with things such as intent which are seldom capable of proof

by direct evidence, but may be established from the reasonable inferences to be drawn from the facts.

      C.      §1983 Sexual Harassment Claim

            i.      *Defendant Anderson's conduct prior to September 30, 2004 was part of a continuing violation and may be considered.*

      Initially, Defendant seeks to have this Court ignore Defendant's conduct prior to September 30, 2004, the date when Defendant calculates the five year statute of limitations in Missouri for a §1983 claim expired. Defendant Anderson's Legal Memorandum in Support of His Motion for Summary Judgment (hereinafter Defendant's Memorandum), p. 34. However, the 8th Circuit Court of Appeals has clearly recognized that past conduct, even conduct which would fall outside the time scope of any applicable statute of limitations, can and should be considered "under a 'continuing violation theory,' which permits the court to consider alleged discriminatory acts occurring prior to the statutory limitation for Title VII actions." *Jenson v. Eveleth Taconite Company*, 130 F.3d 1287, 1302 (8th Cir. 1997). As explained by the 8th Circuit, "in the arena of sexual harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature" and, to establish a continuing violation, "the critical question is whether 'any present violation exists' during the statutory period." Id. In other words, the continuing violation theory provides "a remedy for past actions which operate to discriminate…at the present time." Id at 1303.

      Additionally, Defendant's earlier conduct, which he seeks to have this Court ignore, may also be considered as relevant circumstantial evidence to explain the events which are actionable and have been alleged in this case. *Nolan v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994). In Nolan, the court concluded that the District Court errorred in disregarding evidence as sexual harassment by the

defendant which occurred prior to the date he became the plaintiff's supervisor. "Although not being actionable itself, those events occurring before McAdoo became plaintiff's supervisor provides relevant circumstantial evidence to explain the events after McAdoo became Plaintiff's boss." Id. Thus, case law clearly establishes that this court may consider the past incidents between Defendant Anderson and Plaintiff, at a minimum, relevant background evidence to Plaintiff's §1983 sexual harassment claim.

In light of this well established precedent, it is inappropriate to ignore the pattern of Defendant Anderson's action, including conduct which occurred prior to September 30, 2004. Indeed, it is hard to place in context the conduct within the statutory five year period without understanding the past pattern and practice.

The case cited by Defendant, _The Shotts Family v. Gierer_, 399 F.Supp.2d 1973, 1978 (E.D. Mo 2004) is not to the contrary. That case did not involve a claim of sexual harassment or hostile work environment, and therefore did not require consideration of past incidents under a continuing violation theory.

ii.    Anderson's action were taken under color of state law.

Noting that in order for a §1983 claim to lie, the sexual harassment must have been by persons acting under color of state law, Defendant argues that "any and all the allegations dating from the time period where Hutchison was employed at the private law firm should not be considered by the Court." (Defendant's Memorandum, p. 37-38.)While Plaintiff agrees that the actions Defendant Anderson took in the private law practice do not involve the state action necessary to support at §1983 claim, Defendant is incorrect in asserting that this Court cannot and should not consider those prior acts. In _Nolan v. McAdoo_, 39 F.3d 269, 271 (10th Cir. 1994), the 10th Circuit Court of Appeals agreed that the actions taken by the defendant while he was a co-employee, and

33

prior to being plaintiff's supervisor, were not actionable under §1983 because he lacked supervisory capacity at that time, but nonetheless held "to the extent, however, that the District Court disregarding all evidence of sexual harassment occurring prior to January 1990, we deem that error. Although not actionable itself, those events occurring before McAdoo became plaintiff's supervisor provide relevant circumstantial evidence to explain the events occurring after McAdoo became plaintiff's boss".

Defendant next argues that Defendant Anderson was not acting under color of state law with respect to the events of the night of December 17/early morning of December 18, 2005, when Defendant showed up Plaintiff's house, attempted to get in, and called her numerous times leaving messages professing his love and his feelings for her. Defendant's argument is incorrect legally, as explained below, and ignores under its own theory a question of fact which must be resolved.

Although Plaintiff's argument is premised on his assertion that Anderson was acting in a purely personal capacity, and not as Monica Hutchison's employer, Defendant Anderson, in what appears to be his only pre-summary judgment motion statement regarding his reason for going over to Plaintiff's house on December 18, told Christina Mosely, an employee in Defendant Anderson's Prosecuting Attorney's office, that he went to Plaintiff's house to tell her "we've got to fix this. You can't be having sex with other cops" as an employee of the Prosecuting Attorney's office. (R.S.F. #122-126.) Defendant Anderson testified that somewhere in the first week of December, he met with Plaintiff to tell her that she needed to change her ways or find another job, and that one of things he was concerned about was his belief "that she was having affairs with several married police officers." A.S.F. #154. If Defendant Anderson's statement on the subject is to be believed, then he clearly had a work related motive in showing up at her house, as he apparently intended to continue a discussion of problems in the office. It should also be kept in mind that the visit to

34

Plaintiff's house occurred after Defendant had been riding around with Corporal Kinder earlier in the evening and requested Corporal Kinder drop him off at his office, rather than his home, because he was going to spend some time there (R.S.F. #122.)

Defendant's argument also suffers from legal, as well as factual, problems. Although Defendant cites no case involving a §1983 claim based upon sexual harassment in support of his argument that Defendant was not acting under color of state law, a review of such cases indicate that where the defendant is a plaintiff's supervisor he exercises state authority over him or her. This supervisory capacity has been noted to establish the state action necessary to support a §1983 claim. See _Nolan v. Mcadoo_, 39 F.3d at 271. Indeed, "[i]t is firmly established that a defendant in a §1983 suit acts under color of state law when he abuses the position given to him by the state." _West v. Atkins_, 487 U.S. at 49-50 (1988). Here, Defendant exercised authority over Plaintiff in his position as Prosecuting Attorney for Texas County, Missouri, in which capacity he was Plaintiff's employer.

To the extent that Defendant is asserting that conduct by an employer towards an employee outside the office or outside regular work hours cannot form the basis for a §1983 case, that argument is refuted by _Moring v. Arkansas Department of Correction_, 243 F.3d 452 (8th Cir. 2001). There, the plaintiff's supervisor came to her hotel room after business was concluded and subjected her to unwanted sexual advances. Under those circumstances, the 8th Circuit affirmed a District Court's denial of defendant's Motion for Judgment as a Matter of Law on the plaintiff's §1983 Civil Rights action for sexual harassment against her supervisor at the Arkansas Department of Correction. Defendant's cases, as previously noted, are not on point. They do not involve situations where sexual harassment by a supervisor forms the basis of the §1983 action. Because Defendant was bestowed with authority over Plaintiff under state law as her supervisor, his abuse of that authority, as occurred here, can form the basis of a §1983 claim for sexual harassment.

35

iii.  <u>Conduct insufficient to establish §1983 sexual harassment claim</u>.

Defendant makes no argument that when *all* of Defendant's conduct towards Plaintiff, particularly events at Plaintiff's house in the early morning of December 18, are considered the evidence is insufficient to establish a §1983 sexual harassment claim. Their whole argument is based upon an improper exclusion of consideration of certain conduct and events as discussed earlier. Instead, Defendant argues only that the "remaining conduct" "after those actions barred by the statute of limitation are excluded and those actions under which Anderson was not acting under color of state law are also excluded" are insufficient to establish a §1983 sexual harassment claim. (Defendant's Memorandum, p. 40.) Indeed, Defendant is attempt to steer the Court away from some of Defendant's conduct reflects, perhaps, an understanding that the entire picture of Anderson's conduct is more than sufficient to allow a fact finder to conclude Plaintiff was subjected to sexual harassment.

The fact alleged established that Anderson harassed Plaintiff and created a hostile work environment by engaging in unwelcomed physical conduct of a sexual nature, using offensive and abusive language toward Plaintiff, asking Plaintiff out for drinks, inviting her to come to his house and get in his hot tub when his wife is not present, and inviting her to ride on his motorcycle, inappropriately commenting on her body parts, staring at Plaintiff's body in a lewd manor while at work, commenting on a man Plaintiff was dating, including saying "what does he have that I don't", throwing a drink against a wall when Plaintiff told Anderson he was not her boyfriend, forcing Plaintiff to choose between resigning or being fired because she was putting together evidence to file a sexual harassment suit against him, coming to Plaintiff's house in the middle of the night and leaving phone messages, banging on doors, opening storm doors, wiggling door handles to try to get in, and yelling obscenities at Plaintiff, obtaining a court order for Plaintiff to produce the answering

machine and tape and any tapes containing Anderson's messages. (See Statement of Uncontroverted Facts #10, 12, 15, 19, 20, 21, 25,26, 28, 30, 31, 33, 35, 36, 45, 63, 64, 68, 75-79, 81, 94, along with Plaintiff's response, and Additional Material Facts #137, 142, 143, 145.)

Plaintiff found Anderson's behavior as stated above objectionable and inappropriate and sexual in nature. The discriminatory conduct here was frequent, and in particular the incident at the Lake at a conference and at Plaintiff's house on December 18 were severe. The incident at the Lake was dramatic enough to cause Plaintiff's co-workers to question her as to whether she had ever been "intimate" with Defendant as an explanation for "why he was acting like that." (A.S.F. #137.) Plaintiff felt the need at that point to re-emphasize to Defendant that they could only have a professional relationship and she started trying to distance herself from him. (R.S.F. #65; A.S.F #138.) The incident at Plaintiff's home caused, according to Plaintiff's expert Dina Vitoux, Plaintiff to suffer from Post Traumatic Stress Disorder. As explained by Ms. Vitoux in her report, the events at Plaintiff's house on the morning of December 18 involved what she perceived to be a threat of serious injury or physical integrity of herself and her friend, and Plaintiff's response involved intense fear and helplessness. Her response was intensified by the power displayed by Defendant Anderson when he was able to get a court order for the tapes, which violated her sense of privacy and any feelings of safety that may have remained after the night Anderson came to her home. Ms. Vitoux points out in her report that Plaintiff's feelings of fear and threat were further intensified "with the act of calling the police but having no record filed of the event." A.S.F. #155. Plaintiff's treating physician, Dr. Myers, testified that Plaintiff suffers from medically diagnosable depression, anxiety and insomnia for which he has prescribed medicine, including Xanax, Cymbalta, Rozerem, and Hydroxyzone Pamoate that "Mrs. Hutchison's need for the medication listed above from December

2005 to date is primarily caused and necessitated by Mike Anderson's conduct and harassment described above", referring to the incident of December 18, 2005.  (A.S.F. #156.)

Plaintiff found the incident at the Lake, and her co-workers questioning whether she was sexually involved with Mr. Anderson, embarrassing and humiliating.  Further embarrassment and humiliation was caused when Defendant Anderson asked her to call a witness named "Haywood Jablowme" out in the hall, in front of the public, then compounded that embarrassment by repeating and laughing about what he had done to Plaintiff at a gathering of people with whom Plaintiff had to work on a daily basis.  (R.S.F. 94).  Furthermore, the conduct in question here did involve actions which were physically threatening, and actions which caused Plaintiff humiliation, and were not mere offensive utterances.  Finally, it is clear that after the incident at the Lake, and particularly after the incident of December 18, 2005, the harassment interfered with Plaintiff's ability to perform and enjoy her work.

Furthermore, although as noted above this case involves a pattern of conduct and repeated incidents, it is important to note that an incident as severe as what occurred here on the night of December 18 may provide a sufficient basis for a §1983 case.  For example, in the case of _Moring v. Arkansas Department of Correction_, 243 F.3d 452 (8th Cir. 2001), although the conduct involved a single incident, the Court found it sufficiently severe to alter the terms and condition of Plaintiff's employment, and stated they're "unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment."   Id at 456.

Finally, Defendant's argument for summary judgment ignores the precedent establishing that once there is evidence of improper conduct and offense, the determination of whether the conduct rose to the level sexual harassment is largely in the hands of the jury, and whether a work environment if objectively hostile or abusive is a fact intensive inquiry.  243 F.3d at 456.

D.    §1983 Retaliation and First Amendment Claim.

Defendant challenges Plaintiff's §1983 retaliation and First Amendment claims on two grounds.  First, Defendant contends that Plaintiff was not engaged in any protected conduct saying she testified that at the time Defendant gave her a choice to resign or be fired, she was not actually gathering evidence to file a sexual harassment suit against him.  Regardless of whether Plaintiff actually intended to file a claim for sexual harassment when she was told to either resign or be fired, her testimony clearly established that she had objected to what she viewed as objectionable and sexually motivated conduct on the part of Defendant Anderson.  Title VII provides that an employer may not discriminate against any of his employees because they have "opposed any practice made an unlawful employment practice."  42 U.S.C. §2000(e-3)(a).  Thus, it is not only the filing of a charge or testimony that is protected, but the opposition to sexually harassing conduct.  Furthermore, _Sauers v. Salt Lake County_, 1 F.3d, 1122 (10th Cir. 1993) makes it clear that "action taken against an individual in an anticipation of that person engaging in protected opposition to discrimination is no less retaliatory then action taken after the fact; consequently, we hold this form of pre-emptive retaliation falls within the scope of 42 U.S.C. §2000(e-3)(a)."  Id at 1128.

Defendant next asserts that, with respect to filing the lawsuit, that there was no state action involved and that "the lawsuit was not related to Anderson's duties as Texas County Prosecutor and was not filed on behalf of the Prosecutor's office."  However, this misstates the facts and ignores the comments Defendant Anderson made to the press, including a press release signed and issued by "Michael R. Anderson, Texas County Prosecuting Attorney".  (A.S.F. #157.)  As noted by the United States Supreme Court in _Buckley v. Fitzsimmons_, 509 U.S. 259, 278 (1993), a prosecutor's statements to the press "may be an integral part of a prosecutor's job" and "may serve a vital public

39

function." Furthermore, Anderson's lawsuit against Plaintiff, on its face, claims to be defending the integrity of his office.

Finally, Defendant Anderson challenges the §1983 retaliation of First Amendment claims and so far as they pertain to filing the 2006 lawsuit because "Anderson's alleged motivation for filing the 2006 lawsuit would fall under a claim for malicious prosecution and the general rule in the 8th Circuit is that an action for malicious prosecution does not state the claim of constitutional injury." While it is true, as noted in the cases cited by Defendant, that the general rule is an action for malicious prosecution does not state a claim of constitutional injury, and therefore may not be brought under §1983, where there are allegations that Defendant's conduct in connection with the malicious prosecution "also infringes some provision of the Constitutional federal law", a §1983 action will lie. The allegations here are not a §1983 claim based upon malicious prosecution *by itself*, but Plaintiff has alleged that the motivation behind the lawsuit commenced maliciously and without reasonable grounds, and with an improper or wrongful motive, was for the purpose of 'illegally retaliating against Plaintiff for filing a charge of sexual harassment and attempting to intimidate or coerce her in to not exercising her legally rights to seek redress for Defendant's sexual harassments as alleged herein." Thus, it is clear that the motivation for the lawsuit was to deprive the Plaintiff of rights secured for her by the United States Constitution and laws, including Title VII. This is not malicious prosecution *by itself*, where the improper motive might not have had anything to do with Plaintiff's federal rights.

Rather than unnecessarily repeat here the evidence showing and establishing that motivation, Plaintiff refers this Court to the portion of her response addressing Defendant's Summary Judgment Motion with respect to her malicious prosecution claim.

     E.    <u>Defamation Claim</u>

40

Defendant first challenges Plaintiff's defamation claim by asserting that the statements he made were privileged. However, the privilege he refers to, as Defendant concedes, applies only to matters contained in pleadings that are filed according to law in a court having jurisdiction. _Laun v. Union Electric Company of Missouri_, 166 S.W.2d 1065, 1069 (Mo 1943). Because the claim of defamation here involves statements Defendant Anderson made the public, including press releases, the privilege does not apply. It is not the fact that Defendant filed the lawsuit that gives rise to the defamation; it is his publicizing those claims outside the court proceedings to the public at large to constitute the defamation. In addition to the press release Defendant issued, Brad Gentry, the publisher of the Houston Herald, testified that Defendant Anderson repeated allegations from his lawsuit against Plaintiff in an interview for a newspaper article. (Statement of Facts, paragraph 130.)

Next, Defendant claims that Defendant's defamation claim is barred by the statute of limitations, because "Hutchison has failed to produce any evidence of a subsequent republication" after the interview with Brad Gentry for the June 8, 2006 article." (Defendant's Memorandum, p. 52-53.) However, Gentry testified that Defendant continued to make statements regarding the litigation as late as January 29, 2009, when another article was published based on either a verbal or written response from Defendant in which he stated "these are the same claims investigated by the Equal Employment Opportunity Commission and the Department of Justice. Those investigations found no basis for a claim then, and nothing has changed," and "these are false claims made by a disgruntled former employee hoping to make a profit." (A.S.F. 158.) The EEOC investigator assigned to Plaintiff's complaint, Harold Emde, testified that Mr. Anderson's statement in that article was not accurate with respect to the investigation, and the EEOC in fact found reasonable cause to believe Plaintiff's allegations are true. (A.S.F. #159.) Finally, the statute of limitations period begins to run only when the cause of action accrues, and "the cause of action shall not be deemed to

41

accrue when the wrong is done…but when the damage resulting there from is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." §516.100 R.S.Mo. Plaintiff has testified to ongoing and continuing damage, as this matter continues to be a topic of conversation not only locally, but on the internet.

### iii. There is sufficient evidence of reputational damage.

Defendant argues that Plaintiff has failed to produce evidence of reputational damage. However, this statement is inaccurate. In *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 817, n.3 (Mo. Banc 2003), the Missouri Supreme Court stated "for an example of what may constitute proof of actual reputational injury, See David A. Anderson, *Reputation, Compensation, and Proof,* 25 Wm. & Mary L. Rev 747 (1984)." In that treatise, Professor Anderson notes that there are "at least four distinct types of reputational harm. First, the defamation may interfere with the Plaintiff's existing relationships with third persons….Second, the Plaintiff may suffer an interference with future relations….Third, the defamation may destroy a favorable public image….Fourth, defamation can cause harm by creating a negative public image for a person who previously had no public image at all." Id at 765-766. In *Scott v. LeClercq,* 136 S.W.3d 183, 194 (Mo App 2004), the Missouri Court of Appeals stated that with respect to reputational injury, "one form of proof is that an existing relationship has been seriously disrupted…"

In this case, Plaintiff testified to several disruptions in her relationships, including Terry Haden, her mother, Mildred Williams, and Danny McNew. In addition, Plaintiff produced evidence of the fourth type of reputational harm-creating a negative public image for a person who previously had no public image at all. Plaintiff was not a public figure when Defendant Anderson made his defamatory statements to the press. However, those statements Mr. Anderson made to the press, that

Plaintiff engaged in a swinger style sex ring, destroyed evidence, and misused her office, were given nationwide publicity and broadcast to persons that would know nothing about her other that what Mr. Anderson said. Plaintiff testified that people she did not know apparently believed this defamatory statements, which they read and commented on online, and look at her and whisper when she went out in public.  (R.S.F. #115.)

Just because the witnesses whose testimony Defendant cites, who know Monica Daniel, choose not to believe Mr. Anderson's charges and do not think less of her does not mean that her reputation is unscathed. Plaintiff has produced more than enough evidence of reputational damage.

      F.     <u>Intentional Infliction of Emotional Distress</u>

      i.     <u>Plaintiff's claim is not barred by the Statute of Limitations</u>.

Although Defendant asserts that Plaintiff's claim for Intentional Infliction of Emotional Distress was untimely because the Statute of Limitations on that claim was two years.  The Statue of Limitations for Intentional Infliction of Emotional Distress, however, if based on conduct independent of traditional tort claims, is five years.  See *Ridder v. Hibsch*, 94 S.W.3d 470, 472 (Mo App. 2003).  Defendants bases its claim of a two year Statute of Limitations on a theory that the conduct here was an assault.  However, Plaintiff has not pled assault.  Thus, cases such as *KG v. RTR*, 918 S.W.2d 795 (Mo banc 1996) and *Ridde*r, in which the court found the battery statute of limitations should be applied are not relevant here.  Indeed, in *KG*, the principal case relied upon by Defendant on this point, the court found that the facts alleged would not support a claim for intentional infliction of distress because the conduct alleged was not intended only to cause extreme emotional distress to the victim, and the conduct amounted simply to the commission of one of the traditional torts – battery.  Id at 799.  In contrast, this court has already found that Plaintiff has sufficiently alleged an intentional infliction of emotional distress claim.  (Document #118, p. 9).

Next, Defendant argues his conduct was not sufficient to be considered outrageous. In so arguing, Defendant views his conduct on the night of December 18, 2005 in isolation, without regard to the pattern of behavior leading up to it and, more importantly, with regard to Defendant's status as Plaintiff's employer and Prosecuting Attorney of Texas County Missouri, a powerful position. When Defendant came to Plaintiff's house in the early morning hours of December 18, 2005, made the phone calls that have been discussed, repeatedly banged on doors of her house, and cursed Plaintiff, saying "ignore me you fucking bitch", this was not some random stranger or a misguided friend. The events of December 18th were, at that time, the culmination of escalating sexual harassment of Plaintiff by Defendant Anderson.

Defendant Anderson may believe that it is not outrageous for a married prosecuting attorney to arrive at a single female employee's house at 1:30a.m. on a Sunday morning and engage in the conduct that has been described over and over again in these Suggestions and in the Motion for Summary Judgment. Plaintiff disagrees with that position.

Next, Defendant argues that Plaintiff testified that the sole purpose of the conduct was not to cause extreme emotional distress, and cites testimony indicating that Plaintiff believes that Anderson originally came to her house in the early morning hours of December 18, 2005 in order to have sex with her. Assuming, for the sake of argument, that such motivation itself would not cause or be designed to cause emotional harm when directed by an employer at an employee, that ignores Defendant's conduct *after* he arrived, in which he met her rejection with conduct designed and intended to cause Plaintiff emotional distress. Again, intent maybe inferred from conduct, and Plaintiff is not required to present direct evidence of Defendant's intentions. His conduct speaks for itself. See, e.g., *City of Kansas City v. Thorpe*, 499 S.W.2d 454 (Mo 1973) in which the Missouri Supreme Court stated "it is elementary that intent need not be proved by direct testimony, but may

44

be inferred from facts and circumstances. Where different inferences are reasonably deducible therefrom, it is for the trier of the facts to determine which inference shall be drawn and we may n not cast aside their inference for another of our own choice." Id at 459. (Citations omitted.)

Finally, Defendant argues there is no evidence of bodily harm. Contrary to Defendant's assertion, Plaintiff has presented expert testimony that as a result of Defendant's conduct on December 18, 2005, she suffers from medically diagnosable and significant emotional distress in the form of post traumatic stress disorder, and has been required to take medication. Report of Dina Vitoux, attached hereto as Exhibit 9; report of Dr. David Myers, attached hereto as Exhibit 10.

     G.    <u>Hutchison's Malicious Prosecution Claim</u>

         i.    <u>Termination of prior lawsuit</u>.

Defendant first contends, with respect to Plaintiff' malicious prosecution claim, that Plaintiff cannot demonstrate the 2006 lawsuit filed by Anderson terminated in her favor. Plaintiff has asserted that Defendant Anderson abandoned his claim against Plaintiffs by operation of law after he did not re-file his action in a timely fashion following his voluntary dismissal. <u>Arana v. Reed</u>, 793 S.W.2d 224, 226 (Mo App. 1990). As held in that case, the underlying cause of action is considered abandoned when it no longer can be re-filed. This Court has previously addressed the issue of Defendant's abandonment of his lawsuit, in the context of Defendant's Motion to Dismiss and Supplemental Motion to Dismiss (Documents #3 & #5), and this Court ruled "based on these factors, Anderson will be considered to have abandoned his lawsuit no earlier than July 10, 2007 and no later than May 31, 2008." (Order, Document #16, p. 9).

In his Motion for Summary Judgment, despite the earlier ruling that Defendant abandoned his lawsuit, Defendant asserts that the parties reached a voluntary agreement to hold off on civil actions during pendency of the EEOC proceeding. (Defendant's Memorandum, p. 60-61.)

Interestingly, Defendant does not argue that Defendant Anderson was prevented by the alleged agreement from ever re-filing his lawsuit, and this agreement does not change, in any way, the fact that Defendant abandoned his lawsuit by operation of law when he did not re-file it in a timely fashion. Again, under Missouri law, an underlying action in a malicious prosecution claim is terminated in the Plaintiff's favor when the action is abandoned, and the underlying cause of action is, as a matter of law, considered abandoned when it can no longer be re-filed. *Arana v. Reed*, 793 S.W.2d 224, 226 (Mo App. 1990).

Furthermore, as pointed out in her deposition testimony, Plaintiff was not told of any so called "agreement with Ms. MacPherson that the lawsuit would be dismissed while the EEOC complaint was being handled or investigated, and she was told by her attorneys that Defendant Anderson had simply "decided to dismiss it." (R.S.F. #132.) She further testified that she did not receive any correspondence her attorneys had had with Ms. MacPherson "about the terms of that dismissal". (R.S.F #132.) It is also important to note that Defendant's dismissal was without prejudice. (A.S.F. #160.)

Although not clear from Defendant's Motion for Summary Judgment, it is possible he is arguing that the agreement tolled the statute of limitations and he is still able to re-file his lawsuit, a possibility Defendant Anderson held open in his deposition, taken on August 25th of 2009, when he testified he had not decided whether or not to re-file his claim. (A.S.F. #160.) The EEOC proceedings concluded on October 23, 2008 when Plaintiff received her Right to Sue letter. (Plaintiff's Second Amended Complaint, Document #53, Exhibit A.) Adding the 15 ½ months between the alleged agreement on July 7, 2006 and the conclusion of the EEOC proceedings on October 23, 2008 to the deadlines previously considered by this Court in determining when Mr. Anderson abandoned his lawsuit would change the dates of the abandonment to "no earlier than

46

October 26, 2008, and no later than August 16, 2009." Thus, Defendant Anderson has allowed any tolling period added by his alleged agreement to expire without attempting to re-file his lawsuit.

ii.    Evidence of probable cause and malice.

Defendant next challenges Plaintiff's malicious prosecution claim for a purported absence of evidence that Anderson lacked probable cause to bring the lawsuit, which is another element of a malicious prosecution action. *State Ex Rel Police Retirement System of St. Louis v. Mummert*, 875 S.W.2d 553, 555 (Mo banc 1994). Under Missouri law, probable cause for initiating a civil suit requires a belief in the facts alleged "based on sufficient circumstances to reasonably induce such belief by a person of ordinary prudence in the same situation, plus a reasonable belief by such a person that under such facts the claim may be valid under the applicable law." *Fust v. Francois*, 1913 S.W.2d 38, 44 (Mo App. 1995). In considering whether the circumstances are sufficient to reasonably induce such belief by a person of ordinary prudence, persons filing a lawsuit are held responsible for not only the facts known to them at the time of filing, but also "for all other facts ascertainable through due diligence." Id at 45.

Because proving the absence of probable cause involves proving a negative, "the slightest of proof is all that is required to make a prima facia case." Id at 44.

Against this legal background, there is more than sufficient evidence from which Defendant Anderson's lack of probable cause for initiating his suit against Monica Hutchison and Mildred Williams could be found. Initially, for purposes of establishing a claim for malicious prosecution, dismissal of the Defendant's action against the Plaintiff is some evidence of lack of probable cause. Id. Here, as previously noted, Defendant Anderson dismissed and then abandoned his lawsuit against Plaintiffs. Anderson admitted lack of knowledge prior to filing the suit is striking. While he claims to have had information that Plaintiff was having affairs with Jeff Kinder and Danny McNew

prior to his lawsuit, he testified that her affairs with McNew and Kinder were not part of the sex ring he alluded to in his lawsuit. (A.S.F. #161.) Defendant does not assert in his Motion for Summary Judgment that there was in fact "sex ring" being run out of the office; nor does he submit it as an undisputed fact that he was told that there was a sex ring being run out of his office and that of the Associate Circuit Court. There is, quite simply, no evidence to that effect in this case.

Going paragraph through paragraph by his damage complaint, Defendant Anderson repeatedly gave information that was either contradicted by other witnesses or failed to support his allegations. With respect to his allegation in paragraph #4a of his complaint against Plaintiff, he testified that Debbie James told him that Millie Williams said he threatened to kill Monica Daniel "if she cut off our affair." (A.S.F. 162.) However, Debbie James not only denied telling Mr. Anderson that, but said Millie Williams never told her that. (A.S.F. 163.) And Defendant Anderson never claimed to have information Monica was making those statements. (A.S.F. # 164.)

When asked about part b, disseminating false information Plaintiff Michael R. Anderson made comments of the sexual nature during the phone call, he testified he heard they were playing the tapes which, of course, if true could not be false information. (Deposition of Defendant Anderson, p. 128, lines 16-22.)

With respect to paragraph #4c of his complaint, Defendant Anderson testified "the talk around the courthouse was that Monica and I had had some blow up at the Lake and I had acted inappropriately towards her." (A.S.F. #165.)

Similarly, Defendant Anderson totally failed to investigate the claims he made against Plaintiff and Millie Williams. He admitted he did not talk to any of the alleged participants involved in the alleged group sex, he did not go out and interview people about his allegations, that he didn't talk to Judge Ellsworth regarding Millie Williams and her alleged role in all of this. (A.S.F. #168.)

48

In fact, the only investigation he did, which was to contact the Attorney General's office, resulted in a negative computer forensics report, which he received prior to filing his lawsuit. (A.S.F. #168.) Incredibly, Defendant Anderson admitted that Millie Williams was not a part of the so called "removal of criminal investigative documents" allegations in his lawsuit, although in the suit he claims she was and his allegations against her were basically from his assumption that "Monica didn't do much without Millie there at the time." (Deposition of Defendant Anderson, p. 137, lines 4-25; p. 138, lines 1-8.)

These admitted facts are clearly sufficient to establish the "slightest of proof" standard required to make a prima facia case for lack of probable cause.

Similarly, Defendant Anderson totally failed to investigate the claim.

Next, Defendant argues that there is no evidence of malice. The malice required to support a claim for malicious prosecution is "malice in law" which is "defined as a wrongful act done intentionally without just cause or excuse." _Pernoud v. Martin_, 891 S.W.2d 528, 535 (Mo App. 1995). As explained in MAI 16.01, "it does not necessarily mean hatred, spite or ill will", and it differs from legal malice required to justify punitive damages. _Brockman v. Regency Financial Corporation_, 124 S.W.3d 43, 48 (Mo App. 2004).

It is well established under Missouri law that where a Plaintiff has made a submissable case on lack of probable cause in a malicious prosecution action, "the jury could infer malice from the lack of probable case." _Kelley v. Kelly Residential Group, Inc._, 954 S.W.2d 544, 551 (Mo App. 1997). Thus, the evidence here of lack of probable cause, set out above, is also sufficient to allow a jury to infer malice, which "need not be proven by a direct testimony." _Waddell v. Krausc_, 241 S.W. 964, 967 (Mo App. 1922).

H.    Abuse of Process.

As Defendant correctly notes, Plaintiff points to two separate incidents that she alleges support her claim for abuse of process: the filing of the lawsuit by Defendant Anderson against Plaintiff in May of 2006 and his actions in obtaining the subpoena for investigation/order to appear/produce documents on December 23, 2005.  *Stafford v. Muster*, 582 S.W.2d, 670 (Mo banc 1979) sets forth three elements for the tort of abuse of process.  The first element of the tort of abuse of process in Missouri is satisfied where the "use of process" was aimed at an objective not legitimate in the proper employment of such process.  582 S.W.2d at 678.  The second element, the ulterior purpose, may be inferred from the wrongful use made of the process.  *Romeo v. Jones*, 86 S.W.3d 428, 433 (Mo App. 2002).  The third element is damage.  Id at 433.

  i. <u>Defendant's subpoena as abuse of process</u>

   Before discussing this subpoena, Plaintiff finds it necessary to correct Defendant's repeated assertions that the subpoena did not ask Plaintiff to turn over any original recording or recordings she may have made of the messages that Defendant Anderson left on her answering machine.  The subpoena quite clearly requires production "for copying, any voice recording, audio or otherwise in a telephone answering machine recordings of Michael Anderson taken at your residence on December 18, 2005."  (R.S.F. #86.)  This would include not only any and all tapes Plaintiff  made, as they constitute "voice recordings, audio or otherwise", but the original answering machine messages on the digital machine—in other words, she would have to turn over her answering machine to satisfy the literal terms of the subpoena.

   Defendant Anderson asserts that his use of the subpoena was legitimate under §56.085, R.S.Mo, because "Anderson began to suspect that he had possibly been drugged by GHB, a date rape drug."  In <u>Johnson v. State of Missouri</u>, 952 S.W.2d 834 (Mo Banc 1996), the Missouri Supreme Court held that "in order to request a subpoena under §56.085, a prosecutor must be 'in the

course of a criminal investigation.'" There is a significant issue of fact as to whether Defendant

Anderson was truly in the course of a criminal investigation. Defendant Anderson testified that there

was no criminal file opened, he did not ask a special prosecutor to be appointed to this crime in

which he was the alleged victim, and that he called the Sheriff's Department and asked Lieutenant

Dunn to assist, but she told him she didn't want to get involved." (R.S.F. #86.)

When asked by Plaintiff's counsel if Melissa Dunn is the person we would talk to or depose

regarding your investigation into your claims that you were drugged", Defendant Anderson said "I

discussed it with her, but she never did anything that I am aware of …." (A.S.F. #170.) Defendant

Anderson named no other law enforcement officials as persons he discussed this with or had

investigate his purported drugging. (A.S.F. #171.) Thus, even under Defendant Anderson's

testimony, there was no investigation going on when he obtained the subpoena.

Lieutenant Dunn also testified in this case and she explained that she was summoned to

Judge Ellsworth's office to meet with the Judge and Defendant Anderson on December 22, 2005,

and Defendant Anderson claimed that he had spoken to a doctor and the doctor told he had possibly

been under the influence of "GHB", date rape drug on the evening of December 17 through

December 18, 2005, and that the doctor supposedly could tell him if he had been under the influence

of the drug if he could hear or see a tape from that evening. (A.S.F. #172.) Lieutenant Dunn

informed Mr. Anderson that the alleged crime was in the jurisdiction of the Licking Police

Department and they are the ones that should conduct the investigation. (A.S.F. #173.)

Lieutenant Dunn also indicated in her report that on the morning of December 23, 2005 she

informed the Texas County Sheriff of the discussion she had had with Judge Ellsworth and

Defendant Anderson on December 22, 2005. The Sheriff and Lieutenant Dunn went to speak to

Judge Ellsworth, and the Judge informed them that "it would be best to leave this alone." (A.S.F.

#175.)  Later on the afternoon of December 23, 2005, Lieutenant Dunn was informed that Defendant Anderson had taken an investigative subpoena to the Judge requesting the answering tape recording from Monica Daniel.  (Dunn Deposition Exhibit 37.)  Lieutenant Dunn thought the Judge had changed his mind and that it was to be investigated, so she went to the Judge's office and asked for the tape.  (A.S.F. #175.)  She was informed that the tape had instead been turned over to the Prosecuting Attorney.  (A.S.F. #175.)

In light of the above testimony, a fact finder could certainly conclude that Defendant Anderson was not truly conducting a criminal investigation, but rather used the subpoena power of his office to obtain incriminating evidence against himself.  While Defendant Anderson attempts to shift the blame for the improper subpoena onto Judge Ellsworth, his request of the subpoena and use of it after Judge Ellsworth signed it is the abuse of process complained of.  Again, subpoenas such as Mr. Anderson required, obtained, and then used, when properly employed, may be issued only in the course of a criminal investigation.  The fact that this subpoena was not so employed is sufficient to establish its wrongful use, from the ulterior purpose can be employed.  _Romeo v. Jones_, 86 S.W.3d at 433.

In addition, Plaintiff submits that a fact finder could conclude, as Lieutenant Dunn apparently did, that Defendant Anderson did not truly believe he had been given the date rape drug "GHB" and could prove it through a videotape and audiotape, when he wouldn't tell the only officer he asked to investigate information regarding the videotape, he didn't name the doctor and have the investigating officer talk to him, and he never had anyone review the tape after he obtained it through the subpoena.  (R.S.F. #86.) Thus, by telling Judge Ellsworth that he believed he was the victim of a crime, when his actions, that he needed it for an investigation, and that he wanted the tape for

52

somebody to listen to, a fact finder could conclude that Defendant Anderson obtained the subpoena through false statements, false pretenses and deceit.

Defendant also asserts that Plaintiff was not damaged because she was able to maintain a copy of the tape. However, the limitation the Defendant suggests on the type of damages Plaintiff can recover for abuse of process is not supported by a citation to any authority and is, in fact, not the law. A Plaintiff in an abuse of process claim may recover whatever actual damages she sustained for personal injuries that were proximately caused by the Defendant's abuse of process. 34 Mo Practice § 7: 12. In *Sanders v. Pete and Son's Garage Inc*., 769 S.W.2d 844, (Mo App 1989), the Court of Appeals rejected the Defendant's argument that there was no evidence of damages to support the counterclaimants suit for abuse of process, and found sufficient in that regard the claimant's testimony "that because of the suit she had to take time to appear in court and discuss the case; that the lawsuit made her nervous and caused her to have an upset stomach and lack of sleep."

Plaintiff has introduced expert testimony that Defendant's abuse of process played a factor in her emotional injury and need for medication because it contributed to her sense of helplessness and powerlessness to do anything to stop Defendant's actions.

　　　　ii.　　　　Anderson not entitled to immunity as to the subpoena.

Defendant Anderson argues he is entitled to absolute immunity as the Prosecuting Attorney for his actions alleged in Plaintiff's claim for abuse of process.  The cases Defendant cites, *Imbler v. Pachtman*, 424 U.S. 409 (1976) and *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), do not afford a prosecuting attorney immunity for all actions he takes in his official capacity.  As the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.  *Buckley*, 509 U.S. 259, 273.  Indeed, in *Buckley*, the Supreme Court found a prosecutor not immune for actions that are investigative in character, and

stated "a prosecutor neither is, not should consider himself to be, an advocate before he has probable cause to have anyone arrested."  Id at 274.

Also pertinent here is the Supreme Court's opinion in _Kalina v. Fletcher_, 118 S.Ct. 502 (1997), which found a prosecuting attorney not immune to suit where acting as a complaining witness instead of an advocate.  There, the Court noted that "complaining witnesses were not absolutely immune at common law", Id at 508, n.14, and found that a prosecutor's conduct in "making false statements of fact in an affidavit supporting an application for an arrest warrant" was not protected by the doctrine of absolute prosecutorial immunity.  It is clear in this case that Defendant Anderson was, according to his story, investigating a crime against himself, and he was acting as a complaining witness.  He did not present a request to Judge Ellsworth for an investigative subpoena based on information provided to him by someone else serving as a complaining witness, in which his role might be said to be limited to that of being an advocate.  However, as _Kalina_ clearly establishes, where a prosecutor goes beyond appearing as an advocate for an arrest warrant, and acts as the complaining witness providing information to the court as a witness, not just an attorney, absolute immunity does not apply.

Furthermore, there is a genuine issue of material issue as to whether an investigation was truly being conducted and, as held by the Missouri Supreme Court in _Johnson v. State_, 925 S.W.2d 834 (Mo Banc 1996), a prosecutor's request for a subpoena under §56.085 must be "in the course of a criminal investigation."  Whatever immunity a prosecutor might enjoy under §56.085 for obtaining a subpoena in the course of a criminal investigation cannot extend to a situation where there is in fact no investigation.

       iii.    <u>Lawsuit was used for an improper or illegal purpose</u>.

Defendant's sole challenge, in his Motion for Summary Judgment, to Plaintiff's abuse of process claim premised upon the filing of his civil lawsuit against Plaintiff is that there is no evidence to support Plaintiff's assertions that the lawsuit was instituted for the unlawful and collateral purpose of quieting Plaintiff from making any statements regarding Anderson, intimidating Plaintiff, and retaliating for Plaintiff exercise of her rights to seek redress for unlawful employment discrimination on the basis of sex.

There is abundant evidence from which the fact finder could conclude that Plaintiff's allegations concerning Defendant's own lawful purpose in filing the suit were true, including Defendant's own statement that he filed the lawsuit, at least in part, "to get them to stop making these statements about me."  (Deposition of Defendant Anderson, p. 107, lines 19-24; p. 152, lines 3-6 and lines 17-19.)  That evidence will be discussed further below.

However, Plaintiff first finds it necessary to address and Defendant Anderson's inaccurate statement that "the record actually indicates that Anderson desired that whatever disputes between him and Hutchison be settled by the EEOC investigation that was ongoing on that time." (Defendant's Memorandum, p. 66.)  Defendant is referring there to a letter from his attorney sent after his lawsuit had been filed, and leaving the possibility of litigation open.  Plaintiff disagrees with Defendant's interpretation of that letter as explained in these Suggestions in Opposition.  However, whatever intent Anderson had at the time he dismissed his lawsuit, which is the time period he is referring to, that does not establish his intent at the time he filed his lawsuit.  If he truly wanted everything resolved in the EEOC proceedings, he would never have filed the lawsuit in the first place, but instead let the EEOC investigation, which was ongoing at the time he filed his lawsuit, take its course before taking any legal action.  In fact, Defendant Anderson testified not that he wanted the dispute settled quietly in the EEOC, but that he filed his lawsuit in part to "bring it to

light" and to have the light shine "in court, at a hearing." (Deposition of Defendant Anderson, p. 152, lines 23-25; p. 153, lines 1.) Thus, Defendant Anderson's own testimony is that he chose to filed this lawsuit, knowing the EEOC proceedings were being investigated, because he wanted this matter heard in court.

Turning now to the evidence in this case, there is clearly evidence from which a reasonable inference can be drawn that Defendant Anderson filed his suit to "quiet" Plaintiff from making any statements regarding him and, as held in *Romeo v. Jones*, 86 S.W.3d 428, silencing a party is a "purpose [which] is an illegal, improper, perverted use of process." *Romeo v. Jones*, 86 S.W.3d 428, 433 (Mo App. 2002). Not only are there Defendant's own statements as to why he filed the suit indicative of his desire to silence Plaintiff, but the entire pattern of his conduct in this case is suggestive of that motive. Upon learning that Plaintiff was preparing evidence against him for filing a claim of sexual harassment, he fired Plaintiff. Upon reconsidering, and asking Plaintiff to come back to work for him, Defendant could not control himself and the previously described events of December 18 at Plaintiff's house resulted. Defendant then attempted first to convince Plaintiff to destroy the evidence of his phone messages to her and, when that did not work concocted a story that he needed the tape as evidence and improperly used a subpoena to get that evidence. When Plaintiff nonetheless filed a charge of discrimination with the EEOC, Defendant filed the lawsuit against not only Monica, but her friend, Mildred Williams, whose unfortunate roll in this saga was to have been present as a key witness to Defendant Anderson's actions at Ms. Hutchison's house on the nights of December 17 through 18th. Naming Mildred Williams in his lawsuit clearly shows that his intent and purpose in filing the litigation was to intimidate or stop anyone from repeating what he did and said.

Finally, his actions *after* the lawsuit is filed confirm his ulterior motive in filing the lawsuit. First, he dismissed his lawsuit rather than prosecute it after having it on file for approximately just under two months. This dismissal, according to Defendant, was in exchange for Plaintiff's agreement to make no further statements about him.

In summary, Mr. Anderson's statements cited above, his actions, and the timeline in which they occurred clearly reflect that his lawsuit was instituted for the unlawful and collateral purpose of quieting Plaintiff from making any statements regarding him and/or retaliating for Hutchison's exercise of her right to seek redress for unlawful employment discrimination on the basis of sex.

Respectfully Submitted,

STEELMAN, GAUNT & HORSEFIELD

By:    /s/    Stephen F. Gaunt
       MO Bar #33183
       David L. Steelman   MO Bar #27334
       901 Pine Street, Ste. 110
       P.O. Box 1257
       Rolla, MO  65402
       Telephone:  573-341-8336
       Fax:  573-341-8548
       sgaunt@steelmanandgaunt.com
       dsteelman@steelmanandgaunt.com

       ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen F. Gaunt, hereby certify that on the 20th day of September, 2010, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to:

Warren E. Harris
Taylor, Stafford, Clithero, Fitzgerald & Harris, LLP
3315 East Ridgeview, Ste. 1000
Springfield, MO  65804
Counsel for Defendant Michael Anderson

Corey L. Franklin
The Lowenbaum Patnership, LLC
222 South Central Avenue, Ste. 901
St. Louis, MO  63105
Counsel for Defendant Texas County, Missouri

/s/    Stephen F. Gaunt
Stephen F. G
