# Monica Daniel Hutchison's Deposition Excerpts

EXHIBIT

**41**

1  not positive, but I believe he used that for
2  his tax purposes for business expense.
3  Q. Okay. Did your duties change at all during
4  the course of your employment with Mike in
5  his regular law practice, his private law
6  practice?
7  A. No.
8  Q. Did you ever accompany him to court?
9  A. No, not at his law office.
10 Q. Okay. Did you ever assist him in preparing
11 exhibits for trial?
12 A. At his law office?
13 Q. Uh-huh.
14 A. He would give me the exhibits, and I would
15 put the little Exhibit A, B, or C label
16 markers on them for him and make copies as
17 he would need for -- to hand out to other
18 people.
19 Q. Okay. Would you do the -- did he dictate
20 documents at all?
21 A. Not that I recall.
22 Q. Okay.
23 A. He may have. I know Mr. Bidson did when I
24 worked for him. He had a recorder and
25 dictated. I don't recall if Mr. Anderson

**42**

1  did that, but he may have a few times.
2  Q. Did he type his own letters typically?
3  A. Yes.
4  Q. Okay. And then he'd have you review them?
5  A. Uh-huh.
6  Q. Would that include personal letters?
7  A. I don't believe I ever saw any personal
8  letters go out from Mr. Anderson.
9  Q. Okay. Did you receive any training when you
10 were hired?
11 A. No. I mean, we didn't have anybody that
12 trained us. I --
13 Q. Kind of knew what you were doing when you
14 came in?
15 A. Yeah. We just both kind of worked together
16 to --
17 Q. Was there anybody else working there?
18 A. At the law office?
19 Q. Uh-huh.
20 A. Myself as a secretary; Dianne, his wife,
21 Ms. Anderson, came in and took care of the
22 books.
23 Q. When you say "took care of the books," what
24 do you mean?
25 A. She had her own office. I think she

**43**

1  handled, like, paying the bills and the
2  money that would come in and go out. She
3  took care of all the finance stuff.
4  Q. Was there anybody else in the office other
5  than you and Dianne and Mike?
6  A. No.
7  Q. How often was Dianne in the office?
8  A. Quite often. Well, probably two, three
9  times a week. I mean, she would just -- she
10 set her own schedule, of course, and -- when
11 we first started, she wasn't there as much,
12 but then -- and then she started doing --
13 you know, taking care of everything. I'm
14 not sure how far into it, but she had her
15 own office. She was in and out quite often.
16 Q. About how many hours a week would you say
17 Dianne was in the office?
18 A. Oh, gosh, I don't know.
19 Q. Twenty?
20 A. Twenty, probably. I'm not positive.
21 Q. Could it have been more?
22 A. Some weeks, some weeks less.
23 Q. Did you have access to Mike Anderson's
24 calendar when you were working as his
25 administrative assistant in his private law

**44**

1  practice?
2  A. Yes.
3  Q. And did you have access to his e-mail?
4  A. No.
5  Q. Okay. And like I said with some of the
6  preliminary matters, in discussing some of
7  the allegations in the lawsuit and the
8  nature of your employment, I'm going to try
9  to ask some of these questions as delicately
10 as possible, given some of the subject
11 matter, and please bear with me. This is
12 not an exercise to try to embarrass anyone
13 or be indelicate with the situation, just an
14 effort to ask -- you know, ask questions
15 that are relevant to the claims. Okay?
16 A. Okay.
17 Q. In your complaint -- and I would refer you
18 to Defendant's Exhibit 3 -- you reference
19 that you had worked -- perhaps I'm in the
20 wrong spot here. During the time that you
21 were working for Mike in his solo law
22 practice, did you experience what you
23 believe to be harassing conduct?
24 A. Yes.
25 Q. Okay. Approximately how often would that

14 (Pages 41 to 44)

ALPHA REPORTING SERVICE
Phone 417-887-4101 www.alphareporting.com Fax 417-889-4246
Case 6:08-cv-03018-RED Document 101-1 Filed 09/20/10 Page 2 of 33

45

```
1   conduct occur in a given week?
2   A.  It'd depend on the week, but it was ongoing.
3   Not -- it -- it was ongoing.
4   Q.  I'm going to hand you an exhibit that's been
5   labeled Defendant's Exhibit 14, direct your
6   attention to that for a second.  If you need
7   a second to review it, that's fine.  Just
8   tell me when you're ready to go, and away
9   we'll go.
10  A.  Okay.  I believe I'm ready.  I've reviewed
11  this before.
12  Q.  This is a document that's dated
13  February 1st, 2006.  It's addressed to the
14  EEOC, and looking to the last page, it's
15  signed by you.  That is your signature,
16  right?
17  A.  Yes, sir.
18  Q.  Okay.  It says that for the past -- you've
19  been employed by Mr. Anderson for the last
20  five years until recently.  You began
21  working for him in January 2001, and that it
22  was not long after you began working for
23  Mr. Anderson in January 2001 that the first
24  incident occurred.  Okay.  Approximately how
25  long was it before you encountered some
```

46

```
1   level of sexual harassment in the course of
2   your employment by Mr. Anderson in his
3   private law practice?
4   A.  A few weeks.  I'm not sure that -- a month.
5   I'm not positive.
6   Q.  Okay.  And this is this incident that you
7   reflect here about being in the copy room?
8   A.  Uh-huh, correct.
9   Q.  And having him touch your backside?
10  A.  Correct.
11  Q.  Okay.  Was it -- again, I don't mean to be
12  indelicate about this.  Was it a brush?  Was
13  it a grab?  What are we talking about --
14  It was a brush.  There was no grab.
15  Q.  Okay.  And you represent in the letter that
16  you felt this made you uncomfortable and you
17  told him you didn't like being touched?
18  A.  Uh-huh.
19  Q.  What did he say?
20  A.  He said it was an accident.  He didn't even
21  realize that he had brushed up against me.
22  Q.  And he apologized?
23  A.  Yes.
24  Q.  Okay.  Did you have any other similar
25  situations where he brushed up against you
```

47

```
1   in that fashion during the time that you
2   were there?
3   A.  Not at that time, I don't believe.  I just
4   recall every now and then he would, like,
5   put his hand on my shoulder when he was
6   reviewing things, but no -- no other areas
7   that were --
8   Q.  Okay.
9   A.  -- really inappropriate.
10  Q.  Approximately how many times would you say
11  that he put his hand on your shoulder while
12  you were -- this is while he'd be reviewing
13  a document on the computer?
14  A.  Yeah, or a document that I was -- I was
15  reviewing or -- it wasn't -- it wasn't all
16  the time.
17  Q.  Okay.  Did you tell him not to touch your
18  shoulder when --
19  A.  No.  I would just move away.
20  Q.  Okay.  Would he move his hand at that point?
21  A.  Yes.
22  Q.  Okay.  Do you have any reason to think that
23  he was -- that his putting his hand on your
24  shoulder was sexual in nature in any way?
25  A.  It made me feel uncomfortable.
```

48

```
1   Q.  Okay.  Did you believe it had any sexual
2   connotation to it in the context of which it
3   was done?
4   A.  I believe it could have, yes.
5   Q.  Okay.  What led you to believe that?
6   A.  Just from other -- like the way he would
7   look at me, and he told me that I looked
8   nice in my -- or my ass looks good in those
9   jeans and just --
10      MR. STEELMAN:  Judge Dorr is on.
11  Get Steve real quick.
12      MR. FRANKLIN:  We'll go off the
13  record.
14      (A discussion was held off the
15  record.)
16  BY MR. FRANKLIN:
17  Q.  Before we went off the record, you had told
18  me that aside from this instance reflected
19  in the first paragraph of Defendant's
20  Exhibit 14, that Mr. Anderson brushed
21  against your backside.  That he had also,
22  during the course of the time that you
23  worked in his private law practice,
24  periodically would put his hand on your
25  shoulder when he would review a document
```

15  (Pages 45 to 48)

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 3 of 33

57

1  Q. So it could be certainly less than that;
2     right?
3  A. Possibly.
4  Q. Okay. It was certainly something that
5     wasn't on an everyday basis --
6  A. No.
7  Q. -- right?
8  A. Right.
9  Q. And did he make other comments about your
10    attire?
11 A. He would tell me that I would look good and,
12    like, look at me and kind of raise his
13    eyebrows and grin. And I would be, like,
14    "cut it out" or "stop it" and then just go
15    on -- we'd just go on with our daily work.
16    At that time I didn't -- I mean, it was
17    uncomfortable, but I didn't think it was,
18    like, a horrible thing that I was, you know,
19    going through. It was something that I was
20    dealing with, and it was just -- it was
21    comments that he had made. It bothered me,
22    but it wasn't to where I couldn't do my job.
23 Q. Okay. So it's fair to say that the comments
24    that he made, that the issue with the
25    bathroom door and the occasion when he

58

1     brushed up against you and the occasions
2     when he put his hand on your shoulder, those
3     were not instances that were inhibiting your
4     ability to do your work; right?
5  A. Correct.
6  Q. And you didn't feel as if it was necessary
7     to leave your employment?
8  A. Correct.
9  Q. Okay. You didn't fear for your personal
10    safety?
11 A. No.
12 Q. Okay. Were you having any emotional
13    difficulty dealing with your job at that
14    point?
15 A. No. I mean, I would just tell him to stop
16    it, cut it out, quit making those comments.
17    Or I think I'd usually say quit being
18    disgusting, and we'd go on about our day.
19    He'd just kind of laugh it off, and we'd go
20    on, and I'd do my work and --
21 Q. He'd leave you alone?
22 A. Usually for the rest of the day, yes.
23 Q. Okay. So at least in the immediate sense,
24    if you said something to him, he'd cut out
25    whatever behavior was going on at that point

59

1     in time?
2     At that point, yes.
3  Q. Okay. All right. So let's look at the one,
4     two, three, four, fifth paragraph. It says,
5     "Whenever I was around, he'd be looking at
6     parts of my body he shouldn't have been
7     looking at." What did you mean?
8  A. My breasts.
9  Q. Okay. Would he look at anything else?
10 A. Not -- no, not that I'm aware of, no.
11 Q. Okay. What was your regular workplace
12    attire at the time that you worked for
13    Mr. Anderson?
14 A. I believe that I wore jeans and dress pants
15    whenever I worked there, occasionally a
16    skirt, not too often. It was more of a
17    casual dress there.
18 Q. Okay. Okay. What kind of tops would you
19    wear?
20 A. I would wear button-up tops, just regular
21    blouses that females wear, sweaters. It
22    would vary.
23 Q. Did you ever wear halter tops or --
24 A. No.
25 Q. -- tank tops?

60

1  A. No.
2  Q. Okay. Upon --
3  A. If I ever wore a summer dress, sometimes
4     they had just the little straps, but not --
5  Q. Okay. In the summer, was it regular
6     practice for you to wear summer dresses --
7  A. No.
8  Q. -- in the summer?
9  A. I'm not a dress person, so no.
10 Q. Okay. Okay. And when he would look at you
11    again, you'd say, "Cut it out," and he'd cut
12    it out, and you'd go on about your business;
13    right?
14 A. Uh-huh.
15        MR. STEELMAN: Objection, leading
16    question.
17 BY MR. FRANKLIN:
18 Q. And -- looking at this paragraph, it says,
19    "It got to where I dreaded being alone with
20    him in a room because of it." When did that
21    occur? When was it that you dreaded being
22    alone in a room with him?
23 A. It was later on after I'd worked for him for
24    quite a while. I just always felt like
25    there was going to be some kind of comment

18 (Pages 57 to 60)

ALPHA REPORTING SERVICE
Phone: 417-887-4110          www.alphareportingservice.com          Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 20-1   Filed 09/20/10   Page 4 of 33

61

1     made that I would have to say, you know,
2     "Hey, stop it. You're creeping me out.
3     You're being disgusting. Cut it out." It
4     got worse whenever I was at the prosecutor's
5     office rather than at the law office.
6     Q. Well, let's focus on the law office.
7     A. The law office?
8     Q. Because -- at least as I'm reading your
9     letter, at this point in time, you're
10     talking about your experiences when you're
11     working in his private law office. Is that
12     accurate?
13     A. Yes.
14     Q. So during the time that you were working in
15     his private law office, you developed this
16     feeling where you dreaded being alone with
17     him; right?
18     A. Yes. I mean, I was uncomfortable, not to a
19     point where I was scared he was going to
20     hurt me or anything like that while I was at
21     the law office.
22     Q. Okay. Did you ever consider leaving your
23     employment with his private law practice?
24     A. No, 'cause, I mean, I felt like I could
25     handle what was being said or -- you know,

62

1     things that was being said to me because
2     usually, you know, whenever I would say,
3     "Hey, knock it off," he would. I just
4     figured that's something I could deal with,
5     because in Texas County there's not a lot of
6     available positions there, and I enjoyed
7     working in that field.
8     Q. Okay. Looking at the last sentence of that
9     paragraph you said that at one point he
10     said, "Come on, let me flirt with you."
11     A. Where are you at? I apologize.
12     Q. Bottom of the one, two -- fifth paragraph,
13     second to last sentence.
14     A. Okay. Yes.
15     Q. Okay. One time he said, "Come on, let me
16     flirt with you." Okay. Do you remember
17     when?
18     A. I believe that was at the prosecutor's
19     office.
20     Q. Okay. Okay. What was the context in which
21     that comment was made?
22     A. I don't recall specifics. I remember he --
23     he made some comment, and I don't recall the
24     comment, and I told him, "Cut it out, quit,"
25     and he's, like, "Come on, let me flirt with

63

1     you." And I told him, you know, no, or I
2     changed the subject or left the office or
3     left the room.
4     Q. Okay. Was anybody else present when he made
5     that comment?
6     A. No.
7     Q. Okay. Was there ever anybody else present
8     when he would make comments that you found
9     were inappropriate?
10     A. No. It was usually when I was in his office
11     or it was just me and him in the office.
12     Q. Okay. Do you know of anybody who observed
13     conduct that you believe was harassing in
14     nature during the time that you were
15     employed in the private law practice?
16     A. The only one that would have -- like, for
17     example, the bathroom thing would be Dianne,
18     but, no, it was just me and him that worked
19     there.
20     Q. Okay. Did anybody else ever come into the
21     office?
22     A. Well, people that he met with did.
23     Q. So clients?
24     A. Clients, correct, yes.
25     Q. Other lawyers?

64

1     A. Yes. I don't believe there was a lot of
2     other lawyers there very often.
3     Q. Okay. Would they have depositions at the
4     office?
5     A. I don't recall.
6     Q. You don't recall anybody else that was --
7     that would have come into the office that
8     would have observed any of this conduct that
9     you deemed was harassing in nature?
10     A. Not that I can think of at this time, no.
11     Q. And in January 2003 Mr. Anderson -- I guess
12     in November of 2002, Mr. Anderson ran for
13     county prosecutor; is that correct?
14     A. I'm not sure what date he filed on, but,
15     yeah, I know it was for the '03 election
16     day.
17     Q. Okay. And did you have any role in helping
18     him with his campaign?
19     A. No. I did allow him to put a sign in my
20     yard.
21     Q. Did you ever pass out leaflets with him?
22     A. No. I participated in a parade.
23     Q. Did you bring anybody with you to go to the
24     parade?
25     A. I don't recall. I don't recall if I did or

ALPHA REPORTING SERVICE
Phone: 417-887-4300    www.alphareporting.com    Fax: 417-889-4246

## Page 65

1    not. I know there was other people there
2    that participated. I came by myself, but
3    there could have been other people there.
4    Q. Did you help him prepare campaign letters?
5    A. I don't recall doing that, no.
6    Q. Okay. Do you recall helping him handle
7    campaign-related phone calls that would come
8    into the office?
9    A. No.
10   Q. Do you remember helping him coordinate the
11   passing out of yard signs?
12   A. No. I took the yard sign for myself and for
13   my mother. Those are the two I took.
14   Q. Okay. So you got one for your mom as well?
15   A. Yes.
16   Q. Okay. And when you were at the parade, did
17   you -- did you wear something that had his
18   name on it?
19   A. Yes.
20   Q. Okay. And were you marching in the parade?
21   A. I don't remember if there was a float or if
22   we walked or -- I just know that we -- he
23   had some T-shirts made, I believe, that said
24   vote for Mr. Michael Anderson. I'm not real
25   sure what the T-shirt even said, to be

## Page 66

1    honest with you, but there was T-shirts.
2    Q. But you participated in that event?
3    A. Correct.
4    Q. Okay. On the bottom of this first page on
5    Defendant's Exhibit 14, you talk about
6    Mr. Anderson trying to get you to go riding
7    on his motorcycle with him. You said he
8    always tried to get you to go riding on his
9    motorcycle. How often would you say that he
10   asked you to do that?
11   A. It was normally, of course, in the
12   summertime. Maybe once or twice a month in
13   the summer whenever he would be riding it.
14   He rode it quite frequently to work and
15   would park it inside the office at times --
16   Q. Okay.
17   A. -- of an evening so nobody would bother it.
18   Q. Okay. Did you ever go riding on his
19   motorcycle with him?
20   A. There was only one time he talked me into
21   riding from the office to the sheriff's
22   office, and that was it.
23   Q. How far is the sheriff's office from the
24   private law practice office?
25   A. Probably a half a mile, mile. I'm not real

## Page 67

1    positive on -- it was down the street and
2    then up towards town.
3    Q. Okay. And what was it that ultimately
4    convinced you to go on a motorcycle ride?
5    A. I thought if I did then he would stop asking
6    me, 'cause I didn't want to ride on the
7    motorcycle.
8    Q. Okay. But you did on this one occasion?
9    A. Yes, I did.
10   Q. Just this one occasion?
11   A. Correct.
12   Q. And you relay an incident when he showed up
13   at your house on his motorcycle. Was that
14   the only time that he showed up at your
15   house on his motorcycle?
16   A. Uh-huh, that I can recall, yes.
17   Q. Okay. Did -- at this point in time, did you
18   have any conversation with him about him
19   showing up at your house unannounced?
20   A. He had brought it up the next week to me and
21   said that he had come to my house.
22   Q. Okay. And what did -- he just said, "I came
23   to your house"? What else was said in that
24   conversation?
25   A. He -- he said that he had come to my house,

## Page 68

1    knocked on my door, but I didn't answer so
2    he guessed I wasn't home.
3    Q. Okay. Did you tell him that it made you
4    uncomfortable that he was visiting your
5    house outside of work?
6    A. No, I didn't at that time, no.
7    Q. Okay. Did you tell him that you thought it
8    was inappropriate for him to try to see you
9    outside of work without his wife?
10   A. Not at that time, no.
11   Q. Okay. Was there any -- was there anything
12   in particular that was keeping you from
13   telling him that?
14   A. I didn't want to make him angry and make --
15   I didn't want to jeopardize my job, if he
16   was angry if he showed up to my house and --
17   I just -- I tried to just deal with it, let
18   it go, and move on.
19   Q. And I'm only asking, because in previous
20   instances when there was conduct that you
21   felt made you uncomfortable, you'd say
22   something to him, and you didn't appear to
23   have an issue with telling him when he was
24   doing things that made you uncomfortable,
25   and in this instance it doesn't appear that

20    (Pages 65 to 68)

Case 1:09-cv-03018-RED www.alphareporting Filed 09/20/10 Page 6 of 33

**69**

1    you said anything, so I was just trying to
2    find out --
3  A. I just pretended like I wasn't home.
4  Q. Okay. And would you discuss with Mike any
5    of the relationships that you were involved
6    in during the course of the time that you
7    were employed in his private law practice?
8  A. No.
9  Q. So the bottom of Defendant's Exhibit 14 and
10   going over to the top of the second page on
11   Defendant's Exhibit 14, it concerns a
12   comment that he made to you about someone
13   you were dating where he says, "What does he
14   have that I don't have?"
15 A. Correct. He had met -- I apologize.
16 Q. Okay. How would he know who you were
17   dating?
18 A. He had met a boy that I was dating when I
19   worked at the law office.
20 Q. Okay. And how did he come to meet him?
21 A. He would come and pick me up or -- I believe
22   that he came up at one point, and I
23   introduced him to Mike. And he was younger,
24   and I believe that was the time that he made
25   that comment.

**71**

1  A. Oh, and I picked up Dianne at one point to
2    ride up with me, but I didn't go in the
3    house at that time.
4  Q. When you say ride up with you, what do you
5    mean?
6  A. To a conference.
7  Q. Oh, okay. Do you know what conference that
8    was?
9  A. No. I don't recall which one it was.
10 Q. Was that -- was that only one occasion when
11   you recall him making comments about someone
12   you were dating, particularly, "What does he
13   have that I don't have?"
14 A. No. He would tease me about the age -- I
15   remember him saying something to the effect
16   of, like, "I'd be more motherly to them
17   instead of dating" -- just tease me 'cause I
18   was older.
19 Q. Than the gentlemen you were dating?
20 A. Right, right.
21 Q. Okay. Approximately how many times would he
22   make such comments?
23 A. Not a lot.
24 Q. It was infrequent?
25 A. Yes.

**70**

1  Q. Okay. Did you and Mr. Anderson and his wife
2    ever socialize outside of work?
3  A. I felt like I was friends with Dianne. I
4    mean, we talked on the telephone and in the
5    office. I thought a lot of her. I'm trying
6    to think if we ever -- I don't believe we
7    ever went to dinner together. I know we
8    went to lunch together, but all the other
9    secretaries, like when we worked at the
10   prosecutor's office, would also go. I never
11   went, like, to their house and hung out or
12   anything like that.
13 Q. Was there ever -- there was never a point in
14   time when you ever went to Mike Anderson's
15   house?
16 A. Yes, I was at his house for -- I believe it
17   was his election party, I believe, or --
18 Q. His victory celebration?
19 A. Something like that, yes. I didn't stay
20   very long, though. I was only there for a
21   little bit. I wanted to get back to my mom
22   so -- yeah, I was there and went in and had
23   some hors d'oeuvres that Dianne had made.
24   Yes, I was there at his house that time.
25 Q. You were invited to that party?

**72**

1  Q. Okay. Okay. Looking at the second page of
2    this document it says, "Mr. Anderson asked
3    me on several occasions throughout the past
4    years to come out to his house and get in
5    his hot tub with him." Would he -- would
6    the second sentence says, "Even on occasions
7    when his wife was out of town."
8    First question that you asked, he would make
9    those offers to you when his wife was in
10   town too, right?
11 A. Yes.
12 Q. Okay. So irrespective of whether his wife
13   was around, he'd invite you out to his
14   house, right?
15 A. Yes.
16 Q. Okay. And approximately how many times did
17   he invite you out to his house to use the
18   hot tub?
19 A. Approximately five or six times.
20 Q. Okay.
21 A. I'm not sure.
22 Q. And that's including when you were with the
23   prosecutor's office too?
24 A. Yes.
25 Q. Okay.

21 (Pages 69 to 72)

**ALPHA REPORTING SERVICE**
Phone: 410-887-3018     www.alphareporting.com     Fax: 887-889-4246
Case 8:09-cv-03018-RED   Document 60-2   Filed 09/20/10   Page 8 of 33

---

**73**

1   A. I don't believe he invited me out while I
2   was at the prosecutor's office. This was
3   just at the law office.
4   Q. Okay. And did you ever go?
5   A. To let in the hot -- no.
6   Q. No?
7   A. No.
8   Q. Did you ever tell him you had any interest
9   in going out there?
10   A. No.
11   Q. Okay. Did Dianne ever invite you out?
12   A. I don't believe so, no.
13   Q. Okay. Did you ever invite Dianne and Mike
14   to go with you anywhere?
15   A. I had asked them to go to lunch with me.
16   Q. Okay. Did you invite them to go anywhere
17   else with you?
18   A. I had invited Dianne over for -- I had,
19   like, a cookie party. I invited her over
20   for that. That's all I can recall.
21   Q. Okay. Was there ever an occasion, either
22   during the time that you were working in the
23   private law practice or working in the
24   prosecutor's office, when you invited Dianne
25   and Mike to accompany you to a strip club?

**74**

1   A. This was at a conference.
2   Q. Where was the conference?
3   A. At the lake.
4   Q. Okay.
5   A. And the answer, I guess, would be yes.
6   Q. Okay. So how was it that you came to invite
7   Dianne and Mike to go to a strip club at the
8   lake?
9   A. It was a club that had male dancers at the
10   time, and it was kind of a joke.
11   Q. Okay.
12   A. 'Cause I didn't explain to Mr. Anderson it
13   was male dancers.
14   Q. Okay. Did you think that he might find that
15   an uncomfortable situation?
16   A. I don't know how he would have found that.
17   Q. Well, you didn't tell him and the joke was
18   that --
19   A. Right.
20   Q. -- presumably that he'd get there and be
21   uncomfortable, right?
22   A. Right, right.
23   Q. Was Dianne in on the joke?
24   A. No.
25   Q. No. So she didn't know either?

**75**

1   A. No.
2   Q. Was there ever any other occasion when you
3   invited Mike and Dianne to go to a strip
4   club with you?
5   A. I know that me and some of my friends had
6   went to a club on my birthday, and I believe
7   we invited Dianne to go with us.
8   Q. Do you remember when that was?
9   A. But I don't recall for sure if we did invite
10   her.
11   Q. Do you remember when that was?
12   A. No, I don't.
13   Q. Was that while you were with the
14   prosecutor's office?
15   A. Yes.
16   Q. And was that a club that had men or a club
17   that had women?
18   A. Women.
19   Q. Where was it? Yes, where was it?
20   A. At St. Robert.
21   Q. In St. Robert, Missouri? Do you remember
22   the name of the club?
23   A. No, I don't.
24   Q. And who went with you ultimately?
25   A. I'm trying to remember who all -- I don't

**76**

1   remember who all went. There was quite a
2   few. There was Terry Haden, Lorette Smith,
3   Millie Williams. I believe
4   Christina Wheeler went. I don't remember
5   who else went. I apologize.
6   Q. Okay. So it's fair to say that you went to
7   this strip club with a number of people who
8   were either employed in the Texas County
9   prosecutor's office or employed by the
10   county as a general proposition?
11   A. They were my friends.
12   Q. But they were employed by either -- in the
13   prosecutor's office or by the county?
14   A. Not all of them, no.
15   Q. Okay. Who was not employed by the county?
16   A. Terry Haden was not and Lorette Smith was
17   not.
18   Q. Okay. And did you -- did you invite these
19   individuals to go with you to this club?
20   A. No. I think we all just decided to go and
21   eat dinner down there, is what the plan was,
22   at one of their restaurants down there to
23   eat dinner.
24   Q. When you say "their restaurants" --
25   A. At St. Robert, one of the restaurants at

22   (Pages 73 to 76)

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 20-1   Filed 09/20/10   Page 8 of 33

105

```
1   Q.  And was anybody else present in this
2       interview?
3   A.  I believe Christina was in there for a
4       little while also --
5   Q.  Okay.
6   A.  -- but I'm not 100 percent sure, but I think
7       she was in there too.
8   Q.  But you're not positive?
9   A.  No.
10  Q.  And were you involved in the
11      interview when Christina Wheeler was hired?
12  A.  Yes.
13  Q.  Similar circumstance, you sat in on that
14      interview?
15  A.  Uh-huh.
16  Q.  Do you recall reviewing her resume at all?
17  A.  I'm sure I did.  There was several resumes,
18      so, yeah, I'm sure.
19  Q.  Okay.  Did you know Christina Wheeler prior
20      to the time that she interviewed for a
21      position with the Texas County prosecutor's
22      office?
23  A.  No, I don't believe I knew Christina.
24  Q.  Okay.  Approximately how many resumes do you
25      recall seeing prior to the interview
```

106

```
1       sessions?
2   A.  Probably three or four, five.
3   Q.  Okay.
4   A.  I'm not sure.
5   Q.  Did you interview other individuals as well?
6   A.  I believe that there was a lady that came
7       in.  I don't have no idea what her name was.
8       There was a gentleman that had applied, but
9       Mr. Anderson didn't want to interview him.
10  Q.  He didn't want to interview him?
11  A.  Correct.
12  Q.  Did he say why?
13  A.  He wasn't comfortable with a male working as
14      a secretary there.
15  Q.  Okay.  Did you tell him that you felt that
16      that was inappropriate?
17  A.  I felt that -- yes, I told him that I
18      thought he would do a really good job
19      because he was actually -- I believe he had
20      his bachelor's degree in -- his resume, I
21      believe he worked as a schoolteacher or
22      something like that.  He may have even been
23      overqualified.
24  Q.  How did Mr. Anderson respond when you told
25      him that you thought he would make a good
```

107

```
1       candidate?
2   A.  He wasn't interested in interviewing a male
3       for the position.
4   Q.  Okay.  So you interviewed at least one other
5       person?
6   A.  Maybe two.  I don't recall, but I believe
7       there was a couple others.
8   Q.  And after the interviews were -- had
9       concluded, did you recommend that
10      Mr. Anderson select Christina Wheeler from
11      the applicants that you guys had
12      interviewed?
13  A.  Yes.
14  Q.  Okay.  And why was that?
15  A.  She seemed to really want the job, and she'd
16      expressed, you know, she was a single mom
17      and needed employment, so I just -- I felt
18      like she would do well.
19  Q.  Did Mr. Anderson solicit your opinions on
20      the other individuals who had applied in the
21      interview?
22  A.  Yes.  He asked me about each of them, and
23      there was some good points on others also.
24  Q.  Uh-huh.  And you guys would have a fairly
25      comprehensive discussion about the people
```

108

```
1       that had interviewed for these jobs?
2   A.  I believe so.
3   Q.  Okay.  Did you feel that he was attentive to
4       the issues that you raised about the various
5       candidates?
6   A.  I don't believe I raised any issues.
7   Q.  Positive or negative.
8   A.  Yeah, I believe so, yeah.
9   Q.  Okay.  This is going a little bit backwards.
10      When we were talking with respect to
11      Defendant's Exhibit 14 about the incident
12      when Mr. Anderson showed up at your house on
13      his motorcycle, do you know how long he was
14      there?
15  A.  No, I don't know how long.  I know he
16      knocked on the door, and then he went and
17      fidgeted with his motorcycle for a while.
18  Q.  Okay.  Were you aware whether there was any
19      problem with his motorcycle?
20  A.  When he pulled in, it sounded fine.
21      Whenever he started it, it started, and he
22      left.
23  Q.  Okay.  Was it uncommon -- were you married
24      at this time?
25  A.  No.
```

30  (Pages 105 to 108)

ALPHA REPORTING SERVICE
Phone: 417-887-4110          www.alphareportingservice.com          Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 9 of 33

117

1   sexual harassment?
2   A. I don't recall which training it was that he
3       had offered me his room key. I don't know
4       if it was that one or another one. That's
5       the only thing. The rest of it, no.
6   Q. Okay. So irrespective of the year, there
7       was an occasion when you were down there
8       that Mr. Anderson offered you his room key?
9   A. And he said it was just in case I needed
10      something out of his room. He didn't say,
11      "Hey, come have sex with me," or anything
12      like that, so --
13  Q. Okay. What kind of stuff would he have in
14      his room?
15  A. I never went to his room.
16  Q. Okay. In the context of what he was telling
17      you, if he was saying "In case you needed
18      something out of his room," what might he
19      have had in his room to which you might have
20      needed?
21  A. I don't know. I told him I don't need it.
22      I don't know what he was referring to.
23  Q. Okay. Did you tell him that it made you
24      uncomfortable that he offered you that key?
25  A. No, I didn't.

118

1   Q. Did it make you uncomfortable?
2   A. I jut thought it was kind of odd.
3   Q. Okay. So it wasn't something that you found
4       explicitly harassing in nature; right?
5   A. No.
6   Q. Okay. Was anybody else with you when he
7       offered you that key?
8   A. No.
9   Q. Do you remember where you were when he
10      offered it to you?
11  A. Down in the lobby.
12  Q. Okay. Was it just kind of in front of the
13      front desk?
14  A. Yeah, kind of off to the side of the front,
15      yeah.
16  Q. Was this as he was checking into the hotel?
17  A. After he had checked in, correct.
18  Q. Okay. And you had checked in
19      simultaneously?
20  A. I believe he arrived first. I believe he
21      arrived first, 'cause we never rode
22      together.
23  Q. Okay.
24  A. And we checked in later. I think he had
25      already checked in.

119

1   Q. Okay. Was there anybody else that -- anyone
2       who you knew that you recall witnessing this
3       exchange?
4   A. No.
5   Q. Okay. Do you recall the second -- as the
6       timeline proceeds, it appears that you would
7       have gone to three conferences at the
8       Lake of the Ozarks; right, 2003, 2004, 2005?
9       Do you recall the second trip to the Lake of
10      the Ozarks?
11  A. No, I really don't.
12  Q. Okay. Do you recall who would have attended
13      that second trip to the Lake of the Ozarks?
14  A. In '04?
15  Q. Uh-huh.
16  A. It would have been whomever -- I believe it
17      was Christie and myself, but -- and
18      Mr. Anderson. I'm not sure.
19  Q. Do you remember if Mr. Anderson's wife
20      attended?
21  A. No, I don't recall.
22  Q. She may have?
23  A. She may have. She was there every now and
24      then.
25  Q. Okay. And, again, you would have stayed

120

1       two, three, nights?
2   A. Correct.
3   Q. Do you remember any of the social activities
4       that you engaged in while you were on that
5       trip?
6   A. Mr. Anderson always took us to dinner.
7   Q. Do you remember if you attended any strip
8       clubs during the course of this particular
9       trip?
10  A. I believe that me and Christie may have went
11      to the -- I'm not positive -- and saw some
12      male strippers.
13  Q. Okay. Approximately how many occasions
14      during the time that you were employed in
15      the prosecutor's office did you go to a
16      strip club with another member of the
17      prosecutor's office staff?
18  A. Approximately -- counting that, probably two
19      or three times.
20  Q. Okay. Total over the course of the three
21      years?
22  A. I believe so.
23  Q. And of those two to three times, at least
24      one was to see male strippers, the other
25      ones would have been to see female

ALPHA REPORTING SERVICE
Phone: 417-887-4110     www.alphareportingservice.com     Fax: 417-889-4246

Case 6:09-cv-03018-RED   Document 207-1   Filed 05/20/10   Page 10 of 33

121

1 ~~strippers?~~
2 ~~A. I believe twice was male strippers.~~
3 ~~Q. And once with~~
4 ~~A. One female, yes.~~
5 ~~Q. Okay. Do you recall having any discussion~~
6 ~~with other members of the prosecutor's~~
7 ~~office staff about what went on at the strip~~
8 ~~club with female strippers?~~
9 ~~A. No, I don't recall, I mean, specifically~~
10 ~~discussing anything.~~
11 ~~Q. Okay. Do you recall having any~~
12 ~~conversations with members of the~~
13 ~~prosecutor's office staff about occasions~~
14 ~~when you would go to strip clubs without~~
15 ~~other members of the staff and then tell~~
16 ~~them about what occurred at a strip club?~~
17 ~~A. Well, we talked -- I mean, we were all~~
18 ~~friends, and we probably -- all of us --~~
19 ~~even myself -- talked about things that~~
20 ~~wasn't appropriate in the office. Myself,~~
21 ~~Mr. Anderson, the other girls, we all talked~~
22 ~~about things we probably should have kept~~
23 ~~outside of work.~~
24 Q. And that's not really answering the
25 question.

122

1     MR. FRANKLIN: Could you read back
2 what my question was?
3     (The requested portion of the
4 testimony was read back.)
5 A. No, I don't recall doing that.
6 BY MR. FRANKLIN:
7 Q. Okay. Is it fair to say that you would
8 discuss your sex life with other members of
9 the prosecutor's office staff?
10 A. It's fair to say that we all discussed --
11 like if -- on weekends -- if we had sex,
12 someone would say, "Did you get any this
13 weekend," you know, comments that probably
14 shouldn't have been said by myself or
15 anybody else, but we all participated in it,
16 yes.
17 Q. Okay. Is it fair to say that you were an
18 active and willing participant in these
19 conversations?
20 A. Yes.
21 Q. And it's fair to say that you would discuss
22 the sexual encounters that you had outside
23 of the workplace with the people that you
24 worked with?
25 A. Not in detail and not all the time, no.

123

1 ~~Q. To what degree of detail would you discuss~~
2 ~~your sexual encounters with your co-workers?~~
3 ~~A. For example if they would say, "Hey, did~~
4 ~~you get some this weekend?" I'd say yes or~~
5 ~~no.~~
6 ~~Q. Okay.~~
7 ~~A. "Was it good?" Yes or no.~~
8 ~~Q. Okay. Would you ever identify particular~~
9 ~~sexual partners that you had?~~
10 ~~A. No.~~
11 ~~Q. Okay. Would any of the members of the~~
12 ~~office staff inquire who it was that your~~
13 ~~sexual encounter was with if you came in and~~
14 ~~commented that you had had a sexual~~
15 ~~encounter outside the workplace?~~
16 ~~A. No. I don't believe we really got into~~
17 ~~that. I mean, it was -- it was brief and~~
18 ~~jokingly and probably inappropriate of all~~
19 ~~of us, but we did, you know, talk about~~
20 ~~that.~~
21 ~~Q. Okay. Was there ever a time when any member~~
22 ~~of the office staff was involved in a sexual~~
23 ~~encounter with you?~~
24 ~~MR. STEELMAN: Did you say was~~
25 ~~there ever a time or --~~

124

1 ~~BY MR. FRANKLIN:~~
2 ~~Q. Was there a time -- during the period of~~
3 ~~time that you worked in the prosecutor's~~
4 ~~office, was there -- were you involved in a~~
5 ~~sexual encounter with any of the other~~
6 ~~members of the office?~~
7 ~~MR. STEELMAN: And so that I~~
8 ~~understand, your question is limited to her~~
9 ~~period of public employment, to use~~
10 ~~Judge Dorr's words; is that right?~~
11 ~~MR. FRANKLIN: Yes.~~
12 ~~MR. STEELMAN: Okay.~~
13 ~~A. No.~~
14 ~~BY MR. FRANKLIN:~~
15 ~~Q. Did you, during the time that you were~~
16 ~~employed in the prosecutor's office, discuss~~
17 ~~past sexual encounters that you had with~~
18 ~~members of the staff in the prosecutor's~~
19 ~~office?~~
20 ~~A. No.~~
21 ~~Q. Okay.~~
22 ~~A. -- not that I remember doing so, no.~~
23 ~~MR. STEELMAN: By the way, let me~~
24 ~~interpose an objection. It's pretty clever~~
25 ~~the way you worded it, but that clearly was~~

34 (Pages 121 to 124)

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-05018-RED   Document 207-1   Filed 09/20/10   Page 11 of 33

129

1 very well. And I didn't want to be the only
2 girl at this group of attorneys talking.
3 Q. Sure. Did you ever discuss your sex life
4 with Jimmy Willis with the other members of
5 the prosecutor's office staff?
6 A. Probably in, like, the course I had stated
7 earlier, I'm sure I did.
8 Q. So you would tell them when you guys would
9 have sex?
10 A. If they would say --
11 Q. If they would ask, you would tell them?
12 A. Well, yeah, yeah, and vice versa. They
13 would tell me. Yes.
14 Q. Okay. Did you ever ask any of the members
15 of the staff to have a sexual encounter with
16 you and Mr. Willis?
17 A. No.
18 Q. Did you ever ask --
19 MR. STEELMAN: When you're saying
20 "ever" again, I'm going to take advantage
21 of what I heard Judge Dorr say.
22 MR. FRANKLIN: That's fine. Let me
23 clarify my question. I don't mean to exceed
24 the scope of my leash.
25 BY MR. FRANKLIN:

130

1 Q. During the period of time that you were
2 employed in the prosecutor's office, did you
3 ask any of your co-workers to join you --
4 and this would be inclusive of Mr. Willis
5 and any other sexual partner of yours -- in
6 some type of a sexual encounter?
7 A. No.
8 Q. Okay. Did you ever physically touch any of
9 the members of the prosecutor's office staff
10 on or about their sex organs?
11 MR. STEELMAN: During the time she
12 was --
13 BY MR. FRANKLIN:
14 Q. During the time you were employed at the
15 prosecutor's office.
16 A. Not that I recall. We were always goofing
17 around and -- I mean, it was -- it was one
18 of those work environments where I was a
19 part of it. We would joke around all the
20 time, and we probably took it overboard, but
21 I don't recall ever --
22 Q. What kind of joking around are you talking
23 about?
24 A. Like talking about, "Hey, did you get some?"
25 "Yeah, I did," and -- oh, gosh, just making

131

1 comments to each other and --
2 Q. Did you ever comment on the physical
3 features -- did you ever, during the time
4 that you were employed in the county
5 prosecutor's office, comment on the physical
6 features of any of your co-workers in the
7 office?
8 A. Well, Stephanie Creek would always say, "Oh,
9 I'm so fat, you know, nobody looks at me."
10 And I said, "No, you're not. You're
11 beautiful. You're sexy." I would say
12 things like that.
13 Q. Did you ever comment on the breasts of any
14 of the other members of the staff during the
15 time that you were employed at the county
16 prosecutor's office?
17 A. Not that I recall.
18 Q. Okay. Was there ever an occasion that you
19 exposed your breasts to anybody that was
20 employed in the staff of the prosecutor's
21 office during the time that you were
22 similarly employed?
23 A. At my home.
24 Q. Okay. And when was this?
25 A. At a cookie party.

132

1 Q. Okay. Was this the cookie party that you
2 invited Dianne Anderson to?
3 A. I don't believe it was that one.
4 Q. Okay.
5 A. At the cookie parties, though, like, even my
6 mother and kids would come -- and it would
7 be after everybody left. We would all go
8 out and drink, have fun, and they'd usually
9 all spend the night with me. And whoever
10 fell asleep first, you know, we'd put makeup
11 all over them, and we just goofed off, us
12 girls did. And one occasion, I believe we
13 were talking about whose breasts was the
14 biggest -- and I wasn't the only one that
15 exposed. It was in a joking manner. It
16 wasn't, you know -- I don't think it was
17 meant -- I mean, it wasn't meant to hurt
18 anyone and no one -- everybody was laughing
19 and joking.
20 Q. Okay. And which members of the prosecutor's
21 office staff were present for this
22 post-cookie party?
23 A. I believe Christie and Stephanie were both
24 there, but I'm not positive on that.
25 Q. Okay. Was there any sexual interaction

36 (Pages 129 to 132)

ALPHA REPORTING SERVICE
Phone: 417-887-4110        www.alphareportingservice.com        Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 12 of 33

137

```
 1  Q. Okay. Did you guys have -- what'd you guys
 2     do after you got out of the pool?
 3  A. I don't swim well, so I was actually hanging
 4     on the side. We decided to go back to the
 5     rooms and change and meet down to the social
 6     bar that they had there at the motel.
 7  Q. Okay. The hotel lounge, for lack of a
 8     better term?
 9  A. Yes.
10  Q. Okay. This was, again, kind of a group
11     decision. This wasn't Mike saying, "We're
12     going to meet down there"?
13  A. No, it was everybody.
14  Q. Okay. So did you feel comfortable having
15     drinks with Mike?
16  A. Yeah.
17  Q. Okay. Had you had drinks with him before?
18  A. At other conferences, yes.
19  Q. Okay.
20  A. Yes.
21  Q. Aside from other conferences, you never had
22     drinks with him, right?
23  A. I think we had a -- celebratory champagne,
24     'cause I had never tasted champagne before,
25     whenever he got into office.
```

138

```
 1  Q. Okay.
 2  A. Not that I recall other than that.
 3  Q. Did he ever ask you to go to drinks with
 4     him?
 5  A. Yeah. He would ask me to -- "Hey, let's go
 6     have a drink and celebrate," like if he had
 7     a good day in court or something.
 8  Q. Did you ever go with him?
 9  A. No.
10  Q. Okay. And why not?
11  A. I just wasn't comfortable going.
12  Q. Okay.
13  A. I mean, I don't -- I don't want everybody to
14     think that, you know, Mike really sexually
15     harassed me all the way through, made it
16     horrible on me, 'cause it wasn't like that.
17     It was something that I was handling, and he
18     wasn't saying, "Hey, let's go have sex every
19     day or anything." It wasn't like that. It
20     didn't get bad till later on. I just wanted
21     to -- 'cause we were all -- even at the
22     prosecutor's office -- we were all probably
23     saying and doing things that was
24     inappropriate in the office.
25  Q. Well, and what I'm -- and you're kind of
```

139

```
 1     alluding to this. What I'm getting at is,
 2     you weren't offended by him asking you to
 3     get a drink to celebrate a court victory or
 4     a good day at the office?
 5  A. No, I wasn't offended. I just didn't go.
 6  Q. You didn't find that to be harassing?
 7  A. No.
 8  Q. Okay. All right. So when you went down to
 9     the bar, how many people were down there?
10  A. Well, there was some other conference there,
11     too, like a Farm Ag or some kind of
12     conference, so there was probably, I want to
13     say, between 15 and 50 or -- I'm not
14     positive. There was quite a bit -- large
15     group of people.
16  Q. All right. And was it dark or was it light?
17     Could you see well?
18  A. Yeah, it was, like, off the lobby, so it was
19     pretty lit.
20  Q. Okay. You guys got drinks when you went in
21     there though, right?
22  A. Yes.
23  Q. Did Mike get a drink?
24  A. Yes.
25  Q. Had he been drinking at dinner?
```

140

```
 1  A. Yes.
 2  Q. How much -- were you paying attention to how
 3     much he was drinking?
 4  A. I don't recall what he had at dinner.
 5  Q. All right. So who paid for the drinks? Do
 6     you remember?
 7  A. Usually Mr. Anderson did.
 8  Q. Okay.
 9  A. He was
10  Q. He was generous that way?
11  A. He was generous, yes.
12  Q. Okay. So you got a drink, and, as I
13     understand it, Christina and Stephanie were
14     with you as well, right?
15  A. Correct.
16  Q. And you each got drinks?
17  A. Well, wait, now. When we first got there,
18     Mike -- it took him a while to get there.
19     It took him longer, I guess, to get ready,
20     so we had actually ordered a drink before he
21     got there.
22  Q. So when he got there, did he buy you
23     another drink?
24  A. I think he may have opened a tab, I believe.
25  Q. Okay.
```

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246

Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 13 of 33

**145**

1 going to go play poker." I don't remember
2 where he said he was going to go to or go
3 back to the room. And as we walked out, I
4 told him I felt he was rude to that guy, and
5 he made the comment, "Well, how did he not
6 know I wasn't with you or one of these other
7 girls?" And I said, well -- I got mad, and
8 I said, "You're not my boyfriend. You're
9 not my father," you know. It was
10 embarrassing. And he went -- he threw his
11 drink up against the wall and went off and
12 mumbled something, but I didn't hear him,
13 and then me and the girls went back to our
14 rooms, but we didn't leave after that. We
15 just stayed in the room.
16 Q. So no one else went out -- you didn't
17   go out for the rest of the night? You
18   stayed in the room.
19 A. No. We stayed in the room.
20 Q. Was this the last night of the conference?
21 A. We left that next morning.
22 Q. Okay. Had you gone out other nights while
23   you were at this
24 A. I believe the conference lasted that day,
25   but I left that next morning.

**146**

1 Q. So there were no other evenings where you
2   guys were socializing?
3 A. No.
4 Q. This was the only night of socializing
5   during this conference?
6 A. (Witness nods head.)
7 Q. Okay. And when you said that "you're not my
8   boyfriend, you're not my father," was it
9   because you felt he was taking kind of some
10   type of a paternalistic stance to people
11   coming up to you or --
12 A. Well, I felt like it was just -- it was very
13   odd that he did that to this guy, and then
14   whenever I got back to the room, the girls
15   were asking me questions about whether I'd
16   ever been intimate with Mike and is that why
17   he was acting like that, so --
18 Q. But this gentleman introduced himself to the
19   other girls at the table and didn't even
20   introduce himself to you, did he?
21 A. He had met me prior to, yes.
22 Q. Right, right.
23 A. Yes. But, no, I mean, he came up and
24   introduced himself to the other ones then at
25   that time 'cause I'd already met him.

**147**

1 Q. Okay. So did anybody -- did any of the
2   other employees express some kind of concern
3   that they thought Mike was being overly
4   paternalistic towards them?
5 A. No, they didn't say anything. They were
6   just questioning me about me and Mike's
7   relationship.
8 Q. Well, were they present when you made this
9   comment to him about him not being your
10   boyfriend?
11 A. Yes. We were all walking out together.
12   Yes.
13 Q. So it's your impression that his shaking
14   this gentleman's hand, and not your comment
15   about Mike not being your boyfriend, was
16   what triggered their subsequent comments to
17   you?
18 A. And him throwing the -- I don't know what
19   made them ask me those questions.
20 Q. Okay. So you -- that's what I'm getting at:
21   You don't know?
22 A. Yeah.
23 Q. And he didn't throw the drink until after
24   you made this comment to him that you're not
25   my dad and you're not my boyfriend?

**148**

1 A. Correct.
2 Q. Okay. And Stephanie and Christina both
3   witnessed him throwing the drink?
4 A. Correct.
5 Q. Okay. Looking at the bottom of the second
6   page here, it discusses an incident that
7   occurred the evening of November 25th.
8   Whose house was this?
9 A. Randy Jones.
10 Q. Randy Jones. And he invited both you and
11   Mike to this event?
12 A. He had invited several people, yes.
13 Q. Okay. Was there anybody else from the
14   office that -- at that event?
15 A. I believe Christie was there.
16 Q. Okay.
17 A. I don't recall if Stephanie was there or
18   not. I don't believe she was.
19 Q. Okay. What does Randy do?
20 A. Randy works at the sheriff's department --
21   or did -- as a dispatcher at that time.
22 Q. Okay.
23 A. I'm not sure now.
24 Q. Did you ever have any type of a romantic
25   relationship with Randy Jones?

40  (Pages 145 to 148)

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110   www.alphareportingservice.com   Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 14 of 33

149

1  A. No.
2      MR. STEELMAN: Wait, wait. There
3  you go again.
4      BY MR. FRANKLIN:
5  Q. During the time that you were employed in
6    the prosecutor's office?
7  A. No.
8  Q. You note in here that you're trying to avoid
9    Mike Anderson. Why were you trying to avoid
10  Mike Anderson during this Thanksgiving
11  party?
12  A. It had just got to a point, after the lake,
13    to where -- I mean, we had had a
14    conversation after the lake in the office to
15    where we had discussed -- you know, I told
16    him that the girls had asked -- you know,
17    told me that they felt like something was
18    going on between him and myself, and I felt
19    like we needed to just -- and keep it work
20    related, and he had agreed, and so I just --
21    I just -- I just wanted to distance myself
22    so there wouldn't -- I mean, so there
23    wouldn't be any comments or anything said.
24  Q. When you say he agreed to keep it work
25    related, what was he doing?

150

1  A. Like there would be no joking around like,
2    you know, he used to say things.
3  Q. What kind of things would he say?
4  A. Like, for example, "You look nice in your
5    jeans today," or "that looks really good on
6    you." Just the informal friendship thing
7    that -- you know, I felt we were friends at
8    the time -- just -- we were keeping it
9    totally -- we only talked about work.
10  Q. Okay. Other -- okay. What nonwork issues
11    had you been talking about previously?
12  A. Oh, like -- well, Dianne, and, you know, we
13    would talk about his son and his grandkids.
14    I mean, he was very proud of them. Just in
15    general: "What'd you do last night? Well,
16    what'd you do last night," things like that.
17  Q. Would you share details of your sexual
18    encounters with Mike?
19  A. No.
20  Q. Okay. And he wouldn't share details of his
21    relationship with Dianne with you, would he?
22  A. No.
23  Q. So is it fair to say that the
24    non-work-related discussions that you would
25    have were appropriate to your working

151

1    relationship, wouldn't they -- weren't they?
2  A. Yeah, except after that event occurred, I
3    was just -- I was more guarded and didn't
4    want to be in a social situation to where
5    anything would occur like that that would
6    make me feel uncomfortable. I was just
7    trying to distance myself from him because
8    he made me feel uncomfortable.
9  Q. And to be clear, it was the way he shook
10    this gentleman's hand that made you
11    uncomfortable and want to alter the nature
12    of this longstanding working relationship?
13  A. And the throwing the drink and then all the
14    other just -- in the past -- little things
15    he said. I just wanted it -- I didn't want
16    us to be -- or myself to be in a position to
17    where I would be alone with him at a party
18    where there's alcohol and --
19  Q. There was a number of other people at this
20    party; right?
21  A. Correct. And I wasn't rude to him. If he
22    was inside, I was usually outside or vice
23    versa. I mean -- and sometimes we were both
24    in the house together. It wasn't to where I
25    had left the party because he was there.

152

1  Q. Did you tell him that you didn't
2    feel uncomf- -- that you felt uncomfortable
3    being alone in a room with him?
4  A. Not at this time, no.
5  Q. Okay. Did you -- you note in here that when
6    he was in the kitchen playing cards, he
7    invited you to come in and play, or some
8    other individuals told you, "Mike wants you
9    to come in and play cards." Was that
10    offensive to you?
11  A. No, not really.
12  Q. Did you feel that you were being harassed in
13    that you were being asked to play cards?
14  A. No.
15  Q. Did you feel that this was an act of sexual
16    harassment?
17  A. No.
18  Q. Okay. Did you feel that the incident at the
19    lake was sexually harassing in nature?
20  A. No, not sexually harassing.
21  Q. Okay.
22  A. Inappropriate, but not sexually harassing.
23  Q. Okay. And then you said that after this
24    party was over you went home, and he called
25    asking you about a file, and you felt it was

41 (Pages 149 to 152)

ALPHA REPORTING SERVICE
Phone: 417-887-4300    www.alphareporting.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1 Filed 03/30/10   Page 15 of 33

**153**

1   inappropriate for him to --
2   A. Call me in the middle of the night.
3   Q. How late -- what time was it that he called?
4   A. I don't know, probably two or three in the
5    morning.
6   Q. Oh, okay. Okay.
7   A. One in the morning. I'm not sure. It was
8    really late.
9   Q. Okay. So it wasn't so much the content of
10   the call. It wouldn't have been unusual for
11   him to say, "I can't find a file," but it
12   was the fact that he was saying, "I can't
13   find a file" --
14   A. It was on a weekend, and, actually, he had
15   already asked me prior about the file, so I
16   had --
17   Q. Is it fair to say that he may forget from
18   time to time when you tell him where a file
19   was?
20   A. Yes. It'd be fair to say that, yeah.
21   Q. I can say I have that problem myself. Okay.
22   Let's -- it's fair to say it was the time
23   and not the content of the call; right?
24   A. Oh, correct. Yes, yes.
25   Q. Okay. So approximately five days later on

**154**

1   December 1st, you are called in to
2   Mr. Anderson's office to talk to him; right?
3   A. Yes.
4   Q. All right. And how does this conversation
5    start?
6   A. He told me that he had come to find out
7   information that I was trying to gather
8   information against him for a sexual
9   harassment suit and that he heard I'd been
10   saying bad things about him in public, so he
11   was going to have to either fire me or -- he
12   gave me the option of resigning, because he
13   said if I resigned, he would give me a
14   letter of recommendation, and if I was
15   fired, then I might have the opportunity to
16   draw unemployment. And he asked me what I
17   wanted to do and -- I mean, I was upset, of
18   course.
19   Q. How did you respond to him when he said
20   that?
21   A. I asked him what people had been telling
22   him, you know, and who had said it, and he
23   wouldn't tell me. I asked if, you know, he
24   would bring this person in here, and we
25   could all talk about this, and he refused to

**155**

1   tell me anything. I had never been fired
2   before, so I was, like, lightheaded and sick
3   and nauseous, so -- so it was upsetting to
4   me. So he said, "Well, why don't you go
5   home, think about it, and let me know the
6   next day" whether I wanted to be fired or
7   resign. I left, and I did come back that
8   evening and get all my stuff, gather it
9   together and take it home, because I had
10   decided that -- and I went back the next
11   morning and told him he was going to have to
12   fire me because I didn't feel like I had
13   done anything wrong.
14   Q. Okay. Do you remember him saying anything
15   else to you other than what you've --
16   A. Huh-uh.
17   Q. Okay.
18   A. No, 'cause I kept asking him to let me
19   you know, "Who's telling you that I'm saying
20   this, 'cause everything I've ever said, I've
21   said to you."
22   Q. Did -- let me just ask you: Were you
23   preparing evidence to file a sexual
24   harassment suit against Mike Anderson at
25   this point in time?

**156**

1   A. No, I was not.
2   Q. At this point in time, did you believe that
3   you had -- that incidents had occurred that
4   were sufficient to constitute sexual
5   harassment?
6   A. At that time, I mean, there was some
7   inappropriate actions going on, but as far
8   as filing a lawsuit, no, I don't believe so.
9   Q. You didn't think there was any justification
10   for a lawsuit at that point?
11   A. Right, right.
12   Q. Okay. And --
13     MR. FRANKLIN: Can we take a break
14   for a second?
15     MR. STEELMAN: Sure.
16     (A short break was taken.)
17   BY MR. FRANKLIN:
18   Q. Turning back to Defendant's Exhibit 14,
19   looking at the third paragraph on page 3, it
20   references a gentleman by the name of
21   Corporal Jeff Kinder who called you on
22   December 8th, 2005, to see if you were
23   interested in coming back to work for
24   Mr. Anderson. Do you recall that
25   conversation?

42 (Pages 153 to 156)

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 16 of 33

161

```
 1   prosecutor's office?
 2   A.  No.
 3   Q.  Okay.  Was Corporal Kinder's wife ever aware
 4       of your relationship with him?
 5   A.  Not that I'm aware of, no.
 6   Q.  Okay.  So did you subsequently have -- after
 7       this December 8th call from Corporal Kinder,
 8       did you subsequently have a meeting with
 9       Mike Anderson to discuss your return to the
10       prosecutor's office?
11   A.  Yes.
12   Q.  When did that meeting occur?
13   A.  I don't remember.  I don't even know what
14       day the first was on, like, through the
15       week.
16   Q.  Okay.
17   A.  I don't recall what day it was that we
18       spoke.
19   Q.  Was it a long duration or a short duration
20       between the call with -- between you and
21       Corporal Kinder?
22   A.  Probably a couple days, I would say, but I'm
23       not real positive.
24   Q.  Okay.  And where did this conversation occur
25       with Mr. Anderson?
```

162

```
 1   A.  I believe it was at the prosecutor's office
 2       or over the telephone.  I'm not sure.
 3   Q.  Okay.  And what did Mr. Anderson say to you?
 4   A.  That he would like for me to come back to
 5       work.  I asked him, once again, who had told
 6       him that I was saying bad things about him --
 7       or building a case against him, and, once
 8       again, said it's -- well, he said, "That's
 9       not important.  Would you come back to work
10       for me?"  We talked about it -- staying -- I
11       brought it up -- completely -- until I could
12       find something else, I would come back, and
13       I'd just do my job, and that's it.  No type
14       of friendship or talking anything other than
15       work.
16   Q.  But you had already said that before?
17   A.  Correct.
18   Q.  So that was the operation -- so that was the
19       environment that you were working in prior
20       to the point in time where he offered you
21       the opportunity to either be fired or
22       resign; right?
23   A.  Yes.
24   Q.  So you understood that coming back, you were
25       coming back to the same set of circumstances
```

163

```
 1       that you were in at the time that you left,
 2       which was that you had a very professional
 3       working relationship; right?
 4   A.  Yes.  Yeah, after we had had the discussion,
 5       yes.
 6   Q.  Right.  And so how did things go when you
 7       came -- do you remember what your first day
 8       back at work was?
 9   A.  I put on here the 12th.
10   Q.  Okay.
11   A.  I don't know if that was on a Monday or -- I
12       believe it was on a Monday, but I'm not
13       positive.
14   Q.  All right.  And so how did things go when
15       you went back?
16   A.  That week -- it wasn't bad that week, and
17       that led up to the weekend, the night that
18       he showed up at my house -- but that week
19       everything was fine.
20   Q.  Okay.  And I think when you're referring to
21       that weekend, you're referring to
22       December 18th of 2005?
23   A.  Correct.  That was like a week later when I
24       went back.
25   Q.  Okay.  And in this Defendant's Exhibit 14,
```

164

```
 1       it's referred to as Saturday, December 18th.
 2       Might that have been an early Sunday
 3       morning?
 4   A.  Correct, correct.
 5   Q.  Okay.  And Mildred Williams was staying the
 6       night with you that night?
 7   A.  Yes.
 8   Q.  Why was Millie Williams staying the night
 9       with you that night?
10   A.  She stayed the night with me a lot.  She was
11       one of my best friends, so she stayed over
12       at my house a lot.
13   Q.  Okay.  During the time that you were
14       employed by the Texas County prosecutor's
15       office, did you ever have a sexual encounter
16       with Millie Williams?
17   A.  No.
18   Q.  Okay.  So she was staying the night with
19       you.  Did you guys go out that night?
20   A.  Yes.
21   Q.  Okay.  Were you drinking?
22   A.  A little, yes.
23   Q.  Okay.  When you say "a little," what do you
24       mean?
25   A.  We had went down to a local bar, and I
```

44 (Pages 161 to 164)

165

```
1    believe I had a couple drinks, and Millie
2    had a couple drinks, and there was nobody
3    there, and it was real quiet, so we decided
4    to go back to the house.  Went back to the
5    house for a little bit, and it's like, well,
6    you know, it was kind of early when we went
7    down there so we said let's go back and see
8    if anybody's there, anything's going on,
9    'cause I was just a couple blocks away, real
10   close.  So we drove back down there, and I
11   believe -- I didn't even have a drink at
12   that time.  Millie had, like, a half a
13   drink.  She had just ordered it and didn't
14   even finish it.  We decided to leave, and we
15   went to Texaco -- I believe it was Texaco at
16   that time.  I'm not sure what it's called
17   now -- and bought some sandwiches and food
18   and went back to my house and watched videos
19   and movies and ate.
20  Q.  Okay.  Did you drink any alcoholic beverages
21      when you returned back to your house?
22  A.  No.
23  Q.  Okay.  And when you say you were watching
24      videos and movies, none of the videos and
25      movies were pornographic in nature, were
```

166

```
1    they?
2    A.  No.
3    Q.  And approximately -- you say in this
4        statement that at approximately 1:20 a.m.
5        Mr. Anderson called initially?
6    A.  Yes.  I'm pretty sure it was 1:20.
7    Q.  Were you asleep at the time, or were you
8        still awake?
9    A.  No, we were still up.
10   Q.  Okay.
11   A.  We were still up -- I think we were done
12       eating, but we were still snacking on chips
13       and stuff and watching TV.
14   Q.  Approximately what time was it that you came
15       from the bar back to your house?
16   A.  Probably, I want to say, between 11:30 and
17       12, something like that.
18   Q.  So it's between an hour and a half and two
19       hours after you came back from the bar?
20   A.  Yeah, probably.
21   Q.  Okay.  So as this statement reads, he shows
22       up at your house -- or he calls, he sounds
23       very intoxicated, so you turned off all the
24       lights.
25   A.  Yes.
```

167

```
1    Q.  Why did you turn off all the lights?
2    A.  'Cause he said he was coming over, and "Are
3        you going to let me in?  I want to talk to
4        you."  He sounded really intoxicated.  It
5        was one o'clock in the morning.  I didn't
6        feel like it was appropriate for him to be
7        coming over at one o'clock in the morning,
8        so we -- I thought if we turned off all the
9        lights, he would just think we're in bed and
10       would go away.
11   Q.  Okay.  Was -- who drove that night?
12   A.  I did.
13   Q.  You did?
14   A.  Uh-huh.
15   Q.  Okay.  And you felt, throughout the period
16       of time that you were driving from the bar
17       to and from your house, that you were in a
18       good enough condition to operate a motor
19       vehicle?
20   A.  Correct.
21   Q.  Okay.  So when he arrived at your house,
22       approximately what time was it?
23   A.  It was right after the phone call, probably
24       between 1:20 and 1:30.  I mean, it was just
25       right after.
```

168

```
1    Q.  Okay.  So he was obviously in a close
2        proximity when he made the call?
3    A.  Right.
4    Q.  Okay.  And what happened next?
5    A.  Saw lights pull in the drive and heard the
6        door open, door shut.  I had peeked out the
7        front -- I had a big front bay window with
8        the curtains drawn, and I saw there was a
9        vehicle and Mr. Anderson.  And he came up
10       and knocked on the door several times, and
11       then I believe he went back to his car, and
12       I believe he made another phone call at that
13       time and then came back and -- yeah, he made
14       another phone call and said something to the
15       effect of "Send the boy out.  I want to talk
16       to you," then got out of his car again, came
17       back up to the door, knocked on the door
18       harder this time and actually opened my -- I
19       had, like, a screen door.
20   Q.  Uh-huh.
21   A.  And was hitting on the wooden door, and then
22       it sounded as if he was, like, leaning up
23       against it saying I'm not -- I mean, he
24       was -- I could hear him saying, "Save me.
25       Save me."  And Millie asked me at that
```

45 (Pages 165 to 168)

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 18 of 33

169

```
 1   point, "Is he saying save me?" I said,
 2   "Yeah, I think that's what he's saying."
 3   And then --
 4   Q. Were you concerned for his safety at this
 5       point in time?
 6   A. No, I was more concerned for ours. Went
 7       back to his car, called again, and said
 8       something -- I don't even know what he said
 9       at that point. I'm sure it's on the tape,
10       which we could refer back to the tape.
11   Q. Is this at the point in time where he said
12       something like "Ignore me, you fucking
13       bitch," or
14   A. He didn't say that on the telephone. He
15       said that out in the yard. And he said
16       this -- he came back to the door and was
17       beating really hard on the door. I had a
18       really old door, and I was actually afraid
19       the door was going to come off because it
20       was old. And he was beating on it really
21       hard, and, also, he was beating on the
22       glass, too, after he had shut it. Then he
23       went back to my car -- I had a carport by
24       the front door and then a carport door. He
25       went back there and was beating on it, and
```

170

```
 1   he came back and was jiggling the handle to
 2   my front door. And then as he was walking
 3   off, or walking somewhere in the front yard,
 4   I could hear him say, "Ignore me, you
 5   fucking bitch," and that's when -- I mean,
 6   me and Millie were -- we were scared at that
 7   point. I -- we could tell he was very
 8   angry, very mad and was wanting in the
 9   house. Millie kept saying, "You need to
10   call the police. You need to call the
11   police," and so I finally -- I called the
12   police and --
13   Q. Did you dial 911?
14   A. No. I called the Licking city police.
15   Q. There is a 911 district that would operate,
16       so a 911 call in your area would process?
17   A. I believe at that time there was.
18   Q. Okay.
19   A. But I knew the Licking city police would be
20       the ones to respond, so I called that
21       number.
22   Q. Okay. Who did you speak with?
23   A. Officer Mike Hood.
24   Q. Okay. What did you tell Mike Hood?
25   A. I told him who I was. He knew me from, you
```

171

```
 1   know, working at the prosecutor's office. I
 2   said, you know, "It's Monica. My boss
 3   Mike's outside beating on my door. I think
 4   he's drunk. He's mad. He's trying to get
 5   in. He's not leaving. He's been out here
 6   for quite some time. Could you drive by and
 7   see if you can get him to leave?" And he
 8   said, "You mean the prosecutor?" I said,
 9   "Yes. Could you please come by here?" And
10   we got off, and he said he would when we got
11   off the phone. And Mike had already walked
12   back to his car and was sitting in his car
13   whenever the officer drove by, and then
14   right after he drove by, Mike backed out and
15   left, and then had made another call wherein
16   he was -- he had professed his love and -- I
17   mean, you guys can refer back to the tape
18   for that.
19   Q. Right. Did you tell the police that he was
20       heavily intoxicated and you didn't think he
21       should be driving?
22   A. I told them that I think he's been drinking.
23       You know, he sounds drunk, and he's mad.
24   Q. Okay. Did you see the police car come by?
25   A. Yes.
```

172

```
 1   Q. Was Mike still in the yard?
 2   A. He was in his vehicle in the carport.
 3   Q. Okay. So you
 4   A. And he backed out after the police went by,
 5       and then I called Officer Hood back and
 6       said, "He just pulled out. You know,
 7       "Thank you. If he comes back, I will call
 8       you and"
 9   Q. Did you provide a vehicle description to
10       Officer Hood?
11   A. No.
12   Q. Okay.
13   A. I assume he probably -- I mean, that's
14       assuming he knew what he drove.
15   Q. You're assuming that he saw the car and Mike
16       in the driveway?
17   A. Oh, correct. I know he saw the car.
18   Q. Okay. So just to understand, you told
19       Officer Hood that Mr. Anderson was heavily
20       intoxicated, belligerent --
21       MR. STEELMAN: Excuse me. I don't
22   think she used the "word heavily
23   intoxicated." Are you trying to put words in
24   her mouth or --
25       MR. FRANKLIN: No.
```

46 (Pages 169 to 172)

ALPHA REPORTING SERVICE
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 20-1   Filed 09/20/10   Page 19 of 33

173

1 MR. STEELMAN: Okay.
2 BY MR. FRANKLIN:
3 Q. You thought Mr. Anderson was -- did you
4 think he was heavily intoxicated by the way
5 he was behaving?
6 A. I think he had been drinking and was most
7 likely drunk, yes.
8 Q. And you --
9 A. Just from the -- slurring his speech and --
10 Q. Sure. And he was engaging in what you
11 believed to be belligerent conduct; right?
12 A. Yes.
13 Q. Okay. And did you -- I'm going to go ahead
14 and strike that.
15  You came back into work the following
16 Monday?
17 A. I called in sick.
18 Q. Or, excuse me, the following Tuesday?
19 A. Correct.
20 Q. Okay. And at this point Mr. Anderson is
21 questioning you about the tape, and he wants
22 to get a copy of the tape back?
23 A. Correct.
24 Q. Okay. And the questions about the tape
25 themselves were not sexual in nature, were

174

1 they?
2 A. I felt them to be -- you know, where he --
3 professing his love and saying that he had
4 feelings about me that he didn't know he
5 had, to me, that was sexual in nature.
6 Q. I think we're mixing apples and oranges
7 here.
8 A. Okay.
9 Q. The questions that he was asking you -- when
10 he was asking you, "I want a copy of the
11 tape, I want a copy of the tape, I want a
12 copy of the tape," that was not sexual in
13 nature, was it?
14 A. Oh, no.
15 Q. Okay. And from the time that you came back
16 to work on or about December 12th through
17 your final date of employment, he wasn't
18 making sexual comments about your body --
19 A. No.
20 Q. -- or sexual behavior of any kind, was he?
21 A. No.
22 Q. Okay. And he wasn't touching you
23 inappropriately, was he?
24 A. No.
25 Q. Okay. And so at this point, what you are

175

1 describing as sexual harassment arises from
2 this incident on December 18th,
3 specifically; right?
4 A. With all the -- with everything else that
5 led up to that is when I finally felt afraid
6 and intimidated and -- to where I didn't
7 feel safe at that time.
8 Q. Right. The incident that occurred on
9 December 18th made you feel as if you were
10 not safe?
11 A. Correct.
12 Q. Okay. And as I understand it, on
13 Friday, December 23rd, Mr. Anderson
14 prevailed upon Judge Ellsworth to issue a
15 subpoena; is that correct?
16 A. Correct.
17 Q. And the subpoena required you to produce a
18 copy of the tape?
19 A. Correct.
20 Q. And are you familiar with the difference
21 between a search warrant and a subpoena?
22 A. I wasn't at the time. I thought it was a
23 search warrant.
24 Q. Okay. But did you prepare subpoenas in the
25 course of your work for Mr. Anderson?

176

1 A. Order to appear, yes.
2 Q. Okay. And did you produce orders to produce
3 documents for Mr. Anderson?
4 A. I believe I probably did, yes.
5 Q. Okay. And so this was consistent with the
6 type of document that you would prepare for
7 someone to appear in court or to produce
8 documents?
9 A. I believe it was the same type of form, but
10 I don't know if it was the exact same form.
11 Q. Okay. Do you recall reading the form?
12 A. Yes.
13 Q. Okay.
14 A. Judge Ellsworth handed me one, yes.
15 Q. So your understanding of the form, would it
16 be fair -- would it be fair to say that your
17 understanding of what the form meant was
18 limited to what was reflected on the face of
19 the form?
20 MR. STEELMAN: I object if -- she's
21 not qualified to give an opinion as to what
22 the subpoena meant, but --
23 MR. FRANKLIN: No. I'm saying what
24 her understanding.
25 MR. STEELMAN: -- she can go ahead.

47 (Pages 173 to 176)

ALPHA REPORTING SERVICE
Phone: 417-887-4110 www.alphareportingservice.com Fax: 417-889-4246
Case 6:09-cv-03518-RED Document 207-1 Filed 09/20/10 Page 20 of 33

**177**

```
 1   I'm not instructing her not to answer.  I'm
 2   just saying I object to her not being
 3   qualified to answer the legal question I
 4   thought you just asked.
 5       BY MR. FRANKLIN:
 6   Q.  No.  All I'm saying is, your understanding
 7   of what the form meant was limited to what
 8   you could read on the face of the form,
 9   right?
10   A.  Well, I actually asked the judge, "If I give
11   you a copy of this tape, will you not let
12   them come search my house?"  And he said,
13   "Absolutely."
14   Q.  Okay.  So once you clarified what was going
15   on with Judge Ellsworth, you didn't have any
16   concern that anybody was going to start
17   rummaging through your house, right?
18   A.  Right.
19   Q.  Okay.  And after you turned in that tape to
20   Judge Ellsworth, you resigned your
21   employment, correct?
22   A.  Yes.  I went downstairs, yes.
23   Q.  Okay.  Prior to resigning your employment,
24   had you ever complained to any of the
25   Texas County commissioners regarding
```

**178**

```
 1   Mike Anderson's behavior?
 2   A.  No, I did not.
 3   Q.  Prior to submitting your letter of
 4   resignation, had you ever complained to the
 5   county clerk, Don Troutman, about
 6   Mike Anderson's behavior?
 7   A.  When I did submit my resignation prior to --
 8   Q.  That's not the question.  Prior to --
 9       MR. STEELMAN:  No, no, let her
10   answer your question.
11       MR. FRANKLIN:  Why don't we have
12   the reporter read back the question, and
13   we'll just start from scratch.
14       MR. STEELMAN:  Okay.  Then let her
15   answer.
16       (The requested portion of the
17   testimony was read back.)
18   A.  The answer would be yes, because that day I
19   went down there and told him about what had
20   happened and that I was going to resign, and
21   then they told me I would have to write out
22   a letter of resignation in order to take
23   care of, like, benefits and stuff.
24       BY MR. FRANKLIN:
25   Q.  This is after the hearing with
```

**179**

```
 1   Judge Ellsworth?
 2   A.  After the meeting, yes.
 3   Q.  With Judge Ellsworth?
 4   A.  Yes.
 5   Q.  Okay.  So after this meeting you go down to
 6   Don Troutman's office and say you're going
 7   to resign.  Did you tell him why you were
 8   going to resign?
 9   A.  Yes, I did.
10   Q.  What did you tell him?
11   A.  I told him that Mr. Anderson had showed up
12   at my house in the middle of the night, that
13   I had came back that next week, he had
14   harassed me all week trying to get a copy of
15   that tape.  He finally went to the judge and
16   got an order for me to produce this tape,
17   and I felt like it was just a total hostile
18   work environment, along with -- I felt like
19   that was sexually harassing me, coming to my
20   house, and I felt like he came there in
21   order to try to have sex with me, and that
22   he was mad because I wouldn't let him in.
23   Q.  Did he tell you when he showed up at your
24   house on the 18th that he wanted to have sex
25   with you?
```

**180**

```
 1   A.  No.  He didn't say that specifically, no.
 2   Q.  Okay.  That was your supposition, was that
 3   he wanted to have sex with you?
 4   A.  (Witness shakes head.)
 5   Q.  All right.  I'm handing you a document
 6   that's been labeled Defendant's Exhibit 13.
 7   Is this the letter of resignation that you
 8   submitted?
 9   A.  Yes, I believe so.
10   Q.  Okay.
11   A.  Yes.
12   Q.  And referring you to the one, two, three,
13   four -- beginning the fourth and going into
14   the fifth line of this letter, the hostile
15   working environment is what occurred on
16   December 18th, and then in the days leading
17   up to the 23rd when you resigned?
18   A.  Yes.  It was very hostile, yes, that whole
19   week.
20   Q.  Okay.  And the unethical conduct, what
21   unethical conduct were you referring to
22   there?
23   A.  Him showing up at my house, leaving those
24   messages, and then the whole next week it
25   was a constant everyday harassment of trying
```

ALPHA REPORTING SERVICE
Phone: 417-887-4300              417-887-4300              Fax: 417-889-4246

Case: 4:09-cv-03018-RED   Document 207-1   Filed 05/26/10   Page 21 of 33

189

1  Mr. Anderson?
2  A. No. He put that he loved me, but then he
3  went to explain that I'm not trying to hit
4  on you or anything weird, so -- I mean, he
5  put that in there.
6  Q. You believe -- and you had no reason to
7  question that, did you, at the time that you
8  received this in January 2005; right?
9  A. (Nods head.) Correct.
10 Q. Okay. After the December 18th incident with
11 Mr. Anderson, did you ever call him at home?
12 A. December eight --
13 Q. December 18th.
14 A. No.
15 Q. Did you ever call him on his cell phone?
16 A. No.
17 Q. Okay.
18 A. I don't believe so.
19 Q. Okay. Subsequent to your last day of work
20 when you tendered your resignation, did you
21 have any occasion to speak with
22 Mr. Anderson?
23 A. No. He had left me a message at one point
24 about a case in Phelps County.
25 Q. Okay. Do you remember about when that

190

1  occurred?
2  A. In, I want to say -- no, I don't know. I'm
3  going to say between March and June of next
4  year. I'm not positive.
5  Q. When you tendered your resignation letter to
6  Mr. Troutman, did you advise Mr. Troutman
7  that you wanted to give him an opportunity
8  to fix this situation with Mike Anderson?
9  A. No.
10 Q. Did you have any intention to allow him or
11 the county to fix that situation with
12 Mike Anderson?
13 A. I didn't believe the county would be able to
14 fix it because of Mike -- he had a very
15 powerful position in the county. He has the
16 judge backing him, and I just didn't see the
17 commissioners believing me over him, so, no.
18 Q. Just to be clear -- simple question: You
19 did not provide the opportunity for the
20 county to remedy the situation, right?
21 A. No.
22 Q. And you didn't want to provide them that
23 opportunity. You wanted out, right?
24 A. I wanted away from him, yes.
25 Q. Okay. Are there any harassing statements

191

1  that Mike Anderson made to you that we
2  haven't addressed so far today that you can
3  recall?
4  A. During that whole week of when I went back
5  to try to get the tape?
6  Q. Aside --
7  A. Aside from that?
8  Q. Well, the conversations about the tape were
9  a request to have the tape, and he was
10 repeatedly asking you to get the tape back;
11 right?
12 A. He was angry when he would ask me. Yes.
13 Q. Okay. Were there any sexual comments by
14 Mr. Anderson to you during the course of
15 your time in the Texas County prosecutor's
16 office that we have not yet discussed?
17 A. Not that I can think of, no.
18 Q. Okay. Is there any conduct that
19 Mr. Anderson engaged in during the time that
20 you were employed in the Texas County
21 prosecutor's office that we have not yet
22 discussed today that you found to be
23 sexually harassing in nature?
24 A. Not that I can think of, no.
25 Q. Okay.

192

1  MR. STEELMAN: Off the record for a
2  second.
3  MR. FRANKLIN: Sure.
4  (A discussion was held off the
5  record.)
6  BY MR. FRANKLIN:
7  Q. Off the record you were encouraged --
8  MR. STEELMAN: I object. I asked
9  you, Mr. Franklin, wasn't there an e-mail
10 that we had revealed to you before this;
11 MR. FRANKLIN: Certainly, I don't
12 want to misrepresent what you're saying, and
13 I'm not trying to.
14 BY MR. FRANKLIN:
15 Q. So you said that there was an e-mail. I'm
16 going to hand you a document that is going
17 to be labeled Defendant's Exhibit 12. Okay.
18 Previously you said that there were no
19 statements and no physical conduct that you
20 found harassing other than what we had
21 discussed today?
22 A. There was one more statement that I had
23 forgot about.
24 Q. What was that statement?
25 A. We were in court one day, and he had wrote

Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 22 of 33

201

```
 1      Marci Mosley and Millie Williams or -- I
 2      believe I showed it to them, or I told them
 3      what he wrote.
 4   Q. Do you recall what was going on in the
 5      courtroom when he handed this to you?
 6   A. I think they were in between calling up
 7      cases or something.  It was one of the just
 8      regular court days.
 9   Q. Do you recall whether he was trying to --
10      whether you were going to get witnesses for
11      him or --
12   A. No.  I was sitting beside him, and we were
13      waiting for the next one to be called, I
14      believe.
15   Q. Okay.  So you thought this was just a crude
16      joke that he made?
17   A. (Witness nods head.)
18   Q. Did you take personal offense to it?
19   A. Well, I think I told him -- I was, like,
20      "You're sick," or "Quit being disgusting,"
21      something like that.
22   Q. But you recognized it was a joke; right?
23   A. He told me -- he said that he had saw it on
24      TV and he thought it was funny, or he heard
25      it from someone, thought it was funny, so --
```

202

```
 1   Q. Okay.  You didn't immediately take personal
 2      offense to it?
 3   A. I didn't like it.
 4   Q. Okay.
 5   A. I didn't think it was funny.  I didn't
 6      laugh.
 7   Q. Okay.  You said you took the document to
 8      someone else.  Who did --
 9   A. I don't know if I actually took it and
10      showed it to them.  I may have, but I went
11      into -- I got up and left the courtroom and
12      went to the clerk's office, which was
13      Marci Mosley and Millie Williams.  I don't
14      know if I just told them that he wrote this
15      or if I showed it to them.  I don't recall
16      if I showed it to them or not.
17   Q. Okay.  Did you complain to anybody else
18      about this particular incident?
19   A. No.
20   Q. Did you think it was necessary to complain
21      to anybody else about that incident, or you
22      pretty well handled it?
23   A. I handled it.
24   Q. You didn't think that there was any
25      follow-up necessary?
```

203

```
 1   A. No, not at that time, no.
 2   Q. Okay.  I'm going to hand you a document that
 3      has been labeled Defendant's Exhibit 11
 4      Can you identify that document for me,
 5      please.
 6   A. Yes.  This is a document that I -- a letter
 7      that I had sent to EEOC upon the request of
 8      my previous attorneys, Allen & Rector, once
 9      Mr. Anderson had filed his complaint -- a
10      lawsuit against myself and Ms. Williams.
11   Q. Okay.  And at the time that this lawsuit was
12      filed against you and Ms. Williams, you were
13      no longer an employee of Texas County;
14      right?
15   A. Correct.
16   Q. Okay.  Or the prosecutor's office, at least.
17      And you had -- you had already made a
18      complaint, right, to the EEOC?
19   A. Correct.  Yes.
20   Q. And you had already, as you previously
21      testified, made some reference to this
22      conduct that you found to be harassing to
23      Mr. Troutman when you -- before you provided
24      your resignation letter; right?
25   A. Correct.
```

204

```
 1   Q. And within the context of the employment
 2      relationship, there was no further action
 3      that Mike Anderson could take against you as
 4      of the date that he filed this lawsuit;
 5      right?
 6         MR. STEELMAN:  Would you define
 7      what you mean by "action"?  You specifically
 8      mean job action, don't you?
 9         MR. FRANKLIN:  Right.
10   BY MR. FRANKLIN:
11   Q. I said within the context of the employment
12      relationship.  He couldn't take any job
13      action against you at this point, could he?
14   A. No.
15   Q. And to your knowledge, has Mr. Anderson ever
16      provided a negative reference for you?
17   A. Not to my knowledge.
18   Q. Okay.  Has Mr. Anderson, aside from this
19      lawsuit, ever told a prospective employer
20      that you had slandered him or had raised a
21      bunch of inappropriate -- or not -- let me
22      strike that's not inappropriate, but
23      untruthful sexual allegations against him?
24   A. Did he specifically tell them?
25   Q. Yes.
```

54  (Pages 201 to 204)

ALPHA REPORTING SERVICE
Phone: 417-887-4110     www.alphareportingservice.com     Fax: 417-889-4246
Case 6:09-cv-03018-RED    Document 207-1    Filed 09/20/10    Page 23 of 33

225

1 other than Chief McNew?
2 A. Well, I gave it to Judge Ellsworth, of
3 course. I didn't play it for anyone. And
4 then Allen & Rector listened to it with me,
5 and then my attorneys.
6 MR. STEELMAN: Your present
7 attorneys?
8 THE WITNESS: My present attorneys,
9 yes.
10 MR. STEELMAN: That's Steelman,
11 Gaunt & Horsefield.
12 THE WITNESS: Yes.
13 BY MR. HARRIS:
14 Q. Did you ever discuss the incident that
15 occurred on December 18th, 2005, with anyone
16 other than Michael Anderson,
17 Millie Williams, Judge Ellsworth,
18 Danny McNew, and your attorneys,
19 Allen & Rector, and Steelman & Gaunt?
20 A. The EEOC investigator, and then the
21 Department of Justice investigator.
22 Q. Anyone else?
23 A. Just the -- my previous employers, when I
24 would tell them I had an EEOC complaint
25 filed.

226

1 Q. Do you know, did Millie ever discuss the
2 December 18th incident with anyone?
3 A. You'd have to ask Millie that. I don't
4 know.
5 Q. With regard to the actual incident regarding
6 the production of the tape, as I understand
7 it, the incident occurred in the early
8 morning hours of December 18th, which was a
9 Sunday; correct?
10 A. Correct. Yes.
11 Q. And then you didn't go to work on Monday,
12 which would be December 19th; correct?
13 A. Correct. Can I back up?
14 Q. Sure.
15 A. I forgot that I did -- on Sunday I did
16 contact Brad Eidson.
17 Q. All right. Sunday the 18th?
18 A. Yes. That morning or afternoon, I'm not
19 sure what time it was that I called him, and
20 told him what had happened. I didn't want
21 to -- I forgot that I had mentioned it to
22 him, and I wanted to bring that out.
23 Q. All right. You mentioned the incident to
24 him?
25 A. Correct. And asked him what he thought --

227

1 how I should handle it, and his reply was,
2 "Well, just go back to work and try to
3 pretend like it didn't happen, I guess."
4 That was basically the end of the
5 conversation, so, yes, I did discuss it with
6 him, too. I didn't want to leave that out.
7 MR. STEELMAN: Can we go off the
8 record for just a quick second?
9 MR. HARRIS: Yes.
10 (A short break was taken.)
11 BY MR. HARRIS:
12 Q. Ms. Hutchison, we were talking about the
13 tape recording of the phone messages
14 Mr. Anderson left. And as I understand it,
15 when you returned to the workplace on
16 December 20th, he requested to hear the
17 tape or to actually have the tape?
18 A. To have the tape.
19 Q. Did he ask for the original or just a copy?
20 A. Well, I explained to him that my answering
21 machine was a digital machine and that there
22 wasn't a tape at that time, but I made a
23 tape from my digital machine, so he
24 wanted -- he wanted -- whatever tape I had,
25 he wanted it so it could be destroyed.

228

1 Q. Did he tell you why he wanted to destroy it?
2 A. Well, first -- he went from several
3 different reasons. First was, I believe he
4 felt like Dianne had the right to listen to
5 it out of respect for her, and then he
6 wanted -- he wanted it destroyed because he
7 didn't want it to embarrass him, and then he
8 wanted me to save it because he was making
9 allegations about being drugged, and it just
10 went back and forth.
11 Q. And you never provided him with a copy
12 voluntarily?
13 A. No.
14 Q. Why not?
15 A. I felt that was the only thing that would
16 keep me safe in anyone ever believing that
17 he even said anything like that to me.
18 Q. Well, you could have kept a copy, too,
19 couldn't you?
20 A. I could have, but I didn't feel like he had
21 a right to have that.
22 Q. So it was your belief he didn't have a right
23 to have a copy of his own statements?
24 A. No, I don't -- I mean, I was afraid that he
25 would destroy it or -- I don't know. I

60 (Pages 225 to 228)

ALPHA REPORTING SERVICE
Phone: 417-887-4110     www.alphareportingservice.com     Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 24 of 33

229

1  didn't think it was right for him to be
2  harassing me all week for a copy of that
3  tape.
4  Q. Had you let anyone else listen to it at this
5  point?
6  A. The people that I had expressed to you is
7  the ones that have listened -- Millie
8  listened to it.
9  Q. Did she listen to it again after the actual
10 incident?
11        MR. STEELMAN: During what period
12 of time are you asking?
13 BY MR. HARRIS:
14 Q. Well, what I'm asking is, obviously she was
15 present for the incident on December 18th in
16 the early morning hours; correct?
17 A. Correct. She was there -- she was there
18 whenever I recorded it onto a tape, so,
19 yeah, she heard it again.
20 Q. And when approximately was that that you
21 recorded it onto a tape?
22 A. I think it was either the following day or
23 that Monday. I think it was that following
24 day, that Sunday.
25 Q. Why was it you chose to record it onto a

230

1  tape?
2  A. Because I had a digital machine, and I knew
3  if my power went out or anything, it would
4  have been gone.
5  Q. What type of answering machine was it?
6  A. It was a -- I don't know. It was a little
7  white cheap digital machine, one of the
8  cheapest ones I could have probably bought.
9  Every time the electric went out or there
10 was a power surge, like, my message would be
11 gone, and the time would be off and all
12 that.
13 Q. Other than Millie being there when you
14 recorded it off on the tape, did anyone else
15 hear it in between the time of the incident
16 and when you went back to work on
17 Tuesday, December the 20th?
18 A. I don't believe so.
19 Q. How did you learn about Mike issuing the
20 subpoena?
21 A. Officer Melissa Dunn had contacted me and
22 told me that he was trying to get one.
23 Q. Do you know why she contacted you?
24 A. Or Lieutenant I believe she was. She
25 just -- I don't know. She called and said

231

1  she wanted to let me know that Mr. Anderson
2  had went to the judge and that herself and
3  the sheriff was present at the first initial
4  meeting where he had declined to do it.
5  Q. All right. So you understood that there had
6  been one conference with the judge in which
7  Lieutenant Melissa Dunn, the sheriff, and
8  Judge Ellsworth were present, in addition to
9  Mike?
10 A. Correct.
11 Q. Then what did you do?
12 A. Nothing. I mean, she said the judge told
13 him no, and, I guess, the next day, or later
14 that day, I'm not sure what day it was, he
15 went back and talked to the judge, and the
16 judge called me up there, Mr. Anderson
17 stood outside the doorway while the judge
18 gave me the order.
19 Q. So the next day you were called to
20 Judge Ellsworth's office by Judge Ellsworth?
21 A. Correct.
22 Q. And he gave you a copy of the subpoena?
23 A. Yes. He told me that he really didn't want
24 to get involved in this, but Mike felt like
25 he had been drugged, so he was going to go

232

1  ahead and issue the order for him.
2  Q. And did he provide you a copy of the
3  subpoena?
4  A. Yes, which is what I relayed to my prior
5  attorneys, Allen & Rector. I gave it to
6  them.
7  Q. So you were already represented by counsel
8  at this time?
9  A. No. I kept it then, but whenever I made the
10 appointment is when I handed it over to
11 them.
12 Q. If you look, I've got before you what I've
13 marked as Exhibit 17, and that's another
14 copy of the "Second Amended Complaint," but
15 it has all of the exhibits attached to it.
16 If you would, look at Exhibit C. Is that a
17 copy of what Judge Ellsworth provided to
18 you?
19 A. Yes, I believe so.
20 Q. And it states "Subpoena For Investigation,
21 Order to Appear/Produce Documents", correct?
22 A. Correct.
23 Q. And at this time you had already received
24 your degree in criminology, correct?
25 A. Yes, I graduated, I believe, in May of '05.

61 (Pages 229 to 232)

ALPHA REPORTING SERVICE
Phone: 417-887-4110     www.alphareportingservice.com     Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 25 of 33

**237**

1  a statement of Mike Anderson to
2  Mike Anderson; correct?
3       MR. STEELMAN: Objection, leading
4  question and mischaracterizes the facts.
5  Go ahead. You can answer.
6  A. Actually, I thought it -- I didn't -- I
7  mean, I guess it does -- it says -- it
8  doesn't say to who to produce it to, does
9  it? The requesting party is Mr. Anderson,
10 but I don't see where it says who to produce
11 it to.
12      BY MR. HARRIS:
13 Q. All right.
14 A. I mean, other than the judge's signature.
15 Q. And that's probably a fair point, because my
16 question probably was incorrect.
17      MR. STEELMAN: My objection was, it
18 does not request. It is judicial process
19 that orders her to turn over the tape.
20      BY MR. HARRIS:
21 Q. Let me clear it up. As you understood it,
22 this subpoena, on December the 23rd of 2005,
23 was ordering you to produce a copy of the
24 statement of Mike Anderson to the court?
25 A. Yes. I felt like I had to. The judge

**238**

1  signed it. I didn't have any other option.
2  Q. And you didn't ask to consult with an
3  attorney before you produced it?
4  A. I thought the judge's order was the judge's
5  order. I had to follow it.
6  Q. And, in fact, what was actually produced was
7  a copy of the tape which you'd given to
8  Millie?
9  A. Correct.
10 Q. Nothing happened to your copy of the tape?
11 A. Huh-uh.
12 Q. No?
13 A. No. I gave -- no.
14 Q. Whatever happened to the original answering
15 machine?
16 A. I can't find it. I've looked and looked.
17 I've moved so many times, and I've yet to be
18 able to locate that.
19 Q. So as I understand it, what's on the tapes
20 that have been produced in this case is only
21 what you have recorded off of the digital
22 answering machine?
23 A. Correct.
24 Q. You weren't ordered to produce anything
25 else?

**239**

1  A. No.
2  Q. You were not forced to have your home
3  searched?
4  A. No.
5  Q. Did Judge Ellsworth ever tell you what would
6  happen if you didn't produce the tape? Did
7  you ask him?
8  A. No, I didn't ask him. He was the judge. I
9  didn't question the judge.
10 Q. Well, in your occupation, you've seen
11 attorneys question judges all the time,
12 haven't you?
13 A. Yeah, but I'm not an attorney.
14 Q. And you ultimately got the tape back from
15 Judge Ellsworth, didn't you?
16 A. No, I don't know what happened to the tape.
17 Q. All right. And as you said, you went to
18 Mr. Troutman's office and complained;
19 correct?
20 A. Correct.
21 Q. So I would be correct that the -- prior to
22 being summoned to Judge Ellsworth's office,
23 had you made a decision as to whether or not
24 you were going to continue in the employment
25 of the prosecuting attorney's office?

**240**

1  A. Oh, I was looking for another job, of
2  course.
3  Q. But you hadn't decided to leave?
4  A. I would have if I'd have found another job,
5  but that kind of pushed me over the edge,
6  yes, at that point. I didn't feel like I
7  could be there any longer.
8  Q. So it was the action of Judge Ellsworth
9  ordering you to produce the tape pursuant to
10 the request of Mike Anderson that caused you
11 to resign your employment with the
12 Texas County prosecuting attorney's office?
13 A. That, and the whole week leading up to that,
14 and then Mike's actions leading up to that.
15 I was hoping I could just find another job,
16 and then finally whenever -- I mean, it's
17 the judge -- Mike was being able to do
18 whatever, and -- I mean, he was -- had a
19 very high authority, and the judge had even
20 a higher authority, so, yeah, I didn't feel
21 like I could be there anymore after the
22 judge issued me that.
23 Q. So you left on that day and never returned
24 to the prosecuting attorney's office again?
25 A. Correct.

63  (Pages 237 to 240)

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 26 of 33

**249**

1 appointment to take it to them,
2 Q. Do you know anyone other than your attorneys
3 who actually reviewed the damage complaint?
4 A. Well, it was -- it was in every newspaper
5 there was.
6 Q. I understand that. But what I'm asking you
7 is, do you know of anyone who actually went
8 to the courthouse and reviewed it?
9 A. No. Not that I'm aware of, no.
10 Q. Are you aware of Mike Anderson distributing
11 a copy of the complaint to anyone other than
12 the clerk's office in Texas County?
13 A. It was in every newspaper, and I believe he
14 made comments to the newspaper regarding the
15 complaint.
16 Q. I understand that.
17 A. I was informed that there was, like, blog
18 entries made on different blog sites. There
19 was one in particular.
20 Q. Okay. Let's back up. But as far as my
21 question's concerned, are you personally
22 aware of Mike Anderson providing a copy of
23 this complaint to anyone other than the
24 clerk's office, and the sheriff's department
25 for service?

**250**

1 A. Not that I'm aware of personally, no.
2 Q. And as you sit here today, do you know how
3 it is that the media became aware that the
4 lawsuit had been filed?
5 A. No, other than statements he had made to the
6 media regarding the lawsuit.
7 Q. I understand that Mr. Anderson may or may
8 not have made statements to the papers about
9 the lawsuit --
10 A. I don't know how they received it.
11 Q. -- but as far as how the media became aware
12 of the lawsuit, you don't know?
13 A. No, I don't know.
14 Q. Now, with regard to your attorneys,
15 Allen & Rector, had you had to pay them any
16 money prior to this lawsuit being filed?
17 A. No.
18 Q. When this lawsuit was filed, did you pay
19 them money?
20 A. I entered into an attorney fee agreement
21 with them prior to the lawsuit being filed.
22 Q. All right. What was the --
23 MR. STEELMAN: Listen to his
24 question. He asked you when you paid them.
25 A. When did I pay them? I had to pay them

**251**

1 $1,000 whenever he filed this against me in
2 order for them to represent me.
3 BY MR. HARRIS:
4 Q. Okay. Let's clean this up. Prior to
5 Mr. Anderson filing the lawsuit, which is
6 depicted in Exhibit 17, you had entered into
7 an attorney fee agreement with
8 Allen & Rector, and that was a contingent
9 fee agreement; correct?
10 A. Correct.
11 Q. After the lawsuit was filed on Mr. Anderson
12 and you took it to Allen & Rector, they then
13 requested that you pay them $1,000 to handle
14 the lawsuit that had been filed by
15 Mr. Anderson; is that right?
16 A. Correct. And under the understanding that
17 there could be more fees involved, yes.
18 MR. STEELMAN: Could we take a
19 quick break?
20 MR. HARRIS: Sure.
21 (A short break was taken.)
22 BY MR. HARRIS:
23 Q. Ms. Hutchison, when you received the lawsuit
24 and you took it to your attorney, you said
25 you paid them $1,000. Did you ever get any

**252**

1 portion of that back?
2 A. No.
3 Q. Did they ever provide any kind of billing or
4 accounting to you to document what they done
5 with that thousand dollars?
6 A. Just -- they gave me a receipt whenever I
7 paid them.
8 Q. Did they take any action on the case that
9 you're aware of?
10 A. Not that I'm aware of. I think maybe they
11 took a few phone calls with Mr. Anderson's
12 attorney, who I believe was
13 Cynthia MacPherson. But I don't -- I mean,
14 I don't know. They didn't tell me that.
15 Q. Did they ever discuss with you an agreement
16 whereby they reached an agreement with
17 Ms. MacPherson that the lawsuit would be
18 dismissed while the EEOC complaint was being
19 handled or investigated?
20 A. No. I believe they just told me that he had
21 decided to dismiss it.
22 Q. But they didn't provide you any kind of
23 correspondence or anything that they've had
24 with Ms. MacPherson about the terms of that
25 dismissal?

ALPHA REPORTING SERVICE
Phone: 417-887-4110   www.alphareportingservice.com   Fax: 417-889-4246
Case 6:09-cv-03018-RED  Document 207-1  Filed 09/20/10  Page 27 of 33

269

```
 1        BY MR. HARRIS:
 2   Q.  Has anyone told you that they think less of
 3        you because of this allegation about a
 4        swinger-style sex ring being made by
 5        Mr. Anderson?
 6   A.  There are actions that have told me, but not
 7        specifically told me.
 8   Q.  No one's ever uttered those words, that
 9        they've thought less of you because of this
10        allegation?
11   A.  Not directly to me.
12   Q.  All right.  Has anyone told you that someone
13        told them they thought less of you because
14        of the allegations?
15   A.  Well, I just feel like when I -- with them,
16        when I would go into the community -- I was
17        having people throw trash in my yard of a
18        sexual nature, beer bottles, whiskey
19        bottles.  When I'd go to the stores, people
20        would look at me, and they'd be whispering.
21        I never heard what they said.  And it was
22        just -- it was just embarrassing.
23             MR. STEELMAN:  Just -- 'cause she's
24        left out -- 'cause I don't want to -- do you
25        want to know everything they threw in her
```

270

```
 1   yard after they filed the lawsuit?
 2             MR. HARRIS:  We'll get into that in
 3   a minute.
 4             MR. STEELMAN:  Okay.
 5        BY MR. HARRIS:
 6   Q.  And I understand your thought that it was
 7        embarrassing to you.  I clearly understand
 8        that.  But what I'm trying to find out is if
 9        anyone has ever come up to you and said,
10        "Monica, I think less of you because of what
11        Mike Anderson alleged in his lawsuit"?
12   A.  No, no one's ever specifically come up and
13        said to me that.  No.
14   Q.  Has anyone ever come up to you and said,
15        "Monica, I think less of you because of what
16        I read about you in any of the newspaper
17        accounts"?
18   A.  No, not specifically.  No.
19   Q.  And as I understood your testimony earlier,
20        to your knowledge, the allegations in the
21        lawsuit have not, in any way, caused you any
22        kind of harm with regard to your employment?
23             MR. STEELMAN:  Objection.  That
24        misstates her earlier testimony.  Go ahead
25        and answer.
```

271

```
 1   A.  Yeah, I feel like it has because I've had to
 2        relive this every single time I interview
 3        for a job to let them know.
 4        BY MR. HARRIS:
 5   Q.  And with regard to letting them know, that
 6        was a voluntarily choice on your part to
 7        inform them of what was going on?
 8   A.  Correct, or they would probably hear it from
 9        somewhere else, because it's all over.
10   Q.  But no person in an interview has ever
11        brought up the allegations in the lawsuit or
12        the statements that have been made in the
13        media?
14   A.  No.
15   Q.  And no prospective employer has refused to
16        give you a job because of the allegations in
17        the lawsuit or the statements in the paper?
18   A.  Not yet.  I feel like I'm going to have to
19        explain this, though, for quite some time.
20   Q.  With regard to the newspaper article
21        regarding the lawsuit, do you recall
22        anything within the article that was said by
23        Mike Anderson that was untrue?
24   A.  I don't have the article in front of me.
25   Q.  Okay.  But as you sit here today, do you
```

272

```
 1   recall anything that he said in the paper
 2        that was untrue?
 3   A.  Oh, I'm sure there were.  I don't recall
 4        it -- I don't -- if I had it in front of me,
 5        I could go over it with you.
 6   Q.  Let's do this.  Let's look at Exhibit 17,
 7        Exhibit D.
 8   A.  Okay.
 9   Q.  I'll represent to you that that's a copy of
10        the press release that was issued by
11        Mike Anderson.  And if you would, just take
12        some time -- we can go off the record -- I
13        want you to take the time and review that if
14        you would.
15             (A short break off the record.)
16        BY MR. HARRIS:
17   Q.  Ms. Hutchison, you've read the June 6, 2006,
18        press release; correct?
19   A.  Yes.
20   Q.  Reading -- well, let me back up and ask you
21        this:  Have you read that prior to today?
22   A.  I believe so; yes.
23             MR. STEELMAN:  Can I see it for
24        just a second.
25        BY MR. HARRIS:
```

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110      www.alphareportingservice.com      Fax: 417-889-4246

273

```
 1   Q.  In reading the press release, is there
 2       statements in there that you believe to be
 3       untrue?
 4   A.  Yes.
 5   Q.  Which statements do you believe to be
 6       untrue?
 7   A.  Well, I believe that myself and Millie never
 8       got together to try to slander him in any
 9       way -- or we did not slander or
10       maliciously -- however words it -- trying to
11       ruin his reputation in the community.  It
12       says something about the -- my computer
13       being investigated because they thought I
14       was doing something wrong.  It's -- it's
15       all -- it's all ridiculous.  It's just
16       wrong.  It's just wrong that something like
17       that was published.
18   Q.  Well, you would agree with me you haven't
19       seen -- has the press release been published
20       anywhere?
21   A.  Yeah, I believe it was published.
22   Q.  Or were just excerpts of it published?
23   A.  I believe the whole thing was published, but
24       I'm not 100 percent positive.
25   Q.  All right.  Do you believe that this has
```

274

```
 1       harmed your reputation in any way?
 2   A.  Yes, I believe the whole -- the whole
 3       complaint that he filed and -- yes, I do.
 4   Q.  All right.  With regard to the press
 5       release, has anyone told you that because of
 6       what's stated in the press release they have
 7       a lesser opinion of you?
 8   A.  Not directly to me, no.
 9   Q.  Are there people that have quit speaking to
10       you because of what's contained in the
11       complaint or the press release or the
12       newspaper article?
13   A.  I feel like they have.  I feel like -- I
14       mean, I don't have any contact with hardly
15       anybody down there anymore.  I know that
16       Lorette Smith -- I tried to call her a
17       couple times, and she hadn't returned my
18       calls.  We used to be really good friends.
19       I mean, if she believes this, then -- or if
20       anyone believes something like that, why
21       would they want to continue being my friend.
22       I mean, yeah, I feel like it's really
23       affected different -- and me and Millie's
24       relationship has been strained over it.
25   Q.  All right.  Who are the people who have
```

275

```
 1       stopped speaking to you?
 2   A.  Well --
 3   Q.  You've told us about Lorette Smith.  Anyone
 4       else?
 5   A.  Terry Haden doesn't speak to me anymore.
 6   Q.  Anyone else?
 7   A.  Basically I -- I just -- I don't have any
 8       communication with anyone in Texas County in
 9       fear of them asking me questions so --
10   Q.  Well, that was at the advice of your
11       attorneys; correct?
12   A.  Correct.  Yes.
13   Q.  That wasn't your choice -- or was it your
14       choice?
15   A.  It was -- my attorney told me not to discuss
16       the case at all, but every time I would talk
17       to anyone, it would come up, so I got
18       I've gotten to where I don't even go to
19       Texas County unless it's to briefly see my
20       mom or pick her up and take her -- I know
21       we're getting off subject.  What was your
22       question?  I'm sorry.
23   Q.  Well, the people who told you -- or the
24       people who quit speaking to you, you've told
25       me about Lorette Smith, Terry Haden.  Anyone
```

276

```
 1       else?
 2   A.  Well, I'm sure all law enforcement wouldn't
 3       want to talk to me now since all the
 4       accusations was made.  I don't have anybody
 5       specific other than them.
 6   Q.  Other than those two?
 7   A.  Uh-huh.
 8   Q.  And I take it they have not told you why
 9       they quit communicating with you?
10   A.  No.
11   Q.  Has anyone else told you why they quit
12       communicating with you?
13   A.  No, 'cause under the advice of my attorneys,
14       I quit having contact with almost everyone.
15   Q.  Now, you spoke about the newspaper article
16       being published nationwide.  Upon what
17       information do you have that it was
18       published nationwide?
19   A.  Well, I saw it on, I believe it was, the
20       Kansas City Star.  It was on blogs.  I read
21       some of the Texas County blogs, but I quit
22       doing that because it got so upsetting for
23       me.  I wouldn't even get on there and read
24       it.
25   Q.  What Texas County blogs would you read?
```

72  (Pages 273 to 276)

Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 29 of 33

277

1  A. I don't remember what it was called.  Millie
2     could probably give you more information on
3     that, 'cause she was the one that actually
4     told me about it, and then I got on there
5     and was reading them.  It was so upsetting
6     to me of people making these derogatory
7     comments and believing this, so I quit
8     reading it, 'cause I couldn't deal with it.
9  Q. Did you also see derogatory comments about
10    Mike Anderson?
11 A. Yes, I did.
12 Q. So it'd be true that there have been
13    derogatory statements made about both of
14    you, you and Mike Anderson, on the internet?
15 A. From what I saw, yes.
16 Q. You don't have any reason to believe that
17    Mike feels any differently than you do about
18    the statements that were made about him?
19 A. I don't know how Mike feels.
20 Q. Do you know who made the statements?
21 A. No.
22 Q. Did you ever make any statements on the
23    internet?
24 A. No, never.
25 Q. Did Millie ever make any statements on the

279

1  Q. What city?
2  A. Lincoln, I believe.
3  Q. And it's your understanding that she learned
4     about it because she gets the local
5     Texas County paper mailed to her?
6  A. Yeah, I believe so.  Yes.
7  Q. Has any family member told you that they
8     have less respect for you because of it?
9  A. No.
10 Q. At the time the lawsuit was filed, were you
11    dating anyone?
12 A. At the time the lawsuit was filed?
13 Q. And when I say "the lawsuit," let me be more
14    clear.  The lawsuit filed by Mr. Anderson.
15 A. I don't believe so.  When was it filed?
16    I don't recall.
17 Q. May 31st, I believe, of 2006.
18 A. I don't believe I was dating anyone.  I
19    didn't start dating my husband until later
20    that year.
21 Q. Did your husband know anything about it when
22    you started dating?
23 A. No, I mentioned it to him.  I told him that
24    there was one, after we dated for a while
25    and starting getting close, just so he would

278

1     Internet?
2  A. Not that I'm aware of.
3  Q. Have any family members quit having any
4     contact with you because of these statements
5     that were made by Mr. Anderson and the press
6     release or the complaint or the statements
7     that were made in the newspaper articles?
8  A. Not really, not have contact with me, but
9     it's limited it.  I even had an aunt call my
10    mother from Nebraska 'cause she had read it
11    somewhere.  I don't know where.  I mean,
12    that's how far it went out, and she was
13    asking about it.
14 Q. Which aunt was that?
15 A. Ilene Mitchell.
16 Q. Can you spell that last name for the court
17    reporter?
18 A. M-I-T-C-H-E-L-L.  I believe she gets a
19    Licking newspaper mailed to her 'cause she
20    used to reside down here years and years
21    ago.
22 Q. Is she still alive?
23 A. Yes.
24 Q. Where does she reside?
25 A. In Nebraska.

280

1     be aware.  I didn't want him to date me and
2     not -- then hear, because I figured
3     eventually he would, so -- I didn't want it
4     to be a shock to him and be like, "Why
5     didn't you tell me," if he heard from
6     someone else.
7  Q. But as far as when you first start
8     started dating, he'd not heard about it?
9  A. Not that I'm aware of.
10 Q. Was there any business interest that you had
11    that was affected detrimentally because of
12    the statements made in the lawsuit, the
13    press release, or the newspaper article?
14 A. Well, even now at Boys & Girls Town, I don't
15    work with any kids that's placed there
16    through Texas County.
17       MR. STEELMAN:  I hate to run, I've
18    got to find out where my partner is who's
19    going to take this over.
20       Are we off the record?
21       VIDEOGRAPHER:  Sure,
22       (A discussion was off the record.)
23    BY MR. HARRIS:
24 Q. Ms. Hutchison, when we took our break, you
25    were saying -- I'd asked you about any

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110          www.alphareportingservice.com          Fax: 417-889-4246

Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 30 of 33

281

1   business interests, and you said at
2   Boys & Girls Town you don't accept any
3   children that come from Texas County.
4 A. They don't let me work with the kids from
5   Texas County just in case there's a conflict
6   due to, like, juvenile officers, attorneys,
7   anybody involved.
8 Q. So that's not solely related to this
9   litigation.  It has to do with your previous
10   service in the prosecuting attorney's
11   office?
12 A. No, to the litigation.
13 Q. All right.  So it's specifically limited to
14   this litigation?
15 A. Correct.  And I'm -- I mean, in the
16   future -- I'm sorry.
17 Q. It's all right.  Go ahead.  You can --
18 A. In the future I worry that it might -- I'm
19   wanting to go out on my own to do therapy on
20   my own.  I'll be fully licensed in April,
21   and I'm going to have to get referrals from
22   different children's division counties,
23   different -- you know, different places, and
24   I'm afraid if they've heard about these
25   allegations, that they may believe them to

282

1   be true and take that into consideration in
2   doing referrals for me.  I mean, it's not
3   happened right now, but --
4 Q. But no one's told you to date that they
5   wouldn't refer people to you?
6 A. No.
7 Q. Correct?
8 A. Not to date, no.
9 Q. As I understand it, the issue with your
10   current employment regarding people from
11   Texas County is not limited to the lawsuit
12   Mike Anderson filed against you, but it's
13   limited to the laws -- or it has to do with
14   the lawsuit that you've brought; correct?
15 A. Pending litigations.
16 Q. And you haven't suffered any kind of
17   decrease in pay or job detriment because --
18 A. Yes.  Whenever I left him, I was making more
19   money.
20 Q. No, no.  I understand that.
21 A. Okay.
22 Q. My question was, with regard to the fact
23   that you can't treat or see kids from
24   Texas County at Boys & Girls --
25 A. Oh, no.

283

1 Q. Town, you haven't suffered any kind of
2   decrease in pay or anything?
3 A. No.
4 Q. As far as organizations to which you belong,
5   has your membership in any organization to
6   which you belong been terminated because of
7   the allegations made in Mr. Anderson's
8   lawsuit or the statements made in his press
9   release or statements made in the newspaper
10   articles?
11 A. No, sir.
12 Q. As I understand your testimony -- I think
13   you were asked this, but I can't recall.
14   During the time that you were employed with
15   the Texas County prosecutor's office, you
16   never engaged in sex with multiple partners
17   at the same time?
18 A. No.
19 Q. Did you, during the time that you were
20   employed at the Texas County prosecutor's
21   office, ever engage in sexual relations or
22   sexual conduct with someone where another
23   person observed it?
24 A. No.
25 Q. With regard to your employment at

284

1   Texas County, was there ever an occasion
2   while you were employed at Texas County that
3   you ever did any type of favor, such as fix
4   a ticket for a friend or anything like that?
5 A. No.  Even Millie had asked me at one time
6   for her brother, what he needed to do to
7   have a ticket reduced, and I even -- I mean,
8   I even told her, as I did everyone else, you
9   have to get a copy of your driving record,
10   you have to appear in court and talk to
11   Mike, you know, or get an attorney.  Those
12   were the only two options that he allowed,
13   unless, of course, he spoke with someone
14   directly on his own.
15       (Mr. Gaunt joins the deposition in
16   place of Mr. Steelman.)
17 BY MR. HARRIS:
18 Q. Other than the Kansas City Star, are you
19   aware of any other papers that published the
20   article, you personally?
21 A. Houston Herald, the Licking news.  There was
22   one in Springfield.  I don't recall the name
23   of the --
24 Q. Springfield News-Leader?
25 A. Could be.  And I believe it went through the

74 (Pages 281 to 284)

ALPHA REPORTING SERVICE
Phone: 417-887-4110     www.alphareportingservice.com     Fax: 417-889-4246
Case 6:09-cv-03018-RED   Document 207-1   Filed 09/20/10   Page 31 of 33

285

1  St. Louis Post-Dispatch. I mean, it was on
2  one of the news channels, too, but I don't
3  recall which one.
4  Q. Now, you mentioned your yard being
5  vandalized with sexually explicit trash?
6  A. Correct.
7  Q. What was the sexually explicit trash that
8  was placed in your yard?
9  A. It was, like, an empty vibrator box filled
10  with rocks and fish minnows.
11  Q. Did that just occur one time?
12  A. Yes, except for the constant beer bottles
13  and whiskey bottles. That was ongoing.
14  Q. That reminds me of something I forgot to
15  ask. At any time that you were employed at
16  the Texas County prosecutor's office, did
17  you ever bring any, what would you call
18  them, sexual devices or toys or things such
19  as vibrators, or anything like that into the
20  office?
21  A. No.
22  Q. As far as who placed this sexually explicit
23  trash in your yard, do you know who did
24  that?
25  A. No.

286

1  Q. Did you make a police report about it?
2  A. No. I informed my attorneys,
3  Allen & Rector.
4  Q. And you mentioned beer bottles and cans and
5  things like that. Would you find those in
6  your yard prior to this incident becoming
7  public?
8  A. No.
9  Q. Did you ever receive any kind of harassing
10  phone calls?
11  A. I received hang-ups. I received calls from
12  the press wanting to ask me questions. I
13  ended up getting my number changed, but I
14  don't recall when that was. There would be
15  phone calls in the middle of the night where
16  my phone would ring, and they would make a
17  statement -- make statements and hang up,
18  like, "You whore," or just breathe heavy and
19  then hang up. I mean, things like that. I
20  don't recall exact dates or anything though.
21  Q. How long did that occur?
22  A. Over a few months. I mean, I eventually got
23  my number changed.
24  Q. And how long was it after you left your
25  employment at Texas County that you moved to

287

1  Rolla?
2  A. It took me a while to sell my house. I
3  believe I moved in -- it was right around
4  the end of '06, December of '06, I believe.
5  Almost a year later.
6  Q. Once you moved to Rolla, did you have any
7  kind of harassment or anything like that?
8  A. No, nobody really knew where I lived other
9  than a select few people. There was one
10  time -- well, I don't know if that would be
11  considered harassment, but I did have an
12  officer come to my work while I worked at
13  the attorney's office saying that he had had
14  a report from an anonymous caller saying
15  that I had been driving erratically through
16  town. So he came to investigate that, but I
17  don't know who reported that.
18  Q. And I understand, and I appreciate the way
19  you've told us today all the ways that it's
20  affected you and embarrassed you, but I'm
21  going to ask just kind of a broad -- cap
22  question. As far as the lawsuit that Mike
23  filed against you, the press release and the
24  newspaper articles, anyone at all that you
25  can ever think of that has come up to you

288

1  and specifically told you that they think
2  less of you because of these incidents?
3  A. No, not specifically.
4  Q. Now, as I understand it from your pleadings
5  that have been filed by your attorneys,
6  you're claiming emotional distress as a
7  result of all this, correct?
8  A. Correct.
9  Q. When was it that the emotional -- well, let
10  me back up and ask a foundational question.
11  Did the emotional distress begin before you
12  left employment at Texas County?
13  A. Yes.
14  Q. Can you tell me a time frame when the
15  emotional distress began?
16  A. I think it -- it all kind of started to --
17  where it was really bothersome to me was the
18  lake incident. It started getting to where
19  I was very standoffish, and then him showing
20  up at my house was the real -- well, of
21  course, him firing me. Really no reason
22  that he would really explain, other than he
23  was hearing things that I was saying and
24  that I was supposedly gathering information
25  for a sexual harassment suit, then calling

75 (Pages 285 to 288)

**ALPHA REPORTING SERVICE**
Phone: 417-887-4110    www.alphareportingservice.com    Fax: 417-889-4246
Case 6:09-cv-03018-RED    Document 207-1    Filed 09/20/10    Page 32 of 33

### 301

1       MR. GAUNT: Let me object. Calls
2   for speculation.
3   BY MR. HARRIS:
4   Q. Well, let me rephrase my question. Probably
5   a good point. As I understand it, your
6   relationship with Corporal Kinder was
7   ongoing at the time you began working at the
8   prosecuting attorney's office; correct?
9   A. What do you mean ongoing?
10  Q. Well, you were already involved with him
11  when you began working at the prosecuting
12  attorney's office?
13  A. Yes.
14  Q. Did you make Mike aware of the fact that you
15  had a romantic relationship with
16  Corporal Kinder when you began working at
17  the prosecuting attorney's office?
18  A. No.
19  Q. With regard to Christina Wheeler, did she
20  initially apply for a job right after Mike
21  got elected?
22  A. No. Angie worked prior to Christina.
23  Q. Do you recall calling Christina Wheeler at
24  her employment and telling her that there
25  was a position open at the prosecutor's

### 302

1   office?
2   A. I don't recall, but I possibly could have if
3   I'd known -- if someone would have referred
4   her as an applicant. I don't even remember
5   where she worked at, to be honest with you,
6   prior to there.
7   Q. With regard to the party that occurred in
8   November of 2005 at Randy Jones' house that
9   was discussed earlier today, did you call
10  Mike and ask him to come to that party?
11  A. No, I don't -- no.
12  Q. And I want to -- I don't know if we've asked
13  this specifically or not, but I want to make
14  sure that it's covered. During the entire
15  time you worked for Mike in his private law
16  office and through the prosecuting
17  attorney's office, at no point in time did
18  he ever specifically proposition you to
19  engage in any type of sexual relationship
20  with you, did he?
21  A. Are you asking did he specifically say,
22  "Will you have sex with me?"
23  Q. Yeah. Let me -- at any point in time from
24  when you began working for Mike in 2001 up
25  through the time that you left, did Mike

### 303

1   ever specifically proposition you to engage
2   in any type of sexual conduct or encounter
3   or anything of that nature?
4   A. Not specifically, no.
5       MR. HARRIS: I don't think I've got
6   any further.
7       Wait a minute. Let me ask one more
8   question.
9   BY MR. HARRIS:
10  Q. When you worked at the prosecutor's office,
11  would you make a practice of forwarding
12  e-mails that contained jokes of a sexual
13  nature to other people?
14  A. No, not that I recall.
15  Q. Okay.
16      MR. HARRIS: Nothing further.
17      EXAMINATION
18  BY MR. FRANKLIN:
19  Q. Ms. Hutchison, I appreciate your patience
20  today. I just have a couple of follow-up
21  questions and --
22  A. Okay.
23  Q. -- we should be completed with your
24  deposition in an expeditious fashion.
25      During the time that you were employed

### 304

1   in the Texas County prosecutor's office, did
2   you discuss your use of sex toys with any of
3   your colleagues?
4   A. No.
5   Q. During the time that you were employed in
6   the Texas County prosecutor's office --
7   A. Oh, wait.
8   Q. I'm sorry.
9   A. At my house, I mean, I believe that we
10  probably may have made comments to one
11  another about, "Yeah, we're single. We have
12  sex toys," but not while I was at the
13  prosecutor's office.
14  Q. Okay.
15  A. I wanted to correct that.
16  Q. So you did have discussions, and what I --
17  there's a couple of questions here, and when
18  I'm talking about the time that you're in
19  the prosecutor's office, that includes both
20  the physical confines and when you're with
21  individuals who are employed in the
22  physical -- who are employed in the
23  prosecutor's office?
24  A. I'm sure that one of -- either Christie or
25  both was at the party, so I'm sure.

ALPHA REPORTING SERVICE
Phone: 417-887-4110        www.alphareportingservice.com        Fax: 417-889-4246