# Michael R. Anderson Deposition Excerpts

EXHIBIT
2

1    approval to hire her?

2         A.   I didn't have to get their approval.  I

3    informed them of who I was hiring and they approved

4    it.

5         Q.   Okay.  Well, did they have to approve it?

6              MR. HARRIS:  I guess I'll just object

7    for the record, it's probably a question of law.  He

8    can certainly testify to his opinion as the

9    prosecuting attorney, but --

10             MR. FRANKLIN:  It certainly calls for

11   a legal conclusion as to the prosecutor's statute.

12   BY MR. STEELMAN:

13        A.   I don't know what would have happened if

14   they had said no.

15        Q.   Okay.

16        A.   I guess I would have wanted to know what

17   their reasons were and we would have taken it from

18   there.  But it's a hypothetical because it didn't

19   come up.  I told them I was going to hire her and

20   they approved it.

21        Q.   Did you give her any raises while she

22   worked for you?

23        A.   Yes.

24        Q.   To give her a raise, did you have to obtain

25   the agreement of the Texas County Commission?

                          25

Case 6:09-cv-03018-RED  Document 207-2  Filed 09/29/10  Page 2 of 25

```
 1          Q.    Could I see Exhibit 1 for just a second?

 2          A.    Meeting with Monica day before she left is

 3     what I wrote there.

 4          Q.    And what day did she leave?

 5          A.    Again, I don't --

 6          Q.    We don't know?

 7          A.    I don't recall the exact date.

 8          Q.    But it was about the first week of

 9     December?

10          A.    Somewhere in the first week of December.

11          Q.    And the day before she left, given how you

12     just described it -- I mean, she came back that night

13     -- is when you had this meeting with her to talk

14     about the problems in the office?

15          A.    Yes.

16          Q.    And you made some notes?

17          A.    Yes.

18          Q.    And those notes have been supplied to the

19     EEOC?

20          A.    Yes, sir.

21          Q.    I probably have those.  When we take a

22     break, I'm going to try to dig those out.  Do you

23     have notes of any other meetings with Monica?

24          A.    No, sir.

25          Q.    Well, let me ask, then.  Why -- in general,
```

Joann Renee Richardson

Case 6:09-cv-03018-RED Document 207-2 sFiled 09/29/10 iPage 3 of 25

```
 1    why -- did you tell her to leave or tell her she

 2    needed to leave?  Describe that meeting to me.

 3         A.    I told her that if she could not change her

 4    ways, then she needed to find another job.  And that

 5    since it was before Christmas, I was not going to

 6    force her out, that I would give her until about the

 7    middle of January to look for something.

 8         Q.    When you say "change her ways," what

 9    specifically were you referring to?

10         A.    Well, there were several things.  She was

11    very disrespectful to me.  I felt that she was

12    undermining the integrity of the office by some of

13    the things that she had been doing.  In particular,

14    it had come to my attention that she was having

15    affairs with several married police officers.  I say

16    "several"; at least two that I was told of.  And I

17    was told there may be more.

18              As I said, she had become very

19    disrespectful around the office.  And I had some

20    information that she may be doing other things, like

21    removing subpoenas, closing the office whenever I was

22    out of town, either closing the office and sending

23    people home, or closing the office and staying in the

24    office by herself.

25         Q.    She didn't have authority to do that?
```

Joann Renee Richardson

Case 6:09-cv-03018-RED   Document 207-2   Filed 09/29/10   Page 4 of 25

1      A.    Yes.

2      Q.    Okay.  And who were the officers?

3      A.    The information I had, the first two names

4   I was told was Chief Danny McNew, with the Licking

5   Police Department.

6      Q.    And who told you Chief Danny McNew?

7      A.    Christie.

8      Q.    Okay.  Wheeler?

9      A.    Yes.

10     Q.    Okay.  And who else?

11     A.    Jeff Kinder.

12     Q.    Okay.  Have you ever asked Danny McNew or

13   Jeff Kinder if that was accurate?

14     A.    No.  I had a meeting with Danny McNew where

15   I tried to ask him and he stormed out of my office.

16     Q.    What about Jeff Kinder?

17     A.    No.  I had a meeting where I tried to

18   indicate to him that I knew what was going on, hoping

19   that he would put an end to it, and I hoped that that

20   was enough.

21     Q.    And so if I'm accurate -- because I want to

22   use the words in your petition.  Did you have

23   information that Chief Danny McNew and Jeff Kinder

24   were part of the sex ring that you alleged?

25     A.    No, that's not what I was alluding to.

44

Case 6:09-cv-03018-RED  Document 207-2  Filed 09/29/10  Page 5 of 25

```
 1    Who did you talk to about this before filing the

 2    pleadings?

 3         A.    Primarily the girls that worked in my

 4    office, who brought it to my attention.

 5         Q.    Okay.

 6         A.    They came to me and told me.

 7         Q.    Did you ever talk to any of these names

 8    that allegedly participated in this?

 9         A.    No.

10         Q.    So that I understand, other than talking to

11    the girls in your office and saying to Terry Haden,

12    "Do you know what's going on?" and her saying "yes,"

13    you did nothing else to determine whether or not

14    there was a sex ring operated out of the prosecutor's

15    office and the Associate Circuit Court's Office; is

16    that right?

17         A.    Investigation wise?  Is that what you mean?

18         Q.    Whatever you mean.

19         A.    Did I go out and interview people, no.

20         Q.    Okay.  And do I understand that other than

21    the girls in your office and this statement to Terry

22    Haden, you didn't say to anybody else, including

23    Judge Ellsworth, that Millie and Monica were

24    operating a sex ring out of the prosecutor's office

25    and the Associate Circuit Judge's Office; is that
```

Joann Renee Richardson

Case 6:09-cv-03018-RED   Document 207-2   Filed 09/29/10   Page 6 of 25

1    right?

2         A.    No, sir, I don't think I told him until

3    after I filed the suit.

4         Q.    Okay.  Well, where did Millie come in?  I

5    think your office was telling you about Monica having

6    meetings in your office.  Where did Millie's part of

7    this conspiracy come in?

8         A.    I was told that Monica and Millie had been

9    spending quite a bit of time, mostly Millie spending

10   the night at Monica's office.

11        Q.    Monica's office or house?

12        A.    House, I'm sorry.  And she spent a lot of

13   time in my office, which wasn't that unusual, but

14   there was really no reason for her to be there.

15   Every year Judge Ellsworth takes several of his

16   employees and their spouses to Mexico whenever he was

17   a judge and he would pay their way.  I knew that the

18   plan that year, that Millie was going to go and she

19   was taking Monica.  I saw that as a problem for

20   everybody.

21        Q.    Why?

22        A.    Because I was under the impression and I

23   was told by these people that Monica and Millie were

24   a couple, if you will.

25        Q.    And who is these people who told you that?

                           52

```
 1        A.    I spoke to her.  I asked for advice.  She
 2   told me, basically, there wasn't anything much that
 3   she could do.  I had collected some cigarette butts
 4   out of my ashtray in my car, thinking that if I had
 5   been drugged, that there might be some evidence on
 6   the --
 7        Q.    My question is, is Melissa Dunn the person
 8   that we would talk to or depose regarding your
 9   investigation into your claims that you were drugged?
10        A.    I discussed it with her, but she never did
11   anything that I'm aware of as far as --
12        Q.    Anybody else you discussed it with?
13        A.    Brad Eidson.
14        Q.    Anybody else?
15        A.    Judge Ellsworth whenever I requested the
16   subpoena for the tape.
17        Q.    Anyone else?
18        A.    Dr. Long, Christopher Long with the
19   University of Missouri Hospital in St. Louis.
20        Q.    And was this an official consultation you
21   had with him?  Would he have a record of it?
22        A.    I don't know if he'd have a record.  I was
23   talking to him about another case, a poisoning case
24   where a child had died.  We had an 11-month-old
25   infant that had died that had initially been
```

97

```
 1        A.    Again, Christie and Stephanie.

 2        Q.    And Monica had sex on your --

 3        A.    Monica told them that she had done that --

 4        Q.    And who was it with?

 5        A.    -- and that she thought it was funny.

 6        Q.    With who?

 7        A.    One of the police officers.  I don't

 8   remember which one.

 9        Q.    Was there a name that they told you at that

10   time?

11        A.    They may have, but I honestly can't

12   remember now which one it was.  There was several.

13        Q.    And part of my question is, was this filing

14   of this suit to protect you personally, or was it to

15   protect the Office of Prosecuting Attorney of Texas

16   County?

17        A.    Well, it was to protect me, but the actions

18   that they had taken certainly undermined the office.

19   But you got to remember, Mr. Steelman, I was up for

20   reelection in 2006.

21        Q.    Did you have an opponent?

22        A.    It turned out I didn't, but I didn't know

23   that.

24        Q.    I forget, when does filing open?

25        A.    I think it opens in January.
```

                              121

Case 6:09-cv-03018-RED - Document 207-2 SF Filed 09/28/10 Page 9 of 25

1      Q.      And when does it close?

2      A.      I can't remember, March or April, I think.

3      Q.      Had the filing deadline closed by the time

4      that you filed the petition?

5      A.      If filing closes in March, then it would

6      have closed by the time I filed the petition in May,

7      yes.

8      Q.      Now, I want to talk about what you call in

9      Paragraph 4 malignant, libelous, and slanderous

10     conduct.  And the first one is, conspiring with each

11     other to disseminate false information that you made

12     threatening comments during a series of telephone

13     calls made to the home phone of defendant Monica

14     Daniel on or about December 18th, 2005.  Do you see

15     that?

16     A.      Yes, sir.

17     Q.      And what false information did either of

18     them say that's part of what you're talking about in

19     Paragraph 4-A?

20     A.      I was told that I had, on this tape,

21     threatened to kill Monica Daniel if she cut off our

22     affair.  I was told that I had --

23     Q.      Who told you that?

24     A.      Debbie James.

25     Q.      And where had Debbie James heard that?

122

Joann Renee Richardson

```
1    A.    From Mildred Williams.

2    Q.    Okay.  And what else?

3    A.    That I had threatened them on this phone
4    call if they didn't let me in, I would harm them in
5    some way.

6    Q.    And who told you that?

7    A.    Again, it came to me -- one incident I can
8    remember was what I told you about earlier; when my
9    wife came to me and said this friend of ours
10   approached me in town today and said that he heard
11   this from his cousin, Debbie James, the assessor.

12   Q.    And who was that?

13   A.    I was having people stop me --

14   Q.    And who was that friend?

15   A.    That friend is Jimmy Sutton.

16   Q.    Okay.  And Jimmy Sutton told you that he
17   had heard it from Debbie James?

18   A.    Who is his cousin.

19   Q.    Did you go talk to Debbie James?

20   A.    I did.

21   Q.    And did she tell you that?  Did she confirm
22   that?

23   A.    Yes.

24   Q.    Okay.  So Jimmy Sutton told you, and then
25   she told you she talked directly to Millie Williams?
```

123

```
 1    tape, which would have been, I think, the last week
 2    in December, I went to Mildred Williams and
 3    apologized.
 4              I told her how sorry I was and I couldn't
 5    believe that I would say those kind of things because
 6    that's not the kind of person I am.  I had never done
 7    anything like that before.  Mildred Williams cried,
 8    told me that she had been in abusive relationships
 9    before and it scared her to hear these kind of things
10    and that --
11         Q.    What kind of things?
12         A.    That I had threatened to kill them if they
13    didn't have sex with me.
14         Q.    Okay.  So Mildred Williams told somebody
15    that you threatened to kill them if you didn't have
16    sex?
17         A.    Yes.
18         Q.    And that was Debbie James?
19         A.    That was Debbie James.  At least one person
20    I was able to nail down that would admit that's where
21    she heard it.
22         Q.    Okay.  Anybody else that you have nailed
23    down that they heard from either Millie or Monica
24    saying that statement, that you threatened to kill
25    someone?
```

126

1      A.   I was told it by Debbie James, who told it
2  to her cousin, who told it to my wife, and it was
3  confirmed by Mildred Williams whenever I confronted
4  her.
5      Q.   And what were those comments supposed to be
6  of a sexual nature?
7      A.   That I was demanding sex from them, that I
8  was making lewd comments.  In effect, that I had
9  committed the crime of telephone harassment.
10     Q.   Now, on C -- did you have any other
11 individuals on that one?  I want to make sure I got
12 everybody.  We've got Debra James, Sutton, anybody
13 else?
14     A.   Mildred Williams.
15     Q.   Mildred Williams.  Anybody else?
16     A.   She didn't deny it.
17     Q.   Anybody else?
18     A.   I believe the girls in my office were all
19 aware of it.  They had been told the same things.
20     Q.   Now, what is C:  Conspiring with each other
21 to disseminate false information that you engaged in
22 inappropriate behavior during a prosecutor's training
23 seminar in September of 2005.  What is that about?
24 Who made the statement?  Who'd they make it to?
25     A.   The prosecutor training seminar, when I got

130

1    Q.    D says:  They used the public offices held

2    by Defendant Daniel and Defendant Williams to remove

3    and conspiring to cover up the removal of criminal

4    investigative documents from the Texas County

5    Prosecutor's Office.  What is that?

6    A.    Well, there's one instance in particular

7    where Ms. Daniel's paramour, Danny McNew, who was the

8    chief of police in Licking, had been involved in a

9    fatal car accident.  He was chasing a man who was

10   driving while revoked.  The man crashed his car and

11   was killed.  There were two other occupants in the

12   car and they both had serious injuries and were life

13   flighted.

14        I had no idea at the time that Monica

15   Daniel was carrying on an affair with Danny McNew,

16   none, didn't have a clue.  When the highway patrol

17   brought the initial report to me, which is basically

18   a three-page accident report, they told me that there

19   was going to be an investigation and a

20   reconstruction.

21        I did what I always did in that situation;

22   I gave the initial report to Monica, told her

23   whenever the follow-up investigation got in, to bring

24   it to me and I would look at it.  It was not until

25   after Ms. Daniel left my office that I learned not

132

only did I never get the follow-up report, but the initial report was missing from my office.

Had I known that Ms. Daniel was having an affair with the object of the investigation, if you will, I certainly would have never allowed her to handle the file, and probably would have called in a special prosecutor from the beginning.

I didn't learn until after I got the report that there were some rumors or allegations that Chief McNew may have rammed this car immediately before it lost control and crashed.

Q. And what action did you take then?

A. As soon as I got the information -- well, as soon as I found out the report was missing, I called in the highway patrol officer that had done the report, asked him where was the report and why had I never gotten one. He said not only had he sent me one, but he sent one to the troop in Jefferson City. I told him I needed it. He went and got it.

Q. What's the name of this case?

A. Again, sir, I have so many cases. I want to say, again, this man's name was Sullins. I believe that's his last name, but I've got the file.

Q. And you have that file; correct?

A. Yes, sir.

133

Case 6:09-cv-03018-RED Document 207-2 Filed 09/20/10 Page 15 of 25

```
 1        Q.    Okay.  And what was the patrolman?

 2        A.    The patrolman that brought the report in

 3   was Trooper Terry Nelson.

 4        Q.    And what did Ms. Williams have to do with

 5   this report?

 6        A.    Well, in regards to Ms. Williams, I learned

 7   that she had been -- or I believe that she had been

 8   helping Ms. Daniel move subpoenas around for

 9   different officers.

10        Q.    Who told you that?

11        A.    I think it was obvious by the fact that Ms.

12   Daniel could not have done it on her own without some

13   record appearing in the court records.

14        Q.    Did you report this to Judge Ellsworth at

15   any time?

16        A.    Whenever I filed this.

17        Q.    When you filed the lawsuit?

18        A.    Yes, sir.

19        Q.    Now, if someone is removing criminal

20   investigative documents, that would be a crime;

21   correct?

22        A.    I believe so.

23        Q.    Did you open a criminal investigation file

24   on that?

25        A.    Yes.
```

1    Q.    And so if we request, there's a criminal

2    investigation regarding Monica Daniel and the removal

3    of these documents; is that right?

4    A.    Yes, sir.

5    Q.    Okay.   And did you call the Missouri

6    Attorney General's Office on that?

7    A.    Yes, sir.

8    Q.    And who did you talk to?

9    A.    I sent a letter to Ted Bruce, laid it all

10   out for him, sent him the file, asked him to

11   investigate it.  Several weeks later, maybe one month

12   or two months later, I got a call from his

13   supervisor, Andrea Spillers, saying that, number one,

14   whereas she believed that what had happened, it

15   probably happened, that the report had been removed,

16   there was no proof of it; that, by that time, any

17   evidence of a crime regarding Mr. McNew had been

18   destroyed because the car that was wrecked had been

19   returned to the owners, and the City of Licking had

20   sold the patrol car involved and they were not going

21   to do any more to look into this.

22   Q.    This is a phone call from Andrea Spillers;

23   correct?

24   A.    This is a phone call from Andrea Spillers.

25   I also asked that the attorney general come down and

135

Case 6:09-cv-03018-RED   Document 207-2   Filed 09/20/10   Page 17 of 25

1    do a sweep of all the computers in my office.

2         Q.    Did they do that?

3         A.    Yes.

4         Q.    And is there a written report on that?

5         A.    There's a report indicating that they

6    didn't find anything under the searches that I gave

7    them.  And some of the search terms I gave them was

8    removal of files, the name of the victim in this

9    case, closing the office, meet me after work, all

10   these things.

11        Q.    How about sex, was that word in the search?

12        A.    I've got a list and I don't think it is.

13        Q.    Okay.  And you have files and lists of all

14   these, because they're not listed by your attorney in

15   your disclosures?

16        A.    I have the file that was brought to me by

17   the highway patrol, including photos.  I have the

18   letter that I sent to Ted Bruce.  And I have the

19   report from the forensics investigator, saying that

20   nothing under the search terms that I requested were

21   found on my computer.

22        Q.    And what was the date of your letter to Ted

23   Bruce?

24        A.    I don't recall, sir.  I have got it.

25        Q.    After she left the office?

136

```
 1       A.    Yes.  I'm not clear on it.  I can't
 2   remember, but it is dated.  And before I filed my
 3   lawsuit.
 4       Q.    And did you report Millie Williams as
 5   having part of this to Ted Bruce?
 6       A.    No, I didn't think that she was part of
 7   that, that coverup.
 8       Q.    You said she is in your petition.
 9       A.    Well, I say that she was --
10             MR. HARRIS:  I object, that misstates
11   the petition.
12   BY MR. STEELMAN:
13       A.    Removal of criminal investigative documents
14   from the Texas County Office to the detriment of
15   Office of Texas County Prosecutor and people of Texas
16   County.  Ms. Williams' involvement, I believe, was
17   more the in the way of helping to withdraw subpoenas
18   and that type of thing.
19       Q.    Is that what you're talking about in E, 4-
20   E?
21       A.    Yes.
22       Q.    Now, on 4-F, you talked a lot about this
23   swinger style sex ring, but you also talk about not
24   just the Texas County Prosecutor's Office, but the
25   Texas County Associate Court Office.  And what
```

137

Case 6:09-cv-03018-RED Document 207-2  Filed 09/20/10  Page 19 of 25

1    evidence do you have that it was run out of the Texas

2    County Associate Court Office?

3         A.    Ms. Williams' involvement.

4         Q.    Well, is that just what you testified to

5    earlier, which was basically the Stephanie Creek

6    matter?

7         A.    Well, that, and the fact that Monica didn't

8    do much without Millie there at the time.

9         Q.    Now, again, you didn't report -- other than

10   the letter to Ted Bruce, you didn't report any of

11   this to Judge Ellsworth or any person prior to filing

12   the lawsuit; is that right?

13        A.    I didn't think it would be appropriate to

14   report it to Judge Ellsworth.  He may be hearing this

15   case.  But to answer your question, no, I didn't.

16        Q.    Now, you talked about the damage to your

17   reputation; correct?

18        A.    Yes.

19        Q.    As to why you filed the lawsuit; correct?

20        A.    That and to get them to stop saying the

21   things they were saying.

22        Q.    Do you believe damage to reputation is

23   permanent?

24        A.    I think it can be rectified.

25        Q.    And what can rectify it?

138

Case 6:09-cv-03018-RED   Document 207-2   Filed 09/20/10   Page 20 of 25

```
 1        Q.    Are you going to refile them if you can?

 2        A.    I don't know.

 3              MR. FRANKLIN:  Objection,

 4   attorney/client privilege regarding, you know,

 5   whatever future legal action has been contemplated or

 6   has been discussed with counsel.

 7   BY MR. STEELMAN:

 8        Q.    I'm asking you.  I don't care what you

 9   discussed with counsel.

10        A.    I don't know.

11        Q.    Do you intend to refile these cases?

12        A.    Do I intend right now?  I don't know.  I

13   haven't decided.  I wouldn't decide that until I

14   consulted with my attorneys.

15              MR. STEELMAN:  Can we take a quick

16   break?

17              MR. WATERS:  Current time is 1616.

18   We're now going off record.

19                   (Off the record.)

20                   _____

21              (Back on the record.)

22              MR. WATERS:  The current time is 1624.

23   We're now back on record.  Please proceed.

24   BY MR. STEELMAN:

25        Q.    Paragraph 8 says that the conspiracy has
```

142

victim of a crime, that I have as much right to preserve evidence as any other citizen in the county that would be the victim of a crime.

He said, "No, Mike, I'm not going to do it." A day or two days later, after no more discussion, he called me back, said that he had thought about it and that he agreed with me and that he was going to sign the subpoena.

Q. So the first time you talked to him was a day or two days before December 23?

A. A day, two at the most.

Q. Okay. Was there a criminal file open?

A. No.

Q. It has to be part of -- a subpoena like this must be part of an ongoing investigation; is that right?

A. Yes.

Q. Okay. What else was done for this investigation? Did you believe you were assaulted?

A. Yes.

Q. Okay. And so did you ask a special prosecutor to be appointed?

A. Not at that point. I knew that I probably would at some point. Right now -- at that point, I was just looking to preserve the evidence and see if

170

Case 6:09-cv-03018-RED Document 207-2 Filed 09/20/10 Page 22 of 25

1     there was any evidence.

2         Q.   So you were acting as an investigator of a

3     crime that you thought was perpetrated upon you; is

4     that right?

5         A.   I called the sheriff's department, spoke to

6     Lieutenant Dunn, asked her to assist.  She, in

7     effect, told me that she didn't want to get involved.

8         Q.   Here's my question, very specific.  You

9     believed a crime had been committed, an assault; is

10    that correct?

11        A.   Yes.

12        Q.   And you believed you were the victim; is

13    that correct?

14        A.   Yes.

15        Q.   And you used the power of the prosecutor's

16    office to investigate that crime; correct?

17             MR. FRANKLIN:  I'm going to object.

18    It calls for a legal conclusion as to whether he was

19    using the power of the prosecutor's office.

20             MR. STEELMAN:  That's a good point.

21    BY MR. STEELMAN:

22        Q.   As prosecuting attorney you requested the

23    subpoena to further that investigation; is that

24    correct?

25        A.   I was trying to preserve any evidence that

                          171

```
 1        A.    Stephanie and Christie, the people that she
 2   confided in.
 3        Q.    What's the lack of self-control you're
 4   talking about?
 5        A.    Showing up at her house and making that
 6   tape.
 7        Q.    Did you leave that night, by the way,
 8   before the police arrived, or did you leave when you
 9   saw them arrive?
10        A.    I never saw the police that I recall.  I
11   don't remember when I left or how I left.  I don't
12   remember talking to anyone.  I don't remember seeing
13   anyone.  I remember one brief instance of being on
14   the road driving home and that's all I remember.
15        Q.    At the end of that tape, that last
16   paragraph says, "In return, I ask only that you give
17   me your word that you will destroy the tapes you have
18   and not use them to further embarrass me."
19        A.    Yes.
20        Q.    So on the 21st of December, you wanted the
21   tapes destroyed; is that right?
22        A.    I wanted her tape destroyed, the one that
23   she was playing around at parties and in public to
24   embarrass me, yes.
25        Q.    Well, I don't understand.  Did you want
```

182

1      Q.    Okay, just a couple of questions, Mr.

2    Anderson, and I'm almost done.  After you got the

3    tape by subpoena, did you ever have anyone listen to

4    it to see if they could identify that you had been

5    drugged?

6      A.    No.

7      Q.    Now, did you tell the judge that you wanted

8    the tape in order for someone to listen to it?

9      A.    Yes.

10     Q.    And then you didn't let anyone listen to

11    it; is that right?

12     A.    Yes.  I was told by Dr. Long that if he had

13    that tape, or an audiotape and a videotape, he could

14    observe those and distinguish whether or not someone

15    was intoxicated with alcohol or under the influence

16    of these drugs.  By that time, or shortly thereafter,

17    I learned that the videotape didn't exist.

18     Q.    Well, you didn't get the tape until -- from

19    Monica until the 23rd; is that right?

20     A.    Yes.

21     Q.    So you did not make any effort to find out

22    about the videotape prior to the 23rd?

23     A.    I had been trying to get the videotape,

24    yes.  And I was told days later by Mr. Eidson that it

25    had been taped over.  I thought we were going to have

Case 6:09-cv-03018-RED  Document 207-2   Filed 09/20/10   Page 25 of 25