1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MONICA DANIEL HUTCHISON,   )
                           )
           Plaintiff,      )
                           )
vs.                        ) Case No. 09-3018-CV-S-RED
                           )
TEXAS COUNTY, MISSOURI; MICHAEL)
R. ANDERSON, TEXAS COUNTY  )
PROSECUTING ATTORNEY; and  )
MICHAEL R. ANDERSON,       )
Indivually,                )
                           )
                           ) August 25, 2009
           Defendants.     ) Houston, Missouri


VIDEOTAPED DEPOSITION OF MICHAEL ROY ANDERSON,

a Defendant, produced, sworn and examined on the 25th day of

August, 2009, between the hours of 8 a.m. and 5 p.m. of that

day, at Texas County Courthouse, 519 North Grand, City of

Houston, County of Texas, before

JOANN RENEE RICHARDSON, CCR
Certified Court Reporter
20051 State Route B
St. James, Missouri 65559

in the above-entitled cause, pursuant to Notice to Take

Video Deposition, on the part of the Plaintiff.

Page 9

1 carry a weapon?
2   A. No, sir.
3   Q. Do you use any controlled substances?
4   A. No, sir.
5   Q. Do you use alcohol?
6   A. Occasionally.
7   Q. Obviously, there's -- we're going to talk
8 about the night of December 18th and some other
9 circumstances, so I want to know, have you had any
10 problems with alcohol abuse or addiction to alcohol
11 in the last five years?
12   A. No, sir, never.
13   Q. Have you ever drank alcohol to the point
14 where you were impaired in the last 10 years?
15       MR. HARRIS: Well, I'm going to
16 object. I think impaired is vague and ambiguous.
17 Can you define that?
18       MR. STEELMAN: Probably not. Go
19 ahead.
20 BY MR. STEELMAN:
21   A. If you could define impaired. I have been
22 intoxicated, what I would consider my opinion
23 intoxicated.
24   Q. And what do you mean by intoxicated?
25   A. Where I was feeling the effects of the

Page 10

1 alcohol.
2   Q. Were you at a point that you should not
3 have been driving?
4   A. And I haven't, yes.
5   Q. Okay.
6   A. I've had enough that I shouldn't drive, and
7 I didn't.
8   Q. The night of December 18th, 2005, we're
9 going to talk more about that. That was the night
10 that you left some phone messages on Monica's phone;
11 is that right?
12   A. Yes.
13   Q. And you also came to her door; is that
14 right?
15   A. I don't remember that. But I remember
16 being at her house and talking on the cell phone.
17   Q. Okay. Where were you talking on the cell
18 phone from?
19   A. My car.
20   Q. And where was your car?
21   A. In her driveway.
22   Q. Were you intoxicated that night?
23   A. I was under the influence of something.
24   Q. Were you driving that night?
25   A. Yes.

Page 11

1   Q. Should you have been driving that night?
2   A. No.
3   Q. Let me ask, when -- again, we'll get back
4 to this quicker, but how did you get home that night
5 from Monica's house?
6   A. Apparently, I drove.
7   Q. Okay.
8   A. But I don't remember.
9   Q. Now, when I asked you earlier if you had
10 ever been so intoxicated where you couldn't drive,
11 you volunteered that you didn't ever drive when you
12 were intoxicated. You volunteered that; right?
13   A. Yes, sir.
14   Q. Was that a true statement?
15   A. Yes, sir.
16   Q. Let's talk about the night of the 18th.
17 Were you so impaired that you shouldn't have been
18 driving?
19       MR. HARRIS: Same objection.
20 BY MR. STEELMAN:
21   A. Yes, sir.
22   Q. Did you drive?
23   A. Yes, sir.
24   Q. Had you had alcohol that night?
25   A. Yes.

Page 12

1   Q. How much?
2   A. I had one beer and one mixed drink that I
3 recall.
4   Q. And where did you have the beer at?
5   A. At a place called the Outback in Licking,
6 Missouri.
7   Q. And who was there with you?
8   A. No one.
9   Q. Who supplied you the beer?
10   A. I bought it at the bar. Well, let me
11 rephrase that. Someone gave it to me. Bought it for
12 me and handed it to me.
13   Q. And do you know who that was?
14   A. No, sir.
15   Q. Did you have a mixed drink that night, too?
16   A. Yes, sir.
17   Q. Okay. Who gave you that?
18   A. I bought that and got it from the
19 bartender.
20   Q. Do you recall whether you ever told anybody
21 you drank a fifth of Chivas that night?
22   A. No, sir, I don't recall saying that.
23   Q. Are you under any medication today as we
24 speak?
25   A. No, sir.

Page 41

1  A. No.
2  Q. Or discretion to do that; is that right?
3  A. No.
4  Q. Okay, go ahead.
5  A. Those are just some of the things that come
6  to mind. But I knew that there were problems going
7  on and I told her that she was going to have to
8  change her ways, fix the problems, or that she needed
9  to find another job. I think what I said was, "You
10 need to find another place to work."
11 Q. Did you talk about her being disrespectful
12 at the meeting in the first week of December, 2005?
13 A. I think we talked about the fact that she
14 had made some comments to police officers about cases
15 I was handling, where she would call them and make
16 comments like, "I can't believe my stupid boss let
17 that guy go on probation. I know how hard you worked
18 on that case. He just doesn't know. He's dumb.
19 He's stupid." Those type of things. I considered
20 that disrespectful.
21 Q. So tell me, when was this?
22 A. When were these --
23 Q. When did this occur? We're going to go one
24 by one, so when did this occur?
25      MR. FRANKLIN: Objection; vague. I'm

Page 42

1  not trying to interrupt, but which are you referring
2  to?
3       MR. STEELMAN: When she said, "Can't
4  believe my stupid boss let so and so go on
5  probation."
6  BY MR. STEELMAN:
7  A. When did it occur, or when did I find out
8  about it?
9  Q. When did it occur? I'm going to ask the
10 when did you find out.
11 A. I don't know exactly when it occurred. I
12 know it was recent.
13 Q. Recent, appearing just recent within the
14 first -- next month or two before December of 2005?
15 A. Probably within that time period. I think
16 I was under the impression that it might have been
17 within weeks.
18 Q. Okay. And who did she say it to?
19 A. I was told by Christina Wheeler, Mosley
20 now, who also worked in my office, that she had
21 overheard this.
22 Q. And who was Monica saying it to?
23 A. Highway patrol officers. I believe one of
24 the ones that Christie told me that she had called
25 would have been, I believe, Jeff Kinder.

Page 43

1  Q. Okay. So that I understand, one of these
2  areas in which she was disrespectful was that you
3  were told by Christina Wheeler that Monica told Jeff
4  Kinder and made bad statements about the way you had
5  handled a particular case?
6  A. Case or cases.
7  Q. Case or cases; right?
8  A. I was told she had done this on more than
9  one occasion.
10 Q. Okay. What case or cases are we talking
11 about?
12 A. I don't recall. I don't know what case it
13 was.
14 Q. You don't know the names of any of the case
15 or cases?
16 A. Again, sometimes when we go to court we
17 have 200 cases on the docket. I don't think that
18 Christie ever told me it was a particular case. She
19 just said she overheard Monica talking on the phone.
20 Q. Was it one of Jeff Kinder's cases?
21 A. I would assume, if she's telling him that
22 she thinks I mishandled it.
23 Q. Okay. Now, the next thing you said, "She
24 was undermining the integrity of the office by having
25 affairs with married officers"; correct?

Page 44

1  A. Yes.
2  Q. Okay. And who were the officers?
3  A. The information I had, the first two names
4  I was told was Chief Danny McNew, with the Licking
5  Police Department.
6  Q. And who told you Chief Danny McNew?
7  A. Christie.
8  Q. Okay. Wheeler?
9  A. Yes.
10 Q. Okay. And who else?
11 A. Jeff Kinder.
12 Q. Okay. Have you ever asked Danny McNew or
13 Jeff Kinder if that was accurate?
14 A. No. I had a meeting with Danny McNew where
15 I tried to ask him and he stormed out of my office.
16 Q. What about Jeff Kinder?
17 A. No. I had a meeting where I tried to
18 indicate to him that I knew what was going on, hoping
19 that he would put an end to it, and I hoped that that
20 was enough.
21 Q. And so if I'm accurate -- because I want to
22 use the words in your petition. Did you have
23 information that Chief Danny McNew and Jeff Kinder
24 were part of the sex ring that you alleged?
25 A. No, that's not what I was alluding to.

Page 45

Q. Okay. Well, at this time, did -- because you filed a petition alleging a sex ring, which we're going to get to in some detail. I'm just trying to figure out, is this undermining the integrity of the office in December of 2005, was that the sex ring?

A. No, we're talking about two different things here. I found out first that she was having these affairs with these married officers. I didn't consider that necessarily a sex ring.

Q. Okay.

A. When I found out later that she was having sex with multiple partners, including married couples, and that they were meeting her in my office and that I knew these people and had seen them around my office and found out later that the main reason they were in my office was to set up these meetings with Monica and have these -- whatever you want to call them, I considered that a group sex ring, or whatever they were doing.

Q. Okay. And who told -- who told you about that?

A. Again, most of it came through Christie. Stephanie Creek, who also worked in my office. A couple other people confirmed it.

Q. Who confirmed it?

Page 46

A. Terry Haden, a friend of Monica's.

Q. And when did she confirm it to you?

A. When I asked her if she knew about this, what was going on, she said something to the effect, she didn't want to get involved, but she knew some of the things that Monica was doing in the office and she didn't approve of it.

Q. Was she specific?

A. No, not to me.

Q. Well, who was she specific to?

A. Again, most of my information came through Christie and Stephanie Creek.

Q. So when you say Terry Haden confirmed it, you mean she was specific with Christie or Stephanie, and then you went and talked to her about it and she said, "I don't like what Monica is doing in the office?"

A. Actually, she came to talk to me.

Q. I'm sorry?

A. She came to talk to me.

Q. And then what specifically did she say to you? And when was this?

A. This would have been -- well, I don't know, it's hard to say. I don't know. I don't know when it would have been. I remember her coming to my

Page 47

office and me asking her if she had known about these things.

Q. Did you say "these things," or did you say specifically?

A. Well, I didn't go into detail. I said, did you know that she was doing these things with these people? And I named some of the people. I said, "Who are these people?"

Q. And I'm not trying to be difficult. What I'm trying to ask, did you -- what words, if you can, did you use? Did you say, did you know she's doing these things with certain people and name them? Or did you mention sex acts or sex? I mean, how specific were you?

A. I think I asked her if she knew that Monica was meeting these people in my office.

Q. Okay.

A. And she --

Q. Wait, let me interrupt. And who are these people?

A. I have written their names down. I don't know most of them, except in passing. So I remember there was a Misty and a Ron Hale, a married couple that Monica apparently was involved with sexually. A couple more of her friends and their husband's or

Page 48

boyfriend's.

Q. And what are their names?

A. I'm trying to remember. I have their names written down, but I didn't know these people. I just knew --

Q. Here's all I'm asking. Did you say to Terry Haden that Monica was meeting people in your office for purposes of sex and named those people who were having sex with Monica to Terry Haden? That's all I'm asking.

A. I don't recall if I named the people. I asked her if she knew what was going on. And she indicated to me that she did.

Q. Did you say who was involved? Here is all I'm asking. Do you know what's -- if you ask somebody, "Do you know what's going on?" and they say, "Yes," how do you know you're talking about the same thing?

A. I don't know.

Q. Let me ask this. Did you specifically say to anyone, other than this lawsuit that you filed, that Millie Williams and Monica were involved in a sex ring and named the people who were involved in that sex ring other than them?

A. Did I say that to a person?

Page 49

1  Q. Yes, outside of a court pleading.
2  A. No.
3  Q. Okay. So outside of a court pleading, you
4  have -- well, let me ask this. Have you said to
5  anyone outside of a court pleading that Millie and
6  Monica were involved in a sex ring?
7  A. Yes --
8  Q. And who?
9  A. -- since filing the suit.
10 Q. Well, before filing the suit?
11 A. When I filed the suit, when I said they
12 were involved in a sex ring, that was the only
13 definition of what I learned was going on that I
14 could come up with. How else do you describe
15 something like that?
16 Q. Okay. What I'm asking is, outside --
17 forget the word sex ring. To what other person did
18 you describe what you have just described as being a
19 sex ring, outside of the filing of that pleadings?
20 A. Mr. Steelman, I don't talk about this a lot
21 to people. I filed my lawsuit. I have talked to my
22 attorneys about it. I have talked to the people in
23 my office who brought this to my attention in trying
24 to determine what was actually going on, but this is
25 not something I go around talking about.

Page 50

1  Q. Other than the people who were employees of
2  your office, to who else did you talk to to, in your
3  own words, see what was really going on?
4  A. I know I talked to Ms. Haden.
5  Q. But with Ms. Haden, you never mentioned
6  specifics. Is that right or wrong?
7  A. That's right, I didn't go into detail with
8  any of these people. I'm not going to discuss, you
9  know, what was going on, you know, what are they
10 doing or their sex acts. I was told that they were
11 having group sex and that was all I needed -- all I
12 wanted to know.
13 Q. Did you say to Terry, outside of the --
14 that Monica and Millie were having group sex? Did
15 you say that to her?
16 A. No, I didn't say that. I asked her if she
17 knew what had been going on in my office. She
18 indicated that she did.
19 Q. But other than those words, "Do you know
20 what's going on?" and the answer "yes," you didn't
21 put any other specifics to determine what it was she
22 was talking about or what it was you were talking
23 about?
24 A. No, sir.
25 Q. Okay, that's all I'm trying to find out.

Page 51

1  Who did you talk to about this before filing the
2  pleadings?
3  A. Primarily the girls that worked in my
4  office, who brought it to my attention.
5  Q. Okay.
6  A. They came to me and told me.
7  Q. Did you ever talk to any of these names
8  that allegedly participated in this?
9  A. No.
10 Q. So that I understand, other than talking to
11 the girls in your office and saying to Terry Haden,
12 "Do you know what's going on?" and her saying "yes,"
13 you did nothing else to determine whether or not
14 there was a sex ring operated out of the prosecutor's
15 office and the Associate Circuit Court's Office; is
16 that right?
17 A. Investigation wise? Is that what you mean?
18 Q. Whatever you mean.
19 A. Did I go out and interview people, no.
20 Q. Okay. And do I understand that other than
21 the girls in your office and this statement to Terry
22 Haden, you didn't say to anybody else, including
23 Judge Ellsworth, that Millie and Monica were
24 operating a sex ring out of the prosecutor's office
25 and the Associate Circuit Judge's Office; is that

Page 52

1  right?
2  A. No, sir, I don't think I told him until
3  after I filed the suit.
4  Q. Okay. Well, where did Millie come in? I
5  think your office was telling you about Monica having
6  meetings in your office. Where did Millie's part of
7  this conspiracy come in?
8  A. I was told that Monica and Millie had been
9  spending quite a bit of time, mostly Millie spending
10 the night at Monica's office.
11 Q. Monica's office or house?
12 A. House, I'm sorry. And she spent a lot of
13 time in my office, which wasn't that unusual, but
14 there was really no reason for her to be there.
15 Every year Judge Ellsworth takes several of his
16 employees and their spouses to Mexico whenever he was
17 a judge and he would pay their way. I knew that the
18 plan that year, that Millie was going to go and she
19 was taking Monica. I saw that as a problem for
20 everybody.
21 Q. Why?
22 A. Because I was under the impression and I
23 was told by these people that Monica and Millie were
24 a couple, if you will.
25 Q. And who is these people who told you that?

Page 53

1 A. Mostly Christie and Stephanie, that they
2 had been seen kissing on the mouth in public, that
3 they -- like I said, they spent a lot of time at
4 Monica's house together. I knew that they were
5 planning to make a trip to Mexico, and I thought
6 probably Judge Ellsworth was getting himself into
7 something there that he didn't know anything about.
8 I felt that they were involved in it. I knew that
9 Monica was and I felt that Millie was involved, as
10 well, because she was always there part of it.
11 Q. So have you told me all the facts that you
12 relied upon in determining that Millie and Monica had
13 conspired to operate a sex ring out of the
14 prosecuting attorney's office and the Associate
15 Circuit Court?
16 A. All that I can remember right now.
17 Q. When on this time line, Exhibit 1, did you
18 first find out that Monica had filed a complaint with
19 the EEOC?
20 A. I believe I got my notice in March.
21 Q. Of...?
22 A. 2006.
23 Q. Would you write that in, March, 2006?
24 That's when you got first notice of that?
25 A. I believe that's right, yes.

Page 54

1 Q. Okay.
2 A. (Witness complying.) So it would have been
3 after Monica leaves for final time and before Mike
4 Anderson files suit, so do you want me to put a line
5 there?
6 Q. Would you write that in red ink, please,
7 Mr. Anderson?
8 A. Notice of EEOC complaint?
9 Q. That's fine.
10 A. (Witness complying.) March '06.
11 Q. Now, while you've got Exhibit 1 -- and I
12 may have misunderstood this, so correct me if I'm
13 right or wrong. I thought in one of these statements
14 to the EEOC you talked about her insulting you to
15 your face. Does that sound familiar?
16 A. Yes.
17 Q. What was the insult to your face that you
18 were referring to?
19 A. Well, there was more than one occasion.
20 But I can remember one in particular whenever her
21 mother was in the office in the afternoon, and for
22 some reason she called me an idiot.
23 And her mother said, "Monica, you can't
24 talk to your boss like that." And I just laughed it
25 off. I said, "You know, that's just the way Monica

Page 55

1 is. She says things like that." But it had gotten
2 to the point to where it was embarrassing.
3 Q. And did you talk -- did you talk to her
4 about that in the meeting before she left?
5 A. I told her she was being disrespectful. I
6 thought it was all part of the general deterioration
7 of her work and attitude and everything else.
8 Q. Now, at some time did you send Jeff Kinder
9 to her house or to her to try to get her to come back
10 to work for you?
11 A. Well, I didn't send him. I asked him after
12 she had left the first time if he had seen or heard
13 from her, because, as you remember, she was supposed
14 to go home that day and think about it and she never
15 came back. She cleaned out her desk and left that
16 afternoon.
17 She left some 150 or 200 files on her desk
18 unattended that nobody even knew why they were out or
19 what they were. I had given her a month and a half
20 notice. I had hoped she would give me at least a
21 week or two, but she didn't. She left and never came
22 back.
23 I asked Jeff Kinder if he had seen her or
24 heard from her. He said that he had, that she was
25 doing okay. I said, "Well, do you think she'd be

Page 56

1 willing to come back and start over? Do you think
2 she'd like to have her job back if we could fix this
3 thing, if she would come back and abide by the
4 rules?"
5 He said, "I'll go talk to her." So I
6 didn't send him to talk to her. I was asking him
7 about her, and he said, "Yeah, I'll go talk to her
8 and see if she's interested in that."
9 Q. Let me ask this, so I understand
10 specifically. Did you tell Kinder to talk to her and
11 ask her to come back and talk to you?
12 A. He agreed to go ask her if she wanted to
13 come back and talk about it.
14 Q. Did you know that's what he was going to
15 do?
16 A. Yes.
17 Q. Okay. So that was agreeable with you?
18 A. Yes.
19 Q. You know, have you reviewed the notes from
20 your interview with Emde that was on the telephone?
21 A. I don't think I have.
22 MR. HARRIS: I'm sorry, did you say
23 his notes?
24 MR. STEELMAN: Emde's notes.
25 MR. HARRIS: Oh, okay. I thought you

Page 97

1  A. I spoke to her. I asked for advice. She
2  told me, basically, there wasn't anything much that
3  she could do. I had collected some cigarette butts
4  out of my ashtray in my car, thinking that if I had
5  been drugged, that there might be some evidence on
6  the --
7  Q. My question is, is Melissa Dunn the person
8  that we would talk to or depose regarding your
9  investigation into your claims that you were drugged?
10  A. I discussed it with her, but she never did
11  anything that I'm aware of as far as --
12  Q. Anybody else you discussed it with?
13  A. Brad Eidson.
14  Q. Anybody else?
15  A. Judge Ellsworth whenever I requested the
16  subpoena for the tape.
17  Q. Anyone else?
18  A. Dr. Long, Christopher Long with the
19  University of Missouri Hospital in St. Louis.
20  Q. And was this an official consultation you
21  had with him? Would he have a record of it?
22  A. I don't know if he'd have a record. I was
23  talking to him about another case, a poisoning case
24  where a child had died. We had an 11-month-old
25  infant that had died that had initially been

Page 98

1  determined to be a SIDS death.
2  Q. And when was this?
3  A. This would have been in -- the death, I
4  think, was spring of 2005. We didn't get the
5  toxicology reports back for several months. When the
6  toxicology reports came back, they indicated that the
7  child had died of lethal levels of Oxycontin.
8  Q. What was the name of this case?
9  A. The case is still open. The mother is
10  charged with manslaughter. The child's name --
11  Q. What's the mother's name?
12  MR. FRANKLIN: I was just going to
13  say, to the extent that you're allowed to --
14  MR. STEELMAN: It's an open file.
15  It's a charged case.
16  BY MR. STEELMAN:
17  A. The case is still open. I can't discuss
18  much more than what I've already said, but I believe
19  her last name is Sullins. It's either Sullins or
20  Hatcher. I had two homicides about the same time
21  and, for some reason, I get those two names mixed up.
22  One was Sullins and one was Hatcher. I believe she's
23  the Sullins.
24  Q. Lieutenant Michael Hood?
25  A. He's a police officer with the City of

Page 99

1  Licking. He is allegedly the officer who was called
2  the night that I made the telephone call at Monica's
3  house.
4  Q. Did you see him there? Did you talk to
5  him?
6  A. No, sir. If I did, I don't remember.
7  Q. You drove off?
8  A. I left. I went home. I don't know how I
9  got there, but I went home.
10  Q. Could you have been picked up by somebody?
11  A. I don't remember, Mr. Steelman. It's
12  possible.
13  Q. Well, let me ask you, have you ever talked
14  with Sergeant Kinder? Has he ever told you whether
15  he picked you up that night?
16  A. No, he's never mentioned it.
17  Q. Dean Belsh?
18  A. Former Texas County Sheriff. I can't
19  recall offhand why we felt that he would be a
20  witness, but I know we thought that he had some
21  information that might be relevant. I just can't
22  recall right now what it was.
23  Q. Doug Long?
24  A. Judge Long is something of a character
25  witness. I have known Judge Long for a lot of years.

Page 100

1  There was one incident where once a year, Judge Long
2  has a party at his house, he and his wife, Ruth. And
3  you're probably aware that attorneys from the area
4  are invited over, people, citizens, friends of Judge
5  Long's. And I was told that there was one occasion
6  wherever Monica acted inappropriately towards Judge
7  Long at his home, in his house.
8  Q. Who told you that?
9  A. I believe, again, it may have come from my
10  wife, and possibly from Mr. Garrabrant.
11  Q. Brad Eidson?
12  A. Mr. Eidson, I've talked to him about the
13  incident at the Outback bar. I asked for his
14  assistance. He also used to be the employer of
15  Monica Daniel before she came to work for me. He's
16  indicated to me that he also observed a huge change
17  in her behavior in the last year that she worked for
18  me and, I believe, she had made some -- according to
19  him, at least, some very inappropriate comments to
20  him while she worked in my office.
21  Q. Kody Lucas?
22  A. He was a police officer for the City of
23  Edgar Springs, married at the time, now works
24  undercover -- no, actually, I think he's still
25  working with the police, but he's not undercover any

Page 121

1  A. Again, Christie and Stephanie.
2  Q. And Monica had sex on your --
3  A. Monica told them that she had done that --
4  Q. And who was it with?
5  A. -- and that she thought it was funny.
6  Q. With who?
7  A. One of the police officers. I don't
8  remember which one.
9  Q. Was there a name that they told you at that
10 time?
11 A. They may have, but I honestly can't
12 remember now which one it was. There was several.
13 Q. And part of my question is, was this filing
14 of this suit to protect you personally, or was it to
15 protect the Office of Prosecuting Attorney of Texas
16 County?
17 A. Well, it was to protect me, but the actions
18 that they had taken certainly undermined the office.
19 But you got to remember, Mr. Steelman, I was up for
20 reelection in 2006.
21 Q. Did you have an opponent?
22 A. It turned out I didn't, but I didn't know
23 that.
24 Q. I forget, when does filing open?
25 A. I think it opens in January.

Page 122

1  Q. And when does it close?
2  A. I can't remember, March or April, I think.
3  Q. Had the filing deadline closed by the time
4  that you filed the petition?
5  A. If filing closes in March, then it would
6  have closed by the time I filed the petition in May,
7  yes.
8  Q. Now, I want to talk about what you call in
9  Paragraph 4 malignant, libelous, and slanderous
10 conduct. And the first one is, conspiring with each
11 other to disseminate false information that you made
12 threatening comments during a series of telephone
13 calls made to the home phone of defendant Monica
14 Daniel on or about December 18th, 2005. Do you see
15 that?
16 A. Yes, sir.
17 Q. And what false information did either of
18 them say that's part of what you're talking about in
19 Paragraph 4-A?
20 A. I was told that I had, on this tape,
21 threatened to kill Monica Daniel if she cut off our
22 affair. I was told that I had --
23 Q. Who told you that?
24 A. Debbie James.
25 Q. And where had Debbie James heard that?

Page 123

1  A. From Mildred Williams.
2  Q. Okay. And what else?
3  A. That I had threatened them on this phone
4  call if they didn't let me in, I would harm them in
5  some way.
6  Q. And who told you that?
7  A. Again, it came to me -- one incident I can
8  remember was what I told you about earlier; when my
9  wife came to me and said this friend of ours
10 approached me in town today and said that he heard
11 this from his cousin, Debbie James, the assessor.
12 Q. And who was that?
13 A. I was having people stop me --
14 Q. And who was that friend?
15 A. That friend is Jimmy Sutton.
16 Q. Okay. And Jimmy Sutton told you that he
17 had heard it from Debbie James?
18 A. Who is his cousin.
19 Q. Did you go talk to Debbie James?
20 A. I did.
21 Q. And did she tell you that? Did she confirm
22 that?
23 A. Yes.
24 Q. Okay. So Jimmy Sutton told you, and then
25 she told you she talked directly to Millie Williams?

Page 124

1  A. I asked her where she had heard -- I asked
2  her if she had been saying these things, and she
3  said, yes, that she had. And, like, "What are you
4  going to do about it?" And I said, "Where did you
5  hear it?" And she said from Mildred Williams.
6  Q. And when did she tell you that?
7  A. It would have been the day I confronted
8  Millie Williams, because I left her office and went
9  straight to the judge's office to confront her on it.
10 Q. And when was that date?
11 A. I don't know the date.
12 Q. 18th? 19th? 20th?
13 A. It would have been not long before I filed
14 my lawsuit, probably within a week or 10 days at the
15 most. Maybe within two or three days.
16 Q. So you just found out about those
17 statements prior to filing your lawsuit?
18 A. Yes, sir. I had been hearing these kind of
19 things for some time. I had people stop me at the
20 corner grocery store and --
21 Q. Who? Any time you say "they," please tell
22 me the person.
23 A. Well, one person was Ms. Daniel's uncle,
24 Dewayne Reese.
25 Q. And when did he stop you?

Page 125

A. He told me that he had been hearing the things that Monica had been saying about me and he didn't believe it.

Q. And what were those things?

A. Well, that's what he said. "I have been hearing the things that Monica had been saying about you and I want you to know I don't believe it and I support you."

Q. Well, did he tell you that Monica ever said you had made threatening phone calls?

A. No.

Q. Okay. So we've got -- Millie has been the one that I've heard from you who said you made threatening phone calls; right?

A. Uh-huh.

Q. Did Monica tell anyone you made threatening phone calls?

A. Not that they told me directly. That's what I was hearing that Monica and Millie were saying to people.

Q. What? What did you hear that they were saying?

A. That I had made a threatening phone call. In fact, whenever I first heard that, Mr. Steelman, way back in -- well, it was before I ever got the

Page 126

tape, which would have been, I think, the last week in December, I went to Mildred Williams and apologized.

I told her how sorry I was and I couldn't believe that I would say those kind of things because that's not the kind of person I am. I had never done anything like that before. Mildred Williams cried, told me that she had been in abusive relationships before and it scared her to hear these kind of things and that --

Q. What kind of things?

A. That I had threatened to kill them if they didn't have sex with me.

Q. Okay. So Mildred Williams told somebody that you threatened to kill them if you didn't have sex?

A. Yes.

Q. And that was Debbie James?

A. That was Debbie James. At least one person I was able to nail down that would admit that's where she heard it.

Q. Okay. Anybody else that you have nailed down that they heard from either Millie or Monica saying that statement, that you threatened to kill someone?

Page 127

A. Sir, you brought up the topics earlier. This was all-over topics at the time. That's the kind of things that they were saying about me.

Q. Okay, my question is specific. I'm just trying to find out where your information was that they said false information about your threatening phone calls, okay? Now, we've got Debra James; who else?

A. Well, Jimmy Sutton heard it from Ms. James.

Q. Okay, who else?

A. And I went directly to Mildred Williams and she admitted it, but told me since I was a public official, that she could say anything about me that she wanted.

Q. What did she admit to you?

A. I confronted her. I said, "Have you been saying that I threatened you on that phone call? Have you been saying that I was having an affair with Monica Daniel? Have you been saying that I threatened the two of you and told you that if you didn't let me in, that I was going to hurt you?"

Q. And was Brad Ellsworth present when you said this?

A. He was. And her response was, "You are a public official. I can say anything about you I want

Page 128

and there's nothing you can do about it."

Q. And this was in front of Brad Ellsworth?

A. This was in front of Judge Ellsworth.

Q. Okay.

A. I told her that if she did not stop, I would sue her for libel and slander.

Q. And what did she say?

A. She just laughed and said, "You're a public official. There's nothing you can do about it."

Q. Anything else on these threatening phone calls? What about Monica?

A. Again, there were several postings going on on different websites that I suspect were coming from Monica, or close friends, associates of hers.

Q. Anything other than suspicion?

A. I heard that Monica had taken the tape to a party with some police officers.

Q. Who did you hear that from?

A. I believe it was Christie. And played it for them like a party joke and told those people that I had threatened her, that, you know, she had me where she wanted me.

Q. And who did she say that to? Who was present?

A. I don't know all those people. I was given

Page 129

1 the name of the family. I can't remember it right
2 now, but I'm sure that the girls in my office would
3 remember. It was a big joke. Everybody was laughing
4 about it, having a big laugh at my expense.
5 Q. Okay. And I'm asking specific about
6 threatening comments. So Monica played the tape at
7 this -- and said then that there were things in
8 addition to the tape; is that what she was supposed
9 to have said?
10 A. Well, they were telling me that these
11 threatening comments were on the tape.
12 Q. Okay. Let's go to B. Conspiring with each
13 other to disseminate false information that you made
14 comments of a sexual nature. Who are you talking
15 about? What false statements were made and to whom
16 regarding the comments of a sexual nature during the
17 phone calls on or about December 18th, 2005?
18 A. You're looking at Subparagraph...?
19 Q. B.
20 A. B?
21 Q. 4-B, yes.
22 A. Well, that's what we were just talking
23 about. They claim that there were comments of a
24 sexual nature on that tape.
25 Q. To whom?

Page 130

1 A. I was told it by Debbie James, who told it
2 to her cousin, who told it to my wife, and it was
3 confirmed by Mildred Williams whenever I confronted
4 her.
5 Q. And what were those comments supposed to be
6 of a sexual nature?
7 A. That I was demanding sex from them, that I
8 was making lewd comments. In effect, that I had
9 committed the crime of telephone harassment.
10 Q. Now, on C -- did you have any other
11 individuals on that one? I want to make sure I got
12 everybody. We've got Debra James, Sutton, anybody
13 else?
14 A. Mildred Williams.
15 Q. Mildred Williams. Anybody else?
16 A. She didn't deny it.
17 Q. Anybody else?
18 A. I believe the girls in my office were all
19 aware of it. They had been told the same things.
20 Q. Now, what is C: Conspiring with each other
21 to disseminate false information that you engaged in
22 inappropriate behavior during a prosecutor's training
23 seminar in September of 2005. What is that about?
24 Who made the statement? Who'd they make it to?
25 A. The prosecutor training seminar, when I got

Page 131

1 back on Monday, following the seminar, the talk
2 around the courthouse was that Monica and I had had
3 some blowup at the lake and I had acted
4 inappropriately towards her. And I knew that was
5 untrue, but these are the same rumors that were being
6 told. When I got back Monday from the prosecutor's
7 meeting on Friday, this was already all over.
8 Q. By "all over," who told you?
9 A. I don't remember where I heard it the first
10 time. I think it might have come from Nina Creek.
11 Q. And who told her?
12 A. I'm guessing her daughter-in-law, Stephanie
13 Creek. Monica.
14 Q. Did they tell you Monica had said it?
15 A. Yes.
16 Q. Did they tell you Millie had said it?
17 A. I don't recall. But everybody at the
18 courthouse, where Ms. Williams works, this was the
19 topic of conversation.
20 Q. So the reason you said that Millie and
21 Monica conspired on that was because Millie works in
22 the courthouse and it was the talk of the courthouse?
23 A. And Millie and Monica were very tight.
24 Q. And that's why you made that allegation?
25 A. Yes.

Page 132

1 Q. D says: They used the public offices held
2 by Defendant Daniel and Defendant Williams to remove
3 and conspiring to cover up the removal of criminal
4 investigative documents from the Texas County
5 Prosecutor's Office. What is that?
6 A. Well, there's one instance in particular
7 where Ms. Daniel's paramour, Danny McNew, who was the
8 chief of police in Licking, had been involved in a
9 fatal car accident. He was chasing a man who was
10 driving while revoked. The man crashed his car and
11 was killed. There were two other occupants in the
12 car and they both had serious injuries and were life
13 flighted.
14    I had no idea at the time that Monica
15 Daniel was carrying on an affair with Danny McNew,
16 none, didn't have a clue. When the highway patrol
17 brought the initial report to me, which is basically
18 a three-page accident report, they told me that there
19 was going to be an investigation and a
20 reconstruction.
21    I did what I always did in that situation;
22 I gave the initial report to Monica, told her
23 whenever the follow-up investigation got in, to bring
24 it to me and I would look at it. It was not until
25 after Ms. Daniel left my office that I learned not

Page 133

1 only did I never get the follow-up report, but the
2 initial report was missing from my office.
3     Had I known that Ms. Daniel was having an
4 affair with the object of the investigation, if you
5 will, I certainly would have never allowed her to
6 handle the file, and probably would have called in a
7 special prosecutor from the beginning.
8     I didn't learn until after I got the report
9 that there were some rumors or allegations that Chief
10 McNew may have rammed this car immediately before it
11 lost control and crashed.
12   Q. And what action did you take then?
13   A. As soon as I got the information -- well,
14 as soon as I found out the report was missing, I
15 called in the highway patrol officer that had done
16 the report, asked him where was the report and why
17 had I never gotten one. He said not only had he sent
18 me one, but he sent one to the troop in Jefferson
19 City. I told him I needed it. He went and got it.
20   Q. What's the name of this case?
21   A. Again, sir, I have so many cases. I want
22 to say, again, this man's name was Sullins. I
23 believe that's his last name, but I've got the file.
24   Q. And you have that file; correct?
25   A. Yes, sir.

Page 134

1   Q. Okay. And what was the patrolman?
2   A. The patrolman that brought the report in
3 was Trooper Terry Nelson.
4   Q. And what did Ms. Williams have to do with
5 this report?
6   A. Well, in regards to Ms. Williams, I learned
7 that she had been -- or I believe that she had been
8 helping Ms. Daniel move subpoenas around for
9 different officers.
10   Q. Who told you that?
11   A. I think it was obvious by the fact that Ms.
12 Daniel could not have done it on her own without some
13 record appearing in the court records.
14   Q. Did you report this to Judge Ellsworth at
15 any time?
16   A. Whenever I filed this.
17   Q. When you filed the lawsuit?
18   A. Yes, sir.
19   Q. Now, if someone is removing criminal
20 investigative documents, that would be a crime;
21 correct?
22   A. I believe so.
23   Q. Did you open a criminal investigation file
24 on that?
25   A. Yes.

Page 135

1   Q. And so if we request, there's a criminal
2 investigation regarding Monica Daniel and the removal
3 of these documents; is that right?
4   A. Yes, sir.
5   Q. Okay. And did you call the Missouri
6 Attorney General's Office on that?
7   A. Yes, sir.
8   Q. And who did you talk to?
9   A. I sent a letter to Ted Bruce, laid it all
10 out for him, sent him the file, asked him to
11 investigate it. Several weeks later, maybe one month
12 or two months later, I got a call from his
13 supervisor, Andrea Spillers, saying that, number one,
14 whereas she believed that what had happened, it
15 probably happened, that the report had been removed,
16 there was no proof of it; that, by that time, any
17 evidence of a crime regarding Mr. McNew had been
18 destroyed because the car that was wrecked had been
19 returned to the owners, and the City of Licking had
20 sold the patrol car involved and they were not going
21 to do any more to look into this.
22   Q. This is a phone call from Andrea Spillers;
23 correct?
24   A. This is a phone call from Andrea Spillers.
25 I also asked that the attorney general come down and

Page 136

1 do a sweep of all the computers in my office.
2   Q. Did they do that?
3   A. Yes.
4   Q. And is there a written report on that?
5   A. There's a report indicating that they
6 didn't find anything under the searches that I gave
7 them. And some of the search terms I gave them was
8 removal of files, the name of the victim in this
9 case, closing the office, meet me after work, all
10 these things.
11   Q. How about sex, was that word in the search?
12   A. I've got a list and I don't think it is.
13   Q. Okay. And you have files and lists of all
14 these, because they're not listed by your attorney in
15 your disclosures?
16   A. I have the file that was brought to me by
17 the highway patrol, including photos. I have the
18 letter that I sent to Ted Bruce. And I have the
19 report from the forensics investigator, saying that
20 nothing under the search terms that I requested were
21 found on my computer.
22   Q. And what was the date of your letter to Ted
23 Bruce?
24   A. I don't recall, sir. I have got it.
25   Q. After she left the office?

Page 137

 1  A. Yes. I'm not clear on it. I can't
 2  remember, but it is dated. And before I filed my
 3  lawsuit.
 4  Q. And did you report Millie Williams as
 5  having part of this to Ted Bruce?
 6  A. No, I didn't think that she was part of
 7  that, that coverup.
 8  Q. You said she is in your petition.
 9  A. Well, I say that she was --
10         MR. HARRIS: I object, that misstates
11  the petition.
12  BY MR. STEELMAN:
13  A. Removal of criminal investigative documents
14  from the Texas County Office to the detriment of
15  Office of Texas County Prosecutor and people of Texas
16  County. Ms. Williams' involvement, I believe, was
17  more the in the way of helping to withdraw subpoenas
18  and that type of thing.
19  Q. Is that what you're talking about in E, 4-
20  E?
21  A. Yes.
22  Q. Now, on 4-F, you talked a lot about this
23  swinger style sex ring, but you also talk about not
24  just the Texas County Prosecutor's Office, but the
25  Texas County Associate Court Office. And what

Page 138

 1  evidence do you have that it was run out of the Texas
 2  County Associate Court Office?
 3  A. Ms. Williams' involvement.
 4  Q. Well, is that just what you testified to
 5  earlier, which was basically the Stephanie Creek
 6  matter?
 7  A. Well, that, and the fact that Monica didn't
 8  do much without Millie there at the time.
 9  Q. Now, again, you didn't report -- other than
10  the letter to Ted Bruce, you didn't report any of
11  this to Judge Ellsworth or any person prior to filing
12  the lawsuit; is that right?
13  A. I didn't think it would be appropriate to
14  report it to Judge Ellsworth. He may be hearing this
15  case. But to answer your question, no, I didn't.
16  Q. Now, you talked about the damage to your
17  reputation; correct?
18  A. Yes.
19  Q. As to why you filed the lawsuit; correct?
20  A. That and to get them to stop saying the
21  things they were saying.
22  Q. Do you believe damage to reputation is
23  permanent?
24  A. I think it can be rectified.
25  Q. And what can rectify it?

Page 139

 1  A. Well, sir --
 2         MR. HARRIS: I want to object. Are
 3  you talking in the hypothetical sense, or are you
 4  talking in the specifics --
 5         MR. STEELMAN: I'm talking in the
 6  hypothetical sense.
 7         MR. HARRIS: I think that calls for
 8  speculation.
 9         MR. FRANKLIN: Join that objection.
10         THE WITNESS: Do you want me to
11  answer?
12         MR. HARRIS: Go ahead.
13  BY MR. STEELMAN:
14  A. Whenever I filed this lawsuit, I felt that
15  I could salvage my reputation by bringing this to
16  court, the things that had been done, the things that
17  had been said to me. And that if a court of law
18  heard this, saw these facts, saw what these people
19  were up to at the time, that in some ways my
20  reputation could be returned to me. That's why I
21  filed it in court. I felt and still feel that that's
22  where it should be heard.
23  Q. Well, that gets us to the dismissal. You
24  dismissed it; right?
25  A. Yes, sir.

Page 140

 1  Q. How much later after you filed it did you
 2  dismiss it?
 3  A. I don't know the date. It was dismissed on
 4  the advice of my attorney, Cynthia MacPherson.
 5  Q. When did you hire her for the case?
 6  A. Shortly after I filed the suit, I went and
 7  consulted with her.
 8  Q. Okay. Why did you dismiss the case?
 9         MR. FRANKLIN: Objection,
10  attorney/client privilege. To the extent you can
11  answer without --
12         MR. HARRIS: I agree.
13         MR. FRANKLIN: -- destroying the
14  privilege, you may answer the question.
15  BY MR. STEELMAN:
16  Q. You don't have to say what Cynthia said. I
17  wouldn't ask you what she said.
18  A. We had communications with Ms. Daniel's
19  attorney that they would stop. They would stop
20  making these statements to the press. They would
21  stop saying these is things that --
22  Q. Is this in a letter from anybody?
23  A. It's in a letter from Ms. MacPherson to --
24  is it --
25  Q. Ted Kinde?

Page 149

1 I agree with counsel that you've answered it in three
2 different ways. I want it on the record that he --
3   MR. FRANKLIN: I want it on the record
4 that we agree on something.
5   MR. STEELMAN: -- and I agree
6 completely on that.
7 BY MR. STEELMAN:
8   A. My recollection of what happened is what I
9 just told you. I was contacted by Brad Gentry. I
10 was told he was going to publish a story, that he had
11 received a copy of the petition. I tried to talk him
12 out of it. I asked him why this was newsworthy or
13 why it needed to be in the paper.
14   He said that it was, wanted to know if I
15 had anything I wanted to put in the article. I may
16 have written something out and sent it to him, or I
17 may have given him some quotes. I know whenever he
18 later e-mailed me what was going to be in the paper,
19 there was some quotes from me in it and that's what
20 ran in the paper.
21   Q. Very specific question. Did you or did you
22 not issue a press release out of the prosecuting
23 attorney's office on the filing of your petition
24 against Monica and Millie?
25   A. I don't recall.

Page 150

1   Q. Okay.
2   (PLAINTIFF'S EXHIBIT NO. 5 WAS MARKED
3 FOR IDENTIFICATION.)
4   Q. Let me show you what's been marked as
5 Exhibit 5 and would you tell me whether or not that
6 is your signature at the bottom?
7   A. Yes, sir.
8   Q. Okay. So that is your signature?
9   A. Yes, sir.
10   Q. Now that you have Exhibit 5 in front of
11 you, can you tell me if you recall whether or not you
12 issued a press release out of the office of the
13 prosecuting attorney regarding the filing of the
14 lawsuit?
15   MR. HARRIS: I'm going to object to
16 the form that -- or to the question to the extent you
17 say it was out of the office of the prosecuting
18 attorney. I think --
19   MR. STEELMAN: Well, that's a good
20 question.
21   MR. FRANKLIN: I'm going to object and
22 say that the document speaks for itself. It
23 indicates that's the contact person.
24   MR. STEELMAN: Yeah, we will agree on
25 that, too, that the document speaks for itself and it

Page 151

1 was from Michael R. Anderson, Texas County
2 Prosecutor. Can we all stipulate to that?
3   MR. HARRIS: That's what it says.
4 BY MR. STEELMAN:
5   Q. Now, can you tell me, do you recall issuing
6 this press release?
7   A. I sent this to Brad Gentry after he
8 contacted me and asked for comments. It's titled
9 "Press Release" at the top. I don't recall if I sent
10 it to any other agencies. Normally when I send out a
11 press release, I have a whole list of news agencies
12 it goes to. We fax them out.
13   I don't think this was sent anywhere but to
14 Brad Gentry, and it was in response to his questions
15 about whether I had anything I wanted to say. And it
16 is titled "Press Release" because that's the form I
17 have on my computer. Whenever I communicate with the
18 media, I use the press release form.
19   Q. So you typed this yourself?
20   A. I believe so. Well, yes, sir, I typed it
21 myself.
22   Q. Now, at the bottom of this you say that I
23 want to assure the people of Texas County that this
24 action was taken after careful consideration and in
25 the ernest hope that bringing the truth to light is

Page 152

1 always better than rumor and innuendo; correct?
2   A. Yes, sir.
3   Q. And is that the reason you filed the
4 lawsuit?
5   A. One of the reasons. And as I said before,
6 to get them to stop spreading the rumors.
7   Q. So is this accurate, that the reasons that
8 you've given for filing the lawsuit are, one, for
9 damages; right?
10   A. Yes, sir.
11   Q. Collect money damages from Millie and
12 Monica; correct?
13   A. Yes.
14   Q. I believe your terms were a substantial
15 sum; is that correct?
16   A. Yes.
17   Q. Two was to stop them from making
18 statements?
19   A. Yes.
20   Q. Okay. And, three, was to bring it all out
21 into the light; correct?
22   A. Yes, sir.
23   Q. So you did file this lawsuit to publicize
24 it; is that correct?
25   A. I filed it with the court and I expected by