# In The Matter Of:
*Hutchison v.*
*Texas County*

*Danny McNew*
*July 14, 2010*

*Alpha Reporting Service*
*3230-G South National*
*Springfield, MO 65807*
*417-887-4110 or 866-991-7787*
*417-889-4246 (fax)*



Original File McNew Danny 7-14-10.txt
Min-U-Script® with Word Index



Page 37

1 Monica Daniel, do you recall having any
2 conversations with members of local law
3 enforcement regarding Monica Daniel's
4 reputation for chastity?
5 A. You said prior to?
6 Q. Prior to those lawsuits being filed.
7 A. No.
8 Q. Has either the lawsuit that -- let me break
9 this up. Has the lawsuit that Mike Anderson
10 filed against Monica Daniel in any way
11 impacted your impression of her?
12 A. Well, I'd like to say no, but when you read
13 things like that, it makes you wonder. But
14 beings I knew her I'd have to say no. But
15 it -- you know, when you read things like
16 that, I guess I would like -- it does make
17 you wonder.
18 Q. I'm a little confused by your answer. Are
19 you saying that it did impact your
20 impression of Ms. Hutchison or that it did
21 not?
22 A. Well, due to the fact I knew her, probably
23 not.
24 Q. Okay. Are you aware of anyone else who has
25 expressed to you that they hold her in a

Page 38

1 lower regard based on what they heard in
2 Mr. Anderson's lawsuit?
3 A. Well, I do know a lot of people discussed
4 her after that, like I said, law
5 enforcement, just in general.
6 Q. But is it fair to say that you have no
7 direct knowledge of whether their opinions
8 changed or stayed the same --
9 A. Correct.
10 Q. -- after this lawsuit was filed by
11 Mr. Anderson?
12 A. Correct.
13 Q. Okay. Just a couple of seconds here. I'm
14 going through my notes. I don't think I
15 have much left for you, Mr. McNew.
16    MR. FRANKLIN: I'll pass the witness.
17    MR. STEELMAN: Mr. McNew, bear with me.
18 I've got to put this microphone on. I'm
19 sorry, Officer McNew.
20          EXAMINATION
21 BY MR. STEELMAN:
22 Q. Officer McNew, my name's Dave Steelman, and
23 we have met before, and I represent
24 Monica Hutchison is now her married name.
25 You would have known her as Monica Daniels;

Page 39

1 is that right?
2 A. Yes.
3 Q. Would you state your full name, please?
4 A. Danny McNew.
5 Q. Where do you live, sir?
6 A. Jeff City.
7 Q. Is that in Cole County, Missouri?
8 A. Yes.
9 Q. Now, what is your present occupation?
10 A. I'm employed by the Capital Police.
11 Q. And in what capacity are you employed by the
12 Capital Police?
13 A. As an officer.
14 Q. And so that I understand, it's your
15 understanding is that -- is you are the
16 security for the Missouri State Capital; is
17 that right?
18 A. I'm security, yeah. I'm involved -- that's
19 what I've been assigned to, the executive
20 security protection.
21 Q. Exactly. And why I was asking that, it is
22 actually an official position with the State
23 of Missouri; is that right?
24 A. Yes.
25 Q. And it is in charge like in Washington you

Page 40

1 have the capital police in charge of the
2 Washington, D.C. capital, the nation's
3 capital. You are in charge of security --
4 or not in charge of security, active in
5 security for the state's capital. Is that
6 an accurate statement?
7 A. My assignment is the security of the
8 executive family, yes.
9 Q. Okay. The governor and other members of the
10 executive --
11 A. His family, yes.
12 Q. Yes. Now, before you had that occupation,
13 you had some other occupations, I believe
14 one was in Iraq as an contractor; is that
15 correct?
16 A. Yes.
17 Q. And you were an investigator for a while
18 with the City of Ellington in the state of
19 Missouri; is that correct?
20 A. Yes.
21 Q. Before that what was your position, sir?
22 A. I was chief of police for the City of
23 Licking.
24 Q. And how long were you chief of police for
25 the City of Licking?

Min-U-Script® ALPHA REPORTING SERVICE *** 866-991-7898 (10) Page 37 - Page 40
www.missouricourtreporters.com
Case 6:09-cv-03018-RED Document 236-1 Filed 11/24/10 Page 2 of 8

Page 41

1  A. Three years.
2  Q. And how long did you work for the City of
3     Licking?
4  A. Almost nineteen years.
5  Q. Was all of that in law enforcement?
6  A. Yes.
7  Q. So that I understand, was that nineteen
8     continuous years?
9  A. Yes.
10 Q. And when did you leave that employment?
11 A. The fall of 2006.
12 Q. Okay. And so in the fall of 2006 you left
13    the employment; correct?
14 A. Yes.
15 Q. And were you dismissed?
16 A. Yes.
17 Q. And did Mr. Michael Anderson, who was
18    Prosecuting Attorney of Texas County, did he
19    a also have any position with the City?
20 A. He was the city attorney.
21 Q. City of Licking's attorney?
22 A. Yes.
23 Q. When you were dismissed?
24 A. Yes.
25 Q. Did his son have any position with the City

Page 42

1     of Licking?
2  A. He was the city prosecutor.
3  Q. City prosecutor. Let me understand this,
4     make sure I'm right. You served the City of
5     Licking in its law enforcement for
6     nineteen years?
7  A. Yes.
8  Q. And that includes during the building of a
9     large prison?
10 A. Yes.
11 Q. And did the building of that prison bring
12    out any added burdens to the city police?
13 A. Yes.
14 Q. And were you able to successfully handle
15    those extra burdens?
16 A. Yes.
17 Q. And this ended in fall of 2006?
18 A. Yes.
19 Q. And when this ended after your nineteen
20    years of service to the City of Licking,
21    Michael Anderson, who was also the
22    prosecuting attorney, was also the city
23    attorney for the City of Licking?
24 A. Yes.
25 Q. And his son had become the prosecutor for

Page 43

1     the City of Licking; is that correct?
2  A. Yes.
3  Q. Now, let me ask how long have you known
4     Monica Daniels?
5  A. From -- after she would have been working
6     as -- in the prosecutor's office.
7  Q. Okay. Now, when you first got to know her,
8     describe her personality. Just describe the
9     Monica Daniels now Hutchison that you met.
10 A. Outgoing, helpful, that would probably be
11    it, professional.
12 Q. Now, as city police chief of Licking, would
13    you interact with the prosecuting attorney's
14    office and with Mr. Anderson's office?
15 A. Yes.
16 Q. Now, when you went down there to the office,
17    was it run professionally?
18 A. Yes.
19 Q. Did Monica act professionally?
20 A. Yes.
21 Q. You know, Mr. Harris and Mr. Franklin have
22    asked you these questions about Mr. Anderson
23    acting inappropriately. Did you see any
24    inappropriate action by any of the employees
25    or staff at the prosecuting attorney's

Page 44

1     office or Mr. Anderson's office while you
2     were there?
3  A. No.
4  Q. The -- as part of law enforcement in
5     Texas County did you hang out or did you
6     know other law officers in the highway
7     patrol or the sheriff?
8  A. Yes.
9  Q. During any time did you hear any of other
10    law enforcement officer tell you that if you
11    needed to get out of testifying in a
12    criminal case all you had to do was go to
13    Monica Daniels in the prosecutor's office?
14 A. No.
15 Q. Did anyone -- did you ever hear anybody ever
16    say to you that there was a person in the
17    prosecutor's office named Monica who would
18    fix tickets, remove subpoenas or anything of
19    that sort?
20 A. No.
21 Q. Did Monica Hutchison that was then Daniels,
22    did she ever fix anything or hide anything
23    of yours that you were involved in with the
24    prosecutor's office?
25 A. I would have never asked her so I would have

Min-U-Script® Case 6:09-cv-03018-RED ALPHA REPORTING SERVICE Document 236-1 *** 866-991-7787 Filed 11/24/10 Page 3 of 8 (11) Page 41 - Page 44
417-887-4110
www.missouricourtreporters.com

Page 45

1 to say no. She had no reason because I
2 didn't ever --
3 Q. I'm trying to get to the bottom of this.
4 You would file -- as city police you could
5 file traffic tickets. Where were those
6 filed?
7 A. Through the City.
8 Q. And did those also go for a while up to
9 Mr. Anderson's office?
10 A. Most traffic tickets, speeding would go
11 through the city. Now, if they was felonies
12 or I guess you wanted jail time, you would
13 take it to Mr. Anderson's office.
14 Q. Did you hear any rumors, anything stated by
15 the highway patrol, by the sheriff's office,
16 by anybody, that there was some problems
17 with processing these criminal prosecutions
18 because Monica Daniels now Hutchison would
19 get involved and get in the way?
20 A. No.
21 Q. At some point in time during the time you
22 knew her, Mr. -- or Officer McNew, did your
23 relationship with Monica change?
24 A. Yes.
25 Q. And can you tell me what happened, in what

Page 46

1 way it changed?
2 A. You mean in the office or after hours?
3 Q. I'm just talking about your personal
4 relationship with Monica.
5 A. Well, I actually become sexually involved
6 with her.
7 Q. And there's been some other questions. I
8 want to clear this up. About what was the
9 period of time you became involved in an
10 intimate manner with
11 Monica Daniels-Hutchison?
12 A. It would have been the end of the summer,
13 beginning of fall 2005 the best I can
14 recall.
15 Q. Now, whether or not it was an on-and-off
16 thing, can you tell me when it ended for
17 good, what period of time?
18 A. I don't know if it went a complete year or
19 not. I don't think it did.
20 Q. During that year period of time that we'll
21 assume, was it an on-and-off thing or was it
22 a constant relationship?
23 A. Well, I mean, she worked for the
24 prosecutor's office, but, no, it wasn't just
25 ongoing sex relationship, no.

Page 47

1 Q. Okay. Did you ever use the prosecutor's
2 office to arrange any of your romantic
3 visits or trysts, you might say, with
4 Monica?
5 A. No.
6 Q. Did you ever help Monica get out of work or
7 play hooky so she could go off with you?
8 A. I don't have that power.
9 Q. To your knowledge did she ever do that to go
10 off with you during the working hours?
11 A. No.
12 Q. And part of law enforcement did you -- did
13 you become aware that Mr. Anderson had been
14 to Monica's house in the late hours?
15 A. Yes.
16 Q. And how did you become aware of that?
17 A. Through Ms. Daniels.
18 Q. And can you describe that in detail what
19 happened?
20 A. She was concerned with her safety. She
21 wanted to make sure somebody was keeping an
22 eye on her. She was also wanting to
23 discuss, I think, whether she should
24 pursue -- see if he could be prosecuted.
25 Q. And why was she bringing that up with you?

Page 48

1 MR. HARRIS: I object. It calls for
2 speculation. If she told him...
3 Q. (By Mr. Steelman) Okay. Did Monica tell you
4 why she wanted your opinions on these
5 things?
6 A. Mostly I can remember she was concerned with
7 her safety. She wanted to make sure people
8 was watching her house at night.
9 Q. Was she scared?
10 A. Yes. She even spoke of having a gun and I
11 said just call the police.
12 Q. And did she say why she was scared? Was it
13 Mr. Anderson going to her house that caused
14 her to be scared?
15 A. Yes.
16 Q. Do you know how long after he had been to
17 her house she called you, the next day or
18 two days, do you know?
19 A. It had been probably that Tuesday.
20 Q. Okay. The -- did she ever play the tapes
21 for you that Mr. Anderson had left that
22 night or morning?
23 A. Yes.
24 Q. Can you remember anything that was said on
25 them?

Min-U-Script® ALPHA REPORTING SERVICE (12) Page 45 - Page 48
www.missouricourtreporters.com
Case 6:09-cv-03018-RED Document 236-1 Filed 11/24/10 Page 4 of 8

Page 49

1 A. I can remember I think at one point he says
2    I'm coming over. I think he says it's an
3    early Christmas present, just rambling.
4 Q. How did he sound? Could you remember? If
5    you remember.
6 A. Well, yeah. Just my guess he would have
7    been intoxicated.
8 Q. A guess is not -- let me ask this: Do you
9    think you could recognize Mr. Anderson's
10   voice when it was intoxicated, when he was
11   intoxicated? Could you tell?
12 A. Well, yes.
13 Q. Did he sound intoxicated on that tape to
14   you?
15 A. Yes.
16 Q. What did you -- did you give Monica some
17   advice on what she would do?
18 A. I -- well, I actually told her that, you
19   know, that there's nothing I really could do
20   for her because the son, his son was our
21   prosecutor and he was the county prosecutor,
22   that she would probably have to go to a
23   different agency.
24 Q. And so that I can understand, Officer McNew,
25   why did you feel powerless in this case to

Page 50

1    help Monica or protect Monica with
2    Mr. Anderson as prosecutor and her son (sic)
3    as the city prosecutor?
4 A. Because anything I'd have turned over would
5    have went to the son or to him directly.
6 Q. Okay. Now, I'm going to show you what has
7    been marked Deposition Exhibit 53. It's not
8    been marked prior to this. And you-all have
9    this, I think.
10      MR. STEELMAN: Do you need a copy this?
11   This is the letter that you supplied to our
12   office dated January 21, 2006.
13      MR. HARRIS: Corey, just for your record
14   since you're not here, it's the letter to
15   Ted Bruce at the AG's office.
16      MR. FRANKLIN: Right.
17 Q. (By Mr. Steelman) Officer McNew, let me tell
18   you that this exhibit was prepared or not
19   prepared -- was produced to your office by
20   Ms. Anderson's attorneys as a letter that
21   was sent in to the Missouri State Attorney
22   General's office and to the attention of a
23   gentleman named Ted Bruce. And you see it
24   says that's a request for investigative
25   assistance?

Page 51

1 A. Okay. Yes.
2 Q. Now, the first -- I've marked a couple
3    passages, and I'm going to read those out
4    loud to you because I have some questions
5    about them and for context. On the first
6    page, Mr. Anderson -- this purports to have
7    been sent by Michael Anderson on the last
8    page. Would you look at that and confirm
9    that, please? See that?
10 A. Yes.
11 Q. It's not a signed copy because I can tell
12   you we have not received a signed copy. I'm
13   just telling you that this is how this
14   exhibit's been produced to us. And it says,
15   "Dear Ted: In November of 2005 I became
16   aware that an individual who had worked as
17   my legal assistant for three years was
18   engaged in conduct in her personal life
19   which in my opinion could adversely affect
20   this office. It was reported me that she
21   was involved with a married police officer
22   who works for the City of Licking, Missouri,
23   and may have compromised the integrity of
24   this office by doing favors for this officer
25   such as moving subpoenas and court dates to

Page 52

1    accommodate his time off schedule,
2    intercepting and interfering with
3    communications with defense attorneys on
4    cases he was involved in, lying about her
5    work hours and sick leave to facilitate
6    their meetings and other troublesome things
7    possibly at the expense of defendants." Did
8    you read that along with me?
9 A. Yes.
10 Q. Now, I don't know who the married police
11   officer he was referring to is, so I'm just
12   going to ask you with regards to you. Is
13   any of that statement true with regards to
14   you, Officer McNew?
15 A. Other than I being married and I was at one
16   time involved with her.
17 Q. What about this moving subpoenas and court
18   dates to accommodate you? Did that ever
19   occur?
20 A. No.
21 Q. Were you ever told by anyone at
22   Mr. Anderson's officer or anyone by the City
23   of Licking that you supposed to have moved
24   subpoenas and court dates to accommodate
25   your time off schedule using Monica?

Min-U-Script® ALPHA REPORTING SERVICE (13) Page 49 - Page 52
417-887-4110 *** *** 866-991-7787
www.missouricourtreporters.com

Case 6:09-cv-03018-RED  Document 236-1  Filed 11/24/10  Page 5 of 8

**Page 53**

1  A. No.
2  Q. Do you have any knowledge of any
3     communications with defense attorneys in
4     cases you were involved in that Monica may
5     have intercepted or interfered with?
6  A. No.
7  Q. Are you aware of Monica lying about her work
8     hours and sick leave to facilitate any
9     meetings with you?
10 A. No.
11 Q. In any way did Monica do you any favors at
12    the expense of any criminal defendants or
13    the victims of crime in Texas County?
14 A. No.
15 Q. Now, I'm going to show you another phase,
16    and it's a three-page letter. Do you see?
17    I've got it marked pages 1, 2 and 3. On the
18    second page it says -- and this is a letter
19    from Mr. Anderson; correct?
20 A. Yes.
21 Q. It says "Recently I have become concerned
22    about one incident in particular. On
23    March 10, 2005, the police officer in
24    question, Police Chief Danny McNew of the
25    Licking City Police, initiated a car chase

**Page 54**

1     of a suspect which resulted in a crash and
2     the death of the individual being chased,
3     Ronald D. Sullins, and serious injuries to
4     two of his passengers." I'm going to go
5     down to the second phase that I have marked,
6     and it says "I am, of course, concerned that
7     possible collusion between my former staff
8     member and Officer McNew may have resulted
9     in a deliberate effort to thwart the
10    investigation or at least that their actions
11    may give the appearance of a cover up." Do
12    you see that?
13 A. Yes.
14 Q. Just tell me. How do you feel having these
15    allegations made about you in a letter to
16    this state's Attorney General's office?
17       MR. HARRIS: Object, relevance.
18 Q. (By Mr. Steelman) Go ahead, sir.
19 A. Upset, a little sick.
20 Q. Now, it's on the letterhead of
21    Michael R. Anderson, Texas County
22    Prosecuting Attorney; is that correct?
23 A. Correct.
24 Q. Now, what I want to ask, first of all, is
25    for you to describe what this incident is

**Page 55**

1     regarding Ronald Sullins. What occurred?
2  A. I activated my vehicle's emergency lights,
3     siren. He fled east on Old Salem Road. At
4     one point the passenger tires dropped off
5     the driven portion of the roadway, the
6     vehicle then sharply turned to the left,
7     which would have been the passenger -- I
8     mean the driver's side and went off the
9     road.
10 Q. Resulted in a serious accident and the death
11    of Mr. Summons, Sullins?
12 A. Sullins, yes.
13 Q. Did your car ever come in contact with their
14    vehicle?
15 A. No.
16 Q. Did any member of the highway patrol ever
17    indicate to you that you were under some
18    sort of criminal investigation or any
19    investigation for your participation in this
20    chase and subsequent accident?
21 A. No.
22 Q. When you were in this -- pursuing
23    Mr. Sullins' vehicle, was it in your role as
24    a law enforcement officer?
25 A. Yes.

**Page 56**

1  Q. Was it in your role as the chief of police
2     of Texas County?
3  A. City of Licking, yes.
4  Q. Of City of Licking I mean.
5  A. Yes.
6  Q. Did any person from the City of Licking
7     administration come to you and indicate to
8     you that Mr. Anderson or his son, who was
9     the prosecutor for the city, brought to
10    their attention your potential involvement
11    in causing the Sullins accident and death?
12 A. No.
13 Q. Was there any collusion between you and
14    Monica with regard to this?
15 A. No.
16 Q. When this occurred in March of 2005, were
17    you and Monica even romantically involved?
18 A. No.
19 Q. I'm going to tell you that there had been
20    some statements made by some people who say
21    they heard Monica tell you that she could
22    take care of it on the phone. Was there any
23    conversation about that?
24 A. No, there was nothing to take care of here.
25    There wouldn't have been anything to take

Min-U-Script®    ALPHA REPORTING SERVICE    (14) Page 53 - Page 56
417-887-4110    866-991-7787
www.missouricourtreporters.com

Case 6:09-cv-03018-RED   Document 236-1   Filed 11/24/10   Page 6 of 8

Page 57

1  care of.
2  Q. When you looked at the police report, is
3     there anything in the police report
4     indicating you were at fault or had done
5     anything wrong or improper?
6  A. No.
7  Q. Now, there were some rumors that popped up
8     about your potential involvement; is that
9     correct?
10 A. Later.
11 Q. Okay. And do you know the source of those
12    rumors?
13 A. I think one of the -- well, no, you know, I
14    don't.
15 Q. Okay. And what I want to get at, prior to
16    those rumors about you potentially causing
17    the death of another human being, prior to
18    those rumors, had anyone in law enforcement,
19    in the judicial system or in the City of
20    Licking, in the Texas County Prosecuting
21    Attorney's office or any other official ever
22    indicated to you there was an investigation
23    in your potential causing the death of
24    Ronald Sullins?
25 A. No.

Page 58

1  Q. Other than this letter which we have had --
2     which is Exhibit 53 and which has been given
3     to us, is a letter that Michael R. Anderson,
4     the Prosecuting Attorney of Texas County,
5     sent to the Missouri State Attorney's
6     General's office making these accusation,
7     have you been made aware of any other
8     accusations other than the rumors that
9     started?
10 A. No.
11 Q. I want to make sure this is clear. Was
12    there anything that occurred that night that
13    made you even believe that you might be
14    investigated?
15 A. No.
16 Q. And you were, of course, interviewed just as
17    to what happened from the highway patrol;
18    correct?
19 A. Yeah.
20 Q. Did they ever indicate to you there was a
21    possible crime committed?
22 A. No.
23 Q. Now, prior to Monica leaving the prosecuting
24    attorney's office, which occurred in about
25    December, the last week of December 2005,

Page 59

1     you're aware basically of that, aren't you?
2  A. Yes.
3  Q. Prior to that did Monica Daniels how
4     Hutchison ever say disparaging things about
5     Michael Anderson at the prosecuting
6     attorney's or any of the girls or workers in
7     the prosecuting attorney's office?
8  A. Not that I heard.
9  Q. I want to bring your attention back to the
10    events that occurred after Mr. Anderson went
11    to Monica Daniel Hutchison's house. Is that
12    okay?
13 A. Sure.
14 Q. And at that time did you become involved in
15    your official capacity as the chief of
16    police of Texas County -- I mean Licking?
17    I'm sorry. I have --
18 A. I'm sorry. I didn't --
19 Q. Did you become involved in your official
20    capacity as the chief of police in Texas
21    County to see if that had been -- that
22    incident had been handled properly?
23 A. Yes, I did.
24 Q. How did that occur?
25 A. Actually, I had been made aware of this

Page 60

1     incident.
2  Q. By Monica?
3  A. Yes.
4  Q. Okay.
5  A. I looked in the log and there was no log
6     entry.
7  Q. I want to make sure I understand this. You
8     were not told by Ms. Daniels until around
9     Tuesday of the next week; is that correct?
10 A. Correct.
11 Q. You had no knowledge of this occurring until
12    then? Had you heard any rumors about it or
13    anything?
14 A. No.
15 Q. And so on Tuesday of the next week did you
16    go to the logs of the Texas County -- or the
17    City of Licking Police and look at the logs
18    themselves?
19 A. Yes.
20 Q. Was there any log entry made by
21    Officer Mike Hood as to what had occurred
22    that night?
23 A. No.
24 Q. So what did you do then? Let me ask you
25    this: I want to make sure I understand this

## Page 61

1    because I've never been in law enforcement.
2    What's the rules as to whether you log some
3    sort of call or complaint?
4  A. If we get a call for service, that we take
5    any kind of calls that we log it. No
6    matter, you know, from -- if we get a call
7    for service to even do standby to keep the
8    peace and we take no actions, we at least
9    make a log of that.
10 Q. Is that City of Licking's policy?
11 A. Yes.
12 Q. You've also had training in law enforcement;
13   is that right?
14 A. Yes.
15 Q. Is that standard policy of law enforcement?
16 A. Yes. I would say most places make a log of
17   any time they take any -- just any kind of
18   call, yes.
19 Q. Well, do you know why that the call that
20   Monica made that was taken by Officer Hood
21   of the Licking Police Department with
22   regards to Mr. Anderson's late night journey
23   to her house, why that wasn't logged?
24 A. I believe Mike Hood -- from what I gathered
25   from Mike Hood, Officer Hood, he had spoke

## Page 62

1    with the assistance chief Scott Lindsey and
2    they just thought it would be best to not
3    put it on the log.
4  Q. Now, who told that you?
5  A. Mike Hood.
6  Q. And he told you he had spoken with Scott
7    Lindsey?
8  A. Yes.
9  Q. Who was the assistant chief at that time?
10 A. Yes.
11 Q. Did you talk to the Assistant Chief Lindsey
12   about this?
13 A. Yes.
14 Q. And what did he say?
15 A. Well, he just said he thought it would be
16   best and since it was so minor, that no
17   really arrest or anything was made, that it
18   would just be better off for the parties
19   involved it not be put on the log.
20 Q. So do I understand they thought it was
21   better off for the parties involved that
22   there was no record indicating
23   Mr. Anderson's trip to Monica Daniel's house
24   in the late night? Is that an accurate
25   statement?

## Page 63

1  A. Yes.
2  Q. Well, now I'm curious. After Mr. Hood did
3    this, is he still employed with the City of
4    Licking?
5  A. Yes.
6  Q. Well, let me ask what about the assistant
7    chief of police, Mr. Lindsey, who
8    participated in this? Is he still employed
9    with the City of Licking?
10 A. Yes.
11 Q. No kidding. What is his -- what is his
12   role -- what is his position now?
13 A. He's the chief.
14 Q. Okay. And Mr. Anderson and his family, are
15   they still working with the City of Licking?
16 A. I, you know, I don't keep -- I don't keep up
17   with --
18 Q. Okay. Now, did Mr. Anderson ever have any
19   conversations with you before you left the
20   employ -- or, no, before you were dismissed
21   so that Mr. Lindsey could become chief? Did
22   you have any conversations with
23   Mr. Anderson?
24 A. Yes.
25 Q. About these problems?

## Page 64

1  A. Yes.
2  Q. And when did that occur?
3  A. I can't -- I'm not for sure what date or
4    time.
5  Q. Can you give me -- do you know if it was
6    before or after Monica had left employment?
7  A. It would have been after she left.
8  Q. After she left the employment of
9    Mr. Anderson in the Texas County
10   Prosecutor's office?
11 A. Yes.
12 Q. Well, how did this occur?
13 A. He just -- he just -- like we'd be in court
14   and one time, Myrna, the city administrator
15   and Scott, and he walked by and said Hi,
16   Scott. Hi, Myrna. He just started behaving
17   like I didn't exist and we agreed to talk
18   about that at his office.
19 Q. And did you have that conversation?
20 A. Yes.
21 Q. And where did that conversation take place?
22 A. At his office.
23 Q. And -- well, tell me about that
24   conversation.
25 A. He told me that I guess Monica had told him

Min-U-Script®   ALPHA REPORTING SERVICE   (16) Page 61 - Page 64
417-887-4110   ***   866-991-7787
www.missouricourtreporters.com

Case 6:09-cv-03018-RED Document 236-1 Filed 11/24/10 Page 8 of 8