IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MONICA DANIEL HUTCHISON,       )
                               )
        Plaintiff,             )
                               )
vs.            )Case No. 09-3018-CV-S-RED
                               )
TEXAS COUNTY, MISSOURI; MICHAEL)
R. ANDERSON, TEXAS COUNTY      )
PROSECUTING ATTORNEY; and      )
MICHAEL R. ANDERSON,           )
Individually,                  )
               )June 16, 2010
        Defendants.   )St. Louis, Missouri


VIDEOTAPED DEPOSITION OF HAROLD EMDE

a Witness, produced, sworn and examined on the 16th day of

June, 2010, between the hours of 8 a.m. and 5 p.m. of that

day, at the EEOC - St. Louis District Office - 1222 Spruce
Street, City of St. Louis, before

        JOANN RENEE RICHARDSON, CCR
          Certified Court Reporter
              20051 State Route B
           St. James, Missouri 65559

in the above-entitled cause, pursuant to Notice to Take
Video Deposition, on the part of the Plaintiff.



        Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

---

APPEARANCES:
For the Plaintiff:
  DAVID L. STEELMAN
    Attorney at Law
    STEELMAN, GAUNT & HORSEFIELD
    901 Pine Street, Suite 110
    Rolla, Missouri 65402
    tel: (573) 341-8336
    fax: (573) 341-8548

For the Defendant Texas County, Missouri:
  COREY L. FRANKLIN
    Attorney at Law
    THE LOWENBAUM PARTNERSHIP, LLC
    222 South Central Avenue, Suite 901
    St. Louis, Missouri 63105
    tel: (314) 863-0092
    fax: (314) 746-4848

For the Defendant Michael R. Anderson, Individually:
  WARREN E. HARRIS
    Attorney at Law
    TAYLOR, STAFFORD, CLITHERO, FITZGERALD & HARRIS
    3315 East Ridgeview, Suite 1000
    Rolla, Missouri 65804
    tel: (417) 887-2020
    fax: (417) 887-8431

For the St. Louis District Office, EEOC:
  MS. BARBARA SEELY
    Attorney at Law
    ST. LOUIS DISTRICT OFFICE, EEOC
    1222 Spruce Street, Room 8.100
    St. Louis, Missouri 63101
    tel: (314) 539-7880
    fax: (314) 539-7893

Also Present: Curt Shaw, videographer
EXHIBIT INSTRUCTIONS:
  Plaintiff's Exhibits 38 through 48 were kept by the
Reporter and attached to the original transcript; copies of
all exhibits were attached to each copy of the transcript.
SIGNATURE INSTRUCTIONS:

  Signature waived.


        Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

---

INDEX
                                                Page
Harold Emde
    Examination by Mr. Steelman............   5

    Examination by Mr. Franklin............  39

    Examination by Mr. Harris..............  60

Reporter's Certificate.....................  72


EXHIBITS:

EXHIBIT:                                PAGE:

38 - File of charge of discrimination       6
39 - Case log                        8
40 - April 20, 2006, letter to Mr. Emde     10
41 - May 4, 2006, letter to Harold Emde     10
42 - Memo of Phone Conversation - 5/10/06    12
43 - Phone interview notes of Mike Anderson  16
44 - Memo of Phone Conversation - 2/16/07    23
45 - Email to Allen & Rector         35
46 - Department of Justice letter    65

47 - Memo of Phone Conversation - 8/17/06    66
82-A - Same page as page 82 of Exhibit 38    38
48 - Handwritten notes - 10/17/06        70

        Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

---

1       MR. SHAW: We are on the record at
2  11:18 a.m. Today's date is June 16th, 2010. We are
3  at the offices of the St. Louis District EEOC. The
4  address is 1222 Spruce Street, St. Louis, Missouri.
5       I'm Curt Shaw, legal videographer, along
6  with Joann Richardson, certified court reporter, here
7  today for the deposition of Harold Emde, taken in the
8  cause of motion of Monica Daniel Hutchison vs. Texas
9  County, Missouri, et al.
10      At this time, will counsel please give
11 their representations for the record, beginning with
12 Mr. Steelman.
13      MR. STEELMAN: Thank you. My name is
14 David Steelman, Mr. Emde, and I represent Monica
15 Daniel Hutchison.
16      MR. FRANKLIN: Good morning, Mr. Emde,
17 my name is Corey Franklin. I'm an attorney with the
18 Lowenbaum Partnership and I represent Texas County,
19 Missouri, and to the extent that Michael R. Anderson
20 is also a party as the Texas County Prosecuting
21 Attorney in his official capacity, I represent the
22 County in that respect as well.
23      MR. HARRIS: And I'm
24 represent Michael Anderson ind[ividually]
25      MS. SEELY: And I'm

        Joann Renee Richards[on]
    * 573-699-4110 * St. J[ames, Missouri *]

1  that correct?
2  A. It has been maintained by me beginning 18
3  April, 2006.
4  Q. Okay. And on that date, if you can refer
5  to that, April 18, 2006, what took place?
6  A. On the 18th of April, 2006, I received this
7  charge file for processing and investigation.
8  Q. And the other entries in Exhibit 39
9  indicate your work on the file; is that correct?
10 A. There is one page in this document that
11 does not reflect my work, or at least not all of it.
12 Q. Is that the first page?
13 A. It's the first page. I drew that line on
14 the form.
15 Q. Okay.
16 A. And someone else made this entry.
17 Q. And why I'm really asking that question,
18 does it also reflect your last work that you did on
19 this particular charge in the case?
20 A. Yes, it does.
21 Q. And what was that date?
22 A. September 5, 2007.
23 Q. Now, can you tell the date that -- well,
24 let me ask this first. Did you, Mr. Emde, take care
25 of the notification to the Texas County Prosecutor

1  that Monica Daniel Hutchison had filed a complaint?
2  A. No, I did not.
3  Q. And how was that done?
4  A. The charge notification is the Form 131 as
5  reflected on this first case log, and it was done by
6  an employee with the initials M.P.
7  Q. I'm going to show you what's been marked as
8  Exhibit 40, which is part of the file that I had
9  without a name, and indicates a letter of April 20,
10 2006, from you to the Texas County Prosecutor. Would
11 that be accurate?
12 A. Yes, it is.
13 Q. And what was the purpose of that letter?
14 A. To let the respondent know that I have the
15 charge, I'll be the person investigating it, and
16 asking the respondent to contact me and let me know
17 that they received notification of the charge and who
18 my point of contact will be during the investigation,
19 with phone numbers and addresses, and whether or not
20 they're represented by an attorney and, if so, who
21 that attorney is. And if we had requested documents,
22 I was asking whether or not they needed an extension
23 to respond to that.
24 Q. Mr. Emde, I want to hand you what's been
25 marked as Exhibit 41 and can you tell me, sir, if

1  this is the first contact that you received from Mr.
2  Anderson?
3  A. I'm going to have to take this out of the
4  rubber bands.
5  Q. That's fine, whatever you need me to do.
6      MR. STEELMAN: Could we go off the
7  record a second? Never mind, never mind.
8  BY MR. STEELMAN:
9  A. This would be the first contact I had with
10 the respondent.
11 Q. Okay. And how is that signed?
12 A. Michael R. Anderson, Texas County
13 Prosecuting Attorney, Missouri Bar No. 48494.
14 Q. And is it accurate that that is on the
15 letterhead of the Texas County Prosecuting Attorney?
16 A. Yes, it is.
17 Q. And I have some questions to ask you about
18 this. Would you read into the record, and for the
19 judge and the jury, the last paragraph of the second
20 page of Exhibit 41?
21 A. Repeat again which paragraph.
22 Q. The very last paragraph that says, "I
23 assure you."
24 A. Reading: I assure you of my full
25 cooperation, and the full cooperation of this office,

1  in revealing the truth behind these accusations, and
2  look forward to exposing Ms. Daniel for the amoral
3  predator and base opportunist that she is.
4  Q. If I'm correct, this is the first written
5  contact from Mr. Anderson; is that correct?
6  A. To the best of my knowledge, it is.
7  Q. I want to show you now what has been marked
8  as Exhibit 42. And, again, this is two pages that
9  come from the file, but I want you to make sure that
10 these go together.
11     I will represent to you it says, "Memo of
12 phone conversation" and some notes. And this is how
13 it came to us, but I want to make sure that this is
14 accurate. So I'm going to show you Exhibit 42 and
15 could you identify, please, the first and the second
16 page?
17 A. The first page is a memo of a telephone
18 conversation that I had on May 10, 2006, with Mike
19 Anderson.
20 Q. Do you know if you called him or he called
21 you?
22 A. I do not know.
23 Q. Okay. Now, is the first page of Exhibit 42
24 your handwriting completely?
25 A. Yes, it is.

## Page 13

1  Q. And those are your investigations at the
2  bottom beside your name -- I mean, you initials?
3  A. My initials?
4  Q. Yeah, I'm sorry, sir.
5  A. Yes.
6  Q. Now, what does that say under Paragraph 1?
7  A. (Reading): See attached notes. Mr.
8  Anderson was giving me his position over the phone.
9  Q. Now, if you'll turn to what has been marked
10 as page two of Exhibit 42, again, is this -- are
11 these notes in your handwriting?
12 A. Yes, they are.
13 Q. And are these notes the attached notes to
14 which you were referring on the first page of Exhibit
15 42?
16 A. Yes.
17 Q. Now, again, for purposes only -- I don't
18 want to belabor this -- I want you to read this in,
19 because it's in your handwriting and I want to make
20 sure I don't misrepresent or if any of it is hard to
21 read, although I will tell you, sir, that your
22 handwriting is much better than mine. At the top,
23 what does it say that is double underlined?
24 A. (Reading): Will fax me a letter.
25 Q. And then what is the paragraph that you

## Page 14

1  have written in your handwriting under that?
2  A. (Reading): Asked that I conduct interviews
3  before I perfect charge. Told him send letter, but I
4  decide on what to do when.
5  Q. And then there are three lines, I think it
6  says "year ago," but would you read that, please?
7  A. (Reading): Year ago raise to another girl.
8  She got upset.
9  Q. And then what is next, sir?
10 A. I'll go over to the left. (Reading): Told
11 coworker she'd stay there two years and set him up
12 for sex harassment. And then to the right of that.
13 (Reading): Started wearing skimpy clothes.
14 Q. And then the paragraph after that?
15 A. (Reading): CP was running a sex ring out
16 of the office, included cops and their wives.
17 Q. So that I understand, with these notes and
18 your reading them, did Mr. Anderson indicate to you
19 that the sex ring that -- well, let me back up, my
20 fault. CP in this case means Charging Party; is that
21 correct?
22 A. That's correct.
23 Q. And that's how you always, throughout the
24 notes, refer to Monica Daniel Hutchison; is that
25 correct?

## Page 15

1  A. I can't say always.
2  Q. Okay. In this file, if you have the word
3  "CP," would that be referring to Monica Daniel
4  Hutchison?
5  A. Yes.
6  Q. And just so the jury understands, then,
7  when you say CP was running a sex ring, he was
8  telling you that Monica Daniel Hutchison was running
9  a sex ring; is that accurate?
10 A. Yes.
11 Q. Now, did he also tell you that her sex ring
12 that he alleged she was running included cops and
13 their wives?
14 A. Yes.
15 Q. Now, what's the next paragraph?
16 A. (Reading): Coworker has had to resist CP's
17 sexual advances.
18 Q. And then, finally, at the bottom, what was
19 the allegation that Mr. Anderson made to you in this
20 first phone conversation?
21 A. (Reading): Now living with a cop and his
22 wife, cop under investigation.
23 Q. Okay. Now, referring back to the last page
24 of the letter that you read, dated May 4, 2006, do
25 you recall that Mr. Anderson assured you of his full

## Page 16

1  cooperation and the full cooperation of his office;
2  do you recall that?
3  A. Yes, I do.
4  Q. Okay. Now, in this conversation, did Mr.
5  Anderson reveal to you that he had asked the Missouri
6  Attorney General's Office to conduct an investigation
7  of the computers in his office and that they had
8  found no evidence of any criminal activity?
9  A. During this telephone conversation?
10 Q. That's what I asked.
11 A. I did not write it down on here, so I would
12 assume that he didn't.
13 Q. Okay. Did Mr. Anderson, during this first
14 contact with you and your office, reveal to you any
15 indication that he thought, or was alleging, that
16 Monica was discharged because of criminal activity,
17 because of hiding subpoenas or destroying
18 investigation files?
19 A. It's not in my notes.
20 Q. As an investigator, would you consider that
21 sort of statement significant enough to put in your
22 notes if he would have told you?
23 A. I would, and if I heard it.
24 Q. Now, I'm going to show you what's been
25 marked Exhibit 43 that I want to go through, Mr.

1  Emde, and appreciate your bearing with me while I get
2  these exhibits passed around. Did you eventually
3  conduct a phone conversation later in the
4  investigation with Mr. Anderson?
5     A. I did.
6     Q. And is Exhibit 43 part of the official file
7  that indicates -- that are your handwritten notes of
8  that phone interview?
9     A. These are all my notes of an interview I
10 conducted with Mr. Anderson on February 16, 2007.
11    Q. Did you say February 16, 2007?
12    A. Yes.
13    Q. Now, just so that I know -- and you might
14 need to look at the record. And if you do, we can
15 always take a break -- was this next phone
16 conversation, which was a little over nine months
17 after the one we just talked about on May 10th, 2006,
18 the only other phone contact you had with Mr.
19 Anderson?
20         MR. STEELMAN: Let's go off the record
21 for a second so he can look through there, just
22 whatever works for you.
23         MR. SHAW: We're off the record at
24 11:41 a.m.
25         (Off the record.)

1  _____
2         (Back on the record.)
3         MR. SHAW: We're back on the record at
4  11:43 a.m. Please proceed.
5  BY MR. STEELMAN:
6     Q. Mr. Emde, to recap, because we're back on
7  the record, earlier we had talked about a phone
8  conversation you had with Mr. Anderson on May 10th,
9  2006, and that Exhibit 43, which we're getting ready
10 to discuss, are your notes of a conversation of
11 February 16th, 2007. And my question was, during
12 that nine-month interim, were there any other phone
13 contacts with Mr. Anderson?
14    A. Okay. I had no other telephone
15 conversations with Mr. Anderson before February 16th,
16 2007, other than the one that we already talked
17 about.
18    Q. Thank you, Mr. Emde. Now, going back to
19 Exhibit 43, which is in front of you, and I just want
20 to ask you some brief questions about these notes.
21 And just basically I want to know about your method
22 of preparation -- or not preparation, of how you
23 prepared the notes or when you wrote the notes down.
24 How did you do this from interviewing, these notes?
25    A. My notes are handwritten and the notes were

1  taken as I conducted the interview over the
2  telephone, and I would also be writing questions for
3  follow-up questions as the interview continued.
4     Q. And all of these notes are in your
5  handwriting; is that correct?
6     A. Yes.
7     Q. And to the best of your ability, are these
8  notes an accurate reflection of the questions you
9  asked Mr. Anderson and the answers that he gave?
10    A. Yes.
11    Q. Now, you indicated that the date of the
12 interview was February 16, 2007. Was this a phone
13 interview?
14    A. Yes, it was.
15    Q. And was it just Mr. Anderson, or was
16 anybody else present?
17    A. Well, also on the telephone line was Mr.
18 Harris, Mr. Anderson's attorney.
19    Q. Okay. Now, going to the first page, what
20 was the question reflected on the first page of your
21 notes?
22    A. Whose voice is on the voice recording you
23 subpoenaed on December 23, 2005.
24    Q. And before we talk about his answer, are
25 you aware now -- I know you have to investigate more

1  than one claim. Do you remember how the voice
2  recording was involved in this charge?
3     A. I don't remember exactly.
4     Q. Okay. Well, I'll just continue, then.
5  What was his answer? When you asked him whose voice
6  is on the voice recording that Mr. Anderson
7  subpoenaed on December 23, 2005, what was his answer?
8     A. (Reading): That's my voice.
9     Q. Did you follow up on that?
10    A. I asked why the recording was subpoenaed.
11    Q. And what was his answer to you?
12    A. (Reading): Was at a club with a state
13 police officer; as heard on the tape, was not sober.
14 Had been told about date rape drugs, believes he may
15 have been drugged. Discussed this drug with a
16 doctor, asked Daniel for the tape. She said no, said
17 it was destroyed. New better because Daniel had been
18 others about it. Wanted the tape preserved because
19 it was evidence of an assault.
20    Q. And so that I'm accurate, he indicated to
21 you at this time, which was February 16th, 2007, that
22 Monica had said to him that she had destroyed the
23 tape. Was that his claim?
24    A. Would you please repeat that?
25    Q. I didn't ask that very well, Mr. Emde, and

Page 21

1  I apologize. Again, during this conversation, so
2  that I understand it, on February 16th, 2007, did Mr.
3  Anderson allege that Monica Daniel Hutchison had told
4  him that the tape was destroyed?
5     A. I wrote down, "Said it was destroyed."
6  "She said it was destroyed," meaning Ms. Daniel.
7     Q. Now, I want to go to the second page,
8  please. And rather than go through this whole page,
9  because I think your handwriting is pretty good and
10 defense counsel can ask you about anything they want
11 to --
12          MR. FRANKLIN: Just to be clear, third
13 page or second page?
14          MR. STEELMAN: Actually, the third
15 page where it say, "I have copy of an email" at the
16 top.
17 BY MR. STEELMAN:
18    Q. Is it fair to say that you were asking him
19 questions about a copy of an email that you had,
20 dated December 20, 2005?
21    A. I am asking him about that email.
22    Q. Correct. Now, I want you to go to the last
23 paragraph that says, "Around September." And would
24 you read that, please?
25    A. (Reading): Around September, I realized

Page 22

1  things were going on. I have the notes from that
2  meeting. I'll read them if you want. This was
3  before I decided to fire her. I told her that and
4  this is what started the whole problem. I wasn't
5  trying to get rid of Ms. Daniel. I was trying to fix
6  a problem.
7     Q. Now, I have two questions in regards to
8  that. And the first question is, did you follow up
9  to obtain the notes that he referred to you?
10    A. I would have to search through the file.
11    Q. Let me mark that separately as an exhibit,
12 because I think the record will reflect that you did.
13 And let me just follow up and indicate, to make sure
14 that I am clear, that Mr. Anderson told you that this
15 meeting was not to fire Monica Daniel Hutchison; is
16 that accurate?
17          MR. HARRIS: Let me object. When you
18 say "this meeting," which meeting are you referring
19 to?
20          MR. STEELMAN: The meeting from the
21 notes.
22          MR. HARRIS: The September meeting
23 that's referenced in the question?
24 BY MR. STEELMAN:
25    Q. Let me go to the notes here, Mr. Emde --

Page 23

1     A. Okay.
2     Q. -- and we can make this, I think, easier.
3  I'm going to show you -- and we'll get back to
4  Exhibit 43. I'm going to show you Exhibit 44 and can
5  you identify that, please?
6     A. It's a memo of a telephone conversation I
7  had with Mr. Harris on February 16, 2007.
8     Q. And what does that say?
9     A. It was regarding documents. My memo reads:
10 During my interview of Mr. Anderson, Mr. Harris
11 stated he would send me copies of notes Mr. Anderson
12 mentioned during the interview.
13    Q. And I'm going to show you what's been
14 marked previously in Mr. Anderson's deposition as
15 Exhibit 23. And if you need to take a break to go
16 through the record, can you tell me if those notes,
17 which are three pages, were in fact the notes, then,
18 that Mr. Harris presented to you as being responsive
19 to Mr. Anderson's statement and your request?
20    A. I will need to look.
21          MR. STEELMAN: Let's go off.
22          MR. SHAW: We're off the record at
23 11:52 a.m.
24      (Off the record.)
25

Page 24

1      (Back on the record.)
2          MR. SHAW: We're back on the record at
3  11:54 a.m. Please proceed.
4  BY MR. STEELMAN:
5     Q. Mr. Emde, since we went off the record
6  again so that you could look through the official
7  file, I wanted to ask you if Exhibit 23 is, in fact,
8  the notes, then, that you received from Mr. Harris in
9  response to your request for the notes that Mr.
10 Anderson referred to?
11    A. Given that I received them after the
12 telephone interview of Mr. Anderson and they appear
13 to be the last document in the file there, I would
14 say that they are.
15    Q. And could you look real quickly and tell me
16 if Exhibit 23 that I handed you is identical to the
17 notes that are in the official file that you
18 received?
19    A. That would be this file?
20    Q. Are the notes in the official file
21 identical to Exhibit 23?
22    A. Is that your number there?
23    Q. Yes, these have been numbered
24 consecutively. The number that is 149 of the
25 official records, 149, 150, and 151 was put on as

1  part of the numbering of the exhibit.
2      A. They look to be the same.
3      Q. Thank you. Now, in the left-hand corner --
4  and tell me if you agree -- "notes used first
5  meeting, Monica," that is not your handwriting; is
6  that correct?
7      A. That is not my handwriting.
8      Q. But that appears in the official -- your
9  official file the same as it does on Exhibit 23; is
10 that correct?
11     A. That's correct.
12     Q. Now, did you review those notes that he
13 sent you?
14     A. Yes.
15     Q. Do you recall -- or if you want to look at
16 them now -- whether the notes indicated to you or
17 said anything about either a sex ring on the part of
18 Monica Daniel Hutchison or criminal activity?
19     A. I do not recall without reading the
20 documents.
21         MR. STEELMAN: Go ahead and take a
22 moment. Let's go off the record for just a second.
23         MR. SHAW: We're off the record at
24 11:58 a.m.
25         (Off the record.)
             Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

1  _____
2         (Back on the record.)
3         MR. SHAW: We're back on the record at
4  12:04 p.m.
5  BY MR. STEELMAN:
6      Q. Mr. Emde, we're back on the record. Have
7  you had time to review Exhibit 23, which are the
8  notes that Mr. Anderson, or Mr. Harris on behalf of
9  Mr. Anderson, sent you and at the top say, "Notes of
10 first meeting." Have you had a chance to review
11 those?
12     A. Yes, I have.
13     Q. And did you find any reference in them to
14 either a sex ring or criminal activity on the part of
15 Monica Daniel Hutchison hiding subpoenas or
16 destroying investigative files or anything like that?
17     A. I did not.
18     Q. Now, I want to refer back to Exhibit 43.
19 Now, what I have done, so the record is clear, during
20 the interim, because we're referring to different
21 pages, I have numbered the exhibit itself 1 through
22 10 in red in my handwriting at the bottom, so I'll
23 try to use some of those pages as you refer to that.
24 Is that agreeable with you, sir?
25     A. Yes.
             Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

1      Q. Now, the next thing I wanted to talk to you
2  about appears -- if I could see that for just a
3  second -- appears on Page 5 of the Exhibit 43 and
4  starts with the words, "What is your response?" so
5  that counsel can all follow that. And let me say,
6  Mr. Emde, that this question is with regard to
7  Corporal Jeff Kinder.
8         And there have been some statements with
9  regard to whether or not Mr. Anderson himself asked
10 Corporal Jeff Kinder to ask Monica Daniel Hutchison
11 to come back to work for Mr. Anderson. And did you
12 deal with that in your interview, as reflected in
13 your notes on Page 5 of Exhibit 43?
14     A. I asked Mr. Anderson to respond to an
15 allegation that he had asked Corporal Jeff Kinder to
16 ask Ms. Daniel to come back to work on about December
17 8, 2005.
18     Q. And did he respond to you, sir?
19     A. Yes, he did.
20     Q. And what did he tell you during your phone
21 interview with him, with his attorney present, on
22 February 16, 2007?
23     A. (Reading): I did do that. Kinder and
24 Monica were close. When I told her to leave in
25 December, I told her to think about it. She cleaned
             Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

1  out her desk and went home. I told Kinder to talk to
2  her and ask her to come back and to -- I can't read
3  the word there.
4      Q. Could that be talk?
5      A. Okay.
6      Q. Mr. Emde, my handwriting is so bad, I can
7  even read other people's handwriting.
8      A. I'll start that sentence over. (Reading):
9  I told Kinder to talk to her and ask her to come back
10 and talk to me. I just wanted her to make the
11 changes. She came back. A few days after that, the
12 incident at her house happened.
13     Q. Thank you. And did you also -- and I'm
14 referring to the next page of your notes. Did you
15 also talk to him about how long he had been hearing
16 that Monica Daniel Hutchison was planning to file a
17 complaint regarding sexual harassment or
18 discrimination?
19     A. I asked Mr. Anderson, "What did you do when
20 you first heard that Ms. Daniel was planning a sexual
21 harassment complaint against you?"
22     Q. And what did he say?
23     A. (Reading): I don't remember. I had been
24 hearing that for about six months. Christine Wheeler
25 told me and my wife that Daniel was going to work for
             Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

Page 29

1  two years, until she got her graduate degree, and
2  then would sue me.
3      Q. And, finally, Mr. Emde, if you would go to
4  the second to last page of your handwritten notes.
5      A. That would be number nine?
6      Q. And if you -- correct me if I'm wrong, but
7  I believe that you will remember that in the notes in
8  the first contact you had, he made some allegations
9  regarding her making unwanted sexual advances; do you
10 recall that?
11     A. Yes.
12     Q. And would you read the question that you
13 asked and the answer that Mr. Anderson gave during
14 this phone interview with regard to those
15 allegations?
16     A. Are we talking about Page 9?
17     Q. Yes.
18     A. Okay. (Reading): In the statements you
19 submitted from Christina -- Christiana Wheeler and
20 Stephanie Creek, neither mentions that you were
21 targets of sexual advances by Ms. Daniel, as you
22 contend in your letter to the Commission, dated May
23 16, 2009. What evidence do you have to support these
24 allegations? (Reading answer): The statements that
25 they gave me. This was related to me by them.

<span style="text-align:center">Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *</span>

Page 30

1      Q. Finally, if you go to the last page, number
2  ten, you had one further question that is reflected
3  in these notes. And can you read what question you
4  asked Mr. Anderson and his answer?
5      A. (Reading): During Ms. Daniel's employment,
6  when, if ever, did an employee allege that they were
7  subjected to a sexually hostile work environment by
8  Ms. Daniel? (Reading answer): They never told me
9  until after she left. You can speak to them if you
10 want.
11     Q. And, again, just to recap, all of what we
12 were going through with Exhibit 43 was in your
13 handwriting and your notes from the phone interview
14 with Mr. Anderson, with his attorney, Warren Harris,
15 also on the line; is that correct?
16     A. Correct.
17     Q. Thank you. Now, what I'd like to do now,
18 if it's agreeable with you, Mr. Emde, because I think
19 this involves several documents and rather than be
20 doing this on the tape, I'd ask that we go off the
21 record so that I can distribute everything to counsel
22 and give you copies. Is that agreeable?
23     A. Yes.
24         MR. SHAW: This is going to end tape
25 number one of the deposition of Harold Emde. We are

<span>Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *</span>

Page 31

1  off the record at 12:11 p.m.
2         (Off the record.)
3         _____
4         (Back on the record.)
5         MR. SHAW: We're back on the record at
6  12:18 p.m. This begins tape number two in the
7  deposition of Harold Emde. Please proceed.
8  BY MR. STEELMAN:
9      Q. Mr. Emde, we're back on the record. Before
10 I go to my questions regarding Exhibits 10, 11 and
11 13, which have been previously marked in this case,
12 you indicated the file had jogged your memory with
13 regard to one answer that you gave. Would you
14 explain that, sir?
15     A. As I recollect, you asked me if I had any
16 recollection of a tape, I believe an audiotape --
17     Q. Yes, sir.
18     A. -- that was referenced on the document I
19 was looking at, and I answered that I did not. I
20 wasn't sure if there was more than one tape. And
21 when I read the first line of the next paragraph, I
22 immediately recalled it, okay, yes, I do remember it,
23 so.
24     Q. Okay. And did you listen to that tape as
25 part of your investigation; do you recall?

<span>Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *</span>

Page 32

1      A. I would have to look at my log in order to
2  determine that.
3      Q. Don't worry about that.
4      A. Okay.
5      Q. Well, maybe we should clear that up. Can
6  you refer to your log? We'll take whatever time you
7  need.
8      A. On December 26th, 2006, I reviewed Charging
9  Party's audiotape.
10     Q. Thank you very much, Mr. Emde. And,
11 finally, your attorney, Ms. Seely, had caught
12 something that I had actually missed. And if you go
13 back to Page 9 of Exhibit 43, we're concerned that
14 maybe that was misread, so would you just read Page 9
15 again?
16     A. (Reading): In the statements you submitted
17 from Christiana Wheeler and Stephanie Creek, neither
18 mentions that they were targets of sexual advances by
19 Ms. Daniel as you contend in your letter to the
20 Commission, dated May 16, 2006. What evidence do you
21 have to support these allegations? (Reading answer):
22 Statements that they gave me. This was related to me
23 by them.
24     Q. And, again, that was just -- there was some
25 concern that you had read the word "they" as the word

<span>Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *</span>

<span>8 (Pages 29 to 32)</span>

<span>Case 6:09-cv-03018-RED   Document 236-3   Filed 11/24/10   Page 7 of 9</span>

## Page 33

1  "you." And it's "they" were targets; correct?
2  A. Statements that they gave me, this was
3  related to me by them.
4  Q. Now, I've handed you exhibits -- and I
5  handed to all counsel Exhibits 10, 13. And,
6  particularly, Exhibit 10, I have highlighted in
7  yellow a statement that -- well, a newspaper article
8  and a quote that the newspaper indicates was given by
9  Mr. Anderson to the Houston Herald, which is a
10 newspaper in Houston, Missouri. Do you see that
11 highlighted statement?
12 A. I do.
13 Q. And would you read that, please?
14 A. (Reading): These are the same claims
15 investigated by the Equal Employment Opportunity
16 Commission and the Department of Justice. Those
17 investigations found no basis for a claim then, and
18 nothing has changed.
19 Q. Now, in particular, the statement that
20 those investigations found no basis for a claim then,
21 is that statement, if, in fact, Mr. Anderson gave it,
22 an accurate statement of the position of the Equal
23 Employment Opportunity Commission or the Department
24 of Justice?
25 MR. HARRIS: I object, lack of

## Page 34

1  foundation. He's not been established as knowing
2  anything or having any knowledge of what the
3  Department of Justice did or didn't do.
4  MR. STEELMAN: That's a fair
5  objection. I can get to that later with the letter.
6  BY MR. STEELMAN:
7  Q. Let me re-ask that question, Mr. Emde; is
8  this agreeable?
9  A. Yes.
10 Q. Is that statement an accurate reflection of
11 the decision by the Equal Employment Opportunity
12 Commission? And I would refer you to the
13 determination, Exhibit 11, too.
14 A. It is not true that those investigations
15 found no basis for a claim then and nothing has
16 changed. I really don't know what nothing has
17 changed means, but.
18 Q. So that my question and answer is clear, is
19 part of his statement that those investigations found
20 no basis for a claim then, is that a true statement?
21 A. It is inaccurate with respect to the
22 investigation that I conducted of this charge.
23 Q. Okay. Are you aware and can even answer a
24 question with regards to how the process works and
25 the Department of Justice even gets involved?

## Page 35

1  A. When an employer is a public employer and
2  the charge is Title 7 and we find cause on the
3  charge, issue a letter of determination, and the
4  following conciliation is unsuccessful, I do a
5  conciliation failure and submit the charge through
6  the chain of command here at EEOC for sufficient to
7  the justice department for review.
8  Q. And in your experience, does the justice
9  department take these cases very often, or do they
10 leave them to private litigation?
11 MR. FRANKLIN: I'm going to object
12 that it calls for speculation.
13 MR. HARRIS: Join.
14 BY MR. STEELMAN:
15 Q. Let me hand you just what's been marked as
16 Exhibit 45, Mr. Emde. Go ahead, sir. In your
17 experience, does the justice department take over
18 these cases very often, or do they leave them to
19 private litigation?
20 A. In my experience, they do not take very
21 many.
22 Q. And are you aware -- and I don't want to
23 ask questions that are outside of your purview -- of
24 the necessity, before a claimant can file, to receive
25 what we call a Right to Sue letter from the justice

## Page 36

1  department giving the claimant the right to go
2  forward?
3  A. The claimant must receive a Right to Sue
4  from the justice department, yes.
5  Q. I'm showing you what's been previously
6  marked as Exhibit 13, which I've handed you. And is
7  that an example -- well, it's there somewhere. But
8  is that an example of what we refer to as a Right to
9  Sue letter from the justice department?
10 A. I've never seen one of these before.
11 Q. Okay. They're issued separately by the
12 justice department. You don't see them; is that
13 right?
14 A. I've never seen one.
15 Q. Okay. Mr. Emde, thank you very much. I
16 just want to refer back again to Mr. Anderson's
17 letter of May 4th and his promise to be fully
18 cooperative; do you recall that?
19 A. Yes.
20 Q. Did he ever, at any time during any of his
21 contact with you, either in person or by counsel,
22 reveal to you that he had requested investigations by
23 the Missouri Attorney General's Office that had come
24 up with no evidence of wrongdoing?
25 MR. FRANKLIN: I'm going to object and

1  say lack of foundation.
2  BY MR. STEELMAN:
3    Q. Go ahead, sir.
4    A. I don't know.
5    Q. Do you know -- is it possible just by
6  referring to your log as to whether you can say
7  whether there's no indication in the file that you
8  received any of that information from Mr. Anderson,
9  or his attorney, Mr. Harris?
10   A. I wouldn't be able to tell that from the
11  log. I would have to look through the Tab D section
12  of the charge.
13        MR. STEELMAN: Let's go off the record
14  for just a second so you can look through the Tab D.
15  And this will be my last question to you.
16        MR. SHAW: We're off the record at
17  12:27, p.m.
18        (Off the record.)
19  _____
20        (Back on the record.)
21        MR. SHAW: We're back on the record at
22  12:41. Please proceed.
23  BY MR. STEELMAN:
24   Q. Mr. Emde, before we had gone off the
25  record, I was asking you whether Mr. Anderson or his

        Joann Renee Richardson
     *  573-699-4110  *  St. James, Missouri  *

1  attorney, Mr. Harris, had revealed to you the results
2  of an investigation by the Missouri Attorney
3  General's Office that he had requested. And you, at
4  that time, thought it was necessary to review the
5  file; is that correct?
6    A. That's correct.
7    Q. Did your review of the official file of
8  this investigation indicate that either Mr. Anderson
9  or his attorney ever revealed to you, during any part
10  of the investigation, the results of the
11  investigation that Mr. Anderson requested from the
12  Missouri Attorney General's Office?
13   A. I do not recall ever receiving the results
14  of the investigation.
15   Q. And does that include, you never recall
16  receiving the results of their forensic investigation
17  of the computers in the prosecutor's office; is that
18  right?
19   A. I do not recall that.
20   Q. Okay. Now, one more thing to clear up --
21  and, again, I want to express my appreciation to you
22  and Ms. Seely of the office for helping us.
23       I've marked what is called Exhibit 82-A,
24  which was Page 82 in the official file, but we were
25  able, with Ms. Seely's help, to obtain a copy that

        Joann Renee Richardson
     *  573-699-4110  *  St. James, Missouri  *

1  showed the entire record at the bottom.
2        And would you now read the entire sentence,
3  the last two lines at the bottom of what was Page 82
4  and is now Page 82-A and going to be included in the
5  document?
6    A. (Reading): Now living with a cop and his
7  wife. Cop under investigation. Records missing.
8  Attorney General involved.
9    Q. Did Mr. Anderson explain to you what he
10  meant by Attorney General involved, or do you know?
11   A. I don't know.
12        MR. STEELMAN: Mr. Emde, thank you so
13  much for your time today. I appreciate it. I have
14  no further questions at this time.
15  _____
16  EXAMINATION BY MR. FRANKLIN:
17   Q. Good afternoon, Mr. Emde.
18   A. Good afternoon.
19   Q. As we introduced ourselves --
20        MR. STEELMAN: Can we go off the
21  record real quick --
22        MR. FRANKLIN: Sure.
23        MR. STEELMAN: -- to put this exhibit
24  back together?
25        MR. FRANKLIN: No problem

        Joann Renee Richardson
     *  573-699-4110  *  St. James, Missouri  *

1        MR. SHAW: Off the record at 12:43
2  p.m.
3        (Off the record.)
4  _____
5        (Back on the record.)
6        MR. SHAW: We're back on the record at
7  12:44 p.m.
8  BY MR. FRANKLIN:
9    Q. Good afternoon, Mr. Emde.
10   A. Good afternoon.
11   Q. As we introduced ourselves earlier this
12  morning, my name is Corey Franklin. I'm an attorney
13  with the Lowenbaum Partnership and I represent Texas
14  County, Missouri, as well as Michael R. Anderson,
15  Defendant, in his official capacity as the prosecutor
16  in Texas County, Missouri.
17        As your testimony that's being taped today
18  may be used at trial in lieu of your live appearance,
19  I'd like to go through some prerequisite questions,
20  and then I'm going to ask you a series of substantive
21  questions. Is that all right?
22   A. Yes.
23   Q. Okay. In response to those substantive
24  questions, I'm going to ask that you provide me with
25  an audible answer, a yes, a no, or a narrative, as

        Joann Renee Richardson
     *  573-699-4110  *  St. James, Missouri  *