# In The Matter Of:

*Hutchison v.
Texas County*

---

*Seth Walker
May 26, 2010*

---

*Alpha Reporting Service
3230-G South National
Springfield, MO 65807
417-887-4110 or 866-991-7787
417-889-4246 (fax)*



To open files, click on the desired file type in bookmark on left.
For quick saving or searching multiple files, click attachments tab (or paperclip) on left.
For best viewing/searching, use Adobe Reader/Acrobat ver. 9 or higher
(www.adobe.com).



Page 29

1     probably four years as a supervisor.
2 Q. Okay. Are you aware of any occasions when
3     Mike Hood responded to calls placed by
4     Monica Daniel seeking assistance?
5 A. I didn't see it. I've heard about it.
6 Q. You are aware of an occasion when he was
7     called to her house?
8 A. I've heard about it.
9 Q. What did you hear?
10 A. I heard that she called them because
11     Mike Anderson was over there knocking on the
12     door or something like that. And I guess he
13     went over there and Mike Anderson was
14     already gone or something of that nature.
15 Q. Okay. Did you ever discuss that incident
16     where Mr. Anderson went over to
17     Monica Daniel's house and knocked on the
18     door, did you ever discuss that incident
19     with Monica Daniel?
20 A. No.
21 Q. Do you know who Millie Williams is?
22 A. I've heard the name Millie. Maybe if I seen
23     her face.
24 Q. Okay. And I understand that you haven't
25     been employed in Licking for a while so your

Page 30

1     recollection of local policies and
2     procedures might not be --
3 A. Right. I didn't pay a whole lot of
4     attention to them when I was there.
5 Q. Fair enough. If you receive -- was it
6     standard practice in the Licking Police
7     Department received a call that someone was
8     intoxicated and in a vehicle, was it
9     standard procedure if that person was
10     present when a car arrived to do some type
11     of a field sobriety check or determine
12     whether that driver was impaired?
13 A. Well, it would depend. I don't believe
14     there's any set policy.
15 Q. Okay.
16 A. That would depend on if you have enough of a
17     driving case for criminal prosecution.
18 Q. Okay.
19 A. Or the circumstances. In that small little
20     town there's one officer who works a shift
21     at a time and if there's a million things
22     going on at once or if you're on -- if you
23     get called to something like that and
24     another call comes up, you may leave. As
25     far as in the normal flow of things, yes, I

Page 31

1     would.
2 Q. Okay. And that would -- assuming that there
3     wasn't another more pressing call --
4 A. Yeah, absolutely.
5 Q. -- that required your attention, it was the
6     practice --
7 A. Are you saying if the person was in the
8     vehicle?
9 Q. Right.
10 A. Oh, yeah, absolutely.
11     MR. GAUNT: Absolutely, I'm not sure
12     that answer's clear.
13 A. You asked if you received a call that a
14     person was intoxicated and you said that a
15     location --
16 Q. (By Mr. Franklin) Right, at a location and
17     you drove up and saw that person in the
18     vehicle or attempting to get into the
19     vehicle.
20 A. Oh, yes. Absolutely.
21 Q. Okay. So you would ask to conduct some type
22     of field sobriety test and that's just
23     general best practice; right?
24 A. Absolutely.
25 Q. Okay. Now, would that operating procedure

Page 32

1     be different if you just got a call hearing
2     that someone was being obnoxious as opposed
3     to someone that was visibly inebriated?
4 A. Yes.
5 Q. Okay. So if someone was just being
6     obnoxious, you wouldn't necessarily?
7 A. Yeah. I mean, you'd still respond --
8 Q. Right.
9 A. -- of course, but I mean, if you didn't have
10     any signs that they were intoxicated, then
11     you wouldn't have any reason to do field
12     sobriety.
13 Q. Right. And then the kind of the last
14     follow-up would be notwithstanding the
15     nature of the report, if you drove to a
16     scene and saw someone stumbling out to their
17     car and acting in an erratic fashion, that
18     would be an appropriate time to conduct a
19     field sobriety examination?
20 A. Yeah. Probably at that point if they were
21     walking out to a vehicle it wouldn't be a
22     situation probably an arrest but more like,
23     you're not going to drive.
24 Q. Right.
25 A. Type scenario.

Min-U-Script®    ALPHA REPORTING SERVICE    (8) Page 29 - Page 32
417-887-4110    866-991-7787
www.missouricourtreporters.com
Case 6:09-cv-03018-RED    Document 236-4    Filed 11/24/10    Page 2 of 5

Page 45

1  A. I know that I've never talked to Mike Hood
2     about it or that I can remember, anyway. At
3     that time I wasn't his supervisor I don't
4     believe.
5  Q. If Mr. Anderson was -- I'm asking you to
6     assume this for purposes of this question.
7     If Mr. Anderson was suspected of being
8     intoxicated at the time of this phone call
9     and the phone caller reported that he was
10    outside of her house drunk and a Licking
11    Police Officer responded to the scene as
12    requested, it would be a breech of standard
13    procedure to just let Mr. Anderson drive off
14    if he was still at the house or in his
15    vehicle when the officer arrived; correct?
16 A. Yes.
17 Q. Should have done a field sobriety test if he
18    was in the car?
19 A. I would have. I mean, you know, that's a
20    very broad statement that an officer while
21    he's on patrol by himself can observe things
22    in a lot different ways and the facts are
23    presented and, of course, you're always
24    worried about getting sued from a hundred
25    different angles, no matter whether it's the

Page 46

1     county prosecutor there or if it's anybody
2     else. So, I mean, to say that there's a
3     standard operating procedure for that
4     scenario, there's not. But just in those
5     facts if you drive by and you see somebody
6     who appears to be intoxicated, at that point
7     you don't have a right to arrest them but,
8     you know, contact them just for well being
9     of that person.
10 Q. And let me make my hypothetical a little bit
11    clearer. I'm assuming in my hypothetical
12    that in the call for assistance the person
13    calling indicated that they believe this
14    person was intoxicated.
15 A. Yeah. I mean, at any time if I received a
16    call for assistance basically trespass or
17    harassment whatever scenario, yeah, I would
18    contact the people.
19 Q. And if Mr. Anderson was still in his vehicle
20    under these circumstances and you didn't do
21    the field sobriety test, would you follow
22    him to observe his driving?
23 A. If he was parked?
24 Q. You'd gotten this call, you show up --
25 A. If he's driving down the road?

Page 47

1  Q. Yeah.
2  A. Yeah. I mean, at that point I think --
3  Q. Make sure that he was okay to drive; right?
4  A. Well, if I'd received a call of that, then I
5     would probably go ahead and stop him no
6     matter whether he was going to drive or not.
7  Q. But if you didn't stop, the next best thing
8     would be to follow him for a bit to make
9     sure he was good to drive; right?
10 A. Yeah, I suppose. I can't imagine a scenario
11    where you wouldn't stop him to investigate
12    the complaint but...
13 Q. Okay. That's kind of hard for you to
14    imagine that --
15 A. Yeah.
16 Q. -- they wouldn't stop him and do a field
17    sobriety test? Okay. Have you ever known
18    Mike Anderson to drink to the point of
19    intoxication?
20 A. I've seen Mr. Anderson what I would believe
21    intoxicated probably on two different
22    occasions.
23 Q. Tell me about those occasions. When and
24    where?
25 A. When I don't know. One time was in deer

Page 48

1     season. It was at a deer camp cookout-type
2     thing. I think he was intoxicated then.
3     Another time was in the summertime and it
4     was at Boiling Springs at a river access.
5     There was a little gathering there.
6  Q. That's the only times that you're aware of?
7  A. Yeah. Whenever I was an officer in Licking
8     I seen his vehicle at a lot of the -- I
9     think there was two at that time, two of the
10    bars in town.
11 Q. You saw his vehicle frequently at the bars
12    when you were on patrol?
13 A. I wouldn't say frequently. Sometimes.
14 Q. How often are we talking about by sometimes?
15 A. That I couldn't say with certainty.
16 Q. Couple times a month?
17 A. No, no. Probably the entire time I worked
18    there probably four to five times.
19 Q. Okay. And those two bars would be what?
20    Sheila's Bar would be one of them?
21 A. Sheila's Bar which is outside of town so I
22    didn't patrol that area, but the other one,
23    I think it's called --
24 Q. The Outback?
25 A. Yeah, Outback. And the reason why that

Case 6:09-cv-03018-RED   Document 236-4   Filed 11/24/10   Page 3 of 5

Page 49

1  stood out to me I just remember driving by,
2  which there's roads all the way around it,
3  because I remember seeing -- I think at that
4  time he drove an Explorer. I don't know
5  what he drives now. I remember thinking
6  looks real good, the prosecutor's here.
7  Q. And that was at the Outback when you seen
8     him because that was on your patrol?
9  A. Uh-huh.
10 Q. You don't know how often --
11 A. One other time one of the people, I think it
12    was at Sheila's Bar had -- it was later in
13    the week that they sad said some type of
14    story about him having a wreck in the
15    parking lot as he left or something like
16    that.
17 Q. You heard from somebody that Mr. Anderson
18    was intoxicated and got in a wreck at
19    Sheila's Bar?
20 A. Yeah.
21 Q. Do you know who told you that?
22 A. No, I don't have a clue.
23 Q. Do you recall when you were told that you
24    were still at the police department?
25 A. Yeah.

Page 50

1  Q. Do you recall if it was before or after he
2     filed his lawsuit against Monica and Millie?
3  A. I would to say it was before but I don't
4     know for certain.
5  Q. Okay.
6  A. That was in 2005?
7  Q. He filed his lawsuit in May of 2006,
8     May 31st, 2006. The incident at the house
9     was December of 2005, December 18th.
10 A. Yeah. I don't know.
11 Q. Okay. Now, Sheila's Bar is outside your
12    town and not a place that you drove by on
13    your patrol regularly; is that correct?
14 A. Not regularly. I did sometimes.
15 Q. And you can just testify as to what you saw
16    when you were going by on your patrol. You
17    don't know if he was there other times when
18    you weren't on patrol or other times at
19    Sheila's Bar when nobody was patrolling out
20    there?
21 A. And I should probably specify. I didn't run
22    his license plates, I didn't see him, I
23    couldn't swear that it was him. I should
24    say it was a vehicle that looked very
25    similar to his.

Page 51

1     MR. GAUNT: Okay. I have no further
2  questions.
3     MR. HARRIS: Mr. Walker, I've got just a
4  few follow-ups.
5            EXAMINATION
6  BY MR. HARRIS:
7  Q. Your encounter with Ms. Daniel, you said you
8     believed it was after she left the
9     prosecuting attorney's office?
10 A. Yes.
11 Q. Do you recall how long after it would have
12    been?
13 A. I want to say -- I remember it was warm
14    outside but --
15 Q. Okay.
16 A. -- I don't know for certain.
17 Q. So it's your recollection that it was at
18    least warm out?
19 A. Yeah.
20 Q. Okay.
21 A. I drank a lot then.
22 Q. I understand. And you say you don't recall
23    who told you about the incident at Monica's
24    house with Mr. Anderson?
25 A. I can't remember if I read that somewhere or

Page 52

1     if somebody told me about it.
2  Q. All right. And as I understand it there was
3     a period of time you were Mike Hood's
4     supervisor?
5  A. Yes.
6  Q. Was he a good officer?
7  A. He showed up at work on time. He was always
8     there.
9  Q. Did you have a protocol in place if one of
10    the officers that was on duty -- as you said
11    the officers were on duty solely one officer
12    at a time; is that right?
13 A. Most of the time. Early on whenever I
14    worked there at some point there would be
15    two officers on kind of overlapping shifts
16    in the evening.
17 Q. How big is Licking?
18 A. It's tiny.
19 Q. You got any idea what the population is?
20 A. I think that the sign says somewhere around
21    3,000, but that's counting the population of
22    the Department of Corrections so I want to
23    say it's like a thousand people.
24 Q. All right. With regard to your time when
25    you were at the City of Licking as an

## Page 53

1  officer, were you intimidated by
2  Mike Anderson?
3  A. One time I thought he said something kind of
4  strange to me and I remember it was at the
5  Licking rodeo. And I don't remember what
6  year it was. I remember Danny was still
7  employed there, but I had applied for the
8  highway patrol at that point. And
9  Mike Anderson walked by and said hello and
10 we were always professional at that point,
11 still are now. And he said, "I heard you
12 applied for the highway patrol." I said
13 yes. And he said, "Huh" and kind of had a
14 strange look at on his face and said, "Good
15 luck with that."
16 Q. You just took it as kind of strange?
17 A. Yeah. I thought it was really strange.
18 Q. Well, let me ask you this: The reason I ask
19 the question, when you were a Licking Police
20 Officer, if you'd seen Mike Anderson driving
21 intoxicated, would you have any hesitation
22 to arrest him?
23 A. Yes.
24 Q. You would have had hesitation to arrest him?
25 A. Absolutely.

## Page 54

1  Q. Why?
2  A. Because he's the county prosecutor.
3  Q. What would you have done?
4  A. It's hard to say in that scenario. I guess
5  it would just be -- I mean, I know my duty
6  would be to arrest him and I'm not saying
7  that I wouldn't. Would I have hesitation?
8  Absolutely. You catch enough shit off
9  arresting some moron that whenever you
10 arrest an attorney, and not just an attorney
11 but a prosecutor, oh, yeah, it's not going
12 to be a fun day. It puts you in a real bad
13 spot.
14 Q. As a Licking Police Officer did you have the
15 ability to call for assistance from either
16 the sheriff's department or the highway
17 patrol?
18 A. Oh, you could call. They're not -- under
19 normal circumstances there's not going to be
20 anybody there for 15 minutes.
21 Q. Did you ever have any encounter with
22 Mr. Anderson while you were on duty as an
23 officer of Licking?
24 A. No. Other than court, no. I mean -- when I
25 say on duty in court we were paid to be

## Page 55

1  there.
2  Q. No, I understand that. I'm just saying you
3  never had a situation where you had to stop
4  him or anything like that?
5  A. No.
6  Q. If you as an officer for the City of Licking
7  had received a report that Mike Anderson was
8  threatening somebody, would you have taken
9  action on that or would you have --
10 A. Yeah.
11 Q. Mr. Gaunt read to you some these allegations
12 out of the petition and he used the one
13 about a swinger style sex ring. In your
14 opinion what does that mean?
15 A. Well, I guess Monica and Millie conspiring
16 to have multiple couples engage in sex
17 trading partners type of thing.
18 Q. Okay. On this occasion you were talking
19 about with them about where you and Danny
20 and the other woman and Monica went to
21 Rolla, were you drinking on that occasion as
22 well?
23 A. Oh, I'm sure I was. I don't remember
24 specifically but...
25 Q. Do you have a recollection of mooning one of

## Page 56

1  the other officers for the City of the
2  Licking on that occasion?
3  A. Yeah. Yeah, I do.
4  Q. Did you do that?
5  A. Yes.
6  Q. All right.
7  A. Several times. He was deaf or he couldn't
8  hear really well so he was parked on a
9  parking lot reading a newspaper and we
10 stopped in front of, him honked the horn
11 and -- yeah. He never realized we were
12 there.
13 Q. Did he ever stop you at any time that
14 evening?
15 A. Stopped us? Not that I remember.
16 Q. Okay.
17 A. I don't think so.
18 Q. Do you recall the name of that officer?
19 A. Ryan Anderson.
20     MR. GAUNT: Ryan or Brian?
21     THE WITNESS: Ryan.
22     MR. HARRIS: Okay. I think that's all
23 the questions I have for you, sir.
24     MR. FRANKLIN: I just have a couple real
25 short follow-ups.

Min-U-Script®     ALPHA REPORTING SERVICE     (14) Page 53 - Page 56
417-887-4110 *** 866-091-7787
www.missouricourtreporters.com

Case 6:09-cv-03018-RED  Document 236-4  Filed 11/24/10  Page 5 of 5