IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MONICA DANIEL HUTCHISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-3018-CV-S-RED |
| | ) |
| TEXAS COUNTY, MISSOURI; MICHAEL | ) |
| R. ANDERSON, TEXAS COUNTY | ) |
| PROSECUTING ATTORNEY; and | ) |
| MICHAEL R. ANDERSON, | ) |
| Individually, | ) |
| | ) May 25, 2010 |
| Defendants. | ) Houston, Missouri |

VIDEOTAPED DEPOSITION OF CHRISTINA NORMA ROSE MOSLEY

a Witness, produced, sworn and examined on the 25th day of

May, 2010, between the hours of 8 a.m. and 5 p.m. of that

day, at Texas County Justice Center, 519 North Grand, City

of Houston, County of Texas, before

JOANN RENEE RICHARDSON, CCR
Certified Court Reporter
20051 State Route B
St. James, Missouri 65559

in the above-entitled cause, pursuant to Amended Notice to

Take Video Deposition, on the part of the Plaintiff.

Joann Renee Richardson

\*   573-699-4110   \*   St. James, Miss

Page 137

1  him was that Monica would try to get us to show our
2  breasts to her. She would show -- I told him about a
3  bar incident, where we had went to the bar together
4  and I had pushed her up against the bathroom sink in
5  there because she had bit my nipple. She just come
6  and bit my nipple. And I said -- I pushed her up and
7  she joked about it forever that I had bruised her
8  kidney. I told him about that. That was at the
9  first initial thing. I believe that was told then.
10       But me and Stephanie was sitting there and
11 Stephanie basically -- you know, she didn't want to
12 go into a lot of detail about her personal sexual
13 issue with Monica and she told me that, so I do not
14 think that was actually told to him at that time. I
15 don't think she had told him about that right on that
16 first initial meeting.
17      Q. Let me ask, then, what transpired then? I
18 mean, what happened between that time and the time
19 Monica came back to work?
20          MR. HARRIS: As far as just in the
21 office, or --
22          MR. STEELMAN: Well, regarding Monica.
23 Let me reask it. I'm wearing down, but I can fetch a
24 little surge. I got tired of watching you yawn.
25          MR. HARRIS: That doesn't need to be

Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

Page 138

1  on the record.
2          MR. STEELMAN: Yeah, that doesn't,
3  does it? But you were alert and paying attention at
4  the same time, I could tell.
5  BY MR. STEELMAN:
6       Q. What I want to know is, how did Monica end
7  up coming back to work?
8       A. Okay. I was told by Mike that Jeff Kinder
9  had -- I don't know if he come in and talked to Mike
10 or if it was over the phone, but had basically begged
11 Mike to let her come back. It was Christmas, you
12 know, she needed the money.
13      Q. Did Mike ever tell you anything other than
14 Kinder had come to ask him to take Monica back?
15      A. Jeff Kinder is the only one I know of that
16 come to him and asked.
17      Q. But my question is, what Mike Anderson told
18 you, very clearly, is that Kinder came to him to ask
19 for Monica to get her job back; is that right?
20      A. Right.
21      Q. Go ahead. Go ahead.
22      A. And that's what I heard from him. Sorry,
23 basically -- ask the question again. We got to the
24 Jeff part, sorry, I'm off.
25      Q. I'm trying to ask how Monica came back to

Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

Page 139

1  work?
2       A. How she come back, okay, the Jeff
3  conversation. I believe, from what I understood from
4  Mike, he had kind of tried to talk to Monica about
5  she could not do these things. She needed to --
6  could not be turning in time that she wasn't working.
7  No, it wasn't his business what she done afterwards,
8  but with married cops, it caused a problem.
9       Q. Is this what Mike told you, or is this what
10 you heard?
11      A. Monica told me.
12      Q. Okay.
13      A. And that's when she told me it was none of
14 his freakin' business what she done. Well, she said
15 the other word, but, you know. I said, "Yeah, I
16 understand." And I agreed with her, yeah, yeah,
17 whatever. I know at one point or another, he had her
18 come in and talk to him concerning work, coming back
19 to work.
20       And she come in -- I don't know -- I don't
21 know if they had a meeting there that day or if this
22 was already -- had took place over the phone. I
23 don't know if it was in the office or on the phone.
24 But, anyway, there was a conversation between the two
25 of them concerning her coming back to work and him

Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

Page 140

1  helping her fix this, but it needed to stop. She
2  could not be doing this when she was working.
3       Q. Now, who told you this?
4       A. Him and her.
5       Q. Okay, go ahead.
6       A. I've heard from both of them. And he asked
7  me if I would step down from her job or not. I said,
8  "I didn't want her job to begin with. It wasn't my
9  intention." And I said, "Yes, you know, I'll do my
10 job." So Stephanie went back to doing the bad
11 checks. I went back over to child support. I was
12 just fine where I was at.
13      So then she come back in and she and I
14 still maintained being friends and she was then
15 telling me more and more what she was working on.
16 She said, basically, she was going to get something,
17 one way or another. She was not walking out of
18 there. She come back for a purpose.
19      Q. And did she act the same as she acted
20 before?
21      A. Her demeanor, she was very -- I mean, she
22 was the same, like, towards me. I didn't feel any
23 different. She, I think, actually believed Stephanie
24 was the one who had said something. She didn't know
25 I was actually the one who had went to Mike. She

Joann Renee Richardson
        * 573-699-4110 * St. James, Missouri *

1    A.  Yeah.
2    Q.  Are we talking about the second time she
3 left?
4    A.  Yeah, this was the second time and he told
5 her -- I guess.  I do not know this, I only know --
6 because I didn't hear what they talked about.  All I
7 know is that after I talked to him again, I just told
8 him, you know, he needed to watch what he was doing
9 because apparently she's still on this vendetta to do
10 something.
11    Q.  Now, I want to make it clear.  You are
12 aware, are you not, that Mike went to her house in
13 the early morning of December 18th?
14    A.  I am aware that, yes, I'm aware that -- and
15 Monica -- and I think -- yeah, I mean, she told me
16 about him coming there.
17    Q.  Okay.  And you had the conversation telling
18 him that she was building a sexual harassment case
19 before he went to her house in the early morning
20 hours?
21    A.  I don't think it was before.  I believe
22 this was actually after when I talked to him, because
23 after I talked to him and told him that --
24    Q.  It was after that he had been to her house?
25    A.  I don't remember the date he went over
            Joann Renee Richardson
        *  573-699-4110  *  St. James, Missouri  *

1 there, but --
2    Q.  Was your conversation where you said, "Now,
3 be careful, she's building a sexual harassment case,
4 I'm telling you again," after he went to her house?
5    A.  No, I believe that was after that whole
6 incident took place with the house thing, when Mike
7 was trying to help her get her life straightened out.
8    Q.  So you told -- when was he trying to help
9 her get her life straightened out?
10    A.  When he brought her back in, what I
11 overheard him saying was, you know, "You can't be
12 doing this, you know."
13    Q.  Okay.
14    A.  I want to help you get this straightened
15 out."
16    Q.  You're aware that he went to her house
17 December 18th, right, in the early morning hours?
18    A.  I'm aware of that.
19    Q.  Okay.  Did you tell him to beware of the
20 sexual harassment before that date or after that
21 date?
22    A.  I told him on the first initial thing.
23    Q.  No, not first, we're not on the first.
24    A.  I know, but I did tell him that time.
25    Q.  You told him the second time?
            Joann Renee Richardson
        *  573-699-4110  *  St. James, Missouri  *

1    A.  Right.
2    Q.  We're talking about the second time.
3    A.  That was after -- she was still employed
4 with us, so it was after.
5    Q.  Please listen, I'm going to ask you a very
6 specific question.  On this second time that you told
7 Mike to beware that she was still building a sexual
8 harassment case, was this before he went to her house
9 in the early morning hours, or after he went to her
10 house in the early morning hours?
11    A.  It was after.
12    Q.  Thank you, okay.
13    A.  I said that, I'm sorry.
14    Q.  Now, what did Mike say to you at that point
15 in time?
16    A.  What is she trying -- "How is she trying to
17 build something on me, I've done nothing to her."
18    Q.  Wait a second.  You mean after he had been
19 to her house in the early morning hours, he said to
20 you, "I have done nothing to her"; is that right?
21    A.  He has told me that he done nothing to her,
22 period.
23    Q.  Listen to what I'm asking.  After he went
24 to her house, he said he done nothing to her?
25    A.  He told me that originally, as well.
            Joann Renee Richardson
        *  573-699-4110  *  St. James, Missouri  *

1    Q.  Did he deny going to her house?
2    A.  No, he told me he went there.
3    Q.  What did he tell you about that?
4    A.  He told me he went there and he was
5 knocking on the door and trying to get her to open
6 up; he knew she was in there.  And he wanted to tell
7 her, "We've got to fix this.  You cannot be having
8 sex with other cops," blah-blah-blah.
9    Q.  This is why he went to her house in the
10 early morning hours -- this is what he told you?
11    A.  No, this is what she told me he said.  She
12 tape-recorded him on her answering machine when he
13 called.
14    Q.  Ma'am, please, please, please, I'm asking
15 what Mike Anderson.  Please, I beg you.  I am
16 literally begging you to stick with what my question
17 is.  Mr. Warren here and Mr. Corey will be awake at
18 that time and they can ask you any other questions
19 they want.
20    A.  Okay.  All right.
21    Q.  What did Mr. Anderson tell you about --
22    A.  He didn't.
23    Q.  He told you nothing about --
24    A.  He told me nothing in particular about what
25 he had done there.
            Joann Renee Richardson
        *  573-699-4110  *  St. James, Missouri  *

Page 149

1 Q. Did he admit to you he was there?
2 A. Yes, he told me he had went over there.
3 Q. Did he tell you what his condition was when
4 he went over there?
5 A. No.
6 Q. He didn't? He never said to you that --
7 A. Not --
8 Q. Go ahead. Did he ever tell you about what
9 his condition was on the night that he went to
10 Monica's house?
11 A. He told me he had stopped by Licking.
12 There is a small bar there. We had --
13 Q. What bar is that?
14 A. I don't know what it's called. I'm sorry,
15 I don't know the name of it.
16 Q. Go ahead.
17 A. Outback, maybe, is the name.
18 Q. Go ahead.
19 A. He told me he had stopped by there and that
20 he had -- he told me he had went to Monica's, but she
21 had already told me this on the phone. I already
22 knew about this.
23 Q. Ma'am, please listen to me.
24 A. I know what you're asking --
25 Q. Just tell me what Mike Anderson said.
     Joann Renee Richardson
     * 573-699-4110 * St. James, Missouri *

Page 150

1 A. -- and I'm telling you that. Mike told me
2 just specifically that he went over there.
3 Q. After he went to the bar?
4 A. He had stopped by the bar.
5 Q. Okay, and then what?
6 A. Then went to Monica's --
7 Q. Okay.
8 A. -- knocked on the door --
9 Q. Okay.
10 A. -- nobody answered --
11 Q. Okay.
12 A. -- and that was it. He told me he wanted
13 to talk to her about what had happened with these
14 cops. He didn't tell me anything more.
15 Q. All right. I want to make it clear.
16 A. Okay.
17 Q. Mike Anderson, after he went to her house,
18 told you he had been to a bar and had stopped by and
19 wanted to talk to Monica about what had happened with
20 the cops; is that right?
21 A. Right.
22 Q. And did he tell you what time of the
23 morning it was?
24 A. No.
25 Q. Did he ever tell you about his physical
     Joann Renee Richardson
     * 573-699-4110 * St. James, Missouri *

Page 151

1 condition?
2 A. No.
3 Q. Okay. Did he ever indicate to you whether
4 he had drank too much or been drugged?
5 A. Later.
6 Q. Okay. How much later?
7 A. Within a few days.
8 Q. Now, here's my question.
9 A. I'm guessing there.
10 Q. Do you all in your office prosecute DWI's?
11 A. Yes.
12 Q. And tell me what the prosecuting attorney's
13 policy, Mr. Anderson's policy is towards people who
14 drive while intoxicated?
15 A. Well, we have the law that we must abide by
16 and, basically -- it depends on where it's at. City
17 cases through city court.
18 Q. Okay.
19 A. Are prosecuted through them, unless a
20 person has several, then they may forward that to the
21 prosecutor for review. The county officers, that all
22 comes directly to us. State patrol comes directly to
23 us, whether it's the first time or tenth time. But
24 City does have the opportunity, you know, prosecuting
25 them on their own.
     Joann Renee Richardson
     * 573-699-4110 * St. James, Missouri *

Page 152

1 Q. Do you have an office policy towards DWI's?
2 A. As far as...?
3 Q. Are you lenient? Are you strict with them?
4 What's your policy?
5 A. When they come in, if there's a decent case
6 -- he reviews his case and if he's got a case against
7 an individual that he feels is something that can be
8 proven, in any case, whether it's DWI or anything, we
9 file those charges.
10 Q. And follow up on them?
11 A. Correct.
12 Q. Now, do you know if Mike Anderson ever
13 requested a special prosecutor to examine the
14 condition that he was in when he left Monica's house
15 on December 18th?
16 A. No.
17 Q. Okay.
18 A. I do not know anything about what you're
19 talking about there at all.
20 Q. Okay.
21 A. Well, he told you something about his
22 condition later, you said?
23 A. Right, but he never told me about --
24 Q. What did Mike Anderson tell you about his
25 condition?
     Joann Renee Richardson
     * 573-699-4110 * St. James, Missouri *
38 (Pages 149 to 152)
Case 6:09-cv-03018-RED   Document 236-6   Filed 11/24/10   Page 4 of 17

Page 153

A. He said he had stopped by this bar and had had, I believe, a drink. There was -- and I don't remember the boys' names that was in there, but they was people that we had prosecuted was in there, come over to him and, I think, there was a conversation and he thought he had been drugged possibly. That's what he said.

He never drank enough to be, I guess, out of line, or however you want to put that. Not over the limit, we'll put it that way. And that he wondered if he hadn't been drugged. And he told me there was -- and I don't remember the defendants' names that was in that case. It seems like it was maybe -- maybe Klause or Almonies. I don't remember for sure if that was the ones or not. I never dealt with that case, so I don't know them people at all.

Q. Okay.

A. Okay? He just told me that and that was basically it. And what you're asking about, I knew nothing about him having been checked out or whatever you said. I'm not aware of that.

Q. Did he ever tell you about any investigation into whether or not he was drugged or intoxicated that night?

A. I know he mentioned that he wanted it

Page 154

investigated, but he never told me no more specifics as to if it was or what happened or anything.

Q. I'm curious, do you handle the DWI's now?

A. Yeah.

Q. Is that a common defense when people are arrested for driving while intoxicated, that they indicate they've been drugged? I'm just curious.

A. Well, people can be charged for drugs in their system if they are pulled over and they are in a drugged condition, whether it be by medication or whatever, and they're under the influence of drugs and not able to operate a vehicle, yes, we do charge those.

Q. Well, no. In files you've handled, have you ever seen the defendant raise the issue, when they were charged with driving while intoxicated, that they were involuntarily drugged?

A. Involuntarily drugged?

Q. Yes.

A. Yes, we've had people probably said that. I remember -- it seems like there was one incident a guy said he -- that's been a more recent thing that happened in court. It's not been back then.

Q. Okay.

A. That somebody alleged that they had

Page 155

something slipped in their drink that impaired them. I don't remember the outcome of that case or anything like that. I just know that that was an issue.

Q. Okay. Do you know -- I think I asked you this question, but what follow-up was there regarding Mr. Anderson and his condition that night, whether it was drugs, if you know?

A. I don't know what follow-up there was. I have no clue.

Q. Well, I'm going to get back to this. You tape -- phone recorded your conversation with your friend Monica because you had decided that it was wrong that she wanted money from Mr. Anderson; is that right?

A. Yes, because she was saying it was sexual harassment. There was no harassment that I ever noticed.

Q. What about the night of December 18th, 2008, you tape recorded her after that night; is that correct?

A. Correct.

Q. You don't have any idea whether there was sexual harassment the night of December 18th, 2008, do you?

MR. FRANKLIN: I'm going to object,

Page 156

that calls for a legal conclusion. I think that's appropriate for a judge and a jury to decide as a matter of law and a matter of fact as to whether sexual harassment occurred in that single incident.

MR. HARRIS: Invades the province of the jury.

BY MR. STEELMAN:

Q. Go ahead.

A. I really don't know how to answer that, as far as whether or not there was sexual harassment that took place. I don't know, I was not there.

Q. And yet you still went ahead and tape-recorded Monica after that; is that correct?

A. On the issues of what she had told me and the things she had done in the office.

Q. Have you ever had that tape played for you of Mr. Anderson?

A. Of Mr. Anderson?

Q. Yes.

A. Monica took it out and put it in her car and had a little thing of a -- a tape player thing to play it, and it started in and then she shut it off, so I never heard the whole thing. I didn't hear anything -- I didn't hear -- from what I heard of it, I didn't hear enough.

### Page 161

1  them. It was like a father to her.
2  Q. Man, this is so easy.
3  A. That is it.
4  Q. Do you think it's appropriate or not?
5  Because you used the word appropriate in your
6  affidavit and I'm trying to understand if it was
7  appropriate or not.
8  A. Because of what I knew about her
9  relationship --
10 Q. Yes.
11 A. -- I did not find that odd that he went to
12 help her because she had told me he was like a
13 father.
14 Q. So you believe that it was appropriate for
15 Mr. Anderson to go to Monica's house in the early
16 morning hours of December 18th; is that correct?
17 A. I did not find that to be a problem.
18 Q. You didn't think it was inappropriate?
19 A. I did not think it was inappropriate --
20 Q. That's all I'm trying to understand.
21 A. -- because of the fatherly figure she
22 claimed him to be.
23 Q. That's all I'm trying to understand.
24 A. Okay.
25 Q. Now, if Mr. Anderson was not drugged and

### Page 162

1  was drinking, do you think it was appropriate for him
2  to drive himself home that night?
3  A. No.
4  Q. Now, did you ever talk to any of the
5  Licking Police or any of the patrolmen about the
6  incident that night?
7  A. What night, sorry?
8  Q. When Mr. Anderson went to Monica's house.
9  A. No.
10      MR. STEELMAN: Let's take a break.
11      MR. WATERS: The current time is 1409.
12 We're now going off record.
13      (Off the record.)
14      _____
15      (Back on the record.)
16      MR. WATERS: We're now back on record.
17 The current time was 1426. Please proceed.
18 BY MR. STEELMAN:
19 Q. Gentlemen, so that you know -- and I don't
20 have a copy for you, but you all have your own
21 copies, I know it -- it's the affidavit of Christina
22 Wheeler, filed May 12, 2006, Exhibit 32. Now that
23 I've told everybody what it is, would you identify
24 that, please?
25 A. Yeah. This is a statement I wrote that I -

### Page 163

1  - when I found out that she was proceeding with her
2  EEOC, I believe, complaint, the thing that was filed
3  first, I told Mr. Anderson I volunteered to write an
4  affidavit due to what I knew briefly, without going
5  into, you know, lengthy detail for him for that
6  respect, on the respect of EEOC complaint. Yes, this
7  is mine. And, yes, this is my signature.
8  Q. And did you type this document, Exhibit 32,
9  up?
10 A. Yes.
11 Q. Did anybody indicate to you what should go
12 in the document?
13 A. No, I typed this all myself.
14 Q. All of the words were yours; is that
15 correct?
16 A. Yes.
17 Q. You chose to use the words "appropriate"
18 and "inappropriate"?
19 A. Yes.
20 Q. Correct? You chose what the contents of
21 this affidavit would be; is that right?
22 A. Yes, every bit of it.
23 Q. You chose what was important to you to file
24 in the affidavit and what wasn't important enough to
25 file in the affidavit; is that right?

### Page 164

1  A. Yeah. I put in just the basics of just
2  kind of a brief statement of what had happened.
3  Q. And that's what I'm trying to understand.
4  On May 12, 2006, did you prepare it on that day or
5  sign it on that day?
6  A. I believe I prepared it that morning and
7  whenever Dorothy could come down, she -- it was all
8  done the same day. I done it actually that morning,
9  and then Dorothy come down later, the Notary, and
10 notarized me and I signed it.
11 Q. Did you give it to anybody to review before
12 you completed it?
13 A. No, I completed this myself.
14 Q. That's what I'm wanting to understand. So
15 nobody told you what to put in --
16 A. No.
17 Q. -- what to leave out; is that correct?
18 A. No.
19 Q. You made all the decisions at that time;
20 correct?
21 A. Correct. Like I said, I put in kind of the
22 basics of what had happened that I knew of offhand.
23 Q. That's all I wanted to understand.
24 A. All mine.
25 Q. These were the basics that you put into the

1 affidavit; correct?
2   A. Right.
3   Q. I should ask this. At that time, you knew
4 pretty well what was going on. I mean, you knew what
5 the case was about?
6   A. Yeah.
7       MR. FRANKLIN: I'm going to object
8 that -- that's pretty broad.
9       MR. STEELMAN: I'll restate that.
10 I'll restate that.
11 BY MR. STEELMAN:
12  Q. You had been involved in talking to Mike
13 Anderson, as you've earlier testified; correct?
14  A. Right.
15  Q. And Mike Anderson had talked to you?
16  A. Yeah. And I --
17  Q. And you knew all the information that you
18 had just previously given us in this deposition;
19 correct?
20  A. Correct.
21  Q. You haven't testified to anything that you
22 found out after May 12, 2006, have you?
23  A. After that?
24  Q. Yes.
25  A. No, everything should be prior to that

1 date.
2   Q. It is your testimony that everything you've
3 testified today is information you had prior to the
4 affidavit, Exhibit 32, being drawn up by you and
5 signed; is that correct?
6   A. Right. After the EEOC issue became, I
7 asked to write something on my behalf.
8   Q. Okay, on your behalf?
9   A. Yes, for what I knew.
10  Q. Okay. Okay. Now, ma'am, the other thing I
11 want to do -- and we'll get to some other stuff --
12 but I have tried to hear part of what has been given
13 to me as your phone conversation and I need some help
14 on it, so I'm going to play certain segments and we
15 can replay it, do whatever you want, and then you can
16 interpret for me and we'll ask some questions.
17  A. Okay.
18  Q. Is that agreeable?
19  A. Sounds fine.
20  Q. I've got to see if I can work this, which
21 is always a big "if."
22       (A portion of the tape was played.)
23 BY MR. STEELMAN:
24  Q. Now, ma'am, was that Monica's voice?
25  A. Yes.

1   Q. And was that your voice?
2   A. Yes.
3   Q. And is this one of the phone conversations
4 that you taped?
5   A. Yes.
6   Q. Without Monica being aware of it; correct?
7   A. Right.
8   Q. Okay. Now -- and I want to say -- you tell
9 me if this is right. Did you say that you went over
10 there today and Randy was in there and I said, "Do
11 they not like me very much?" Did you say that? Was
12 that your voice?
13  A. Right.
14  Q. Wait, I got a question. Who is Randy?
15  A. Randy Jones. He was a dispatcher at the
16 Texas County Sheriff's Department and he's, I think,
17 a part-time one now. He may be doing full-time, I'm
18 not sure.
19  Q. And did you say that you don't know why
20 they're not coming into your office with the tickets?
21  A. Right, because prior to the incident -- it
22 was just a statement to her, letting her know that
23 none of them was stepping foot in there right now,
24 after all this had blew up with her leaving, being
25 fired, or quitting, whatever part of whichever

1 happened when, at what time, you know. But used to,
2 they come in all the time. Now, they don't.
3   Q. Here's what I'm curious about. Now, I can
4 remember your testimony that you gave under oath
5 earlier as completely wrong. I wanted you to make
6 very clear that I thought you asked them to not --
7   A. That was later.
8   Q. I thought you testified that after you took
9 over, you asked them not to bring in the tickets any
10 more?
11  A. That was later.
12  Q. Okay.
13  A. Not at this point. This was right here,
14 right around -- this was like January/February time
15 frame whenever these phone conversations took place.
16 Right after her dismissal issue. It was later that I
17 talked to Mike about, well, let's just make it policy
18 that -- they're welcome. They need to be able to
19 come in here and be able to talk to us about their
20 cases, not to avoid the office.
21  Q. I thought this had to do with you not
22 having a key to the zone office and whole lot of
23 other reasons.
24  A. Right.
25       MR. HARRIS: Let me just object.

Page 173

1  that same tape when I would back up to re-listen. I
2  did not have it properly hooked up.
3      MR. HARRIS: Just so the record is
4  clear, I don't think that tape was produced to Mr.
5  Anderson --
6      THE WITNESS: Yeah.
7      MR. HARRIS: -- until after this
8  litigation was filed.
9      THE WITNESS: Right.
10     MR. STEELMAN: That is not what her
11 testimony was, Mr. Harris, because I asked that
12 question. We can go back and look at it, but that is
13 not what she testified to earlier.
14     MR. HARRIS: And I just want to make
15 the record clear --
16     MR. STEELMAN: In all due respect and
17 I know you're not trying to be difficult, but I don't
18 believe that you can make the record clear as to when
19 Mr. Anderson received the tape, with all due respect
20 to you.
21     MR. HARRIS: Well, I think I can make
22 it clear because the way it happened, she disclosed
23 to me that she had a tape and I told her to give it
24 to Mike and then Mike gave it to me.
25     MR. STEELMAN: Well, that may be how

Page 174

1  it got to you eventually --
2      THE WITNESS: That is correct.
3      MR. STEELMAN: -- but that's not what
4  the testimony is. And I will say again, that is you
5  as a witness. If you want to be a witness, you can
6  be a witness.
7      MR. HARRIS: I'm just telling you what
8  the record is as far as the production of documents.
9      MR. STEELMAN: That is not the record,
10 that is your position of it. I'm not saying you did
11 anything improper, but I don't think that you have
12 full knowledge, unless you knew that this had been
13 taped at some time, did you, prior to when she told
14 you about it?
15     MR. HARRIS: No, I knew about it when
16 I produced it.
17     MR. STEELMAN: Okay, that's what I
18 thought, so you don't know -- none of us do, except
19 Mr. Anderson and Ms. Mosley here -- what happened, so
20 the record will be made by them.
21     MR. HARRIS: Well, but what I want the
22 record to be clear about is simply this. When I
23 found out about the existence of the tape, it was not
24 in my client's possession and I requested that Ms.
25 Mosley give it to my client so that I could produce

Page 175

1  it.
2      MR. STEELMAN: I think the record is
3  clear that you did not believe it was in your
4  client's possession and that you told Ms. Mosley to
5  give it to your client so you could produce it. Can
6  we agree on that?
7      MR. HARRIS: Well, we'll leave it at
8  that.
9      MR. STEELMAN: I thought that was a
10 pretty fair rendition.
11     MR. HARRIS: Still a little shaky,
12 but.
13 BY MR. STEELMAN:
14     Q. We're going to try again.
15     A. Question? Is these segmented off, or
16 something, where you took the original tape and cut
17 where you needed it for the purpose of this hearing?
18     Q. Yes. I have only specific questions. But
19 I can also tell you that we've had it enhanced and
20 we'll have to bring in an expert to explain all that,
21 too.
22     A. Okay. Well, I just was wondering.
23        (Playing a portion of tape.)
24 BY MR. STEELMAN:
25     Q. Was that your voice and Monica's voice?

Page 176

1      A. Yeah, and I was --
2      Q. I've got questions, ma'am, trust me on
3  this.
4      A. That was my voice.
5      Q. Now, Monica said, if I've got this right --
6  and I may not, so you tell me if you agree with it --
7  he would never have asked or been concerned if he
8  knew that wasn't wrong. You were talking about Mike
9  Anderson in this conversation; right? You all were
10 talking about Mike?
11     A. At the very beginning of the tape?
12     Q. Yes.
13     A. It just kind of starts up and I was kind of
14 lost at what part of that conversation we was talking
15 about.
16     Q. Well, let me ask you this. You said, "I
17 don't know what all happened." Do you know what you
18 were referring to, not knowing what happened?
19     A. If I heard what I had said prior to that,
20 up to that very beginning of that tape, I might know.
21 It's not real clear to me at that point of the
22 conversation.
23     Q. Let's ask about this one. Did you say, "If
24 I was actually asked, the only thing I know about is
25 Danny, that I was actually there, and that's the only

Page 177

1  thing I know. The other is all hearsay, you know.
2  Your word is my word, you know, and I thought about
3  that, you know. I don't really know about anything
4  that happened with Jeff. And Danny, yeah, I was
5  there one time, but that's it, so I'm not -- you
6  know, I'm not really lying." Were those your words?
7     A. Basically, yes, to try to --
8     Q. Were those your words, ma'am?
9     A. Yes.
10    Q. Okay.
11    A. For a reason.
12    Q. Okay, tell us your reason that you said
13 that?
14    A. To get her to elaborate more into detail
15 about what had happened. She knew I knew more.
16    Q. Why would you need to do that if you had
17 seen things? Why would you not tell Monica what you
18 had seen?
19    A. Monica knew what I had seen. She didn't
20 try to correct me. I was trying to get her to
21 correct me.
22    Q. Well, she didn't correct you, did she?
23    A. She didn't.
24    Q. And you said the only thing you saw was
25 Danny McNew; is that right?
              Joann Renee Richardson
         *  573-699-4110  *  St. James, Missouri  *

Page 178

1     A. And I did that for a purpose.
2     Q. And she didn't correct you, did she?
3     A. Because, like I said, she knows what I knew
4  and she knows what I saw.
5     Q. If she knows what you saw, why did you only
6  say you had seen Danny McNew one time?
7     A. To try to get her --
8        MR. FRANKLIN: Objection, asked and
9  answered.
10    A. -- to tell me more on the tape.
11    Q. So that I understand, you're talking to the
12 person who was there and you think by saying
13 something to the person who was actually there
14 something different that occurred, that was your way
15 of getting her to open up?
16    A. About like you're doing to me, yeah.
17    Q. Is that what I'm understanding?
18    A. Trying to --
19    Q. No, ma'am, the difference is, I'm actually
20 trying to get you to tell the truth; is that okay?
21       MR. FRANKLIN: That's argumentative.
22       MR. HARRIS: That is argumentative.
23 This is ridiculous.
24       MR. FRANKLIN: You're not here to
25 badger this witness about her testimony.
              Joann Renee Richardson
         *  573-699-4110  *  St. James, Missouri  *

Page 179

1        THE WITNESS: Exactly.
2        MR. STEELMAN: I was responding to the
3  witness fairly, guys.
4  BY MR. STEELMAN:
5     A. You're calling me a liar, sir. I am not
6  lying. I'm under oath. I have sworn to be telling
7  you the truth.
8     Q. That's a good question. Are you different
9  when you're under oath than when you're not under
10 oath?
11    A. Yes. I believe that when you take an oath
12 to tell the truth, you're going to tell that truth,
13 nor am I trying to change your wording around to
14 confuse you. I'm trying to explain this where you
15 understood it and how it took place.
16    Q. Okay. So if you're not under oath, does
17 that mean you might not tell the truth? I'm just
18 asking.
19    A. In this situation, I did not tell her
20 everything I knew that was going on, nor did I tell
21 her I was the one telling.
22    Q. I'm asking a general question, ma'am. I'm
23 trying to determine what your attitudes are towards
24 the truth. If you're not under oath, will you tell
25 the truth?
              Joann Renee Richardson
         *  573-699-4110  *  St. James, Missouri  *

Page 180

1     A. I believe in telling the truth totally, all
2  the time.
3     Q. Okay.
4     A. But with the circumstances that were at
5  hand with this situation, I didn't really have much
6  of a choice but to try to lure her into telling
7  something that was backing up what I had said.
8     Q. And what were the circumstances that were
9  at hand?
10    A. That she was building her sexual harassment
11 case, that she had been having sex with these
12 officers. This is what I told Mr. Anderson. I
13 wanted her to say it on tape, or if she would have
14 admitted it.
15    Q. Why?
16    A. Just to back up that this was true.
17    Q. What was true?
18    A. What I just said.
19    Q. Why?
20    A. That she had sex.
21    Q. Why?
22    A. That she was doing this.
23    Q. Why?
24    A. Because she was suing him for something
25 that was not done.
              Joann Renee Richardson
         *  573-699-4110  *  St. James, Missouri  *

1  Q. You had said you weren't there on December
2  18th?
3  A. I don't know what happened that night.
4  MR. HARRIS: Can we state for the
5  record that you're limiting your case for sexual
6  harassment to just what occurred on December 18th?
7  MR. STEELMAN: No.
8  MR. HARRIS: Because that was not your
9  client's testimony at her deposition.
10  MR. STEELMAN: No, that's a good
11  point. That's a good point.
12  BY MR. STEELMAN:
13  Q. So you thought that the note that was
14  passed in court was appropriate; correct?
15  A. It was supposed to have been a joke, yes.
16  Q. You thought it was appropriate; correct?
17  A. (Shaking head yes.)
18  Q. And what was the other circumstance that
19  she told you about?
20  A. Are you referring to him showing up at her
21  house?
22  Q. No. When you said there were two
23  circumstances that you told him that she had referred
24  to to you when you met with him the first time,
25  before she left the first time?

1  A. Let's see, we're back to the first time
2  that we talked. It was the note in court. I'm
3  trying to think of what it was. I'm sorry, I'm
4  drawing a blank.
5  Q. Two incidents, I believe, you testified to;
6  is that right?
7  A. Yes, I do know what I've testified to. I
8  know what happened. I'm just drawing a blank on what
9  had took place. I don't know at this point. Could
10  we go to another question, maybe --
11  Q. I need to ask you about that one. Let me -
12  - when you testified that -- when you testified, and
13  correct me if I'm wrong, about your first meeting
14  with Mr. Anderson, that you told him she was building
15  a sexual harassment case based on two things; one,
16  the note that was in court. Correct?
17  A. Right.
18  Q. And what was the other one?
19  A. She had the email that she had. There was
20  a letter, or something, that she was supposed to
21  have.
22  Q. Was that email at this time, prior to her
23  leaving the first time, or did that occur after he
24  had been to her house?
25  A. No, it was at the first time.

1  Q. Okay.
2  A. Because when she talked to me about this
3  stuff I was on leave for the hysterectomy, so
4  somewhere in that time frame there. And then when I
5  come back, it was still being discussed.
6  Q. Okay.
7  A. And I know there was some other stuff. I'm
8  just drawing a blank.
9  Q. Not to belabor this too much and get two
10  lawyers here objecting at me, those were your words
11  that said, "You know, I really don't know anything
12  about what happened with Jeff. And Danny, yeah, I
13  was there one time." Were those your words?
14  A. Yes.
15  MR. FRANKLIN: That was 34; is that
16  right?
17  MR. STEELMAN: Yeah. What I'm going
18  to do is, I'll put 34 here and ask Mr. Waters to
19  initial that. I assume you guys are going to want
20  reproductions of all this stuff.
21  MR. FRANKLIN: In deed. I'll put 34
22  here.
23  MR. STEELMAN: Off the record for a
24  second.
25  MR. WATERS: The current time is 1450.

We now going off record.
2  (Off the record.)
3  
4  (Back on the record.)
5  MR. WATERS: We're now back on record.
6  The current time is 1451. Please proceed.
7  (A portion of the tape was played.)
8  BY MR. STEELMAN:
9  Q. Now, was that your voice, ma'am?
10  A. Yeah, sorry for the bad language here.
11  Q. Who is Terry?
12  A. Terry Haden works for Brad Eidson, legal
13  secretary.
14  Q. Now, did she really come down and say this
15  place might be bugged, or was that all made up?
16  A. Terry had said that she thought it might
17  have been bugged and it was kind of a statement. We
18  was talking about that, wondering if it was actually
19  recorded. But as far as, I told Monica that to see,
20  basically, what she would say about that.
21  Q. That's not -- what I really want to know
22  is, did Terry Haden actually make the statement that
23  she believed this place might be bugged, talking
24  about the prosecutor's office?
25  A. Yeah, she had heard that. I don't remember

Page 185

1  who had told her that.
2  Q. Did you ever have any more conversations
3  with Terry Haden about the place being bugged or the
4  prosecutor's office being bugged or anything like
5  that, or did she ever tell you why she said that?
6  A. I do not remember what -- Terry and I spoke
7  about different things, but I don't remember
8  specifically. It was just kind of in mentioning.
9  MR. STEELMAN: That is Exhibit 35, by
10  the way.
11  BY MR. STEELMAN:
12  Q. Did Mr. Anderson ever say to you about
13  Monica, "She doesn't like me. She thinks I'm a
14  pervert." Did he ever say that to you?
15  A. Monica -- did Mike tell me that? I don't
16  remember him telling me that.
17  Q. Okay. Rather than play this, if you said
18  that to Monica on one of these tapes, were you making
19  it up, or did he say it to you?
20  A. She told me that.
21  Q. No, if you said Anderson --
22  A. I know what you're asking.
23  Q. -- said she doesn't like me and she thinks
24  I'm a pervert, did Mr. Anderson say that to you?
25  A. No, not that I remember him ever telling me

Page 186

1  that.
2  Q. So your testimony is now that you don't
3  remember Mike Anderson saying that Monica thinks I'm
4  a pervert?
5  A. Monica said Mike was a pervert.
6  Q. That wasn't my question.
7  A. I know what your question is. I don't
8  remember Mike telling me that.
9  Q. That's what I wanted to establish.
10  A. She told me that.
11  Q. You don't ever remember Mike saying --
12  accusing that Monica thinks he's a pervert?
13  A. Right.
14  Q. Okay. Oh, and you did say to her -- again,
15  it's easier than going through all these things. You
16  did say to Monica, "Your secrets are safe with me.
17  You know that, don't you?"
18  A. Right. I did.
19  Q. At the time you were tape recording her;
20  correct?
21  A. Correct.
22  Q. Okay. Well, let me see, I may have to play
23  this one.
24  (A portion of the tape was played.)
25  Q. Now, my questions are, I'm trying to figure

Page 187

1  out who some of these people are. Who is Clifford?
2  A. That is my cousin, works at the hospital.
3  Q. What's his full name?
4  A. Clifford Stark.
5  Q. And what does Clifford have to do with
6  this? Where does he work?
7  A. He works at Texas County Memorial Hospital.
8  Q. Okay. What does he have to do with this?
9  A. Basically, he had just mentioned this issue
10  with Brad Evans. Monica had kept a thing for Brad
11  and she's trying to use in that part of that that it
12  wasn't her and I just let her go along with that,
13  although she must have forgot that she had told me
14  that she was working on trying to get some of that,
15  so I just acted like it was just bull crap. And,
16  yes, my mom did tell me that. And I figured it might
17  have been Clifford that actually heard that. And I
18  did ask Clifford, so.
19  Q. And what did Clifford say?
20  A. Clifford said that, yeah, he had heard
21  several things about her, which he knew her better
22  than I did, Monica. He went, actually, to school
23  with her.
24  Q. And what did he tell you he heard?
25  A. That she was supposed to be messing around

Page 188

1  with this Brad that was a city cop for Houston, which
2  I already knew Monica -- I just told him, "Awe, that
3  ain't true," because I didn't want these rumors
4  actually floating around any more than what they was,
5  I mean, at that point.
6  Q. So did you say to him, Monica left here
7  because she was uncomfortable with working here?
8  A. Yeah, and that's what I used -- that's what
9  I told her and that's what I told him, and that I
10  wasn't going into details about anything. And I
11  haven't to anybody.
12  Q. What's your mom's name?
13  A. Charlotte Metz.
14  Q. Charlotte what?
15  A. Metz, M-e-t-z.
16  Q. And where does she live?
17  A. She lives in Raymondville in the senior
18  citizens apartment.
19  Q. What's her health like?
20  A. Not good. I mean, she's not in good health
21  at all now.
22  MR. STEELMAN: Okay, what number are
23  we up to? Off the record a second.
24  MR. WATERS: The current time is 1502.
25  We're going off record.
Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

47 (Pages 185 to 188)

Case 6:09-cv-03018-RED   Document 236-6   Filed 11/24/10   Page 11 of 17

Page 189

```
 1              (Off the record.)
 2              _____
 3              (Back on the record.)
 4       MR. WATERS: We're now back on record.
 5   The current time is 1519. Please proceed.
 6   BY MR. STEELMAN:
 7       Q.  Mr. Anderson indicated that he had a
 8   meeting with Terry Haden at some time before Monica
 9   leaving -- or after Monica leaving, where he found
10   some things out. Do you know anything about that
11   meeting?
12       A.  No, just what Terry told me.
13       Q.  What did Terry tell you?
14       A.  That she had a meeting with Mike and told
15   him what she knew.
16       Q.  What did she know?
17       A.  About Monica telling her, basically, about
18   having sex with Danny McNew and Jeff Kinder.
19       Q.  And when was this meeting?
20       A.  I don't know when they actually met.
21       Q.  So Terry Haden did tell you that she had a
22   meeting with Mike Anderson and told him about Monica
23   having sex with Danny McNew and Jeff Kinder; is that
24   right?
25       A.  Right.
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 190

```
 1       Q.  Who told Mike about somebody named Raynelle
 2   Wilson?
 3       A.  I did. Monica told me.
 4       Q.  And who is Raynelle Wilson?
 5       A.  Her name is actually Ranelle.
 6       Q.  Okay.
 7       A.  And Monica had told me that her and her --
 8   I think it was a boyfriend at the time. I think
 9   they're married now -- had some sexual relationships.
10       Q.  And when did you tell Mike?
11       A.  I don't know the specifics on when I told
12   him about that because it really wasn't something I
13   was real familiar with. I hadn't witnessed that.
14       Q.  How did you come to tell him that?
15       A.  Just that general talking of these are the
16   people I know of that she's told me she's done things
17   with.
18       Q.  How did that come up?
19       A.  When I was telling him of the people I knew
20   of.
21       Q.  Is this before the first meeting?
22       A.  No.
23       Q.  Or the first meeting before he let her go
24   the first time, I mean. I should have restated that.
25       A.  I believe that might have been at that
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 191

```
 1   first meeting. Might have been the second one. But
 2   it was during the time frame there. I believe it was
 3   the first meeting, though.
 4       Q.  What about somebody named Hackman and his
 5   wife?
 6       A.  Yes, that was the first meeting, I'm pretty
 7   sure.
 8       Q.  What did you say?
 9       A.  I told him that -- previously, basically
10   Monica -- actually, Kelly Hackman, his wife, was a
11   probation officer, misdemeanor probation officer, and
12   she had told me of her husband not coming home. And
13   when he come home, it was up in the middle of the
14   night and he slept on the loft, or something in the
15   loft. I've never been to their house, but in a
16   different area of the home. And Monica told me that
17   was because he was with her.
18       Q.  And did you tell Mike this in the first
19   meeting before he let Monica go the first time?
20       A.  I believe so.
21       Q.  Now, did you tell Mike Anderson you saw
22   Monica and Millie kissing on the mouth?
23       A.  Yes.
24       Q.  Okay. And when was that?
25       A.  That was just during our times of going
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 192

```
 1   out, was prior to any of this actually taking place
 2   with any lawsuits or anything, nothing with the
 3   firing issue. It was way prior to that. We had -- I
 4   seen them two French kiss.
 5       Q.  And where was this?
 6       A.  In front of her house, in her driveway, in
 7   my vehicle.
 8       Q.  And who else was there?
 9       A.  I know it was -- me and Monica was still in
10   the vehicle. Millie got out. I don't know if Misty
11   had already got out of the vehicle, but Misty had
12   went with us and we had all went out that night,
13   Misty Hale.
14       Q.  When did this take place?
15       A.  I do not remember the time or anything as
16   to when that actually happened, but it was during the
17   course of our working together.
18       Q.  And when did you tell Mike Anderson?
19       A.  I believe I told him about that that very
20   first meeting.
21       Q.  Did you tell Mike Anderson that Monica said
22   to you she was tired of Millie being in her bed all
23   the time?
24       A.  Basically my words was, Monica wanted me to
25   make sure I had Millie go home because she didn't
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

1  and I don't know what made him believe that. I do
2  not know them circumstances, or whatever youn's are
3  going on with the drug issue.
4      Q. But he did tell you later that he thought
5  he was drugged or not?
6      A. I don't remember if he told me -- I don't
7  remember if he's the one who told me that or if it
8  was Monica who told me that that's what he was trying
9  to say. I don't remember who told it, but I heard
10 that.
11     Q. But you didn't have anything to do with any
12 file in the office on investigating his condition
13 that night?
14     A. No.
15     Q. Or whether he was drugged or not drugged;
16 is that right?
17     A. Right, nothing, other than like I said
18 earlier.
19     Q. Did you ever work with Dr. Long, Dr.
20 Christopher Long on any cases?
21     A. I don't know him, so no.
22     Q. I'm going to show you what's been marked as
23 Exhibit 4, which is a damage complaint filed by
24 Michael Anderson versus Monica Daniel and Mildred
25 Williams. Have you see this before?

1      A. I think it was on the internet, actually,
2  on like the news thing. Actually seeing it, no.
3      Q. Okay.
4      A. I've never read it, if that's what you're
5  meaning.
6      Q. I want you to go down to Paragraph 3. And
7  it says, "For a period of time from March, 2005,
8  through May, 2006, said defendants -- that's Monica
9  and Millie -- have entered into a conspiracy to
10 malign, libel, and slander Plaintiff, Michael R.
11 Anderson, in order to deprive him of his publicly
12 held position of Texas County Prosecuting Attorney
13 for the County of Texas, State of Missouri." Do you
14 see that?
15     A. Yes.
16     Q. Now, do you have any information indicating
17 that was true?
18     A. I'm trying to think as to what -- okay, as
19 far as this aspect --
20     Q. Paragraph 3.
21     A. -- the libel and slander --
22     Q. I'm talking about Paragraph 3. We're going
23 to go through it paragraph by paragraph, yeah.
24     A. -- I'm not sure what Mr. Anderson is
25 actually talking about here, okay?

1      Q. My question is -- if you don't understand,
2  you don't understand, that's fine.
3      A. I don't.
4      Q. Do you have any information indicating that
5  Paragraph 3 is true?
6      A. No. Not that I can think of, no.
7      Q. Okay
8          MR. FRANKLIN: I'm going to object
9  just for the record just to the extent it calls for a
10 legal conclusion as to what -- a legal conclusion as
11 to what is the definition of a conspiracy, libel,
12 slander.
13         MR. STEELMAN: Okay.
14         MR. FRANKLIN: So to that extent, to
15 the extent you know.
16 BY MR. STEELMAN:
17     Q. Now, going to paragraph -- let me ask you
18 this. When all this started -- not when all this
19 started. After Mike Anderson went to Monica's house
20 -- and you found out about that from both Monica and
21 Mr. Anderson; is that right?
22     A. Yeah.
23     Q. Did anybody else say anything to you or
24 tell you anything about Mike Anderson going to
25 Monica's house on December 18th?

1      A. No.
2      Q. Okay.
3      A. His wife, yes.
4      Q. What did his wife tell you?
5      A. She asked me if I knew about it. That was
6  the only thing.
7      Q. When?
8      A. It was right about the same time, I mean,
9  when it happened. She just asked me if I had heard
10 about that.
11     Q. How did that come up? Tell me about this.
12     A. It was just a general conversation. It was
13 nothing to this.
14     Q. Were you in the office?
15     A. No.
16     Q. Where were you.
17     A. I was on the phone with her.
18     Q. Did you call her, or did she call you?
19     A. I don't remember who called who.
20     Q. Okay.
21     A. I don't recall if I called her or if she
22 called me. But, anyway, she did mention to me that -
23 - and it was after because I already knew it happened
24 or had happened, but there was nothing mentioned bad
25 or good or anything, just that it had happened. If I

Page 201

1  knew about it happening, and I said yeah. And I
2  believe that was all that was ever really said.
3      Q. Did anybody else ever say anything to you
4  at any time about Mike Anderson going to Monica's
5  house?
6      A. I do not believe so. I'm trying to think,
7  but I don't remember anybody offhand.
8      Q. Now, Paragraph 4-A says that -- this is
9  talking about Monica Daniel and Mildred Williams:
10 Conspired with each other to disseminate false
11 information that Plaintiff, Michael R. Anderson, made
12 threatening comments during a series of telephone
13 calls made to the home phone of Defendant, Monica
14 Daniel, on or about December 18th, 2005. Do you see
15 that?
16     A. Yes.
17     Q. Do you have any information that that
18 allegation is true?
19     A. All I know is that Monica had a tape
20 recorder tape that she started to play that I heard
21 some of and that, I guess, is what -- she is
22 referring to that, would be that telephone call.
23     Q. Do you remember what you heard?
24     A. At the beginning, it was like, "Are you
25 there?" It seemed like it was -- don't hold me to

Page 202

1  this -- like, "Are you there? I need to talk to you
2  about this stuff that's going on. Let me in, I just
3  want to talk," basically, was about it. It didn't
4  sound threatening to me, what part I heard. But it
5  was only a very small part, so. And I really
6  couldn't tell you if it was the beginning of the
7  tape.
8      Q. Did Monica tell you it was threatening?
9      A. Monica said to me that Millie was scared,
10 because Millie was there with her.
11     Q. Did Millie say anything to you?
12     A. No.
13     Q. 4-B says: Conspired with each other to
14 disseminate false information that Plaintiff, Michael
15 R. Anderson, made comments of a sexual nature during
16 a series of telephone calls made to the home of
17 Defendant, Monica Daniel, on or about December 18,
18 2005. Do you see where it says that?
19     A. Yes.
20     Q. Do you have any information that that is
21 true?
22     A. Okay, Monica had said that she got him.
23 "I've got him on tape."
24     Q. When did she tell you that?
25     A. That was after the night he went over

Page 203

1  there. She indicated that Millie was there. I said,
2  "Now, you know Mike, he's never been a threatening
3  person. How is that helping you?" And she said,
4  "Because it will." Now, what it will, I don't know.
5  She never did tell me. As you could hear on the
6  phone conversations, she's pretty vague.
7      Q. Well, my question, though, what it says,
8  "They conspired to disseminate false information that
9  Anderson made comments of a sexual nature." Did she
10 say anything other than what you just said to me?
11     A. Not that I recall.
12     Q. C says: Conspired with each other to
13 disseminate false information that Plaintiff, Michael
14 R. Anderson, engaged in inappropriate behavior during
15 a prosecutor's training seminar in September of 2005.
16 What do you know about that?
17     A. I was there. I was there the whole time.
18     Q. Okay. What happened?
19     A. Her allegation here is, we was sitting in
20 the bar part of the hotel. There was me, Monica,
21 Mike, Stephanie. There was a guy that was pretty
22 well intoxicated. Monica and --
23     Q. Do you know his name?
24     A. No, didn't know him. He was from another
25 training part there for training, as well. Not for

Page 204

1  prosecutor, but for another group, and he was real
2  drunk. It was like Mike, Monica -- actually, I'm not
3  sure if I was sitting right beside Mike. I think I
4  was. I think Stephanie was like -- I was here,
5  Mike's here, Stephanie, and then Monica.
6          Anyway, the guy come to the table, off the
7  dance floor, introducing himself to us, and about
8  fell on top of, actually, me. I was sitting there,
9  staggering over top. And I was like, "Oh, my God,"
10 you know, attitude.
11         Mike got up and shook his hand and I don't
12 know if Mike actually said something to him like,
13 "You need to have a seat," but basically the guy was
14 drunk. Monica jumps up, storms off and I go
15 following her. I said, "What is wrong?"
16         And she tells -- as Mike is coming up
17 behind us, she's saying, "I'm not with you. You're
18 not my boyfriend. Don't basically tell anybody that
19 they can't come over here." Which I don't think he
20 done that, at all. I don't remember him saying
21 anything about, "You have to leave."
22         It was just basically the guy was drunk and
23 falling down on top of -- practically on top of us.
24 Mike said, "I'm not saying that I'm your boyfriend.
25 The guy is drunk. He's about to fall on top of all

of youn's, you know. He's being disrespectful." That was his, you know, kind of like statement to her.

And she still was screaming at him about this -- him not being her boyfriend, okay? He says, "I never said I was your boyfriend. I'm not your boyfriend. I don't know why you keep saying that." Then he slung his cup of -- whatever was in it -- on the ground and he went his way and I followed Monica to the room, and so did Stephanie.

And I went up there and I asked her, "What in the world are you talking about? Why did you say that was your boyfriend?" And she said, "Well, that's what's he's acting like." I said, "Monica, he didn't do anything to you. I felt like he was protecting us." I told Stephanie that, too.

We had like adjoining rooms, so it was like a door in between our two rooms, and there was me and Stephanie and Monica, so it was us three girls in one room -- or two rooms, actually, that joined. Anyway, we just kind of talked about it. There was -- my personal opinion, he didn't do anything wrong. That was not -- he didn't say anything sexual to Monica.

The guy was drunk. The guy was belligerent, and he come over there and made a scene.

Page 206

I'm glad Mike said something, although I was single and, you know, it wasn't like I was married. But that guy didn't know that, either. He didn't know who was with who.

Q. Anything else?
A. We didn't go back really around Mike. If I remember correctly, that was, I think, the last night we was at that training. That was the training that took place after the raise. My raise is basically what brought on all of this, whichever training that was. I don't remember if it was spring or fall.

Q. The next allegation in Mr. Anderson's complaint is D. And it says: Using the public offices held by Defendant Daniel and Defendant Williams to remove and conspire to cover up the removal of criminal investigative documents from the Texas County Prosecuting Attorney's Office to the detriment of Mike Anderson and the Office of the Texas County Prosecutor and the People of Texas County. What do you know about that?

A. I'm not really sure what he's offhand talking about.

Q. Let me ask you this. Do you have any information that Millie Williams was involved in removing any criminal investigative documents from

Page 207

the Texas County Prosecutor's Office?
A. I remember Monica talking about Millie would help her. I do not remember -- I cannot remember if there was something specifically stated or not. I mean, I know -- I see what Mike has put here, but I do not know for sure what he's exactly talking about.

Q. And my question is --
A. I do not know.
Q. -- are you saying that Monica told you that Millie would help her remove and cover up criminal investigative documents?
A. Monica told me that she would help her out.
Q. That's not my question.
A. I know what your question is. I don't know if she meant documents or what, but that was what we was discussing, was Millie and her being friends and she had connections in there.

Q. So that I'm clear, do you have any information that Millie Williams removed or helped cover up the removal of criminal investigative documents?

A. Not to my memory. I don't remember her doing anything.

Q. Now, going on to E. It says: Using public

Page 208

offices held by Defendant Daniel and Defendant Williams to conspire to do favors for their friends and others to the detriment of Plaintiff, Michael R. Anderson, and the Office of the Texas County Prosecutor and the People of Texas County. Do you see that?

A. Yeah.
Q. What do you know about that?
A. That would be in the issue of shredding tickets, not filing stuff, not having officers there on subpoenas where Mike would stand up and give an excuse that was a lie because that was what --

Q. Wait, what would Mike do?
A. Well, when we go to court, if an officer is unable to come, we need to know why.
Q. When you said Mike would give an excuse that was a lie, what did you mean by that?
A. Because that's what Monica would tell him. This is what the officer is doing, whether it be training, gone, out of town. And she would help them so they wouldn't have to come to court.

Q. Can you tell me any specific instances and specific individuals?

A. It was frequent and it usually was with the one she liked. Now, Kevin Floyd was not one she

Joann Renee Richardson * 573-699-4110 * St. James, Missouri *

52 (Pages 205 to 208)

Case 6:09-cv-03018-RED   Document 236-6   Filed 11/24/10   Page 15 of 17

Page 209

1  liked, so that wasn't one she would do anything for.
2  I can name a few that she wasn't real fond of, but
3  Kevin Floyd, unfortunately, is deceased. But I know
4  he wouldn't come into our office because of Monica
5  doing these things.
6      Q. Now, I'm not saying that this was on
7  purpose. Are you saying that because of all this,
8  Mr. Anderson would frequently make statements to the
9  court, in open court, that were untrue?
10     A. Not because he knew it.
11     Q. I know. I'm just trying to clear that up.
12     A. Clear that up?
13     Q. Yes.
14     A. Monica would get her -- talk to whomever.
15     Q. Okay, just answer my question. I'm just
16  trying to understand this.
17     A. Okay.
18     Q. I'm not saying it was anything Mr. Anderson
19  did on purpose. Are you saying that you have
20  personal knowledge that Mr. Anderson has repeatedly
21  made statements in open court to the judge that were
22  untrue?
23     A. Yes, because of her.
24     Q. And you all are saying that's because of
25  Monica?

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 210

1      A. I know it was because of Monica. I heard
2  the phone conversations.
3      Q. I understand. Now, F says: Conspiring
4  with each other to use their public offices to
5  coordinate and orchestrate a swinger-style sex ring
6  out of the Texas County Prosecuting Attorney's
7  Office. What do you know about that?
8      A. I believe that this would probably be --
9  from what I would understand this to be, would be the
10  issue of them, during work hours, discussing what
11  they're doing and who they're doing and their sexual
12  activities that they was planning.
13     Q. In particular, Millie, I want to talk about
14  for a second. What do you know of that Millie did
15  using her office to coordinate and orchestrate this
16  swinger-style sex ring?
17     A. By calling Monica. I would say, by calling
18  Monica and, you know, them discussing their weekend,
19  their evening or whatever, during work hours. Their
20  computers, I believe they messaged each other back
21  and forth, or text messaged each other.
22     Q. So that I understand this, you would have
23  conversations, sexual in nature, with Monica at work,
24  too; correct?
25     A. Monica always had sexual conversations with

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 211

1  everybody.
2      Q. You had those conversations too; right?
3      A. Yes.
4      Q. Were you part of this coordination --
5      A. No.
6      Q. -- and orchestration of a swinger-style sex
7  ring?
8      A. I've never had any sex with anybody in that
9  office that works for this county at all. There's no
10  sexual relationship that I've had with Monica, nor
11  anybody else.
12     Q. So what you mean is having the sex is the
13  swinger-style sex ring. Is that how you interpret
14  that?
15     A. Or coordinating the sexual events, I guess,
16  would be --
17     Q. What kind of sex -- I don't understand.
18     A. Them going out for whatever occasion, who
19  all is going to be there. To me, they talked to each
20  other on the phone frequent about what they was going
21  to do, what we was all doing.
22     Q. I'm just trying to understand. Yeah, you
23  would talk to Monica about what you were going to do,
24  too?
25     A. If I was going to go with them, yeah.

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 212

1      Q. What was different about Millie?
2      A. They had a sexual relationship together. I
3  didn't have one with either of which. There is a
4  difference. I didn't have sex with none of them, so.
5      Q. Did you see them -- I thought you didn't
6  see them have sex?
7      A. No, but I didn't have to see them for them
8  to be telling me -- well, Monica told me that they
9  had sex.
10     Q. Did Millie ever tell you she had a sexual
11  relationship with Monica?
12     A. No. I watched them kiss, so it's pretty
13  obvious something had happened. You don't French
14  kiss a girl, or I wouldn't.
15     Q. And Misty Hale was a witness to this, too;
16  is that correct? I want to make sure I got this
17  right.
18     A. I don't know if Misty got out of the
19  vehicle at the time because my doors open -- both
20  doors open on my truck. But Monica -- Millie was up
21  front and Monica was in the back with Misty.
22     Q. Now, it says in Paragraph 8 that such
23  conduct and conspiracy to malign, libel, and slander
24  plaintiff has deprived plaintiff -- that's Mr.
25  Anderson -- of the benefit of public confidence and

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 217

```
 1   lawsuit itself?
 2       A.  It might have been.
 3       Q.  Okay.
 4       A.  Just the purpose of the swinger-style sex
 5   ring issue, was Mike doing anything, you know, had he
 6   done anything. Is it true?
 7       Q.  So people would call you --
 8       A.  Well, yeah, he's an elected official.
 9       Q.  -- and ask about the swinger-style sex
10   ring?
11       A.  Well, they would ask me, "What in the heck
12   is going on? What's going on with a swinger-style
13   sex ring in Texas County?" It was a big joke.
14       Q.  And is this a lot of people?
15       A.  Yeah, very frequent. Come on, read it.
16       Q.  And what else?
17       A.  I had many people state their opinion of
18   Monica, I mean, as far as, "What in the heck, you
19   know, could anybody do to her that she wouldn't ask
20   for."
21       Q.  And who said that to you?
22       A.  Monica is very well-known for her --
23       Q.  We're talking specifics.
24       A.  -- sexual innuendos.
25       Q.  What people? Can you tell me some people
```

## Page 218

```
 1   that we're talking about?
 2       A.  Oh, God. Well -- yeah, there's lots. I
 3   mean, it's just naming off names of people who you
 4   talk to.
 5       Q.  So you're saying a lot of people had bad
 6   things to say to you about Monica; is that right?
 7       A.  Right, and you're sitting there trying to
 8   pinpoint it down to exact people.
 9       Q.  After the filing of this lawsuit?
10       A.  I knew things about her before people had
11   said.
12       Q.  That's not what we're talking about.
13       A.  But, yes, after the fact, yes, on the
14   lawsuit.
15       Q.  After the lawsuit, you had a lot of people
16   say bad things to you about Monica?
17       A.  Yeah, that apparently knew her before me
18   because I didn't know her. I just knew of her.
19       Q.  Okay. What else? Tell me any of those
20   names if you can, two, three, four, five, whatever?
21       A.  I'm trying to think. I had some of the
22   officers. I think Mike Huffman had asked me.
23       Q.  Who is Mike Huffman?
24       A.  He works at the sheriff's office.
25       Q.  And what did he ask you?
```

## Page 219

```
 1       A.  If this stuff was -- if that was true.
 2       Q.  The swinger-style sex ring?
 3       A.  Whatever was going on at that time, if it
 4   was the swinger-style thing, or just the issue with
 5   Mike supposedly -- sexual harassment with Monica.
 6       Q.  How was the issue of sexual harassment out
 7   there? I don't understand.
 8       A.  Well, I don't know what was printed in the
 9   paper. I did not keep up with this stuff at all. I
10   don't look at it. I don't have time. I have a life.
11       Q.  I don't know this, so you can tell me. Was
12   anything printed in any paper about sexual harassment
13   prior to Mr. Anderson filing the lawsuit and the
14   complaint, which is Exhibit 4?
15       A.  I don't know.
16           MR. FRANKLIN: Objection, asked and
17   answered. She said she doesn't read the paper.
18   BY MR. STEELMAN:
19       A.  I don't read the paper. I haven't read
20   these, nor have I been on any of the stuff that
21   talked about this, so I don't know.
22       Q.  So the answer is, you're not aware of
23   anybody writing about or reading about sexual
24   harassment prior to Mr. Anderson filing the lawsuit
25   that is Exhibit 4; is that right?
```

## Page 220

```
 1       A.  Okay, prior to, no. After this was -- I
 2   think it was actually published, or something, or put
 3   on the front page, or something, about a swinger-
 4   style sex ring, what the prosecutor had alleged. And
 5   I don't know if there was a site you could go to to
 6   review this document. I do not know that, I never
 7   looked. But people told me that they had seen the
 8   petition that was filed. How they seen them, I guess
 9   it's public record.
10       Q.  Is it fair to say that after the petition
11   was filed by Mr. Anderson that you had, what, would
12   you say dozens of people or hundreds of people
13   wanting to talk to you about the allegations
14   contained in it?
15       A.  I wouldn't say hundreds, but dozens of
16   people has asked me throughout if it was true or, you
17   know, alleged that they thought maybe it was true.
18   Or alleged the opposite, that Monica was a whore and,
19   once a whore, always a whore statements. That she
20   screwed anybody in Houston. She moved to Licking,
21   screwed that up, so now she's in Rolla. And then she
22   went to Cuba or somewhere. I don't know where she's
23   at actually, but somewhere up in that area.
24       Q.  People were talking about this all over the
25   place; right?
```