IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MONICA DANIEL HUTCHISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 09-3018-CV-S-RED |
| ) | |
| TEXAS COUNTY, MISSOURI; MICHAEL ) | |
| R. ANDERSON, TEXAS COUNTY ) | |
| PROSECUTING ATTORNEY; and ) | |
| MICHAEL R. ANDERSON, ) | |
| Individually, ) | |
| ) | April 5, 2010 |
| Defendants. ) | Houston, Missouri |

VIDEOTAPED DEPOSITION OF HONORABLE BRADFORD E. ELLSWORTH

a Witness, produced, sworn and examined on the 5th day of

April, 2010, between the hours of 8 a.m. and 5 p.m. of that

day, at Texas County Courthouse, 210 North Grand, City of

Houston, County of Texas, before

JOANN RENEE RICHARDSON, CCR
Certified Court Reporter
20051 State Route B
St. James, Missouri 65559

in the above-entitled cause, pursuant to Notice to Take

Video Deposition, on the part of the Plaintiff.

Joann Renee Richardson

\*   573-699-4110   \*   St. James, M

Page 21

```
 1  period.
 2      Q.  And I know time has passed. Could you be
 3  as specific as possible and tell me what you had
 4  heard about that situation?
 5      A.  Well, I had heard just about what you had
 6  said; that Mike had gone out there to Monica Daniel's
 7  home and that Millie Williams was there that evening
 8  and that he was intoxicated and that he caused some
 9  kind of a commotion.
10      Q.  And do you know who you had heard that
11  from?
12      A.  No.
13      Q.  I want to get to the criminal investigative
14  subpoena in a second.
15      A.  All right.
16      Q.  It is also indicated by Mr. Anderson that
17  you have some information regarding a confrontation
18  between him and Mildred Williams. Do you know if
19  that's accurate?
20      A.  That's accurate.
21      Q.  And can you tell me what that situation
22  was?
23      A.  Well, I can't give you a time frame on
24  that, other than a general one. But it was after
25  this incident. And Mike came into my office in this
```

Page 22

```
 1  building -- the courthouse was here at that time --
 2  and it was shortly after noon and he indicated that
 3  he wanted to talk to Millie, and I could see he was
 4  upset.
 5          I said, "Okay, come on in here." She came
 6  in and she kind of stood at the door. Mike was -- I
 7  was in my chair, which was facing out towards the
 8  door. Mike was over to my right. And I think a
 9  couple of other girls were in the doorway, at least,
10  but I'm not sure.
11          And Mike said to Millie that he had heard
12  that she had been talking about him and saying things
13  about him and he was upset about this and he was
14  going to sue her if she didn't stop doing that and
15  things like that.
16      Q.  Did he say or can you remember if he said
17  specifically what she was alleged to have said about
18  him?
19      A.  It had to do with this incident. I don't
20  recall the specifics. He just didn't want her
21  talking about him.
22      Q.  And tell me if I'm right or not, he
23  threatened to sue her unless she agreed to quit
24  talking about him?
25      A.  Yeah. And she said, "Well, I didn't talk
```

Page 23

```
 1  about it." And he said, "Yes, you did. I heard you
 2  did." And she said, "The only thing I did is, I
 3  answered some questions that Linda Garrett asked me."
 4  Linda Garrett is a county commissioner, was and still
 5  is.
 6          Apparently, she had asked Millie some
 7  things about it. And she said, "That's all I did.
 8  She asked me questions -- she was a county official -
 9  - and I answered questions." And Mike got pretty mad
10  about it.
11      Q.  Two things so that the judge and the jury
12  understands. Linda Garrett, at that time, held what
13  county position?
14      A.  She was a county commissioner.
15      Q.  And is it, in your opinion, legitimate for
16  Linda Garrett to be concerned about whether the
17  county had exposure with that kind of situation?
18          MR. HARRIS: I'm going to object, it
19  calls for speculation. It's improper commentary.
20  You can go ahead and add whatever you want to.
21          MR. FRANKLIN: I'm going to object
22  that you haven't laid any foundation for there to be
23  any line of reporting responsibility or oversight
24  between county governmental officials and individuals
25  who Judge Ellsworth has previously testified were
```

Page 24

```
 1  under his exclusive scope of authority and control.
 2  BY MR. STEELMAN:
 3      Q.  Go ahead, Judge, if you can answer the
 4  question.
 5      A.  I think it would be proper for her to ask
 6  that question.
 7      Q.  So did that strike you as anything unusual
 8  for Linda Garrett to be asking Ms. Williams about
 9  this incident?
10      A.  No.
11      Q.  Now, I want you to describe, as best you
12  can, Mr. Anderson's demeanor during this situation?
13      A.  Well, he was upset. I can't remember all
14  the things that were said, but he kind of took a
15  couple of steps towards Millie and I said, "Stand
16  back, Mike!" And he did, he took two steps back.
17  And then that pretty well ended the matter. I think
18  he said something else to her when he went out the
19  door.
20      Q.  Did he take a couple of steps towards Ms.
21  Williams in a threatening manner?
22          MR. HARRIS: I'm going to object. I
23  think that calls for speculation. It's vague and
24  ambiguous.
25  BY MR. STEELMAN:
```

Page 25

1  Q. Go ahead, if you don't mind, Judge.
2  A. I don't know. He was upset.
3  Q. Okay. Was he raising his voice?
4  A. Yes.
5  Q. And this was in the courthouse?
6  A. It was in my office.
7  Q. In the courthouse; right?
8  A. Yes, sir.
9  Q. And what other individuals witnessed this
10 situation?
11 A. I think Melinda Hutchison was there and --
12 or Hudson. I've done that. Melinda Hudson was
13 there. I don't think Marci was. Marci hadn't come
14 back from lunch yet, because they had a staggered
15 lunch time.
16 Q. Now, again, I want to talk about the damage
17 complaint filed by Mr. Anderson, which is Exhibit 4.
18 And as I understand, had you ever had a chance to
19 actually review the complaint, what he calls a damage
20 complaint, prior to today?
21 A. I don't believe I've seen it prior to
22 today.
23 Q. Then what I would like to do is, we'll go
24 off the record so you have the time to review that.
25 Because what I'd like to do, Judge, is not just take

Page 26

1  and drag this out too long, so I'd like you to have a
2  chance to review that and I'll have a few more
3  questions.
4  A. All right.
5      MR. STEELMAN: Let's go off the
6  record.
7      MR. WATERS: The current time is 9:37.
8  We're now going off record.
9      (Off the record.)
10
11     (Back on the record.)
12     MR. WATERS: The current time is 9:38.
13 We're now back on record. Please proceed.
14 BY MR. STEELMAN:
15 Q. Judge Ellsworth, you've now had a chance to
16 read the damage complaint filed by Mr. Anderson,
17 which is Exhibit 4; is that correct?
18 A. I have.
19 Q. And so why I wanted you to read that is
20 simply to ask you, do you have any information
21 regarding any of these allegations contained in
22 Exhibit 4 that Mr. Anderson has made?
23 A. I do not.
24 Q. Do you have any information that any of
25 these allegations were true?

Page 27

1  A. I don't know one way or the other.
2  Q. Do you have any -- did Mr. Anderson have
3  any -- make any effort that you're aware of to
4  investigate the truth of any of these allegations?
5  A. I don't have any knowledge of that.
6  Q. Did he talk to you regarding any of the
7  matters discussed in the damage complaint prior to
8  filing this in the official records of Texas County?
9  A. No.
10 Q. After it was filed, did he come to you at
11 any time and indicate that an investigation would be
12 undertaken and that your office would be involved?
13 A. No.
14 Q. Did he discuss with you, other than what
15 comments you've already made, the truth of these
16 allegations at any time after the complaint was
17 filed?
18 A. No.
19 Q. Now, I want to talk to you for a second
20 about something that you've already mentioned, which
21 is the -- if I can find it -- the criminal
22 investigative demand. This has already been marked
23 as Exhibit 15 and I'm going to show you a copy. Have
24 you seen that before?
25 A. I have.

Page 28

1  Q. Now, above where "Circuit Clerk" appears
2  and that's lined out and it says "Associate Circuit
3  Judge," would you tell me if that is your signature?
4  A. It is.
5  Q. And it was dated December 23, 2005; is that
6  right?
7  A. That is correct.
8  Q. Is that your handwriting?
9  A. That is my handwriting.
10 Q. Now, above that it says: "To produce the
11 following for copying any voice recording, audio or
12 otherwise, and any telephone answering machine
13 recording of Michael Anderson taken at -- it says
14 your residence -- it's directed to Monica Daniel --
15 "on December 18, 2005." Do you see that?
16 A. I do.
17 Q. And whose handwriting is that?
18 A. That's Michael R. Anderson's.
19 Q. And under the signature of the requesting
20 party, do you recognize that signature?
21 Q. Where did you put that?
22 A. I'm sorry, let me point that out to you.
23 A. Oh, yes. Yes, that's his signature.
24 Q. And who does it say is the person
25 subpoenaed?

Page 73

1   Q. You indicated when Mr. Harris was
2 questioning you that Mr. Anderson indicated that
3 there were some people he was prosecuting at a bar he
4 was at; is that correct?
5   A. Yes.
6   Q. And this is the night that he went to
7 Monica's house?
8   A. Yes.
9   Q. Did he tell you the names of those people?
10  A. I think so. I don't recall where they
11 were. The circumstances were, there were some adults
12 and some juveniles that were accused of statutory
13 rape and there were two adults that were involved in
14 that situation.
15  Q. And two of the adults were at the bar?
16  A. At the bar.
17  Q. But do you recall the names?
18  A. No, I don't. And --
19  Q. Go ahead, I'm sorry.
20  A. No, I don't recall the names.
21  Q. In addition, after this was there a time
22 period when Mr. Anderson filed an abnormally large
23 number of change of judge motions from your court?
24  A. From me?
25  Q. Yes.

Page 74

1   A. Oh, no.
2   Q. Okay. Oh, and Mr. Franklin kept asking
3 about the swinger-style sex ring, but his question
4 indicated just out of the Texas County Prosecuting
5 Attorney's Office, I believe.
6   A. Uh-huh.
7   Q. Exhibit 4 says the swinger-style sex ring
8 was run -- and I'm quoting the complaint filed by Mr.
9 Anderson -- was run out of the Texas County
10 Prosecuting Attorney's Office and the Texas County
11 Associate Court Office. Do you recall that?
12  A. Yes.
13  Q. Is that allegation true?
14  A. No, sir.
15  Q. Now, Mr. Harris also asked you whether you
16 saw anything -- I think his word was inappropriate.
17 Do you remember that?
18  A. Yes.
19  Q. And rather than try to define the word
20 inappropriate, I just want to understand a little bit
21 your use of it, if that's okay? I want you to assume
22 that Mr. Anderson has admitted to passing a note to
23 Monica Daniels when she was working for him of a name
24 that, pronounced phonetically, said, "Hey, would you
25 blow me?" Do you believe that is appropriate?

Page 75

1       MR. FRANKLIN: I'm going to object and
2 say that calls for speculation insofar as the witness
3 was not privy to the circumstances in which the note
4 was passed and could not assess whether the note was
5 welcome or not in the context of the situation.
6       MR. HARRIS: I join.
7 BY MR. STEELMAN:
8   A. It would not be appropriate.
9   Q. And you don't have any problem at all, as
10 an individual who has been a part of the community
11 down here for some period of time, stating that that
12 is inappropriate, would you?
13  A. No, of course not.
14  Q. Now, in addition, do you have an opinion as
15 to whether when Mr. Anderson went to Monica Daniel's
16 house after drinking and knocking on the door and
17 leaving her a variety of phone messages late at
18 night, as to whether that action was appropriate?
19  A. No, that wouldn't be appropriate.
20      MR. STEELMAN: Go ahead.
21      MR. FRANKLIN: I was going to object
22 insofar as the witness has testified that he has no
23 direct personal knowledge of the incidents that have
24 alleged to have occurred on December 18.
25 BY MR. STEELMAN:

Page 76

1   Q. Judge, so that I understand, assuming that
2 to be true, what is your opinion as to whether that
3 is appropriate or not?
4   A. Assuming it's true, it's not appropriate.
5   Q. Now, in addition, as you are aware that Mr.
6 Anderson, in both his private capacity as a licensed
7 attorney, and as Prosecuting Attorney of Texas
8 County, filed what he entitled a damage complaint in
9 the public records of Texas County alleging that a
10 swinger-style sex ring was run out of the Texas
11 County Prosecuting Attorney's Office and the
12 Associate Circuit Court Division of which you were
13 judge. Do you have an opinion as to whether that was
14 appropriate?
15      MR. HARRIS: Well, I'm going to
16 object. I think that that calls for expert testimony
17 and this witness has not been disclosed as an expert,
18 either retained or non-retained.
19      MR. FRANKLIN: Furthermore, I would
20 testify that there has not been an adequate
21 foundation laid as to the nature and extent of Mr.
22 Anderson's investigation and knowledge and
23 information that he possessed at the time that he
24 filed that pleading that would render any testimony
25 by the witness regarding the propriety or impropriety

## Page 77

1  of that particular filing to be pure speculation and
2  inadmissible as a matter of law.
3       MR. HARRIS: Join.
4  BY MR. STEELMAN:
5    Q. Go ahead, Judge.
6    A. I don't really want to comment on it.
7    Q. I understand, Judge, but in this particular
8  case, I'll just ask you for an answer?
9    A. It's pretty clear.
10   Q. I think so, too. But what is your answer?
11      MR. FRANKLIN: Same objection for this
12 question, as well.
13 BY MR. STEELMAN:
14   A. Yeah. It wasn't true. It wasn't
15 appropriate.
16      MR. STEELMAN: I have no further
17 questions. Thank you.
18
19 RE-EXAMINATION BY MR. HARRIS:
20   Q. Your Honor, I think we can all talk about
21 the wisdom, or lack thereof, of the filing of the
22 complaint by Mr. Anderson. I could tell you're of
23 the opinion it wasn't a very smart thing to do;
24 correct?
25   A. It's my opinion. You can file whatever you

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 78

1  like.
2    Q. Right.
3    A. Go to the courthouse and pay your money.
4    Q. And you understand, as a lawyer, that
5  people oftentimes file complaints or petitions that
6  make all kinds of allegations; correct?
7    A. I suppose.
8    Q. And I'd be correct that as a judge, before
9  you would ever rule on anything, you'd have all the
10 facts; right?
11   A. I hope so. If you had some good attorneys
12 that would bring them to you.
13   Q. And you would agree --
14   A. Oh, sorry.
15      MR. STEELMAN: Thank you, Your Honor.
16 BY MR. HARRIS:
17   Q. You would agree with me that in this
18 situation, with regard to what did or didn't occur in
19 your office, you have a knowledge about; correct? Is
20 that correct
21   A. That's correct.
22   Q. But as far as what went on in Mike
23 Anderson's office, you don't know what went on?
24   A. I do not.
25   Q. And you wouldn't presume to judge whether

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 79

1  or not this complaint was meritorious or not
2  meritorious with regard to Monica Daniel without
3  knowing all the facts, would you?
4    A. Fair enough.
5       MR. HARRIS: Nothing further.
6
7  RE-EXAMINATION BY MR. FRANKLIN:
8    Q. I just have maybe two questions. You
9  testified earlier, Your Honor, that, for a time, you
10 served as prosecuting attorney?
11   A. Yes.
12   Q. And since you've been asked to opine on a
13 host of other legal issues in your eminent
14 experience, what is your understanding of the term
15 "prosecutorial immunity" under Missouri law?
16   A. Well, I guess it's -- you're going to have
17 -- if you're going to show the prosecutor has done an
18 act that is beyond the scope of his duties and is
19 actionable by someone else, it's going to have to be
20 a malicious kind of a thing, otherwise there's broad
21 immunity -- there's broad discretion for the
22 prosecutor to file the cases that he or she wants to
23 file.
24   Q. And that immunity, as you understand it --
25 and you somewhat alluded to it earlier -- is

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 80

1  particularly broad in the area of requesting
2  investigatory subpoenas to assess whether the pursuit
3  of charges is appropriate?
4    A. I think that's a broad area. And as
5  vindicated, the case law seems to indicate it's a
6  broad area.
7    Q. And would it be accurate in your assessment
8  of Mr. Anderson's conduct in this case that you did
9  not find his request for the document -- excuse me --
10 the subpoena that's identified in the document
11 labeled Plaintiff's Exhibit 15, it was not your
12 impression that he was acting with any malice in his
13 pursuit of that?
14   A. Oh, no. No.
15   Q. And you obviously would not have granted
16 that subpoena if you believed that he was pursuing
17 that investigative subpoena with any malicious
18 intent?
19   A. True.
20      MR. FRANKLIN: I have nothing further.
21      MR. STEELMAN: I have nothing further.
22      MR. WATERS: That shall conclude the
23 deposition of the Honorable Brad Ellsworth. We're
24 now going off record.
25      (Off the record.)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *