IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MONICA DANIEL HUTCHISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 09-3018-CV-S-RED |
| ) | |
| TEXAS COUNTY, MISSOURI; MICHAEL ) | |
| R. ANDERSON, TEXAS COUNTY ) | |
| PROSECUTING ATTORNEY; and ) | |
| MICHAEL R. ANDERSON, ) | |
| Individually, ) | |
| ) | June 29, 2010 |
| Defendants. ) | Houston, Missouri |

VIDEOTAPED DEPOSITION OF TERRY HADEN

a Witness, produced, sworn and examined on the 29th day of

June, 2010, between the hours of 8 a.m. and 5 p.m. of that

day, 112 East Main Street, City of Houston, County of Texas,

before

JOANN RENEE RICHARDSON, CCR
Certified Court Reporter
20051 State Route B
St. James, Missouri 65559

in the above-entitled cause, pursuant to Notice to Take

Video Deposition, on the part of the Plaintiff.

Joann Renee Richardson

\*   573-699-4110   \*   St. James, Missouri



1  better lawyer than I am -- it's also vague and
2  ambiguous.
3  BY MR. STEELMAN:
4      Q. Let me say it again. If Mr. Anderson
5  testified in the meeting or talk with you that there
6  were no specifics discussed -- those are his words.
7  We can go off record. I'll find it if we need to.
8  Let's do that. Let me find it. Let's go off the
9  record.
10         MR. WATERS: The current time is
11  11:16. We are now going off record.
12         (Off the record.)
13     _____
14         (Back on the record.)
15         MR. WATERS: We're now back on record.
16  The current time is 11:18. Please proceed.
17  BY MR. STEELMAN:
18      Q. Now, Ms. Haden, what I want you to do is, so
19  I can have the time line, tell me each and every
20  conversation that you had with Mr. Anderson regarding
21  Monica Daniel Hutchison and -- well, regarding Monica
22  Daniel Hutchison.
23      A. In what time frame?
24      Q. I want to start with the first one you
25  remember and just see how many you can remember and

1  go through them one by one.
2      A. The first time I can remember is, before he
3  even hired her, I told him it would be a mistake.
4  There were various times when I felt that she felt
5  that she was the boss and running the office and
6  downgrading him to his face. There were various
7  times.
8      Q. I can tell we're going to go far. I just --
9  I'm trying to get these discussions -- these
10  conversations identified first and then make sure I
11  know which conversation is which.
12      A. Well, I can't give you a date because that
13  went on for -- from the time she started working for
14  him.
15      Q. Not what went on, meetings with Mr.
16  Anderson, between you and him, is what I'm talking
17  about.
18      A. As far as closed-door meetings?
19      Q. Well, meetings with him regarding Monica
20  Daniel Hutchison.
21      A. See, that's what I'm confused about. Are
22  you talking about conversations I've had with Mike
23  concerning Monica?
24      Q. Yes.
25      A. Okay. Well, that's what I'm trying to do.

1  There were several conversations. As far as
2  meetings, there was only one meeting.
3      Q. Okay.
4      A. Well, I guess there was two meetings.
5      Q. Okay. Now, the first conversation that you
6  remember was when?
7      A. As I said --
8      Q. Regarding Monica.
9      A. -- before he even hired her.
10     Q. And at that time you told him it would be a
11  mistake?
12     A. Yes.
13     Q. Okay. And then the second conversation?
14     A. Just about her basic demeanor and the way
15  she demeaned him in front of him.
16     Q. And when was this?
17     A. I can't give you an exact date. It was when
18  she was working for him at the law office.
19     Q. Okay. And what was -- you mean, even before
20  he brought her over to the prosecutor's office?
21     A. Yeah.
22     Q. Okay. And then next conversation.
23     A. Basically, they were all about the same. As
24  I --
25     Q. I just want to -- I'm just trying to

1  identify them right now.
2      A. Well, that's fine.
3      Q. If you can't, that's okay.
4      A. I can't identify each and every single
5  conversation I ever had where I told him that she was
6  demeaning him and --
7      Q. Okay. That's fair. That's fair. I'm just
8  trying -- so you had multiple conversations with Mr.
9  Anderson while she was working there, telling him
10  that Monica was demeaning him; is that right?
11     A. Asking him why he put up with it, basically.
12     Q. Okay. And what did he say?
13     A. He just kind of shrugged his shoulders and
14  said, "Well, she helps me."
15     Q. Okay. Next conversation.
16     A. Basically, all the same. I can't tell you
17  how many conversations we had in that long of a
18  period.
19     Q. Okay. And then when did you have -- you
20  indicate that there were two meetings.
21     A. Yeah. The first meeting was before any
22  problems between Mike and Monica even started. And
23  it's like I have already stated, I was fed up. A lot
24  of legal secretaries were fed up. A lot of her
25  co-workers were fed up by the way that she conducted

1  herself and the rude and hateful things that she
2  would say to people on the phone.
3     Q. And who else were one of the legal
4  secretaries that felt like this?
5     A. Jeanette Dumus with Privette's office.
6  Loret Smith with the sheriff's office.
7     Q. Okay.
8     A. Stephanie and Christie. There were some
9  others, but I can't really remember their names. But
10 they felt she was rude and abrupt to them.
11    Q. Okay.
12    A. They've long since gone on to different
13 jobs.
14    Q. And so there was a meeting now on this; is
15 that right?
16    A. Yeah. We had a closed-door meeting on her
17 attitude towards me and other legal secretaries.
18    Q. And where did you meet with him?
19    A. In his office.
20    Q. Okay.
21    A. And I'm quite sure she heard every word
22 said.
23    Q. Okay. And then what occurred? What did he
24 say to you?
25    A. He said he'd talk to her about it.

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

1     Q. Okay. And then did you find out from
2  anybody, from Monica or Christie or Stephanie or Mike
3  what occurred after that meeting, if anything?
4     A. No.
5     Q. You didn't hear anything?
6     A. No.
7     Q. Okay. Now, at this time when you had this
8  meeting with Mr. Anderson -- and can you tell me more
9  specifically what it is you said to him so that I can
10 have this right?
11    A. Basically that I was fed up with the way she
12 spoke to me and her attitude towards me and I wasn't
13 the only legal secretary that had issues with her,
14 and that his staff had issues with the way she was
15 treating them.
16    Q. Okay. And at this time, because of the
17 office, you're confident that she heard every word
18 that was said?
19    A. Oh, I'm confident of that, yeah.
20    Q. And did she ever talk to you about that?
21    A. No.
22    Q. Now, after this meeting that you had -- and
23 you're indicating that Monica could hear you -- it
24 doesn't sound to me, and I may be wrong, that you
25 were particularly flattering to Monica. Would that

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

1  be a fair statement?
2     A. Yeah, that would be a very fair statement.
3     Q. And, in fact, when you say "very fair
4  statement," I take it, then, that you were really
5  very upset with Monica; is that right?
6     A. Oh, yes.
7     Q. Okay. At this time, were you Monica's
8  friend?
9     A. We were more like working acquaintances at
10 this time.
11    Q. Okay. And were you still having lunch over
12 at the prosecutor's office, or had that stopped?
13    A. Yeah, we still spoke together. We still
14 worked together. Her demeanor changed a little bit
15 towards me after that conversation with Mike. As far
16 as friends --
17    Q. And let me -- so that I understand, after
18 this conversation that you're confident that Monica
19 heard every word of, you and Monica, along with other
20 girls, would continue to have lunch at the
21 prosecutor's office; is that right?
22    A. At the prosecutor's office, at Miller's. We
23 had lunch together, yes.
24    Q. Various places?
25    A. Yes. You would have to understand the

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

1  relationship Monica and I had.
2     Q. Well, help me.
3     A. We've been friends for thirty years.
4     Q. Okay.
5     A. We've been friends since kindergarten.
6     Q. Okay. And are you still friends?
7     A. No.
8     Q. But you continued to be friends after this
9  closed-door meeting with Mr. Anderson --
10    A. Oh, yeah.
11    Q. -- is that right?
12    A. Oh, yeah.
13    Q. Okay. And after this meeting, you're
14 friends, you continue to go to lunch, and Monica
15 overheard it, you're confident, and you all never had
16 any conversation about it?
17    A. Not about my meeting with Mike. We had
18 various conversations about how rude she was to me
19 and I didn't appreciate it very much.
20    Q. But not about the meeting with Mike; is that
21 correct?
22    A. Not that I can recall, no.
23    Q. Okay. Now, you said there were two meetings
24 with Mr. Anderson?
25    A. Uh-huh.

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 25

1  Q. And did you have any other conversations
2  regarding Monica between this meeting and what you
3  have termed as the second meeting?
4  A. Just like I told you before, various things
5  of, "Why do you let her talk to you that way? You're
6  the boss, why can't you be the boss?"
7  Q. And what would he say?
8  A. He just kind of shrugged his shoulders and
9  say, "Well, she gets her work done."
10 Q. Was Monica a good worker; do you know?
11 A. Monica was a good worker when Monica chose
12 to be a good worker.
13 Q. And then you had a period of these
14 conversations where, basically -- I don't want to --
15 how would you term your conversations with Mike
16 again, up until the second meeting?
17 A. Basically the same thing. And a lot of
18 times they were in front of Monica.
19 Q. And then there was a second meeting; is that
20 correct?
21 A. Well, apparently yes. Right there.
22 Q. Well, you say apparently?
23 A. I didn't recall that meeting until you
24 brought that up.
25 Q. Okay. And then what was that meeting?
<sub>Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *</sub>

Page 26

1  A. Just, basically, if I'd be willing to
2  testify as to the various times she was rude and
3  obnoxious and to the things that -- the rude,
4  obnoxious things that she had done in his office.
5  Said and done and --
6  Q. And so tell me -- as you recall it, Mr.
7  Anderson said, "Would you be willing to testify?"
8  Right?
9  A. Yes.
10 Q. Okay. And what specifically did you all
11 discuss that you were willing to testify to?
12 A. Her behavior. Her attitude.
13 Q. It's probably my fault for the way I asked
14 the question, but, to me, behavior and attitude seem
15 to be generalities. What specifically about her
16 behavior did you discuss, including specific
17 incidents?
18 A. Specific incidents being the demeaning way
19 she spoke to him, telling him that if it wasn't for
20 her he would be nothing, and that he was stupid and a
21 moron and various things like that.
22 Q. And where did this meeting occur?
23 A. In his office.
24 Q. And this was after Monica left; is that
25 correct?

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 27

1  A. This was in between when Monica left and
2  when Monica came back.
3  Q. Okay. And was there any other meeting you
4  had with Mr. Anderson?
5  A. No.
6  Q. Okay. Now, other than those specifics, and
7  you talked about a few other -- a few other -- well,
8  you said behavior and attitude. What about -- was it
9  the same thing on attitude when you just talked about
10 specifics?
11 A. Yes.
12 Q. Okay. And what did Mr. Anderson say?
13 A. Basically that he didn't realize that she
14 was making comments to him outside of the office,
15 other than what she said to him in the office.
16 Q. And did you have any other meetings with Mr.
17 Anderson that you recall?
18 A. Not closed-door meetings. No, I wouldn't
19 term them as meetings.
20 Q. Okay. Did you have any other conversations
21 with Mr. Anderson about the lawsuit or the issues in
22 the lawsuit?
23 A. I think I probably told him when he filed
24 his lawsuit against Monica that that was a mistake
25 and it was wrong.

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 28

1  Q. After he filed his lawsuit?
2  A. Yes.
3  Q. Okay. Then correct me if I'm wrong, did you
4  supply him any information on which the lawsuit was
5  based?
6  A. I had no idea he was going to file that
7  lawsuit, so the answer would be no.
8  Q. Okay. Let's go to damage complaint No. 4,
9  or which is Exhibit 4. And I apologize, this can
10 become somewhat laborious. I want to go through
11 these allegations. Let's go off the record for a few
12 seconds and let her do some paper flipping.
13       MR. WATERS: The current time is
14 11:29. We're now going off record.
15      (Off the record.)
16 _____
17      (Back on the record.)
18      MR. WATERS: We're now back on record.
19 The current time is 11:33. Please proceed.
20 BY MR. STEELMAN:
21 Q. Ms. Haden, I've handed you what's been
22 marked as Plaintiff's Deposition Exhibit 4, which is
23 a damage complaint filed by Mr. Anderson against
24 Monica Daniel, now Monica Daniel Hutchison, and
25 Mildred Williams. Have you ever seen this document

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 29

1 before today?
2    A. Not that I can recall.
3    Q. Now, you indicated earlier that you had told
4 Mr. Anderson that you thought the filing of this was
5 a mistake; is that correct?
6    A. Yes.
7    Q. So what was it that you had seen or heard at
8 that time?
9    A. It was all over the paper as far as that
10 goes. I don't remember seeing this per se, but I'm
11 sure I saw various parts of this. Like I said, it
12 was all over the paper and, at this time, Monica and
13 I were still friends and we were still speaking and
14 she was livid about it. And I can't say that I blame
15 her, but --
16    Q. And this was in May of 2006; does that sound
17 about right? I know you don't have the exact memory
18 of the date.
19    A. Somewhere around there, yes.
20    Q. I want to go through some of these
21 allegations. If you go down to Paragraph 4 -- but
22 let me back up for a second, I need a few more
23 preliminary questions. Do you know Mildred Williams,
24 who's named as a defendant?
25    A. Yes.

Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

## Page 30

1    Q. And how well -- how do you know Mildred
2 Williams?
3    A. I've known Millie since I was probably seven
4 years old.
5    Q. Are you and Millie friends?
6    A. We used to be.
7    Q. And when you say "used to be," does that
8 mean you're not now?
9    A. I really don't know. I really don't know
10 how to answer that question.
11    Q. And why is that?
12    A. Sometimes she's friendly, sometimes she's
13 not.
14    Q. When did your relationship with Millie
15 change?
16    A. Probably when I cut Monica off as being any
17 sort of a friend to me.
18    Q. And when did you cut Monica off?
19    A. It would probably be around February/March,
20 after she was fired or quit or whatever happened
21 last.
22    Q. So that would be February or March of 2006?
23    A. I suppose so. I don't really remember what
24 year. Yes, because my son was born in 2005 and he
25 was over a year old.

Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

## Page 31

1    Q. Well, to put it into context, you're talking
2 about within a couple of months after she left the
3 Texas County Prosecutor's Office?
4    A. Yes.
5    Q. Now, you said she was fired; is that right?
6    A. I think she was -- she walked out once and
7 was fired once, but I can't remember which -- what
8 came first. Kinda like the chicken and the egg.
9    Q. Who told you she was fired?
10    A. Well, I'm sure she did.
11    Q. Did Mr. Anderson ever tell you she was
12 fired?
13    A. No.
14    Q. And so that I understand, she could have
15 been referring to the -- do you recall, she left the
16 office at one time, sometime early in December of
17 2005, and came back before leaving the office for the
18 final time --
19    A. Yes.
20    Q. -- late in December of 2005.
21    A. Yes.
22    Q. So when she said she was fired, it could
23 have been the first time she left the office or the
24 second time?
25    A. One of those two times, yes.

Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

## Page 32

1    Q. Okay. Now, going to Paragraph 4 -- and
2 these are the allegations made by Mr. Anderson. And
3 working in the legal field for Mr. Eidson, you're
4 aware that these -- the complaint is drafted up and
5 signed by a lawyer, and in this case by Mr. Anderson
6 representing himself, basically.
7    A. Yes.
8    Q. Okay. Now, Paragraph 4 says that such
9 malignant, libelous, and slanderous conduct by said
10 defendants -- and that's referring to Monica Daniel
11 and Mildred Williams -- has included -- and I want
12 you to look at 4-A -- conspiring with each other to
13 disseminate false information that Plaintiff, Michael
14 R. Anderson, made continuing comments during a series
15 of telephone calls made to the home phone of
16 Defendant Monica Daniel on or about December 18,
17 2005. Do you see that?
18    A. Yes.
19    Q. Now, I want to ask a couple specific --
20 well, let me ask this question. Did you give Mr.
21 Anderson information indicating that the allegations
22 in 4-A were true?
23    A. Not that I can recall.
24    Q. Okay. Now, have you ever heard the
25 telephone recording?

Joann Renee Richardson
    * 573-699-4110 * St. James, Missouri *

8 (Pages 29 to 32)

Case 6:09-cv-03018-RED   Document 236-10   Filed 11/24/10   Page 5 of 8

Page 41

1 Q. Okay. Can you, as specific as possible,
2 recognizing that it's been several years, tell me,
3 did she bring it up first, asking your opinion?
4 A. Yes.
5 Q. Okay. And then tell me, what did she say,
6 and then I'll ask you what you said in response.
7 A. I can't remember exactly what she said. She
8 said she felt intimidated by Mr. Anderson and that he
9 had been making sexual comments to her. And she
10 brought up the sexual harassment suit, which I told
11 her would be the worst mistake she ever made in her
12 life.
13 Q. And did you go into details as to why that
14 was so?
15 A. Yes, I did, because I've been through a
16 sexual harassment suit on a federal level while I was
17 in the military and they will dredge up every affair
18 she's ever had with every married man she's ever had,
19 every affair she's ever had period. They would drag
20 her through the mud. They would basically make her
21 life a living hell.
22 Q. And you expressed this to her?
23 A. Yes, on several occasions.
24 Q. Let me back up just so that I understand.
25 Did you file a sexual harassment claim when you were

Page 42

1 in the military, or were you the --
2 A. No, I was a witness.
3 Q. Oh, you were a witness, okay. And was it a
4 friend of yours who filed the claim?
5 A. It was a co-worker that filed the claim.
6 Q. And did you testify on behalf of the
7 co-worker or on behalf of the --
8 A. I didn't testify. I wrote a statement out.
9 Q. Okay. And was your statement on behalf of
10 the person who claimed to have been harassed, or was
11 it on behalf of the employer?
12 A. It was on the person who filed the claim.
13 Q. Would you say on their behalf, saying that
14 they were harassed?
15 A. Yeah. Yes. We were all harassed, yes.
16 Q. Okay. When were you in the military, ma'am?
17 A. I was in the military -- I went in July of
18 1991 until December, the end of December of 1993. I
19 got out on a honorable discharge for child birth.
20 Q. And how long have you been married to your
21 present husband?
22 A. My present husband?
23 Q. Or maybe your only husband. I should have -
24 - how many times have you been married? Let me ask
25 that first.

Page 43

1 A. I've been married twice.
2 Q. Okay. When did you and Mr. Haden -- or what
3 is his rank again?
4 A. Corporal.
5 Q. Corporal Haden become married?
6 A. October 25th, 2002.
7 Q. Okay. Anything else about when you went to
8 Monica's house to talk about -- and this discussion
9 or argument, whichever it was, whether or not she
10 should take any legal action against Mike Anderson?
11 A. No, that about sums it up and I left.
12 Q. Now, were you all still friends at this
13 time?
14 A. Strenuously, yes. She was more like a
15 sister to me than a friend. You put up with an awful
16 lot out of your sisters, a lot more than you put up
17 with out of your friends.
18 Q. Now, let me go back. Did you ever tell or
19 talk to Mr. Eidson about what you heard on the taped
20 phone conversation?
21 A. Yes.
22 Q. And when did you talk to him about that?
23 A. Probably a day or two afterwards.
24 Q. Okay. And do you remember what you said to
25 Mr. Eidson at that time?

Page 44

1 A. No, I don't.
2 Q. Okay. Did Mr. Eidson say anything to you at
3 that time that you remember?
4 A. I can't recall a specific conversation.
5 Q. Now, I want to go to -- I'm sorry, am I
6 accurate when I say, though, that you did not talk to
7 Mr. Anderson about that meeting or the phone
8 conversation prior to him filing -- or the phone tape
9 recording prior to him filing the lawsuit, which is
10 Exhibit 4?
11 A. I've never discussed that with Mr. Anderson.
12 Q. Okay. Now I want to go to 4-B, where it
13 alleges that Mr. Anderson alleged that Monica Daniel
14 Hutchison and Mildred Williams conspired with each
15 other to disseminate false information that
16 Plaintiff, Michael R. Anderson, made comments of a
17 sexual nature during a series of telephone calls made
18 to the home of Defendant Monica Daniel on or about
19 December 18, 2005. Can you see that?
20 A. Yes.
21 Q. Now, again, from what your earlier answer
22 was -- and I want you to correct me if I'm wrong -- I
23 assume, then, you did not give to Mr. Anderson any
24 evidence or statements supporting allegation 4-B
25 prior to Mr. Anderson filing his lawsuit on May 31,

## Page 117

1  Harris and Mr. Franklin asked you to put them in a
2  form that I can present them to the court. Is that
3  agreeable?
4      A. That's fine.
5      Q. The day after Mr. Anderson went to Monica's
6  house in the early morning hours and left the
7  recorded conversation, she called you; is that right?
8      A. Yes.
9      Q. And she was in tears when she called you; is
10 that correct?
11     A. Yes.
12     Q. And she told you that she was upset; is that
13 correct?
14     A. Yes.
15     Q. And she told you that she was afraid of Mr.
16 Anderson; is that correct?
17     A. Yes.
18     Q. Now, you talked to her about whether or not
19 she should take any legal action against Mr.
20 Anderson; is that correct?
21     A. Yes.
22     Q. Now, at that time you told her that she
23 should not file any sort of sexual harassment case
24 because you had an idea of what she'd be getting
25 herself into; is that accurate?

## Page 118

1      A. Yes.
2      Q. And, in fact, you yourself had been a
3  witness in a military claim filed by someone for
4  sexual harassment; is that accurate?
5      A. Yes.
6      Q. And you have been the victim of sexual
7  harassment yourself while in the military; is that
8  correct?
9      A. Yes.
10     Q. And what you told her was, when you file a
11 sexual harassment case, you can expect the defense to
12 drag out every bit of your private sexual life, any
13 affair you had, any relationships you've had, and put
14 them out in the open; is that right?
15     A. Yes.
16     Q. Now, from your own experience, that's not
17 fun, is it?
18     A. Well, being as how mine had nothing to do
19 with sex, it just had to do with the way I was
20 treated as a pregnant naval personnel under a chief
21 that was just rude and hateful. But I had seen other
22 cases where that was done, yes.
23     Q. Now, sexual harassment is about power as
24 much as sex. You'd agree with that, wouldn't you?
25     A. Oh, yes.

## Page 119

1      Q. In fact, some people think sexual harassment
2  is a lot more about power than sex. Would you argue
3  with that?
4      A. To a certain extent.
5      Q. Okay. You would argue, or to a certain
6  extent you agree?
7      A. To a certain extent, I would agree.
8      Q. Okay. Now, you talked about the
9  father/daughter type relationship between Mr.
10 Anderson and Monica. Is that a fair statement?
11     A. Yes.
12     Q. Now, at some point, Mr. Anderson started to
13 change that relationship, didn't he? Well, let me
14 ask you some specifics.
15     A. Not that I'm aware of.
16     Q. Let me ask you some specifics. You are
17 aware of a note being passed by Mr. Anderson -- and
18 you've heard this story -- in open court, which was a
19 name when pronounced said, "Hey, would you blow me."
20 You've heard about that, haven't you?
21     A. I don't know what the note said. I just
22 know he passed her a note that pissed her off.
23     Q. Okay. If he did, in fact -- and just assume
24 that Mr. Anderson has admitted to this -- pass her a
25 note in open court that said, "Hey, would you blow

## Page 120

1  me," would you agree that is not a father/daughter
2  relationship?
3      A. Yes, I would.
4      Q. Okay. In addition, you've heard about an
5  incident that occurred at the lake between Mr.
6  Anderson and Monica; is that correct?
7      A. Yes.
8      Q. And even Christie said, in addition to
9  Monica acting inappropriately, that Mr. Anderson
10 acted inappropriately; is that correct?
11     A. Yes.
12     Q. Then you are aware, of course, that Mr.
13 Anderson came to Monica's house in the early morning
14 hours of December 18th, 2005, aren't you?
15     A. Yes.
16     Q. And you've heard that tape, haven't you?
17     A. Yes, I have.
18     Q. And on that tape, Mr. Anderson was obviously
19 intoxicated; would you agree?
20         MR. FRANKLIN: Objection, misstates
21 testimony.
22         MR. HARRIS: We've been down this
23 road.
24         MR. FRANKLIN: We've been down this
25 road for about an hour.

Page 125

1  remove criminal investigative documents from those --
2  from the prosecutor's office. You read that;
3  correct?
4      A. Yes, I read that. Correct.
5      Q. Now, again, you thought this was a mistake
6  for Mr. Anderson to file this, didn't you?
7      A. Yes, I did.
8      Q. You thought it was wrong for a prosecutor to
9  use the power of his office to allege a removal of
10 criminal investigative documents?
11     A. Without concrete --
12         MR. HARRIS: I'm going to object, that
13 assumes facts not evidence. That was not filed in
14 his capacity as prosecuting attorney. It was filed
15 by him individually as an attorney and as an
16 aggrieved person. It was not filed in his capacity
17 as prosecuting attorney.
18 BY MR. STEELMAN:
19     Q. Go ahead, ma'am.
20     A. Without concrete facts, I don't think it
21 should have been put into a petition without concrete
22 facts.
23     Q. Now, you also know that he was able, as
24 prosecutor, to get a subpoena issued, or what's
25 called a criminal investigative demand, issued in a

Page 126

1  case where he claimed he was the victim. Is that
2  right?
3      A. Yes.
4      Q. And you were made aware of that, weren't
5  you?
6      A. Yes.
7      Q. And you were shocked by that, weren't you?
8      A. Yes.
9      Q. You don't have to be a lawyer. Anyone in
10 the legal system knows that it was totally improper
11 for Mr. Anderson to use the power of his office to
12 seize evidence in this case?
13         MR. HARRIS: I object; argumentative.
14         MR. FRANKLIN: Also calls for a legal
15 conclusion.
16         MR. HARRIS: Assumes facts not in
17 evidence.
18 BY MR. STEELMAN:
19     Q. Would you agree, ma'am?
20     A. I agree with them that it calls for a legal
21 -- I'm a legal secretary. I'm not a --
22     Q. That's okay, you may not have an opinion.
23     A. I have no opinion on that.
24     Q. But you were shocked, weren't you?
25     A. I was shocked, yes.

Page 127

1      Q. Why were you shocked?
2      A. I was shocked that the judge signed it.
3      Q. And why?
4      A. Because I was.
5      Q. Well, what shocked you?
6      A. The fact that the judge was willing to get
7  involved in a subject matter like that.
8      Q. Where Mr. Anderson requested it?
9          MR. FRANKLIN: Objection, asked and
10 answered.
11 BY MR. STEELMAN:
12     Q. Go ahead, ma'am.
13     A. To clarify my answer a little bit more, I
14 was shocked that the judge would put himself in a
15 personal pissing match between Monica and Mike.
16     Q. Did you -- well, with your experience with
17 harassment, again, you would agree it's about power
18 quite a bit of the time, wouldn't you?
19     A. Oh, yes.
20     Q. And did it really shock you that someone
21 would side with the powerful person in the office?
22     A. Well, Monica thought she was the powerful
23 person in the office. Monica was shocked at it
24 because she couldn't believe the judge went against
25 her.

Page 128

1      Q. Do you think Monica had as much power in the
2  issuing of subpoenas --
3      A. I think Monica --
4      Q. Let me finish my question. Do you think
5  Monica had as much power in the issuing of a criminal
6  investigative demand as Mr. Anderson?
7      A. I think Monica thought in her mind she did.
8      Q. That's not my question. Do you think --
9      A. That's my answer.
10     Q. But that's not my question. You have to
11 answer my question, ma'am. Do you think that Monica
12 had the same amount of authority and power to issue a
13 criminal investigative demand as Mike Anderson, the
14 Prosecuting Attorney of Texas County?
15     A. No.
16     Q. And you believe that that power should be
17 exercised fairly and objectively, don't you?
18     A. Yes, I do.
19     Q. Now, ma'am, the opinion and the impression I
20 have is that you resent Monica filing the lawsuit.
21 Is that an accurate statement?
22     A. I resent Monica filing the lawsuit because I
23 resent the fact that Monica's doing this because
24 Monica didn't get her way. I resent the fact that
25 Monica is trying to destroy people's lives because

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

32 (Pages 125 to 128)