IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MONICA DANIEL HUTCHISON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>TEXAS COUNTY, MISSOURI; MICHAEL)<br>R. ANDERSON, TEXAS COUNTY )<br>PROSECUTING ATTORNEY; and )<br>MICHAEL R. ANDERSON, )<br>Indivually, )<br>)<br>Defendants. ) | Case No. 09-3018-CV-S-RED<br><br><br><br><br><br>August 25, 2009<br>Houston, Missouri |

VIDEOTAPED DEPOSITION OF MICHAEL ROY ANDERSON,

a Defendant, produced, sworn and examined on the 25th day of

August, 2009, between the hours of 8 a.m. and 5 p.m. of that

day, at Texas County Courthouse, 519 North Grand, City of

Houston, County of Texas, before

JOANN RENEE RICHARDSON, CCR
Certified Court Reporter
20051 State Route B
St. James, Missouri 65559

in the above-entitled cause, pursuant to Notice to Take

Video Deposition, on the part of the Plaintiff.

Joann Renee Richardson

\*   573-699-4110   \*   St. James, Mi

1  Q. So you did have this discussion about
2  married police officers with her?
3  A. To that extent. I told her that I knew,
4  had heard what was going on. That's what I remember.
5  Q. And tell me again, because we'll get to the
6  petition later. But the fact that it was married
7  police officers, her relationship -- you had heard
8  she had a relationship with married police officers
9  that you thought made it look badly for you or badly
10 for the prosecutor or what?
11 A. Well, let me explain how I felt about this
12 and how I still feel about it. Monica was single.
13 If she had been dating, she could date anyone she
14 wanted. If she were dating a married man, that's her
15 business. If she were dating police officers, that's
16 her business.
17    But to be dating married police officers
18 where she had a secret on them and they had a secret
19 on her would jeopardize the workings of that office,
20 would undermine the integrity of that office.
21    Mr. Steelman, we had a situation here about
22 20 years ago that I heard about where two
23 conservation agents were dating a girl in the
24 prosecutor's office that ended up in a running gun
25 battle through the streets of Houston.

1  I did not see anything good coming out of
2  her having affairs with married police officers that
3  worked in our office. I thought that that would be a
4  conflict, for one thing, a conflict with her job and
5  a conflict for me. It would be a conflict for the
6  officers.
7    And I was concerned at that time whether or
8  not I was going to have to report it to the officers'
9  superiors and possibly have them fired. I was very
10 concerned about it, and I still am.
11 Q. And you would never do anything to
12 encourage that; is that right?
13 A. No, sir.
14    MR. HARRIS: Encourage what?
15 BY MR. STEELMAN:
16 Q. A relationship between Monica and a married
17 police officer; is that right?
18 A. No, sir.
19 Q. Okay. And this was all in the first week
20 of December; is that right?
21 A. That's when I had my conversation with her.
22 I had known about it for about a week and a half, two
23 weeks.
24 Q. And in the second week of December, did you
25 agree that one of those married police officers

1  should go to her and talk her into coming back to the
2  prosecutor's office?
3  A. Yes.
4    MR. HARRIS: I'm going to object, it
5  misstates his testimony.
6  BY MR. STEELMAN:
7  Q. That did not misstate your testimony, did
8  it?
9  A. I agreed that he would go ask her. I knew
10 he knew her and I agreed if he'd go ask her if she
11 was interested in coming back.
12 Q. And he's a married police officer; right?
13 A. Yes.
14 Q. And he was one of the ones you were
15 concerned about; right?
16 A. Yes.
17 Q. And you wouldn't do anything to encourage
18 that relationship between them, would you?
19 A. I didn't think that was encouraging a
20 relationship. I thought by then everybody understood
21 that that was not going to be tolerated, even him and
22 her.
23 Q. Did you talk to him about how it wouldn't
24 be tolerated?
25 A. I tried to draw him out and indicate to him

1  that I knew what was going on.
2  Q. And what did he say to you?
3  A. He never admitted anything, but I got the
4  feeling that he understood.
5  Q. Did you tell Mr. Emde of the EEOC that you
6  sent Mr. Kinder to get her back to the office?
7  A. I don't think I used those words. I may
8  have. I knew that he was going to talk to her and I
9  approved of it.
10 Q. This is Exhibit 23. So that I understand,
11 before I start talking about your disclosures, you
12 have never had any sort of sexual relationship with
13 Monica; is that right?
14 A. Never.
15 Q. Okay. And so you're not saying that you
16 did something, but she asked for it. You're saying
17 you didn't ever do anything?
18 A. I never did anything.
19 Q. Okay, I just wanted to make that clear.
20 You're not saying that her behavior led you on to
21 make some advance; correct?
22 A. No, sir.
23 Q. Okay.
24 A. I will say this. Her behavior changed in
25 the last year towards me. I felt that in some

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

19 (Pages 71 to 74)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 2 of 17

## Page 95

1  Q. Did John and you ever discuss Monica prior
2  to October/November, 2005?
3  A. Discuss her in what way? What do you mean?
4  Q. Talk about her sex life.
5  A. We've never talked about her sex life.
6  I've never talked about her sex life. I have talked
7  about her being flirtatious, and I even admonished
8  her for it on a couple of occasions; "Monica, that's
9  not appropriate," but laughed it off.
10 Q. When did you admonish her?
11 A. Once in my office she walked in and pulled
12 her pants down and showed Mr. Garrabrant a tattoo
13 that I had never seen before. And I told her that
14 that was inappropriate, but we laughed it off and she
15 went out.
16 Q. And when was that?
17 A. Probably in the summer sometime of 2005.
18 Q. Okay. Anything else with Mr. Clayton?
19 A. No, sir.
20 Q. Let's see, here's Kinder. You got him on
21 twice.
22 A. That's probably an error.
23     MR. HARRIS: That would be a mistake
24 on my part.
25     MR. STEELMAN: I didn't say that.

## Page 96

1  BY MR. STEELMAN:
2  Q. Melissa Dunn?
3  A. Lieutenant Dunn, again, I think I read in
4  one of the reports that she was involved in serving
5  the subpoena on Monica Daniel, but that's not the way
6  I remember it. I don't know if she was or wasn't.
7  Q. Anything else that she knows?
8  A. I did discuss with Lieutenant Dunn --
9  whenever I began to suspect that I had been drugged,
10 I asked her if she knew anything about that type of
11 thing. I asked her to help me investigate it, see if
12 she knew anything about it.
13     I contacted her at one time and asked her
14 to get me mugshots of David Allmany and Charles Tyler
15 Klause because I suspected that they may have been
16 one of the ones that slipped something into my drink.
17 I looked at their mugshots and I didn't recognize
18 them. I still wouldn't know them today if I saw
19 them.
20 Q. Did she do that?
21 A. She got the mugshots for me.
22 Q. So she was involved in the investigation,
23 and if I want to talk to someone about the facts of
24 the investigation, into what you claim was a
25 drugging, Melissa Dunn would be who we'd speak to?

## Page 97

1  A. I spoke to her. I asked for advice. She
2  told me, basically, there wasn't anything much that
3  she could do. I had collected some cigarette butts
4  out of my ashtray in my car, thinking that if I had
5  been drugged, that there might be some evidence on
6  the --
7  Q. My question is, is Melissa Dunn the person
8  that we would talk to or depose regarding your
9  investigation into your claims that you were drugged?
10 A. I discussed it with her, but she never did
11 anything that I'm aware of as far as --
12 Q. Anybody else you discussed it with?
13 A. Brad Eidson.
14 Q. Anybody else?
15 A. Judge Ellsworth whenever I requested the
16 subpoena for the tape.
17 Q. Anyone else?
18 A. Dr. Long, Christopher Long with the
19 University of Missouri Hospital in St. Louis.
20 Q. And was this an official consultation you
21 had with him? Would he have a record of it?
22 A. I don't know if he'd have a record. I was
23 talking to him about another case, a poisoning case
24 where a child had died. We had an 11-month-old
25 infant that had died that had initially been

## Page 98

1  determined to be a SIDS death.
2  Q. And when was this?
3  A. This would have been in -- the death, I
4  think, was spring of 2005. We didn't get the
5  toxicology reports back for several months. When the
6  toxicology reports came back, they indicated that the
7  child had died of lethal levels of Oxycontin.
8  Q. What was the name of this case?
9  A. The case is still open. The mother is
10 charged with manslaughter. The child's name --
11 Q. What's the mother's name?
12     MR. FRANKLIN: I was just going to
13 say, to the extent that you're allowed to --
14     MR. STEELMAN: It's an open file.
15 It's a charged case.
16 BY MR. STEELMAN:
17 A. The case is still open. I can't discuss
18 much more than what I've already said, but I believe
19 her last name is Sullins. It's either Sullins or
20 Hatcher. I had two homicides about the same time
21 and, for some reason, I get those two names mixed up.
22 One was Sullins and one was Hatcher. I believe she's
23 the Sullins.
24 Q. Lieutenant Michael Hood?
25 A. He's a police officer with the City of

        Joann Renee Richardson
   * 573-699-4110 * St. James, Missouri *

25 (Pages 95 to 98)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 3 of 17

1   Q. And so if we request, there's a criminal
2 investigation regarding Monica Daniel and the removal
3 of these documents; is that right?
4   A. Yes, sir.
5   Q. Okay. And did you call the Missouri
6 Attorney General's Office on that?
7   A. Yes, sir.
8   Q. And who did you talk to?
9   A. I sent a letter to Ted Bruce, laid it all
10 out for him, sent him the file, asked him to
11 investigate it. Several weeks later, maybe one month
12 or two months later, I got a call from his
13 supervisor, Andrea Spillers, saying that, number one,
14 whereas she believed that what had happened, it
15 probably happened, that the report had been removed,
16 there was no proof of it; that, by that time, any
17 evidence of a crime regarding Mr. McNew had been
18 destroyed because the car that was wrecked had been
19 returned to the owners, and the City of Licking had
20 sold the patrol car involved and they were not going
21 to do any more to look into this.
22   Q. This is a phone call from Andrea Spillers;
23 correct?
24   A. This is a phone call from Andrea Spillers.
25 I also asked that the attorney general come down and

1 do a sweep of all the computers in my office.
2   Q. Did they do that?
3   A. Yes.
4   Q. And is there a written report on that?
5   A. There's a report indicating that they
6 didn't find anything under the searches that I gave
7 them. And some of the search terms I gave them was
8 removal of files, the name of the victim in this
9 case, closing the office, meet me after work, all
10 these things.
11   Q. How about sex, was that word in the search?
12   A. I've got a list and I don't think it is.
13   Q. Okay. And you have files and lists of all
14 these, because they're not listed by your attorney in
15 your disclosures?
16   A. I have the file that was brought to me by
17 the highway patrol, including photos. I have the
18 letter that I sent to Ted Bruce. And I have the
19 report from the forensics investigator, saying that
20 nothing under the search terms that I requested were
21 found on my computer.
22   Q. And what was the date of your letter to Ted
23 Bruce?
24   A. I don't recall, sir. I have got it.
25   Q. After she left the office?

1   A. Yes. I'm not clear on it. I can't
2 remember, but it is dated. And before I filed my
3 lawsuit.
4   Q. And did you report Millie Williams as
5 having part of this to Ted Bruce?
6   A. No, I didn't think that she was part of
7 that, that coverup.
8   Q. You said she is in your petition.
9   A. Well, I say that she was --
10     MR. HARRIS: I object, that misstates
11 the petition.
12 BY MR. STEELMAN:
13   A. Removal of criminal investigative documents
14 from the Texas County Office to the detriment of
15 Office of Texas County Prosecutor and people of Texas
16 County. Ms. Williams' involvement, I believe, was
17 more the in the way of helping to withdraw subpoenas
18 and that type of thing.
19   Q. Is that what you're talking about in E, 4-
20 E?
21   A. Yes.
22   Q. Now, on 4-F, you talked a lot about this
23 swinger style sex ring, but you also talk about not
24 just the Texas County Prosecutor's Office, but the
25 Texas County Associate Court Office. And what

1 evidence do you have that it was run out of the Texas
2 County Associate Court Office?
3   A. Ms. Williams' involvement.
4   Q. Well, is that just what you testified to
5 earlier, which was basically the Stephanie Creek
6 matter?
7   A. Well, that, and the fact that Monica didn't
8 do much without Millie there at the time.
9   Q. Now, again, you didn't report -- other than
10 the letter to Ted Bruce, you didn't report any of
11 this to Judge Ellsworth or any person prior to filing
12 the lawsuit; is that right?
13   A. I didn't think it would be appropriate to
14 report it to Judge Ellsworth. He may be hearing this
15 case. But to answer your question, no, I didn't.
16   Q. Now, you talked about the damage to your
17 reputation; correct?
18   A. Yes.
19   Q. As to why you filed the lawsuit; correct?
20   A. That and to get them to stop saying the
21 things they were saying.
22   Q. Do you believe damage to reputation is
23 permanent?
24   A. I think it can be rectified.
25   Q. And what can rectify it?

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

35 (Pages 135 to 138)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 4 of 17

## Page 139

1  A. Well, sir --
2  MR. HARRIS: I want to object. Are
3  you talking in the hypothetical sense, or are you
4  talking in the specifics --
5  MR. STEELMAN: I'm talking in the
6  hypothetical sense.
7  MR. HARRIS: I think that calls for
8  speculation.
9  MR. FRANKLIN: Join that objection.
10  THE WITNESS: Do you want me to
11  answer?
12  MR. HARRIS: Go ahead.
13  BY MR. STEELMAN:
14  A. Whenever I filed this lawsuit, I felt that
15  I could salvage my reputation by bringing this to
16  court, the things that had been done, the things that
17  had been said to me. And that if a court of law
18  heard this, saw these facts, saw what these people
19  were up to at the time, that in some ways my
20  reputation could be returned to me. That's why I
21  filed it in court. I felt and still feel that that's
22  where it should be heard.
23  Q. Well, that gets us to the dismissal. You
24  dismissed it; right?
25  A. Yes, sir.

## Page 140

1  Q. How much later after you filed it did you
2  dismiss it?
3  A. I don't know the date. It was dismissed on
4  the advice of my attorney, Cynthia MacPherson.
5  Q. When did you hire her for the case?
6  A. Shortly after I filed the suit, I went and
7  consulted with her.
8  Q. Okay. Why did you dismiss the case?
9  MR. FRANKLIN: Objection,
10  attorney/client privilege. To the extent you can
11  answer without --
12  MR. HARRIS: I agree.
13  MR. FRANKLIN: -- destroying the
14  privilege, you may answer the question.
15  BY MR. STEELMAN:
16  Q. You don't have to say what Cynthia said. I
17  wouldn't ask you what she said.
18  A. We had communications with Ms. Daniel's
19  attorney that they would stop. They would stop
20  making these statements to the press. They would
21  stop saying these is things that --
22  Q. Is this in a letter from anybody?
23  A. It's in a letter from Ms. MacPherson to --
24  is it --
25  Q. Ted Kinde?

## Page 141

1  A. Kinde, from Kinde. We would stop doing --
2  they would stop saying these things about me and
3  making these statements to the press and the public,
4  and that we would let this be handled in the EEOC
5  claim in court, which was the appropriate form. Ms.
6  MacPherson convinced me --
7  MR. HARRIS: Now, don't, Mike, get --
8  THE WITNESS: Well, okay.
9  MR. HARRIS: -- into anything she told
10  you.
11  BY MR. STEELMAN:
12  A. But I believed --
13  Q. You are not waiving the defense -- your
14  privilege with Mrs. MacPherson, are you?
15  MR. HARRIS: No, we are not.
16  MR. STEELMAN: Are you claiming advice
17  of counsel -- you're not claiming advice of counsel
18  as any sort of defense, are you?
19  MR. HARRIS: We're not raising advice
20  of counsel as for the filing of the lawsuit, no.
21  MR. STEELMAN: Okay. That's fine,
22  okay.
23  BY MR. STEELMAN:
24  A. But it was on her advice that I dismissed
25  it and I felt that --

## Page 142

1  Q. Are you going to refile them if you can?
2  A. I don't know.
3  MR. FRANKLIN: Objection,
4  attorney/client privilege regarding, you know,
5  whatever future legal action has been contemplated or
6  has been discussed with counsel.
7  BY MR. STEELMAN:
8  Q. I'm asking you. I don't care what you
9  discussed with counsel.
10  A. I don't know.
11  Q. Do you intend to refile these cases?
12  A. Do I intend right now? I don't know. I
13  haven't decided. I wouldn't decide that until I
14  consulted with my attorneys.
15  MR. STEELMAN: Can we take a quick
16  break?
17  MR. WATERS: Current time is 1616.
18  We're now going off record.
19  (Off the record.)
20  
21  (Back on the record.)
22  MR. WATERS: The current time is 1624.
23  We're now back on record. Please proceed.
24  BY MR. STEELMAN:
25  Q. Paragraph 8 says that the conspiracy has

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

36 (Pages 139 to 142)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 5 of 17

deprived you of the benefit of public confidences and social associations. What public confidences and what social associations were you deprived of?
A. Public confidence is, I think, pretty obvious in that the things that they were saying about me would erode public confidence in me as a prosecutor.
Q. What thing, specifically?
A. Well, they were saying that I had made threats; that I had demanded sexual favors; that I had threatened to kill them. Those type things certainly would undermine public confidence.
Q. Can you tell me specifically, though? Are you talking about public confidence in general? Do you have any social associations, any public opportunities that were lost? Anything in specific?
A. Again, sir, I was up for reelection for one thing.
Q. Well, see, that's what I'm talking about, just so you answer my question. You can't say it cost you reelection because you were reelected. What did it cost you? What specifically were you cost?
MR. HARRIS: Well, I want to object to the form of the question in that it's misleading because at the time the petition was filed -- I mean,

we're looking at it hindsight at the time the petition was filed, so I think the question needs to be clear as to what period of time you're referencing. Are you talking about the date at the time of petition was filed, or are you talking about today?
BY MR. STEELMAN:
Q. At the time your petition was filed, you said you were deprived of the benefit of public confidence and social associations. What were you referring?
A. Well, sir, I am an attorney. Whether I run for prosecutor again or go back to private practice, these type of things, these type of allegations would be harmful to me. Public confidence in me as an attorney. Public confidence in me as an elected official. Public confidence in me as a prosecuting attorney. These things -- I think anyone would agree, if these things were being said about you, they are harmful.
Q. And I'm not disagreeing. Do you have any specific examples that you can tell me about?
A. The things I mentioned, the claims that I had threatened them.
Q. Oh, no, specific examples of how you were

damaged --
MR. FRANKLIN: Objection --
Q. -- on social associations?
A. Yes, sir.
Q. Okay, give me a specific example.
A. For probably a year, year and a half after this, my wife and I rarely left the house. I quit going anywhere that I might be in public, because everywhere I went people would either come up and want to talk about this, or they would see me coming and walk away. Friends of mine were embarrassed by it.
Q. Are you talking about after you filed the lawsuit or before you filed the lawsuit?
A. While these things were being said, when these things were being said about me. That's why I filed the lawsuit.
Q. But I'm talking about the loss of social association. Time period, are you talking about after you filed your lawsuit, or before you filed your lawsuit?
A. I'm talking about when I filed the lawsuit.
Q. You said for a year, year and a half --
A. It's continued.
Q. -- you wouldn't go out in public?

A. It continued.
Q. After the lawsuit?
A. Yes, it continued after the lawsuit.
Q. Okay.
A. And it continues to this day.
Q. Now, after the -- you touched on this briefly and I'm not sure I understand. After you filed the lawsuit, did you issue a press release on the filing of the lawsuit?
A. I was contacted by the Houston Herald. They told me that they had a copy of the lawsuit. I don't know who gave it to them, but they had gotten it from the clerk's office. They wanted to know if I wanted to make a comment. I tried to convince them not to run the article.
Q. And who did you talk to there?
A. Brad Gentry.
Q. So you tried to convince Brad Gentry not to run the article?
A. Yes.
Q. Okay.
A. I told him -- I asked him why he thought this was newsworthy. Why does this have to be in the paper.
Q. Okay.

## Page 147

1    A.  Let the courts handle it. He told me he
2 was going to run a story and he asked me if I wanted
3 to say anything in the story. I made a few comments.
4 I can't remember if I wrote anything out or if I
5 talked to him, but the -- I got an e-mail from him
6 later, saying this is the story that's going to run.
7 I don't remember if he said, "What do you think?" or
8 something to that effect. "Do you have anything you
9 want to add?" And I don't even think I responded.
10 And it came out in the paper the following Wednesday.
11   Q.  Was there anything in those newspaper
12 articles that's inaccurate where you're quoted?
13   A.  I'd have to look at them and see. I don't
14 recall exactly what they say, but I know that I have
15 not seen a single article in this case that I felt
16 was accurate or appropriate. So if you have those
17 articles, I'd be glad to read them and tell you what
18 I think is accurate and what isn't, but I don't have
19 them.
20   Q.  But your testimony is, you didn't issue any
21 press release to any of the newspapers?
22   A.  My recollection is that I was contacted by
23 Brad Gentry. I was told he was going to run a story.
24 I tried to talk him out of it. He asked me if I
25 wanted to put anything in it. I can't remember if I
## Page 148

1 talked to him or if I put something in writing and
2 sent it to him. And he --
3    Q.  Just a minute ago you said you didn't even
4 know if you responded. So did you or did you not
5 respond to Mr. Gentry?
6    A.  I responded whenever he called me. I don't
7 think I responded whenever he sent me the final draft
8 --
9    Q.  Okay.
10   A.  -- and said, "This is what's going to be in
11 the paper. Do you have any changes or what do you
12 think?" Or something to that effect. I don't think
13 I even responded to that --
14   Q.  Okay.
15   A.  -- before it ran in the paper.
16   Q.  Okay, now, my question is -- because that's
17 what I wasn't sure of -- did you or did you not issue
18 a press release out of the prosecuting attorney's
19 office regarding the filing of the complaint?
20       MR. FRANKLIN: I'm going to object,
21 that's been asked and answered about three different
22 times, in three different ways already.
23       MR. STEELMAN: The mere fact that he
24 may have answered it three different ways probably
25 gives me a good reason to reask it. And, by the way,

## Page 149

1 I agree with counsel that you've answered it in three
2 different ways. I want it on the record that he --
3       MR. FRANKLIN: I want it on the record
4 that we agree on something.
5       MR. STEELMAN: -- and I agree
6 completely on that.
7 BY MR. STEELMAN:
8    A.  My recollection of what happened is what I
9 just told you. I was contacted by Brad Gentry. I
10 was told he was going to publish a story, that he had
11 received a copy of the petition. I tried to talk him
12 out of it. I asked him why this was newsworthy or
13 why it needed to be in the paper.
14       He said that it was, wanted to know if I
15 had anything I wanted to put in the article. I may
16 have written something out and sent it to him, or I
17 may have given him some quotes. I know whenever he
18 later e-mailed me what was going to be in the paper,
19 there was some quotes from me in it and that's what
20 ran in the paper.
21   Q.  Very specific question. Did you or did you
22 not issue a press release out of the prosecuting
23 attorney's office on the filing of your petition
24 against Monica and Millie?
25   A.  I don't recall.

## Page 150

1    Q.  Okay.
2       (PLAINTIFF'S EXHIBIT NO. 5 WAS MARKED
3 FOR IDENTIFICATION.)
4    Q.  Let me show you what's been marked as
5 Exhibit 5 and would you tell me whether or not that
6 is your signature at the bottom?
7    A.  Yes, sir.
8    Q.  Okay. So that is your signature?
9    A.  Yes, sir.
10   Q.  Now that you have Exhibit 5 in front of
11 you, can you tell me if you recall whether or not you
12 issued a press release out of the office of the
13 prosecuting attorney regarding the filing of the
14 lawsuit?
15       MR. HARRIS: I'm going to object to
16 the form that -- or to the question to the extent you
17 say it was out of the office of the prosecuting
18 attorney. I think --
19       MR. STEELMAN: Well, that's a good
20 question.
21       MR. FRANKLIN: I'm going to object and
22 say that the document speaks for itself. It
23 indicates that's the contact person.
24       MR. STEELMAN: Yeah, we will agree on
25 that, too, that the document speaks for itself and it

## Page 151

1  was from Michael R. Anderson, Texas County
2  Prosecutor. Can we all stipulate to that?
3      MR. HARRIS: That's what it says.
4  BY MR. STEELMAN:
5    Q. Now, can you tell me, do you recall issuing
6  this press release?
7    A. I sent this to Brad Gentry after he
8  contacted me and asked for comments. It's titled
9  "Press Release" at the top. I don't recall if I sent
10 it to any other agencies. Normally when I send out a
11 press release, I have a whole list of news agencies
12 it goes to. We fax them out.
13     I don't think this was sent anywhere but to
14 Brad Gentry, and it was in response to his questions
15 about whether I had anything I wanted to say. And it
16 is titled "Press Release" because that's the form I
17 have on my computer. Whenever I communicate with the
18 media, I use the press release form.
19   Q. So you typed this yourself?
20   A. I believe so. Well, yes, sir, I typed it
21 myself.
22   Q. Now, at the bottom of this you say that I
23 want to assure the people of Texas County that this
24 action was taken after careful consideration and in
25 the ernest hope that bringing the truth to light is

## Page 152

1  always better than rumor and innuendo; correct?
2    A. Yes, sir.
3    Q. And is that the reason you filed the
4  lawsuit?
5    A. One of the reasons. And as I said before,
6  to get them to stop spreading the rumors.
7    Q. So is this accurate, that the reasons that
8  you've given for filing the lawsuit are, one, for
9  damages; right?
10   A. Yes, sir.
11   Q. Collect money damages from Millie and
12 Monica; correct?
13   A. Yes.
14   Q. I believe your terms were a substantial
15 sum; is that correct?
16   A. Yes.
17   Q. Two was to stop them from making
18 statements?
19   A. Yes.
20   Q. Okay. And, three, was to bring it all out
21 into the light; correct?
22   A. Yes, sir.
23   Q. So you did file this lawsuit to publicize
24 it; is that correct?
25   A. I filed it with the court and I expected by

## Page 153

1  bringing it to light would be in court, at a hearing.
2    Q. Now, after the plaintiffs or after Millie
3  and Monica -- or after Monica's suit -- I'm sorry,
4  let me re-ask this. I butchered that. After
5  Monica's suit, you made further statements to the
6  press; is that correct?
7      MR. HARRIS: After Monica's suit, are
8  you referring to this case that we're here about
9  today?
10     MR. STEELMAN: Yes. Yes. Yes.
11 BY MR. STEELMAN:
12   A. I don't think I have, Mr. Steelman, but I
13 could be wrong. I don't remember. I haven't been
14 talking to the press for quite a while.
15     (PLAINTIFF'S EXHIBIT NO. 10 WAS MARKED
16 FOR IDENTIFICATION.)
17   Q. This is Exhibit 10 and it's one article out
18 of the Houstonherald.com.
19     MR. FRANKLIN: Can you give me a
20 moment to read this? Which exhibit was it?
21     MR. STEELMAN: Ten.
22     MR. FRANKLIN: Ten.
23 BY MR. STEELMAN:
24   Q. And what it says -- and I'm going to -- it
25 has one line in here that I'm going to show you. On

## Page 154

1  the fifth paragraph down, it quotes you as saying,
2  "These are the same claims investigated by the Equal
3  Employment Opportunity Commission and Department of
4  Justice. Those investigations found no basis for a
5  claim then, and nothing has changed, Anderson said on
6  Tuesday. Those are false claims made by a
7  disgruntled former employee trying to make a profit."
8  Is that an accurate quote of what you said to the
9  press?
10   A. I believe I did say that to Mr. Gentry.
11   Q. Okay.
12   A. That would have been in January of this
13 year, yes.
14   Q. Okay. Now, why did you make the statement
15 that these are the claims investigated by the Equal
16 Employment Opportunity Commission and that that
17 investigation found no basis for a claim?
18     MR. HARRIS: Let me just object, the
19 document speaks itself. And I believe in your
20 question you misstated his quote, because he says the
21 EEOC and the Department of Justice.
22 BY MR. STEELMAN:
23   Q. Okay. Why did you say those investigations
24 found no basis for a claim?
25   A. That was my understanding of their

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

39 (Pages 151 to 154)

Joann Renee Richardson
Case 6:09-cv-03018-RED Document 236-12 Filed 11/24/10 Page 8 of 17

1  that's what he just said was. I mean, he's the one
2  who wanted to elaborate.
3       MR. HARRIS: But you still can't
4  inquire.
5       MR. STEELMAN: Well, I can if he's
6  just trying -- if he's trying to use as an excuse --
7       MR. HARRIS: No. No.
8       MR. STEELMAN: -- for his statement to
9  the EEOC --
10      MR. FRANKLIN: He has not made any
11 statement that any comment from his attorney was an
12 excuse for --
13      MR. STEELMAN: Well, that's what I'm
14 asking him. That's what I'm asking him.
15 BY MR. STEELMAN:
16    A.   Mr. Steelman, I'm not trying to make any
17 excuse. I'm trying to tell you the truth. I'm
18 trying to tell you my understanding of what the EEOC
19 found was, that there was nothing that they were
20 going to proceed on.
21    Q.   And why is that your understanding? That's
22 what I'm asking you.
23    A.   Because they did not proceed.
24    Q.   So you made the statement to the paper that
25 there was -- that they found no basis to Monica's

Page 160

1  suit or claim based simply upon your understanding of
2  what the EEOC did?
3       MR. FRANKLIN: Objection, asked and
4  answered.
5       MR. STEELMAN: Yeah, that's a bad
6  question.
7  BY MR. STEELMAN:
8     Q.   Were you aware they'd found reasonable
9  cause?
10    A.   I had never seen this.
11    Q.   Okay. That's my question. Were you aware
12 that they had found reasonable cause?
13    A.   No, sir.
14    Q.   Okay. So would you agree now that the
15 statements you made to the Houston Herald was
16 incorrect?
17      MR. FRANKLIN: Objection, asked and
18 answered. I'm also going to object to say it calls
19 for a legal conclusion as to his understanding of
20 Title 7 of the Civil Rights Act of 1964 and The
21 Missouri Human Rights Act, as well as any other
22 federal or state employment discrimination statutes
23 that may have been rolling around in his head at the
24 time he made the statement.
25      MR. HARRIS: Well, I guess I'll object

Page 161

1  it's vague and ambiguous because there's several
2  statements contained in there --
3       MR. FRANKLIN: Also making it a
4  compound question.
5       MR. HARRIS: -- as to which ones are
6  false or which ones are true. That's a late-day
7  objection.
8  BY MR. STEELMAN:
9     Q.   Go ahead, Mr. Anderson.
10    A.   I don't recall the question, sir.
11    Q.   Do you -- you have the article from the
12 Houstonherald.com in front of you. What's that
13 marked? What exhibit number?
14    A.   Ten.
15    Q.   Can I see that for just a second? And you
16 see where it quotes you as saying, "These are the
17 same charges investigated by the Equal Employment
18 Opportunity Commission and the Department of Justice.
19 Those investigations found no basis for a claim then,
20 and nothing has changed." Do you see that quote
21 attributed to you?
22    A.   Yes.
23    Q.   And you have stated earlier that that is an
24 accurate quote; correct?
25    A.   That was my understanding of their

Page 162

1  findings.
2     Q.   And you now have in front of you Exhibit 11
3  that states that eval -- it's a determination and
4  it's states that evaluation of the evidence reveals
5  reasonable cause to believe Charging Party's
6  allegations are true. You have that in front of you;
7  correct?
8     A.   Yes.
9     Q.   Now, with both of those in front of you,
10 did you make a statement to the Herald.com regarding
11 Monica's lawsuit that was incorrect and inaccurate?
12    A.   When I made this statement, I believed it
13 to be truthful.
14    Q.   Okay. And what did you do -- what
15 investigation did you undertake to determine if that
16 was a truthful statement when you made it?
17    A.   I had been informed and --
18    Q.   By who?
19    A.   I don't remember if it was -- it would have
20 been through the process, whatever, that there were
21 no claims being pursued by the EEOC or the Department
22 of Justice. That's what I based my belief on. If I
23 investigate a case and I don't file charges on it,
24 it's usually because I didn't find probable cause.
25 When the EEOC investigated and the Department of

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

41 (Pages 159 to 162)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED  Document 236-12  Filed 11/24/10  Page 9 of 17

## Page 163

1  Justice investigated and did not file charges on me,
2  my understanding of that process is because they did
3  not find probable cause.
4    Q.  And I'm just asking, why is that your
5  understanding? Did you have a reasonable basis to
6  believe this, or did you just think you knew
7  something you didn't know?
8    A.  I --
9      MR. FRANKLIN: It calls for a legal
10 conclusion as to the term "reasonable basis." If
11 you're going to define, I mean --
12 BY MR. STEELMAN:
13   Q.  Well, just tell me, did you know --
14   A.  I reached that --
15   Q.  -- or did you not know?
16   A.  I reached that decision as a lay person --
17   Q.  Okay.
18   A.  -- based on what I saw.
19     MR. WATERS: The current time is 1646.
20 We're now going off record.
21     (Off the record.)
22
23     (Back on the record.)
24     MR. WATERS: We're now back on the
25 record. The current time is 1654. Please proceed.

## Page 164

1     (PLAINTIFF'S EXHIBIT NO. 13 WAS MARKED
2  FOR IDENTIFICATION.)
3  BY MR. STEELMAN:
4    Q.  Now, I'm also going to show you what's been
5  marked Exhibit 13, which is the notice of Right To
6  Sue, and I have got a couple of specific questions on
7  that. At the bottom it copies Mr. Harris, who is
8  here today, and the Texas County Prosecuting
9  Attorney's Office. And I don't know, did the Texas
10 County Prosecuting Attorney's Office get a copy of
11 this? Did you ever see this before?
12   A.  I believe I have seen this.
13   Q.  Okay. All right, look at the first
14 paragraph. Do you see the first paragraph?
15   A.  Yes.
16   Q.  Read the second sentence in the first
17 paragraph.
18   A.  This should not be taken to mean the
19 Department of Justice has made a judgment as to
20 whether or not your charges are meritorious.
21   Q.  And had you seen that before you made the
22 statement to the Houston Herald?
23   A.  I don't know when I saw it, but I had seen
24 this.
25   Q.  So you don't know; is that right?

## Page 165

1    A.  Well, I don't know when I saw it.
2    Q.  You don't whether you had seen it or not
3  when you made this statement to the EEOC?
4    A.  No, sir, I don't know.
5      MR. HARRIS: What's the exhibit?
6      MR. FRANKLIN: Thirteen.
7      MR. HARRIS: Thirteen.
8  BY MR. STEELMAN:
9    Q.  All right, let me get my exhibits back from
10 you, Mr. Anderson, before I lose them all. Go ahead
11 and keep Exhibit 1 there. Okay, I want to talk about
12 the subpoena, if I can figure out where I've got
13 that.
14     (PLAINTIFF'S EXHIBIT NO. 15 WAS MARKED
15 FOR IDENTIFICATION.)
16   Q.  I'm going to show you what I have marked as
17 Exhibit 15 and it's entitled "Subpoena," signed by
18 Judge Ellsworth and you as the requesting party.
19 Could you identify that, please?
20   A.  It looks to be a copy of a subpoena that I
21 prepared, or it may be the original. I'm not sure.
22   Q.  Okay. And tell me, what did you say to
23 Judge Ellsworth to persuade him to sign this
24 subpoena?
25   A.  The first time I took the subpoena to him,

## Page 166

1  he refused it. My argument to him --
2    Q.  May I ask what day that was on?
3    A.  I don't know, sir. It was not long after
4  my discussion with Dr. Long, but I don't remember the
5  exact date.
6    Q.  Okay.
7    A.  I told him that I --
8    Q.  Let met ask you this. Can we agree that it
9  was between December 18th and December 23rd?
10   A.  Well, it was signed December 23rd, so yes.
11   Q.  Okay. And so your discussion with Dr. Long
12 was between December 18th and December 23rd?
13   A.  Yes, sir.
14   Q.  Okay. And then you requested the subpoena
15 to be issued and he turned you down; right?
16   A.  Yes.
17   Q.  And what did you say to him, then?
18   A.  I told him that -- before he turned me down
19 I made my argument, as I do with any subpoena. I go
20 to a judge and they tell me, "Why do you need this?"
21 I explain to them why I need it. I told him that I
22 was beginning to believe that I may have been a
23 victim of an assault; that I had been drugged; and
24 that I had talked to a doctor who told me that if he
25 had a copy of a person on these type drugs and a

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

42 (Pages 163 to 166)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED  Document 236-12  Filed 11/24/10  Page 10 of 17

Page 167

1  video of a person on these type drugs, he believed
2  that he could distinguish between alcohol
3  intoxication and intoxication by GHB.
4  Q. And that's Dr. Long?
5  A. Yes.
6  Q. Now, where's he located at?
7  A. I believe it's the University of St. Louis
8  Medical Center.
9  Q. And did you tell him you were talking about
10 yourself?
11 A. No.
12 Q. Okay. But he thought with a tape, or did
13 he need a tape and a video?
14 A. He told me a tape and a video.
15 Q. Okay.
16 A. I presented it to him as a hypothetical,
17 because I had been told, of course, that this tape
18 existed. And I had been told that there was a
19 videotape of me at the Outback bar that night,
20 stumbling around, knocking things over.
21 Q. Who had told you that?
22 A. I believe someone told my wife that. She
23 asked me about it.
24 Q. Who told your wife that?
25 A. I don't know, you'll have to ask her.

Page 168

1  Q. Let's make sure we understand. Was there
2  such a videotape?
3  A. Apparently, there was at one time. But by
4  the time we got to it, it had already been recorded
5  over. It was on a 24-hour loop.
6  Q. And who was that? Who told you it had been
7  recorded over? Who was in possession of it?
8  A. It was in the bar owned by Eddie Worlow. I
9  went to Brad Eidson, who is a friend of mine and an
10 attorney here in Houston. I knew that he knew Eddie
11 Worlow. I asked him if he would ask Eddie if that
12 tape was available. I told him if he needed a
13 subpoena, I'd try to get one, but I was hoping that
14 he would just turn it over.
15 Q. And did Brad talk to him?
16 A. Yes.
17 Q. So Brad Eidson talked directly to Eddie
18 Worlow about this tape?
19 A. That's what he told me.
20 Q. And did Eddie Worlow tell him he saw the
21 tape?
22 A. No, he told him it had been recorded over.
23 Q. But had he seen the tape?
24 A. I don't know.
25 Q. Who's a witness to that tape?

Page 169

1  A. I don't know anyone that saw it. I know
2  that my wife was told that there was a tape of me in
3  the bar that night, stumbling around, knocking things
4  over.
5  Q. Well, then, I assume, and correct me if I'm
6  wrong, that somebody, then, had seen the tape and I'm
7  trying to find out who that someone is.
8  A. And I don't know.
9      MR. HARRIS: Assuming it was true.
10     MR. STEELMAN: Well, yeah, assuming
11 that's true.
12 BY MR. STEELMAN:
13 Q. Would your wife know who told her that tape
14 existed?
15 A. She may remember, I don't know.
16 Q. Okay, go ahead.
17     MR. FRANKLIN: Could you restate the
18 question?
19     MR. HARRIS: Is there a question?
20 BY MR. STEELMAN:
21 Q. You were telling me about what you told
22 Judge Ellsworth.
23 A. I went to Judge Ellsworth with this
24 subpoena and I explained that to him. He said, no.
25 And I said, Judge, I believe that as a possible

Page 170

1  victim of a crime, that I have as much right to
2  preserve evidence as any other citizen in the county
3  that would be the victim of a crime.
4      He said, "No, Mike, I'm not going to do
5  it." A day or two days later, after no more
6  discussion, he called me back, said that he had
7  thought about it and that he agreed with me and that
8  he was going to sign the subpoena.
9  Q. So the first time you talked to him was a
10 day or two days before December 23?
11 A. A day, two at the most.
12 Q. Okay. Was there a criminal file open?
13 A. No.
14 Q. It has to be part of -- a subpoena like
15 this must be part of an ongoing investigation; is
16 that right?
17 A. Yes.
18 Q. Okay. What else was done for this
19 investigation? Did you believe you were assaulted?
20 A. Yes.
21 Q. Okay. And so did you ask a special
22 prosecutor to be appointed?
23 A. Not at that point. I knew that I probably
24 would at some point. Right now -- at that point, I
25 was just looking to preserve the evidence and see if

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

43 (Pages 167 to 170)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED Document 236-12 Filed 11/24/10 Page 11 of 17

Page 175

```
 1   correct?
 2       A.  Yes, sir.
 3       Q.  Did you tell them that you subpoenaed it
 4   because you were at a club with a state police
 5   officer who told you about the date rape drug?
 6       A.  I don't recall saying that.
 7       Q.  Have you, in preparation for this
 8   deposition, gone over the notes of Mr. Emde?
 9       A.  No, sir, I don't believe I've ever seen
10   them.
11       Q.  Let me just ask what your position is.  Did
12   you or did you not tell the EEOC investigator that
13   you were at a club with a state police officer?
14           MR. FRANKLIN:  Objection, asked and
15   answered.  You may answer.
16   BY MR. STEELMAN:
17       A.  I don't remember saying that and I don't
18   remember being in a club with a state police officer.
19   It's possible.  I can't think of who that might have
20   been, but I guess it's possible.
21       Q.  Did you ask Monica for the tape prior to
22   the subpoena?
23       A.  Yes.
24       Q.  Did you ask her to destroy the tape prior
25   to the subpoena?
```
Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 176

```
 1       A.  Yes.
 2       Q.  Did you ask her for the tape before you
 3   asked her to destroy it or after you asked her to
 4   destroy the tape?
 5       A.  After.
 6       Q.  So you asked her to destroy the tape first?
 7       A.  Yes.
 8       Q.  And then when was this that you asked her
 9   to destroy the tape?
10       A.  Let me try to reconstruct it in my mind.  I
11   know that I called her and asked her to save the
12   tape.  I think that would have been within two or
13   three days of December 18th.  That was after my
14   discussion with Dr. Long.
15       Q.  And, I'm sorry, you may have said this.
16   Did you have a date when you talked to Dr. Long?  I
17   think you told me no, but --
18       A.  I don't think I know the date.
19       Q.  Okay.
20       A.  But it was within a couple of days.  The
21   18th, if that was a Sunday, then it would have been
22   the following Tuesday or Wednesday, at the latest, I
23   believe.
24       Q.  Okay.
25       A.  That's what I remember.  I believe I wrote
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 177

```
 1   a letter to Monica later, after it was obvious that I
 2   wasn't going to be able to do anything about proving
 3   whether I was drugged or not, that I did ask her to
 4   destroy the tape.  That was also during the time that
 5   I had heard they were playing the tape around at
 6   parties.
 7       Q.  Is that part of the reason you filed the
 8   lawsuit?
 9       A.  No, sir.
10       Q.  Because if they were playing the tape at
11   parties, they weren't misrepresenting the tape at
12   those parties, were they?
13       A.  No, sir.
14       Q.  Now, I want to see if I understand this.
15   The phone calls were the early morning of December
16   18th; is that correct?
17       A.  I believe that's right.  It was early
18   morning that Sunday, which we surmised would have
19   been the 18th.
20       Q.  Now, then, you talked to Dr. Long within a
21   day or two of that; is that correct?
22       A.  I think I said it was Tuesday or possibly
23   Wednesday, at the latest.  That's how I recall it,
24   Mr. Steelman.
25       Q.  Okay.
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Page 178

```
 1       A.  I don't remember the exact date, but I
 2   think that's right.  It was within that time period.
 3           (PLAINTIFF'S EXHIBIT NO. 7 WAS MARKED
 4   FOR IDENTIFICATION.)
 5       Q.  I'm going to show you what's been marked as
 6   Exhibit 7, which is an email, and it says it's dated
 7   the 20th of December and the time is more of that
 8   military time, 20:20:48.
 9           MR. FRANKLIN:  This is seven?
10           MR. STEELMAN:  Yes.
11   BY MR. STEELMAN:
12       Q.  And do you recall sending this?
13       A.  Yes, I sent it to myself.
14       Q.  Okay.  And then -- well, how did you get it
15   to Monica?
16       A.  I printed it out and handed her a copy.
17       Q.  And when?
18       A.  I believe the following day.
19       Q.  Okay.  So on Wednesday; correct?
20       A.  This says December 20, which would have
21   been --
22       Q.  Means you would have printed it out about
23   eight o'clock Tuesday night?
24           MR. HARRIS:  That means he would have
25   sent it about eight o'clock.  It's printed 12/21/05,
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

1  some tapes destroyed and some tapes not destroyed?
2  A. I wanted her to destroy that tape. I was
3  hoping she would.
4  Q. Okay. That's on the 21st of December?
5  A. Right.
6  Q. And then on the 22nd of December, you went
7  to the judge because you thought the tape had to be
8  preserved as evidence; is that correct?
9  A. I think you'll find on the tape that after
10 this letter is sent, there is a message from me to
11 her asking her not to destroy the tape, that I had a
12 reason that I couldn't tell her about, but please
13 don't destroy the tape.
14 Q. That's fine. All I want to get is, when is
15 the date of that message?
16 A. I don't know, but it would have been after
17 I talked to Dr. Long and after I found out possibly
18 that it was evidence.
19 Q. I'm just trying to get the time line. On
20 the 21st you wanted the tape destroyed; is that
21 right?
22 A. Yes.
23 Q. And on the 22nd you had learned something
24 and you didn't want the tape destroyed; is that
25 right?

1  A. I think that's right.
2  Q. Okay. And that's when you then requested
3  the subpoena; correct?
4  A. Yes.
5  Q. And when did you talk -- did you talk to
6  Dr. Long before, did you say, this was written, or
7  after?
8  MR. FRANKLIN: Objection, asked and
9  answered.
10 MR. STEELMAN: It may have been, I
11 just can't remember his answer.
12 BY MR. STEELMAN:
13 A. My recollection is, it was after. Because
14 I was asking her to destroy it, and then I found out
15 that I didn't want it destroyed, and that's whenever
16 I called and asked her to preserve it.
17 Q. So within a 24-hour period?
18 A. 24, 48 hours, something like that.
19 Q. Okay. And then in addition, within a week,
20 did you write articles for the Texas County papers on
21 the dangers of the date-rape drug?
22 A. I don't know if it was in a week. I did
23 write an article.
24 Q. How soon after this incident on the 18th
25 did you write that article?

1  A. I don't remember the date, but I did write
2  an article within that time period, within a week or
3  two weeks or three weeks, I don't know, but I wrote
4  an article.
5  Q. For publication in Texas County?
6  A. For publication in the paper.
7  Q. Were these articles published in Texas
8  County?
9  A. I believe they were, yes.
10 Q. And what led you to write those articles?
11 A. I believed that there was a danger out
12 there for people. If somebody would do it to the
13 Texas County Prosecutor, they would do it to anybody.
14 Q. So my understanding, you wrote the articles
15 because of what you're alleging happened to you on
16 the 18th?
17 A. What I believed had happened to me, yes.
18 Q. Okay.
19 MR. STEELMAN: Let's take a quick
20 break, so I don't burn up too much tape trying to
21 find it.
22 MR. WATERS: The current time is 1722.
23 We're now going off record.
24 (Off the record.)
25

1  (Back on the record.)
2  MR. WATERS: The current time is 1723.
3  We're now back on record. Please proceed.
4  BY MR. STEELMAN:
5  Q. Mr. Anderson, we've been talking about some
6  correspondence and in Exhibit 2, -- I shouldn't say
7  you -- Mr. Harris's disclosures, talks about
8  correspondence between Monica and yourself. What
9  other correspondence is there?
10 A. There's the letter that we just looked at.
11 I believe there was another letter that I wrote her
12 shortly after Christie got her raise. I believe
13 there's a card that my wife and I gave her whenever
14 we gave her a dog, a Shih Tzu. That's the only
15 correspondence that comes to mind. There may be
16 something else, but that's all I can remember right
17 now.
18 (PLAINTIFF'S EXHIBIT NO. 16 WAS MARKED
19 FOR IDENTIFICATION.)
20 Q. I'm going to show you what's been marked or
21 will be marked -- I'm going to show you what's been
22 marked Exhibit 16 and purports to be a copy of the
23 Houston Herald, Houston, Missouri, dated December
24 29th, 2005, with a possible new drug threat article.
25 That's the article that we're talking about; is it

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

47 (Pages 183 to 186)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 13 of 17

Page 199

1  MR. STEELMAN: There should be more,
2  if this is the tape you sent me.
3  MR. HARRIS: There should be more on
4  there.
5  BY MR. STEELMAN:
6  Q. Let me ask up to this time -- I've
7  interrupted the tape for a second. Mr. Anderson, was
8  that your voice at all times?
9  A. Yes.
10  Q. Okay, and I'm going to keep playing it.
11  A. Well, with the exception that there's seems
12  to be a recording --
13  Q. A recording, yeah.
14  A. -- of some answering machine.
15  Q. But other than the answering machine,
16  that's your voice; correct?
17  A. That's my voice, yes.
18  MR. STEELMAN: Let's go off the record
19  for a second.
20  MR. WATERS: The current time is 1800.
21  We're now going off record.
22  (Off the record.)
23  _____
24  (Back on the record.)
25  (PLAINTIFF'S EXHIBIT NO. 24 WAS MARKED
Joann Renee Richardson * 573-699-4110 * St. James, Missouri *

Page 200

1  FOR IDENTIFICATION.)
2  MR. STEELMAN: Twenty-four has been
3  marked and I've got it. It was identified -- I think
4  everybody will agree with Mr. Anderson -- up through
5  comments where he said, "I have feelings about you, I
6  don't why." But there's supposed to be other
7  statements on the tape, which I think all of counsel
8  have heard, haven't we?
9  MR. HARRIS: Yes.
10  MR. FRANKLIN: Yeah.
11  MR. STEELMAN: And for some reason
12  it's not playing, so Mr. Harris has another one which
13  we'll make 25 that he'll retain custody of. Is that
14  agreeable?
15  MR. HARRIS: That's fine.
16  (PLAINTIFF'S EXHIBIT NO. 25 WAS MARKED
17  FOR IDENTIFICATION.)
18  MR. FRANKLIN: Off the record.)
19  (Off the record.)
20  _____
21  (Back on the record.)
22  MR. WATERS: We're now back on record.
23  The current time is 1806. Please proceed.
24  MS. REPORTER: (Mr. Steelman is
25  playing tape.)

Joann Renee Richardson * 573-699-4110 * St. James, Missouri *

Page 201

1  BY MR. STEELMAN:
2  Q. Again, Mr. Anderson, other than the message
3  statements, is that your voice?
4  A. Yes.
5  MR. STEELMAN: And, Mr. Harris, you'll
6  be keeping 25 because, clearly, I can't be trusted
7  with these tapes.
8  MR. HARRIS: Yes.
9  BY MR. STEELMAN:
10  Q. A couple of questions, Mr. Anderson.
11  Again, on those statements before the message that
12  just said, "I did something stupid last night," where
13  were you when you made those calls?
14  A. I don't remember. I remember being in
15  Monica Daniel's driveway at one point. I remember
16  having my cell phone in my hand. Other than that, I
17  don't remember anything about those calls.
18  Q. Did you go to her door?
19  A. I don't remember going to her door, no.
20  Q. Did you beat on her door?
21  A. I don't remember it.
22  Q. Now, do you remember making the calls the
23  next morning? I think it said, "I did something
24  really stupid last night and I called to apologize."
25  A. Yes.

Joann Renee Richardson * 573-699-4110 * St. James, Missouri *

Page 202

1  Q. What time was that call made?
2  A. I would be guessing. Whatever time I woke
3  up, which I think was in the morning, nine, 10
4  o'clock, something like that.
5  Q. Was that before you talked to anybody?
6  A. Yes. As a matter of fact, the first thing
7  I did was go out and walk around my truck to make
8  sure that I hadn't hit something on the way home,
9  because I didn't remember getting home.
10  Q. And, then, again, before you went into work
11  or talked to anybody about what you had done the
12  night before, you called to apologize; is that right?
13  A. That would have been on a Sunday. I didn't
14  go into work that day.
15  Q. Okay. But you hadn't talked to anybody
16  else about what you had said; is that right?
17  A. No.
18  Q. What were you apologizing for?
19  A. Well, I knew that if I was calling her on
20  my cell phone, that was wrong. That was
21  inappropriate and that's what I was apologizing for.
22  Q. Did you know what time you were calling her
23  on the cell phone?
24  A. No.
25  Q. So you just knew you had called her the

Joann Renee Richardson * 573-699-4110 * St. James, Missouri *

## Page 203

1  night before and you didn't know whether it was in
2  the morning or anything else?
3      A.   I remembered being in her driveway with my
4  cell phone in my hand and that's all I remembered
5  about the phone calls.
6      Q.   Now, do you also, the next day, remember
7  that message, "I think I'm still a little bit drunk?"
8      A.   Yes.
9      Q.   And you said I had something -- "and I had
10 a really good night last night"; do you remember
11 that?
12     A.   Yes.
13     Q.   What did you mean by that?
14     A.   Well, I remembered being at the club and
15 talking to people and feeling good. That's the last
16 thing I remembered. I thought I was probably waking
17 up from a real bad drunk. At the time, I thought
18 that's what had happened. I had never had a drunk
19 that bad before, but that's what I thought had
20 happened.
21     Q.   And on the next message when you said,
22 "Just seeing how mad you are," when did you make that
23 phone call?
24     A.   That would have been that morning.
25     Q.   Again, Sunday morning?

## Page 204

1      A.   I believe so. All those calls were before
2  noon. I was wanting to apologize. I knew that being
3  at her house and calling her on my cell phone was
4  wrong.
5      Q.   But at that time, when you were making
6  these apologies, you didn't know what time of the
7  night it was; is that right?
8      A.   That's right.
9      Q.   You didn't know whether you beat on her
10 door; is that right?
11     A.   No, sir, I didn't. Mr. Steelman, to this
12 day, I don't know what time it was.
13     Q.   You didn't know if there was anybody else
14 at her house; is that right?
15     A.   No, sir.
16     Q.   Do you remember that night before saying,
17 "Send the boy out?"
18     A.   I don't remember saying it. I heard it on
19 the tape.
20     Q.   Do you know what you meant by that?
21     A.   No, sir, I have no idea.
22     Q.   Then when did you make the call, saying,
23 "Please do not erase that tape?"
24     A.   I believe that would have been the later
25 that week, after I began to piece things together and

## Page 205

1  think that possibly I had been drugged. And it may
2  have even been after I talked to Dr. Long.
3      Q.   But you don't know that?
4      A.   I don't remember the exact date, no, sir.
5      Q.   Now, has -- because I think we sent it to
6  Mr. Harris. Has Mr. Harris played for you the cell
7  phone message that says, "Don't take this the wrong
8  way. I just want to tell you we got a conviction on
9  Phineas Bell."
10     A.   Phineas Golden.
11     Q.   Phineas who?
12     A.   Golden.
13     Q.   Oh, Golden.
14     A.   A child molester.
15     Q.   Do you remember that?
16     A.   Yes, sir.
17     Q.   When did you make that call?
18     A.   I don't remember the months. We could
19 check the court records. I was on my way back from a
20 jury trial in Phelps County that I had won a
21 conviction on for a child molester. It was a little
22 eight year old victim. Before Monica left my office,
23 she had worked extensively with the little victim,
24 meeting with her, talking with her, and taking her up
25 to the courtroom to show her what she would be doing.

## Page 206

1  I knew she had an interest in the case, so I just
2  called to tell her that I had one won.
3      Q.   And about when was that? Was that after
4  Monica had left?
5      A.   It was after she had left, yes, sir.
6      Q.   And how long had she been gone? Was it
7  before the first of the year? After the first of the
8  year?
9      A.   It would have been after the first of the
10 year. And I'm not sure, Mr. Steelman, I can find out
11 from the court records. But it was the day of the
12 trial, on my way back to Texas County. I drove
13 through Licking. I knew she lived in Licking. It
14 just crossed my mind that she might want to know what
15 had happened in that case.
16     MR. STEELMAN: Let's go off the record
17 for a while. I think I'm almost done.
18     MR. WATERS: The current time is 1816.
19 We're now going off record.
20     (Off the record.)
21
22     (Back on the record.)
23     MR. WATERS: The current time is 1820.
24 We're now back on record. Please proceed.
25 BY MR. STEELMAN:

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

52 (Pages 203 to 206)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *
Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 15 of 17

Page 207

1  Q. Okay, just a couple of questions, Mr.
2  Anderson, and I'm almost done. After you got the
3  tape by subpoena, did you ever have anyone listen to
4  it to see if they could identify that you had been
5  drugged?
6  A. No.
7  Q. Now, did you tell the judge that you wanted
8  the tape in order for someone to listen to it?
9  A. Yes.
10  Q. And then you didn't let anyone listen to
11  it; is that right?
12  A. Yes. I was told by Dr. Long that if he had
13  that tape, or an audiotape and a videotape, he could
14  observe those and distinguish whether or not someone
15  was intoxicated with alcohol or under the influence
16  of these drugs. By that time, or shortly thereafter,
17  I learned that the videotape didn't exist.
18  Q. Well, you didn't get the tape until -- from
19  Monica until the 23rd; is that right?
20  A. Yes.
21  Q. So you did not make any effort to find out
22  about the videotape prior to the 23rd?
23  A. I had been trying to get the videotape,
24  yes. And I was told days later by Mr. Eidson that it
25  had been taped over. I thought we were going to have

Page 208

1  the videotape.
2  Q. Okay. So you did not -- your testimony is
3  that Mr. Eidson had not talked -- what was his name?
4  A. Worlow.
5  Q. Worlow. Had not talked to Mr. Worlow at
6  the time he used the subpoena to get the tape; is
7  that right?
8  A. Right, but he was going to.
9  Q. But it was a 24-hour loop you found out; is
10  that right?
11  A. I found that out later.
12  Q. So the video had been gone by the time that
13  you used the subpoena to get the audio from Monica;
14  is that right?
15  A. That's what Mr. Eidson was told by Mr.
16  Worlow.
17  Q. Did you ever make any other action to get
18  that video?
19  A. I didn't think it existed at that point.
20  Q. Did you ever try to use a subpoena?
21  A. No. I was told by Mr. Eidson, and he
22  confirmed it with Mr. Worlow, that the tape didn't
23  exist.
24  Q. Okay. But you didn't try to subpoena it
25  with Mr. Worlow; correct?

Page 209

1  A. No.
2  Q. Now, in addition I want to show you Exhibit
3  18 again, which has already been marked. That's that
4  letter to Mr. Emde. Now, in that second paragraph
5  you say, "However, unknown to me, Ms. Daniel created
6  an atmosphere when she worked here where she
7  regularly seduced and recruited people into what can
8  only be described as a swinger style sex ring where
9  married coworkers and couples were engaged to meet
10  her for group sex sessions outside and inside the
11  office. She used her position in this office as my
12  assistant and office manager to further that agenda."
13  And then when you became aware of that, you informed
14  her that she would have to look for another job. Is
15  that an accurate statement of what happened?
16  A. I think what my statement is, when I became
17  aware of some of what was going on, I informed her
18  that she would have to look for another job. She
19  broke down in tears and begged me to reconsider.
20  Q. Well, let me ask you, in that paragraph,
21  what was it that you were not aware of when you had
22  the meeting with Monica?
23  A. The --
24  MR. FRANKLIN: I'm going to object
25  that that's vague, but to the extent you can answer,

Page 210

1  Mike.
2  BY MR. STEELMAN:
3  A. There was a lot of things that I learned as
4  time went on. I wasn't aware of the group sex
5  sessions with her friends. I wasn't aware that they
6  were meeting in my office. I wasn't aware that she
7  had been sending me on fool's errands around the
8  circuit.
9  Q. Let me re-ask it, although I'll let you
10  answer anything you want to. What was it that is
11  contained in the paragraph to Mr. Emde that you were
12  aware of prior to that meeting where you informed her
13  she had to look for another job?
14  A. I knew that she was having affairs with
15  married policemen.
16  Q. I'm saying, what was it in the paragraph to
17  Mr. Emde, that appears in that writing, that you were
18  aware of prior to the meeting with Monica?
19  A. I'm sorry, you're going to have to clarify
20  that question. I don't know what you're asking.
21  Q. I want you to read the paragraph and tell
22  me, because you said now that you became aware of
23  some of what was going on. What was it, if anything,
24  that you were aware of that is contained in the
25  second paragraph of that letter prior to your meeting

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

## Page 211

```
 1   with Monica and telling her that she needed to get
 2   another job?
 3        A.   I knew that she was having affairs with
 4   married police officers.
 5        Q.   Is that in that paragraph?
 6        A.   Well, it's some of what I learned. You
 7   asked me what I knew before I had my meeting with
 8   her.
 9        Q.   That's contained in this letter.
10        A.   Again, sir, I don't quite understand your
11   question.
12        Q.   You wrote a letter to --
13             MR. HARRIS: It talks about married
14   coworkers and couples.
15   BY MR. STEELMAN:
16        Q.   It says married coworkers and couples were
17   encouraged to meet her for group sex sessions outside
18   and inside the office. Were you aware of that prior
19   to meeting with her and telling her she needed
20   another job?
21        A.   I knew about the police officers at that
22   time. I believe Christie had told me by then that --
23   about the situation with her and Misty Hale and Ron
24   Hale, the people that she had been called to testify
25   in their divorce, I knew about that. I knew about
```

## Page 212

```
 1   that because Monica had told me. I wasn't aware of
 2   the extent of all the other people that were
 3   involved.
 4        Q.   And you became aware of that, am I right,
 5   after Monica left?
 6        A.   Yes.
 7        Q.   How soon after Monica left?
 8        A.   I'm still finding out things.
 9        Q.   Well, in specific, how soon after Monica
10   left did you find out about the swinger style sex
11   ring, as you refer to it?
12             MR. HARRIS: You said Monica told you
13   about something.
14   BY MR. STEELMAN:
15        A.   She told me about Ron and Misty Hale. She
16   was called to testify in their divorce. She stopped
17   me in my office on the way over to give testimony and
18   told me that if she was asked about having sex with
19   them, she intended to lie, but she didn't.
20             MR. HARRIS: That was before she left.
21   I just wanted to make sure.
22             THE WITNESS: That was the day before
23   I called her into my office and told her she was
24   going to have to find another job.
25             MR. HARRIS: Okay.
```

## Page 213

```
 1   BY MR. STEELMAN:
 2        Q.   Let me ask this, though, on that one, on
 3   that statement. She told you she was going to lie
 4   under oath?
 5        A.   Yes.
 6        Q.   What did you do?
 7        A.   I told her she couldn't do that, that she
 8   would be testifying in court, and I walked into my
 9   office. I stomped into my office.
10        Q.   Did you report this to anybody?
11        A.   I found out later that she wasn't called to
12   testify.
13        Q.   You mean, you sent a woman off that was
14   saying she was going to lie under oath and didn't
15   even tell the counsel on the case?
16        A.   I didn't send her anywhere. She was
17   subpoenaed to testify in a divorce case. She told me
18   that she intended to lie on the stand. I told her
19   she couldn't do that, and she better not do that.
20        Q.   And you stomped and went back into your
21   office?
22        A.   I did.
23        Q.   And you did not tell the counsel involved
24   in the case; is that right?
25        A.   If I had found out that she had taken the
```

## Page 214

```
 1   stand and lied, I would have reported it.
 2        Q.   You did nothing to warn them in advance; is
 3   that right? Is that correct?
 4        A.   Yes. I called her in the next day and told
 5   her she would have to find another job.
 6        Q.   Does that appear in your notes as to one of
 7   the things you wanted to talk to her about?
 8        A.   No. But I told her I couldn't trust her.
 9   That's in the notes.
10        Q.   Now, let me go back to what I was asking
11   about. I'm asking about things that -- after she
12   left, you said you found out more things that you're
13   talking about to Mr. Emde here. And I'm trying to
14   figure out, what was it after she left that you found
15   out and when did you find it out?
16        A.   If you want to show me the list of names
17   that you showed me earlier, the witnesses.
18        Q.   Let me ask, did you find out about any of
19   those folks prior to May of 2006?
20             MR. FRANKLIN: Well, I'll object and
21   say it's vague. You're asking if any of those folks.
22   We're talking about dozens of people. I mean, can we
23   be more specific and identify which people we're
24   talking about?
25             MR. STEELMAN: Yeah.
```

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

54 (Pages 211 to 214)

Joann Renee Richardson
* 573-699-4110 * St. James, Missouri *

Case 6:09-cv-03018-RED   Document 236-12   Filed 11/24/10   Page 17 of 17